ORIGINAL



1-4-02

sc

1        IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

3   JOAN D. TESCHE,                    :
                  PLAINTIFF            :
4                                      :
        VS                             :   NO. 1: CV-01-0326
5                                      :
    CNA INSURANCE COMPANIES, and       :
6   CONTINENTAL CASUALTY COMPANY,      :
                  DEFENDANTS           :
7
8

9           TELEPHONE
            DEPOSITION OF:    CHERYL SAUERHOFF
10

11          TAKEN BY:        PLAINTIFF

12          BEFORE:          VIRGINIA LORIA, RPR
                             NOTARY PUBLIC

13          DATE:            DECEMBER 3, 2001, 1:00 p.m.

14          PLACE:           KEEFER WOOD ALLEN & RAHAL LLP
                             210 WALNUT STREET
15                           HARRISBURG, PENNSYLVANIA

16

17

    APPEARANCES:
18

        KEEFER WOOD ALLEN & RAHAL LLP
19      BY:  BRADFORD DORRANCE, ESQUIRE

20          FOR - PLAINTIFF

21      CHRISTIE PARABUE MORTENSEN YOUNG - VIA TELEPHONE
        BY:  MICHAEL J. BURNS, ESQUIRE
22

            FOR - DEFENDANTS
23

24

25

FILED
JAN 0 3 2002
PER
HARRISBURG, PA DEPUTY CLERK

GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577

2

**TABLE OF CONTENTS**

**WITNESS**

| FOR PLAINTIFF | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Cheryl Sauerhoff | 3 | 98 | 99 | |

**EXHIBITS**

| SAUERHOFF EXHIBIT NO. | MARKED |
|---|---|
| 1 - Letter | 46 |
| 2 - File Activity Sheet | 54 |
| 3 - Document | 63 |
| 4 - File Activity Sheet | 83 |

```
 1                        STIPULATION
 2            It is hereby stipulated by and between counsel
 3      for the respective parties that the sealing,
 4      certification, and filing are waived; and that all
 5      objections except as to the form of the question are
 6      reserved to the time of trial.
 7
 8            CHERYL SAUERHOFF, called as a witness, being
 9      sworn, testified as follows:
10
11                    DIRECT EXAMINATION
12
13      BY MR. DORRANCE:
14         Q    Ms. Sauerhoff, my name is Brad Dorrance.  I
15      represent the Plaintiff in this lawsuit, Joan Tesche.
16      Before we begin, I'd like to make sure that you understand
17      the deposition procedure.  Have you ever given a
18      deposition before?
19         A    Yes.
20         Q    Approximately how many times have you given a
21      deposition?
22         A    Probably around 25 times.
23         Q    So you generally understand the format?
24         A    Yes.
25
```

1       Q    Just to reaffirm that you are understanding, a

2   deposition is basically a question-and-answer session in

3   which your answers are provided under oath.  If you don't

4   hear my question or if you don't understand my question,

5   please ask me to repeat it or rephrase it; and I'd be

6   happy to do so.

7            Likewise, please verbalize your answers.  A nod

8   of your head or similar nonverbal answer will not suffice,

9   particularly because we are doing this by telephone.

10      A    Okay.

11      Q    Please wait for me to complete my questions, and

12  I'll try to wait for you to complete your answers so that

13  we don't talk over one another.  Are you under any

14  medication currently?

15      A    Yes.

16      Q    Does it prevent your ability to understand

17  questions or to answer them truthfully?

18      A    No.

19      Q    Did you have any questions before we begin?

20      A    No.

21      Q    Pardon?

22      A    No, I don't have any questions.

23      Q    I'd like to ask you some preliminary questions

24  first.  Since we are doing this by telephone, I think it

25

1    might be a good idea if you could copy -- do you have a

2    badge or something that shows you are a CNA employee?

3         A    I have a badge, but not with me.

4         MR. DORRANCE:  Okay.  I was just thinking, Mike,

5    do you have any problem with just making a copy of a photo

6    -- a driver's license or a CNA employee badge just to

7    further confirm the identity of the deponent?

8         MR. BURNS:  I don't know how that would confirm

9    it, Brad.  But I don't think we'd have much of a problem,

10   but I don't know if it's going to confirm it or not.

11   Holly is sitting right next to her, Holly Fenlon.  And

12   that's probably one of the reasons she's there so that she

13   can tell you that's Cheryl Sauerhoff.

14        MR. DORRANCE:  That's all right.  We'll just go

15   through the usual questions, then.

16   BY MR. DORRANCE:

17        Q    Cheryl, please state your full name and address.

18        A    Cheryl Sauerhoff, S-A-U-E-R-H-O-F-F, 12211 Coral

19   Reef Drive, Orlando, Florida.  32826.

20        Q    Please summarize your educational background.

21        A    I have a Bachelor of Arts in Criminal Justice and

22   Psychology.

23        Q    And where did you receive that degree?

24        A    University of Central Florida.

25

1      Q   Did you receive any postgraduate training or
2  education?
3      A   No.
4      Q   Can you please briefly summarize your work
5  history?
6      A   I've been with CNA Insurance Company since
7  December 1991.  So this will be my tenth year.
8      Q   Okay.  What positions have you held with the
9  company?
10      A   Disability claim specialist, and then appeals
11  committee member.
12      Q   Is that the same position you currently hold?
13      A   Yes.
14      Q   Is that the same position you had as part of Joan
15  Tesche's appeal?
16      A   Yes.
17      Q   How long have you worked in your current
18  capacity?
19      A   Four years.
20      Q   What did you do for CNA before taking on your
21  current job?
22      A   I was a disability claims specialist, which meant
23  that I processed long-term, short-term disability claims.
24      Q   How is your current job different than that
25

1    description?

2        A    I review claims independently from the claims

3    unit.  So I'm not making any input or decision-making

4    process on that claim decision.

5        Q    Okay.  What documents did you review in

6    preparation for today's deposition?

7        A    The entire claim file and the policy.

8        Q    And I understand you have the entire claim file

9    in front of you?

10       A    Yes.

11           MR. DORRANCE:  And, Mike, we've agreed that those

12   documents will be admitted as part of the record in the

13   District Court litigation; is that correct?

14           MR. BURNS:  We stipulated that the administrative

15   record as a whole will come in as authentic and as the

16   basis for any motions for some rejudgement or whatever we

17   need to proceed in the litigation.

18           MR. DORRANCE:  Okay.  Thank you.

19   BY MR. DORRANCE:

20       Q    I'd like a little bit better understanding of the

21   procedures and criteria used in evaluating short-term and

22   long-term disability claims.  Could you please briefly

23   summarize that process for me?

24       A    You mean my role as a disability specialist prior

25

1    to being on the appeals committee?

2        Q    Just based on your knowledge and experience,

3    generally.  I'm not talking about Joan Tesche's case right

4    now, although we will go into that.  I'm referring to your

5    understanding of the customary procedures and criteria

6    used in evaluating short-term and long-term disability

7    claims.

8        A    When a claim is filed, usually it consists of the

9    attending physician's statement, the employer's statement,

10   and the employee's statement making a claim for disability

11   benefits.

12           The policy is reviewed to determine what

13   provision of the policy we have and any occupation period

14   and own occupation period.  There's elimination periods

15   pertaining to both policies, eligibility criteria that

16   have to be met.

17           So when the claim is received, the policy is

18   reviewed, along with the initial claim information.  And

19   from there, usually the disability specialist is partnered

20   with a nurse case manager in retrieving any necessary

21   medical information or supporting documentation for

22   eligibility and in supporting disability in accordance

23   with the policy.

24       Q    What qualifications does the disability

25

9

1    specialist have?

2         MR. BURNS:  I'll object to the form of the

3    question.  It's rather broad because there's probably a

4    whole bunch of Disability Claim Specialists.  But if there

5    are general parameters that you are aware of, Ms.

6    Sauerhoff, you can respond to that question.

7    A    Well, normally, there aren't certain levels of

8    specialty.  But as far as managing claims or handling

9    claims, it would be three to five years' experience with

10   claims handling.  There might be some criteria for formal

11   education.  I don't think you have to possess a college

12   degree.  But usually experience is related.

13   Q    And you also mentioned that the other person, as

14   part of the review process, is a nurse case manager.  Was

15   that the phrase you described it?

16   A    Correct.

17   Q    And I suppose she has to be an R.N., is that

18   correct?

19   A    Usually that's my understanding, that they are

20   registered nurses.

21   Q    So these two individuals are the ones that make

22   the initial decision on a short- and long-term disability

23   claim?

24   A    Correct.

25

1      Q    And after initial decision is made, is the

2    applicant advised of the decision?

3      A    Yes.

4      Q    Before a decision is made, do either one of these

5    individuals ever ask the applicant to provide additional

6    information?

7          MR. BURNS:  I'll object to the form of the

8    question.  It's overbroad, and it may assume facts not of

9    record.  But, Ms. Sauerhoff, if you understand the

10   question, you can answer it.

11     A    Could you repeat the question?

12   BY MR. DORRANCE:

13     Q    Yes.  Again, I'm not asking about any facts of

14   record or anything related to Joan Tesche's case.  I'm

15   just asking, is there a free exchange of information

16   between the CNA representatives and the applicant for

17   disability insurance before a determination is made by the

18   company?

19         MR. BURNS:  Let me just object to the form of the

20   question.  It's kind of leading to the extent of the use

21   of the word free, or the term free exchange.

22         MR. DORRANCE:  Assume that word is removed from

23   the question.

24         MR. BURNS:  Okay.  Then I'll withdraw the

25

1    objection.  And you can respond, Ms. Sauerhoff.

2        A    Okay.  Usually the claimant making the

3    application for disability is contacted either by the

4    nurse case manager or the disability specialist or both in

5    conjunction.

6            An interview is normally done explaining the

7    claim -- that that claim's been received, what information

8    may be necessary, what doctors are being contacted, or

9    gathering further information as far as what medical

10   information is available, because the attending

11   physician's statement is just a framework to work from.

12           And also, information pertaining to the policy,

13   the benefits, things of that nature are usually discussed

14   with the claimant at that time during the interview

15   process.

16   BY MR. DORRANCE:

17       Q    Is medical proof of disability always required?

18       A    Yes.  It is based on medical evidence.

19       Q    Is it based on any other criteria?

20       A    Eligibility -- before you even get to a

21   disability test, you see if a person is eligible.  In

22   other words, are they a correct member of the eligible

23   class, are they eligible under the policy, has the premium

24   been paid, information of that sort before you go on to

25

1    the disability portion.

2        Q    When you go on to the disability portion, is

3    there anything that you look at other than medical

4    evidence of disability?

5        A    We look at everything in totality.  So that could

6    be information from the employer as far as the claimant's

7    work ability, information pertaining to that, how are they

8    working prior to the disability, any problems in their

9    performance.  So there is a totality of information that

10    is reviewed in conjunction with the medical information.

11        Q    Does the disability specialist have a checklist

12    that he or she uses in trying to consider the totality of

13    the situation?

14        A    There's not a checklist to my knowledge.  But

15    there is information such as your claimant interview,

16    activities of daily living, interviews with the medical

17    doctor, if necessary, interviews with the employer.  They

18    normally call it, like, a three-point interview.

19        Q    Is this maintained in any kind of a policy manual

20    or handbook to aid the disability specialist?

21        A    Not to my knowledge.

22        Q    Did you have any knowledge or familiarity with

23    the procedures followed by the nurse case manager?

24        A    No.  Just that they contact -- usually whatever

25

1    actions that they take are documented on the nurse case

2    database.  And usually it entails calling the doctor's

3    office, gathering medical information, maybe talking to

4    the doctor personally to gather further information, and

5    then corresponding or communicating with the disability

6    specialist on the medical finding.

7        Q    Is the disability specialist the employee that

8    decides the case from a vocational standpoint?

9        A    I'm sorry.  Could you repeat that?

10       Q    Is the disability specialist the employee who is

11   responsible for deciding any vocational issues?

12       A    No.  They would bring that to the attention of

13   the vocational case manager with that expertise.

14       Q    So there is also a vocational case manager who is

15   involved in the initial process?

16       A    Not necessarily in the initial process --

17           MR. BURNS:  Hold on.  I'll object to the form of

18   the question just because it puts a lot of words in her

19   mouth and it could be construed as a leading question.

20   But if you understand the question, you can answer it.

21   Sorry.  Go ahead.

22       A    Can you repeat the question again?

23   BY MR. DORRANCE:

24       Q    Maybe I'm mistaken, I had thought you said there

25

1    were two individuals primarily involved in making an

2    initial decision on disability claims.  And you identified

3    them as the disability specialist and the nurse case

4    manager; is that right?

5        A    That's correct.

6        Q    Now, you've mentioned a third individual,

7    vocational case manager.  Can you identify how that

8    individual is involved in the initial decision-making

9    process, if at all?

10       A    Well, they are not normally involved in the

11   initial process unless you have a policy that speaks to

12   any occupation initially.

13       Q    And perhaps we should briefly define those terms

14   as you understand them.  You refer to own occ. and, I

15   believe, all occ. provisions under the policy.  What is

16   your understanding of those provisions, if you have one?

17            MR. BURNS:  I'll object.  I think it's any

18   occupation, Brad.

19   BY MR. DORRANCE:

20       Q    I'm sorry.  I misspoke.  Any occupation.  Do you

21   have any familiarity with those terms?

22       A    Yes.  Well they are defined in the policy under

23   the monthly benefit -- under total disability, rather.

24   And most policies -- now the periods may vary according to

25

1    each policy.

2         Normally, the policy will pay for a certain

3    period of time while the claimant remains disabled or

4    unable to perform the substantial material duties of their

5    regular occupation.  That's referred to as the own

6    occupation.

7         Then beyond that period of time, the test for

8    disability means that they must be disabled from any

9    occupation; and that's relating to the education,

10   experience.  Other vocational factors are taken into

11   account for that determination.

12        Q    Are those definitions standard within each of

13   CNA's policies?

14        MR. BURNS:  I'll object to the form of the

15   question.  But you can answer it if you understand it.

16        A    Well, they are defined under total disability

17   under the policy.  It will specify how the policy pays,

18   and what total disability means.  And if there is a change

19   in that definition, it's explained benefits beyond the

20   period initially paid, disability means the following.

21        Q    I guess what I'm trying to find out, are there

22   any variations in the definitions provided under CNA's

23   many different types of policies?

24        A    My experience has been most of the policies are

25

16

1    very similar, but we always go to the policy in force at
2    that date of loss.  We just don't make a blanket statement
3    that one policy applies to everything.  So we would have
4    to relate to the policy in effect for that particular
5    claim filed.
6        Q    For example, does CNA write mortgage disability
7    insurance?
8        A    I have no knowledge of any mortgage disability
9    insurance.
10       Q    How about insurance providing payments for a car
11   loan in the event of disability?
12       A    The disability area that I work pertains to
13   short-term and long-term disability.
14       Q    Is the term own occ. and the coverage provided
15   under it synonomous with short-term disability?
16           MR. BURNS:  I'll object to the form of the
17   question.  I don't understand the question.  But if you
18   understand it, Cheryl, you can answer it.
19       A    Well, I don't think I understand either.
20           MR. DORRANCE:  Could you define short-term
21   disability for me, if you know?
22           MR. BURNS:  For what?  For what policy?  I'll
23   object to the form of the question.  But if you understand
24   it, Cheryl, you can answer it.
25

1    A    Well, my understanding was short-term disability

2    is disability relating to a short period of time.  They

3    usually have a shorter elimination period.  In other

4    words, a week has to be met before benefits are payable.

5    It usually pays for sometimes up to a maximum of 26 weeks,

6    13 weeks, 52 weeks, depending on the policy.  But it's

7    there, like, if your sick pay has exhausted and you are

8    eligible for short-term disability, that's usually the

9    next.  That policy usually goes into effect.

10    BY MR. DORRANCE:

11    Q    Let's just continue on with the identification of

12    the individuals who are responsible for the initial

13    decision on a claim for disability.  You started to

14    identify the vocational case manager.  How is that

15    individual involved in the process, if at all?

16    A    That would be up to the disability specialist and

17    the nurse case manager reviewing the file.  If they feel

18    they need the expertise, in other words, if they don't

19    understand that person's occupation, or need more

20    vocational experience in understanding that, they may go

21    to the vocational case manager for that expertise.

22    Q    Is there a manual, for example, the Department of

23    Labor's classification of jobs, that you use in getting a

24    better understanding of the physical requirements of a

25

18

1    particular job?

2        A    Well, there's manuals that are available, but

3    usually the disability specialist wouldn't have those

4    particular manuals.  They would go to the vocational case

5    manager if they needed further experience or knowledge in

6    that area.

7        Q    So does the disability specialist have any

8    discretion in identifying jobs that are potentially

9    available for an applicant for disability?

10            MR. BURNS:  I'll object to the form of the

11   question, based upon personal knowledge.  But if you

12   understand it, you can respond to it, Ms. Sauerhoff.

13       A    Well, the Vocational Case Managers are the ones

14   who identify occupation.

15   BY MR. DORRANCE:

16       Q    So, if a disability specialist needs a job

17   description for a particular job, he or she would refer to

18   the vocational case manager?

19       A    Well, if that was felt necessary.  But normally,

20   just getting back to when a claim is filed, we usually

21   will ask for the job description or job activities

22   pertaining to that particular claim.

23       Q    And that would be limited to the job that the

24   claimant had at the time he or she alleged an onset of

25

19

1    disability; is that right?

2        A    Correct.

3        Q    I take it then that we are back to the initial

4    stage of the process.  We are talking only about two

5    people, typically, the disability specialist and the nurse

6    case manager.

7        A    Correct.

8        Q    Let's assume that there has been a payment of

9    benefits under an own occ. policy.  Do policies then

10   provide for additional decisions as to whether the

11   claimant continues to be disabled from any employment?

12       A    Well, yes.  Disability is measured throughout.

13   In other words, periodically there might be requests for

14   updates of medical conditions, response to treatment,

15   treatment plans.  Because with medical technology and so

16   forth, you may not remain disabled continuously during

17   your own occupation period.

18            But if that were the case, and you were found to

19   be disabled from your own occupation and that's

20   determined, then, subsequently, you would be informed that

21   eventually your policy changes definitions of disability

22   and what further information might be necessary to

23   evaluate that.

24       Q    And typically, how long are benefits provided for

25

1    own occ. disability?

2          MR. BURNS:  I'm going to object to the  question

3    to the extent that it's very vague in terms of typically.

4    But if you understand the question, you can respond, Ms.

5    Sauerhoff.

6        A    Again, it relates to the policy that's in force

7    at that date of loss pertaining to that claimant.  But the

8    24 months is the one that we see most familiar in the

9    policy.  But it does vary according to policy and account.

10   BY MR. DORRANCE:

11       Q    And then let's assume that the 24 months of

12   benefits have been provided to the eligible applicant.

13   Does the decision have to be made whether that applicant

14   meets the any occupation definition of disability?

15       A    As you approach, there's not really any

16   particular time frame.  But certainly you don't wait until

17   after the 24 months has gone by and then say, by the way,

18   we are now evaluating you for any occupation.  But

19   normally you start getting some indication or evaluating

20   the claim during that process to determine is that person

21   going to remain disabled.  And usually they are identified

22   of what that own occupation period is and when it ends to

23   see if they are disabled beyond that point.

24       Q    And who is the individual -- or who are the

25

1    individuals by job title -- who review the decision as to

2    whether the eligible applicant continues to be eligible

3    for benefits under any occupation standard?

4        A    Okay.  At this point the disability specialist,

5    normally with the nurse case manager, who at that point

6    the nurse case manager will say the claimant remains

7    disabled from their own occupation, referring to

8    vocational case manager for any occupation assessment.  So

9    at this point the nurse case manager usually excludes

10   themselves from the process.  The disability specialist

11   then refers the case to the vocational case manager for

12   any occupation assessment.

13       Q    I'm sorry.  I couldn't hear all that.  Why does

14   the nurse case manager exclude herself from consideration?

15       A    Because at that time it now becomes a vocational

16   issue.  She or he has done the medical workup, including

17   finding out what restrictions are applicable, what's the

18   medical status at that time, has already worked that

19   information out.  So the nurse case manager is no longer

20   involved in an any occupation decision.

21       Q    Is there any medical director that you have on

22   staff that the nurse practitioner -- I'm sorry -- the

23   nurse case manager can consult with on medical issues?

24       A    We have resources, a panel of doctors that are

25

22

1    available, depending on the expertise that's necessary.

2    And that can be utilized by anybody within the company,

3    including a nurse case manager.

4        Q    Are these salaried doctors or are they doctors

5    that have some sort of a contract arrangement with the

6    company?

7            MR. BURNS:  If you know.

8    BY MR. DORRANCE:

9        Q    If you know.

10       A    I don't know.

11       Q    Who would know the answer to that question, if

12   you know?

13       A    Well, there is a person in charge of the peer

14   review panel for the network of doctors that are used.

15       Q    And who is that individual?

16       A    That would be Nancy Harper.

17       Q    But that's a little bit different, is it not, a

18   peer review panel?

19       A    I'm sorry.  You are asking me?

20       Q    Yes.  I'm sorry.  You referred to a panel of

21   doctors, I would call them consultants.  I don't know if

22   that's the right word.

23       A    Consultants would be accurate.  All I know is we

24   call it peer review.  But it's a variety of doctors

25

1    through a vendor resource program.

2        Q    And can they be consulted at any stage of the

3    application or appeal process?

4        A    Yes.

5        Q    And they can be consulted by the disability

6    specialist, for example?

7        A    Correct.

8        Q    And they can be consulted by the nurse case

9    manager, for example?

10       A    Correct.

11       Q    And they can be consulted by the vocational case

12   manager, for example?

13       A    Yes.

14       Q    Is there anyone else that would customarily

15   consult with a panel of doctors on a disability claim?

16           MR. BURNS:  I object to the form of the question

17   using the word customarily.  It's a leading question.

18   It's not defined.  But you can answer it, if you

19   understand it, Ms. Sauerhoff.

20       A    Anybody that would have claims handling within a

21   claim that feels the need to have additional knowledge or

22   expertise in a medical field can access the peer review's

23   decision.

24   BY MR. DORRANCE:

25

24

1      Q    You said that after a claim is handled by -- I'm

2   trying to remember how you phrased it -- at some point you

3   said it becomes a vocational issue, and I'm trying to

4   remember what you said, at what point that happens.  Is

5   that after initial determination is made?

6      A    Usually, after initial determination is made and

7   benefits are paid for a period of time, an any occupation

8   assessment would be conducted.  We don't customarily wait

9   until the end of the 24-month period, if that were what

10  the period is.

11     Q    Are there different levels to the appeals

12  process, for example, initial application followed by

13  reconsideration, followed by a final and binding

14  determination?

15     A    In our appeals process, if a claim is denied or

16  terminated, the claimant is informed in writing of how to

17  exercise their appeal rights.  And normally they are given

18  60 days to respond in writing and provide any additional

19  information.

20          A ten-day reconsideration is built in when the

21  claimant appeals, formally appeals.  Then that information

22  be brought to the disability specialist to see if that

23  would alter the decision made.  Sometimes there is further

24  information that wasn't made available at the time of the

25

1    initial decision.

2         So, if the information is reconsidered by the

3    disability claim specialist, initially, but if that

4    decision remains unchanged, the claimant's notified in

5    writing that the claim has now been forwarded on to the

6    appeals area for consideration.

7         Q    So it would be fair to say there are three stages

8    to the process; the initial review and decision, that

9    would be one; the built-in ten-day reconsideration stage;

10   and finally the appeal to the -- did you say appeals

11   counsel or committee?

12        A    Right, appeals committee.  And that would be --

13   it's all rolled into one.  Because if it's reconsidered by

14   the claims unit during that first initial ten-day period,

15   that appeal clock is still ticking at that time.  But if

16   the decision is changed at that point and the claim is

17   paid, then it doesn't go any further beyond that.  The

18   matter's been resolved.

19        Q    And I believe you said there's an opportunity to

20   provide additional information during these stages of

21   appeal?

22        A    When the claimant received their denial or

23   termination letter, the last paragraph usually informs

24   them of what their appeals process is.  And if they have

25

1    additional information they wish to submit that can be

2    brought forth.

3        Q    Do you rely solely on the applicant to provide

4    medical evidence of disability?

5        A    Right.  It would be their responsibility to

6    provide that additional information.

7        Q    Do you ever seek to obtain objective proof of

8    disability from your doctor sources?

9        A    There are times that we can, anybody within the

10   company can call and provide additional information or

11   request additional information to assist the claimant.

12       Q    Do you ever have the claimant examined by a

13   so-called IME?

14            MR. BURNS:  Never mind.  Go ahead.  You can

15   answer the question.

16       A    We do have that opportunity.  I mean, it's within

17   our policy that we have the right to have somebody

18   independently examined.  And that is a call that at any

19   level of the claim can be requested.

20   BY MR. DORRANCE:

21       Q    And it can be requested by the disability

22   specialist?

23       A    Yes.

24       Q    The nurse case manager?

25

1    A    Yes.

2    Q    The vocational case manager?

3    A    (No response.)

4    Q    I'm sorry?

5    A    Yes.

6    Q    Is there any other employee of the company who

7    can request an independent medical examination?

8    A    I think anybody that would have working knowledge

9    of that particular file.  It could be an appeal committee

10    member if it were at that level and it was felt that an

11    independent medical exam was necessary.

12    Q    So the appeal committee does have the power to

13    request additional medical evidence?

14    A    Yes.

15    Q    Does it have the power to request additional

16    vocational evidence?

17    A    Yes.

18    Q    Does it have the power to ask the claimant to

19    provide additional information establishing disability?

20    A    Yes.

21    Q    I understand that many companies have a so-called

22    plan document governing the powers and obligations of the

23    so-called plan administrator.  Are you familiar with those

24    terms?

25

```
1          A    I'm familiar with the summary plan description,
2    or sometimes referred to as a plan document.
3          Q    Are you aware of any summary plan description in
4    Joan Tesche's case?
5          A    No.
6          Q    It is customary for there to be a summary plan
7    description for a long-term disability claim?
8          A    Usually, the employer provides some kind of
9    information to the employee on their benefits, and that's
10   normally where you would find information regarding your
11   long-term disability benefits.
12         Q    In Joan Tesche's case, was CNA serving as the
13   plan administrator?
14              MR. BURNS:  I'll object to that question to the
15   extent that it calls for a legal conclusion.  But to the
16   extent that you understand the question, Ms. Sauerhoff,
17   you can answer it.
18         A    In my understanding, we are the claims
19   administrator, and we have the policy.  And that's what we
20   determine our disability decisions by.
21   BY MR. DORRANCE:
22         Q    And the disability insurer, is that  Continental
23   Casualty Company in Joan Tesche's case?
24         A    Correct.
25
```

1          MR. BURNS:  Just so the record's clear, its

2    Continental Casualty Company.

3          MR. DORRANCE:  Oh.  I said insurance, didn't I?

4          MR. BURNS:  Right.

5          MR. DORRANCE:  Thank you.

6          MR. BURNS:  Would you agree with that, Ms.

7    Sauerhoff?

8      A    Yes.

9          MR. BURNS:  Thank you.

10   BY MR. DORRANCE:

11     Q    Do you know whether or not there is any document

12   which gives discretion to CNA as the claims administrator

13   to determine eligibility for benefits?

14         MR. BURNS:  Let me just again object to the

15   extent that it calls for a legal conclusion.  But, Ms.

16   Sauerhoff, if you understand the question, you can respond

17   to it.

18     A    My understanding is that information would be

19   found in the summary plan description.

20   BY MR. DORRANCE:

21     Q    Are you familiar with the summary plan

22   description in Joan Tesche's case?

23     A    No, I'm not.

24     Q    Do you know which individual would be familiar

25

1     with that document?

2              MR. BURNS:  At Continental or CNA?

3              MR. DORRANCE:  At either company.

4              MR. BURNS:  CNA is not a company.  Go ahead, Ms.

5     Sauerhoff, you can respond to the question, if you know.

6         A    My understanding would be somebody with the

7     employer that actually produces or writes the summary plan

8     description would have that information.

9     BY MR. DORRANCE:

10        Q    So, in Joan Tesche's case, that would have been a

11    company formally known as AMP, A-M-P?

12        A    That was the employer that she was employed with.

13             MR. DORRANCE:  Mike, do you have access to that

14    document?

15             MR. BURNS:  I do not have a quote summary plan

16    description, end quote, from AMP Inc., which is

17    independent from a booklet that CNA produces and gives to

18    the employer.  That document is just a brief booklet.  And

19    it provides -- it just covers what is in the insurance

20    policy.  I think AMP is supposed to hand it out to their

21    employees, but I don't know if they do.

22             MR. DORRANCE:  So you don't know of any summary

23    plan description in Joan Tesche's case?

24             MR. BURNS:  I hesitate to call this a summary

25

1   plan description because I don't think, technically, from

2   a legal standpoint, it is.  So the answer to that question

3   is no, I am not aware of a specific summary plan

4   description from AMP.  But there is an insurance booklet

5   that the employee is supposed to get, which is produced by

6   CNA, and provided to AMP, which I have a copy of.

7           MR. DORRANCE:  Would you be able to provide that

8   to me at your convenience?

9           MR. BURNS:  Sure.  And just so we can go forward

10  with the deposition and you don't need to come back, my

11  evaluation of it leads me to conclude that there is no

12  provision in here which would be characterized or

13  construed as a grant of discretion to Continental Casualty

14  Company or CNA with regard to evaluation plan, claims

15  under the plan.

16          MR. DORRANCE:  You don't see any provision

17  vesting discretion in the claim administrator to interpret

18  the terms of the plan?

19          MR. BURNS:  That's correct.  And why don't you

20  let me get a look at that, Mr. Dorrance.  I'll probably be

21  willing to stipulate to that.  But I just wanted -- so we

22  didn't have to go through the deposition.

23          MR. DORRANCE:  Yes.  And, of course, sometimes

24  they amend plan documents.  And I would take it that my

25

1    request for information would not only cover the time

2    period governing Ms. Tesche's claim, but also up to and

3    including the present.

4            MR. BURNS:  Yes.  And AMP Inc. would be the

5    person you might want to contact.

6            MR. DORRANCE:  Okay.  I don't expect you to do my

7    investigation for me, only provide information that it's

8    within your control to obtain.

9            MR. BURNS:  Right.

10   BY MR. DORRANCE:

11       Q    Ms. Sauerhoff, does CNA regard the claimant as

12   having the burden of proof on the question of disability?

13           MR. BURNS:  I'm going to object to that question

14   to the extent it calls for a legal conclusion.  But if you

15   understand that, Ms. Sauerhoff, you can respond to it.

16       A    It's my understanding when a claimant files a

17   claim for  disability that they are obligated to produce

18   information relating to their disability, any medical

19   information, or any information that supports their claim.

20   BY MR. DORRANCE:

21       Q    And do you know whether or not CNA, as a claims

22   administrator, has any obligation to assist the claimant

23   with the application and the review process?

24           MR. BURNS:  I'm going to object to the form of

25

33

1   the question as leading.  And I think it's also in some

2   respects a legal conclusion.  But to the extent that you

3   have that knowledge or information, you can testify to it,

4   Ms. Sauerhoff.

5      A   CNA's obligation when a claim is filed is to

6   review the information presented and to gather any further

7   information to help them assist in their disability

8   determination.

9   BY MR. DORRANCE:

10      Q   Do you consider yourselves as neutral third

11   parties in reviewing the disability application?

12      MR. BURNS:  Same objection as previously raised

13   without restating them.  But you can respond, if you

14   understand that, Ms. Sauerhoff.

15      A   Again, my understanding is that we are obligated

16   to review the information, gather any information and

17   relate it to the policy to determine if that person is

18   eligible and disabled in accordance to the policy.

19   BY MR. DORRANCE:

20      Q   Let me put it this way:  Do you consider your

21   position similar to adversaries in litigation with a

22   claimant, or do you consider yourself independent

23   decisionmakers?

24      MR. BURNS:  Same objections as previously raised,

25

1    in particular the legal conclusion aspect of it.  But to

2    the extent that you have that knowledge or information,

3    Ms. Sauerhoff, you can respond to that question.

4         A    Again, maybe I'm not completely understanding.  I

5    don't see ourself as adversaries.  We just gather

6    information and review it, based on the policy.

7    BY MR. DORRANCE:

8         Q    The disability specialist and the nurse case

9    manager are employees of CNA, correct?

10        A    Correct.

11        Q    And the vocational case manager is an employee of

12   CNA?

13        A    Yes.

14        Q    The panel of doctors that are available for

15   consultation are not employees, to the best of your

16   knowledge?

17        A    Correct.

18        Q    Are the members of the appeals committee

19   employees of CNA?

20        A    Yes.

21        Q    How are the members of the committee appointed?

22        A    Well, by their expertise.  First off, if there is

23   an opening available, anyone is eligible to apply.  But

24   normally they look at your claims-handling expertise, and

25

1   expertise in ability to make independent decisions.

2      Q    And how do they determine your ability to make

3   independent decisions?

4      A    They base that on your experience, work ability,

5   how you've handled case loads, claims, totality of

6   information.

7      Q    Does the appeals committee consist of any medical

8   doctors?

9      A    No.

10     Q    Does the appeals committee consist of any

11  professional in the healthcare profession?

12     A    There are two registered nurses that are members

13  of the appeals committee.

14     Q    What are the profesional profiles of the other

15  members of the committee at present?

16     MR. BURNS:  Mr. Dorrance, if I could cut to the

17  chase here to prevent a lot of questioning on the appeals

18  committee.  The appeals committee is single individuals,

19  and it's made up of several members.  And to the extent

20  that -- one member is usually assigned a case and then to

21  the extent that that one member believes that they need

22  other individuals to assist in evaluating the claim, they

23  are free to go to those other appeals committee members.

24     In this case, it's my understanding that the

25

36

1    appeals committee was, in fact, an appeals committee of

2    one; and that's Ms. Sauerhoff.  So that if you want to get

3    into the makeup of the other members, it may not be

4    relevant herein.  And it may be things you don't need to

5    go through.

6            MR. DORRANCE:  Thank you for clarifying that.  I

7    still need to get an answer on the professional

8    qualifications of the members of the committee generally.

9            MR. BURNS:  Okay.

10   BY MR. DORRANCE:

11       Q    So if you could, please, answer that question.

12       A    Sure.  The other members are senior claims

13   consultants with varied backgrounds or experiences in

14   claims handling, years of experience.  I believe most of

15   the members do have bachelor's degrees.  I'm not quite

16   sure what -- I can only speak to what my degree is in.

17       Q    And who makes the decision to appoint a member of

18   the committee?

19       A    That would be my manager and director.

20       Q    And what's his or her name?

21       A    Her name is Cindy Mansuy.  I believe that's

22   M-A-N-S-U-Y.

23       Q    M-A-N-S-U-Y?

24       A    Correct.

25

1      Q    And was she the manager at the time Joan Tesche's
2    claim was decided by the committee?
3      A    Yes.
4      Q    So she's been the one that appoints the committee
5    currently and, indeed, appointed the committee when Joan
6    Tesche's application was being reviewed?
7      A    Correct.
8      Q    And what is her professional profile?
9      A    I don't know.  I know she's an officer or
10   director of the company, but that's all the knowledge I
11   have.
12     Q    Do you know whether or not she's on the board of
13   directors?
14     A    I don't know.
15         MR. DORRANCE:  Mike, is that something you can
16   get for me?
17         MR. BURNS:  Why don't you put it in the form of
18   an interrogatory and I'll get it for you.  How's that?
19   Just so we protect ourselves.
20         MR. DORRANCE:  Sure.  Thank you.
21   BY MR. DORRANCE:
22     Q    Are appeals to the committee customarily decided
23   by one person?
24     A    Usually, yes.  Like Mr. Burns explained, if the
25

38

1    committee member reviewing that file feels the need to

2    call the committee together or go for other expertise,

3    then that would be the individual decision of that appeal

4    committee member.

5         Q    Is the individual on the appeals committee who

6    decides the case in this example, customarily the

7    individual who has followed the case from its inception?

8         A    I'm sorry can you repeat that question?

9         Q    You testified that, tell me if I'm wrong, appeals

10    to the appeals committee are customarily decided by one

11    individual?

12         A    Correct.

13         Q    And that individual has some discretion as to

14    whether he or she consults with one or more members of the

15    appeals committee?

16         A    Correct.

17         Q    And in those cases where the decision is made by

18    one member of the committee, is that individual someone

19    who is customarily familiar with the claim itself?

20         A    Yes, had reviewed it independently and then is

21    rendering the decision.

22         Q    Let me ask it this way:  Is the disability

23    specialist ever a member of the appeal committee?

24         A    No.

25

39

1    Q    Is the disability specialist ever consulted by a

2    member of the appeals committee?

3    A    They could be.  If they need some clarification

4    or information in the file, you can go back to that person

5    to question them.

6    Q    When an applicant receives supplemental security

7    income, otherwise known as SSI, or Social Security

8    disability, does the company consider that important in

9    evaluating the disability claim submitted to CNA?

10    MR. BURNS:  Let me object to the form of the

11    question as a leading question.  And also I think in the

12    context of the terminology used, important.  But with that

13    caveat, you can answer the question, Ms. Sauerhoff.

14    A    Well the information is taken into consideration,

15    but CNA's decision is independent and based upon the

16    policy and the evidence presented to that particular

17    claim.

18    BY MR. DORRANCE:

19    Q    If you know, is the criteria for determining SSI,

20    or Social Security disability, the same, similar or

21    dissimilar to the criteria used by CNA in determining

22    disability?

23    MR. BURNS:  I'm going to object to the form of

24    the question in that it's compound, and also because

25

1    you're assuming something that may not be of record.  But

2    if you have personal knowledge, you can answer the

3    question.

4         MR. DORRANCE:  I'll break it down into three.

5    You are right, this is a compound question.  I'll rephrase

6    it.

7         MR. BURNS:  Just ask her what her understanding

8    is in terms of Social Security disabilities benefits, the

9    requirements for Social Security benefits.

10        MR. DORRANCE:  I'll ask her in a series of

11   questions.

12   BY MR. DORRANCE:

13        Q    If you know, is the criteria for an award of SSI

14   or Social Security disability benefits the same as the

15   criteria used by CNA in deciding disability benefits under

16   a long-term disability policy?

17        A    Well, I used to work for the Social Security

18   administration some years back.  And they do have a

19   sequential evaluation -- or at least they did when I was

20   there -- so the requirements are different.  At CNA we

21   adhere to the policy and the provisions in the policy that

22   are applicable.

23        Q    Based on your knowledge of working with the

24   Social Security administration, are the requirements for

25

41

1    Social Security disability more difficult to satisfy than

2    the requirements under a CNA long-term disability policy?

3         MR. BURNS:  I'm going to object to that question.

4    To the extent you are getting into an assessment that

5    would be predicated upon a lack of personal knowledge, or

6    you are trying to secure a definition that may not be

7    appropriate in the context of the policy and/or for

8    information that may not be relevant, I'll object to the

9    question.  But I'll let you answer the question, Ms.

10   Sauerhoff, if you understand it.

11        A    My understanding at the time when I was with

12   Social Security administration some years back that it was

13   difficult to be approved at the initial and

14   reconsideration phase, but the administrative law judge

15   level was much lenient.

16   BY MR. DORRANCE:

17        Q    Let me put it this way, Social Security, based on

18   your experience, looks at several factors, including

19   whether the claimant can perform past relevant work; is

20   that correct?

21        A    Correct.

22        Q    And based on your experience, and if you know,

23   the Social Security also looked to determine whether the

24   claimant can perform any substantial gainful employment,

25

42

1    taking into account the claimant's physical restrictions,

2    if any, vocational profile, and educational background?

3         A    Correct.

4         Q    And are those factors that CNA considers in

5    deciding a disability claim?

6         A    Again, our policy, the provisions go, first, the

7    own occupation.  And I think that's where the difference

8    is.  Social Security looks immediately at any occupation.

9    So the any occupation provisions for CNA don't apply until

10   after the own occupation has been exhausted.

11        Q    Do you ever have an occasion where the Social

12   Security claim is pending and the appeals committee is

13   also reviewing a claim for disability under the policy?

14             MR. BURNS:  Let me object to that and ask what

15   the relevance of that is in the context of this case.  Not

16   only is it constituting something that is not relevant,

17   but it's very broad and vague.  And I'm going to ask you

18   for an offer of proof in some respects to tell me why that

19   would be relevant or significant to the case at issue.

20             MR. DORRANCE:  Well, I'll withdraw the question

21   and ask it more specifically later.

22   BY MR. DORRANCE:

23        Q    I believe you've already identified the

24   information that is reviewed at the first level of CNA's

25

1   review process, that included the attending physician's

2   statement, the employer's statement and the employee's

3   statement, as well as relevant policy provisions; is that

4   correct?

5       A    Correct.

6       Q    Are those the same documents considered by the

7   appeals committee?

8       A    Yes.  At the appeals committee level, we look at

9   the entire file.  But those documents would be included.

10      Q    Does the disability specialist, based on your

11  experience, place greater weight on the statement of the

12  attending physician than she does on a physician who has

13  been consulted by the attending physician?

14          MR. BURNS:  I'm going to object to the form of

15  the question.  To the extent you know, Ms. Sauerhoff, if

16  you have personal knowledge of that, you can answer the

17  question.

18      A    My understanding is that the nurse case manager

19  and the disability specialist look at all the information

20  presented and make their determination based on the

21  totality of that information.

22  BY MR. DORRANCE:

23      Q    What I'm getting at, I know, for example, on the

24  Social Security Administration, little weight is given to

25

1    reports of a chiropractor, and far greater weight and

2    importance is placed on the treating physician's opinion.

3         To the best of your knowledge, does CNA make any

4    distinctions between a healthcare provider, depending on

5    the type of license he holds and whether he is a family

6    doctor or specialist, things of that nature?

7    A    Again, we look at all the information presented.

8    But normally we would go with the treating doctor or the

9    primary care doctor who is orchestrating the treatment

10   plan.  And then also relying on auxiliary services, such

11   as specialists or consultants or things of that nature.

12   But my knowledge is that everything is based on the

13   totality of the information presented together.

14   Q    So one specialty is not given any greater weight

15   than another or does it depend on the facts of the

16   particular case?

17        MR. BURNS:  I'll object to the form of the

18   question.  But if you understand it, you can answer it,

19   Ms. Sauerhoff.

20   A    I would have to say relates to the claim for

21   disability and the facts of the case.  Certainly, if it's

22   a cardiac claim, you are not going to be asking a

23   podiatrist information related to that.

24   BY MR. DORRANCE:

25

45

1    Q    Now I'd like to turn our attention to your

2    knowledge of Joan Tesche's case.  If you could, summarize

3    your involvement and knowledge concerning the file.

4    A    Okay.  I would have reviewed the claim as of the

5    date of my letter.  Actually, the claim had been received

6    in the appeals committee area on January 3, 2000.  And I

7    would have logged it into our appeals tracking system or

8    docket, so to speak, for review.

9         And then I would personally have reviewed the

10   file on February 21, 2000, the date of my letter.  And I

11   would have reviewed the entire claim.  Usually, I start

12   from the back to the very beginning reviewing all the

13   information contained in the claim file, looking at the

14   policy to see if that decision was deemed as correct and

15   proper.  Then my letter would speak to the knowledge that

16   I pulled from or the results of that review.

17   Q    Did you maintain any separate notes of what you

18   did on this file?

19   A    No.

20   Q    It is customary for CNA employees to maintain

21   notes of their involvement on the file?

22   A    Well, if there was any actions on the file, such

23   as a file activity sheet document or the nurse case

24   manager database document, those actions would be

25

1    recorded.  As far as with the appeals committee, our

2    documentation is the letter that describes our review,

3    what was reviewed and what the conclusions of that review

4    were.

5         (Recess.)

6    BY MR. DORRANCE:

7         Q    Ms. Sauerhoff, there were a number of documents

8    attached to the complaint that we filed in this case.  I

9    don't know if you have ready access to any of them.  Maybe

10   I'll be a little more specific.  The first document I'd

11   like to talk about is your letter to Ms. Tesche's former

12   lawyer, Steven Courtney, and that's dated February 21,

13   2000.  It appears to be a two-page letter.  It was

14   identified in the amended complaint as Exhibit F.  Do you

15   have that two-page document?

16        A    Yes.

17             MR. DORRANCE:  I'll ask that this be made

18   Sauerhoff Exhibit Number 1.  And we can just make a copy

19   here, if that's okay, Mike.

20             (Letter marked as Sauerhoff Exhibit Number 1.)

21             MR. BURNS:  Why don't you just make a copy and

22   just keep track of how you are marking them.

23             MR. DORRANCE:  Okay.

24             MR. BURNS:  And, if you would, just for purposes

25

47

1    of the record later on, if you have the base numbered

2    copy, it might be appropriate also just to note what the

3    Bates number is.

4         MR. DORRANCE:  Okay.  That's a good idea.  I'll

5    give you a moment to get a copy of that document in your

6    hand.

7    BY MR. DORRANCE:

8         Q    Pardon?

9         A    I do have the letter.

10        Q    You do have the letter?

11        A    Yes, I do.

12        Q    Have you had a chance to review that?

13        A    Yes, I have.

14        Q    Does this letter contain all the reasons why Ms.

15   Tesche's disability claim was denied by the appeals

16   committee?

17        A    It's the conclusion of the review of all the

18   information.  But, yes, it is our finding that Ms. Tesche

19   was capable of performing other occupations, as

20   identified, and therefore is no longer disabled in

21   accordance with the policy.

22        Q    Now, I note in some of the other correspondence

23   that preceded this decision -- and which correspondence

24   attached to the amended complaint, I might add -- there is

25

48

1    an individual by the name of Laura Collins.  are you

2    familiar with that individual?

3        A    Yes.

4        Q    And was she the disability specialist assigned to

5    this file?

6        A    Yes.

7        Q    Was a nurse case manager assigned to this file?

8        A    Yes.

9        Q    And what was her name?

10       A    I believe there might have been changes.  I

11   think, originally, it started out with Mary Ann Gregg,

12   G-R-E-G-G.

13       Q    I'll give you a chance to look over your

14   information, if you need to.

15       A    Sure.  Because there were some changes.  It's

16   reflected on the nurse case manager database.

17           MR. BURNS:  Pam Groover.

18       A    By Pam Groover, was another, G-R-O-O-V-E-R.

19   BY MR. DORRANCE:

20       Q    Was Pam the original case manager?

21       A    I don't believe she was the original nurse case

22   manager.  I believe that person was Mary Ann Gregg.

23       Q    And then Pam became the nurse case manager?

24       A    Yes.

25

49

1      Q    And what qualifications, I should say, what
2   requirements or qualifications do the vocational case
3   managers have, if you know?
4      A    I don't know.
5      Q    Did you consult with the vocational case manager
6   in reviewing this case in your capacity as the sole member
7   of the appeals committee making this decision?
8      A    I didn't personally consult with him.  I looked
9   as his review that he had conducted.
10     Q    Did you consult with Laura Collins in making your
11  decision as a member of the appeals committee?
12     A    No, I did not.
13     Q    Did you consult with either of the nurse case
14  managers in making your decision?
15     A    No, I did not.
16     Q    Did you consult with anyone orally in making your
17  decision?
18     A    No, I did not.
19     Q    I take it you didn't interview the claimant, Joan
20  Tesche?
21     A    No, I did not.
22     Q    I take it you didn't speak with the treating
23  physician, Dr. Wolf?
24     A    No.
25

50

1       Q    I take it you didn't speak with the family
2    doctor, an internist by the name of Dr. Rubenstein?
3       A    No.
4       Q    Your letter which we marked Sauerhoff Exhibit 1
5    -- bear with me here, I lost my place --
6       A    Okay.
7       Q    -- sets forth certain definitions in the policy;
8    is that correct?
9       A    Correct.
10      Q    And the first would be the 24 month own occ. or
11   employee occupation definition; is that correct?
12      A    Correct.
13      Q    And the second one provides the definition of
14   total disability for purposes of determining Ms. Tesche's
15   eligibility for long term disability; is that correct?
16      A    Correct.  The second part is for disability from
17   any occupation.
18      Q    Any occupation, and that's the abbreviated
19   description any occ.  Is that right?
20      A    Correct.
21      Q    And essentially there are two criteria that are
22   included under this definition.  Is that fair to say?
23      A    Correct.
24      Q    And the first criteria is, quote, continuously
25

51

1     unable to engage in any occupation for which she -- well,

2     it says he -- is or becomes qualified by education,

3     training or experience.  Is that the first criterion?

4          A    Yes.

5          Q    And then the second criterion is, quote, under

6     the regular care of a licenses physician other than

7     himself, period, end of quote.  Is that correct?

8          A    Correct.

9          Q    Are those the only two criteria that are used by

10    CNA and by the appeals committee in deciding a long-term

11    disability claim?

12         A    Correct.

13         Q    Correct me if I'm wrong, other than the question

14    of whether Ms. Tesche satisfied the definition of total

15    disability, she was an eligible claimant, was she not?

16         A    Yes.  There was no question of her eligibility.

17         Q    And as part of that, she was clearly a full-time

18    employee who had paid premiums under the policy?

19         A    Correct.

20         Q    And, indeed, this was a noncontributory policy,

21    is that not also correct?

22         A    One second.  Let me look at the policy.  I'm

23    sorry, did you say what type?

24         Q    Noncontributory policy.

25

52

 1          A    I'm looking at the face page to the policy.

 2    Application says what percent of premium is to be paid by

 3    the employer.  It says zero percent.  I'm just looking to

 4    see if there is a rider to that, because that would lead

 5    me to believe that she would pay premiums for the policy.

 6    And that would make it contributory.

 7              MR. BURNS:  I don't see anything, any riders.

 8    But you might want to take a look yourself, Ms. Sauerhoff.

 9    I don't see any riders that indicate that there was any

10    premium contribution by the employee.

11              MR. DORRANCE:  By the employee?

12              MR. BURNS:  I mean by the employer.  I'm sorry.

13          A    Yes.  I don't see anything that speaks contrary

14    to the statement seven on the application.

15    BY MR. DORRANCE:

16          Q    So based on your review, Ms. Tesche paid for all

17    the premiums under this policy?

18          A    Well, that's my understanding, yes.

19          Q    And the information would seem to support -- the

20    documents in front of you would seem to support that?

21          A    Correct.

22          Q    Do you know whether or not the disability

23    specialist -- I'm looking for her name again -- Laura

24    Collins?

25

1      A    Correct.

2      Q    Consulted with the vocational case manager?

3      A    Yes.  I'm looking for that.  The file would have

4    been referred to the vocational case manager.  Actually,

5    on the file activity sheet, and it's dated June 2, 1999,

6    there's an entry.  It says, received permanent

7    restrictions from AP, which would be attending physician,

8    conferenced with the nurse case manager, will send file

9    for vocational assessment.  And that was cosigned by Laura

10   Collins.  And I believe the nurse at that point was Holly

11   Henry, H-E-N-R-Y.

12     Q    To your knowledge, was that the first vocational

13   assessment that was requested?

14     A    Yes.

15     Q    And do you have anywhere in your documentation

16   the results of that assessment?

17     A    Yes.  Mr. Gullidge had performed an any

18   occupation assessment dated June 9, 1999.  There's an

19   entry of that review on the case management database.  And

20   also a handwritten statement on the file activity sheet

21   dated June 9, 1999, that vocational review, own

22   occupation, only claim.  And it's hard to read the rest of

23   writing, but it looks like the disability specialist will

24   pay through the own occupation period and close.  Then

25

1    it's got Mr. Gullidge's initials.

2        Q    Does it say anything else?

3        A    On July 26, 1999, Ms. Collins writes an own

4    occupation letter sent.

5        Q    Are you referring now to handwritten notes?

6        A    The file activity sheet.

7        Q    Okay.  I'd like to make that file activity sheet

8    Sauerhoff Exhibit 2.  It looks like a two-page file

9    activity sheet; is that correct?

10            (File activity sheet marked as Sauerhoff Exhibit

11   Number 2.)

12       A    The file activity sheet --

13   BY MR. DORRANCE:

14       Q    I'm sorry to interrupt you.  For Mr. Burns'

15   benefit, if he hasn't already identified the Bates

16   numbering on that, it's -- well, I'm not going to read all

17   the letters, but the end, 130131.  The full identification

18   is CCC, followed by three zeros, 130.  And I'll just wait

19   for Mr. Burns to get that.

20            MR. BURNS:  I'm okay.  I just wanted to get it on

21   the record.

22   BY MR. DORRANCE:

23       Q    And I just want to make sure I am looking at the

24   right document.  The first entry in terms of a date is

25

1   2/16/99; is that correct?

2        A    Correct.  That's what I'm looking at.

3        Q    Actually, they are sort of out of -- the Bates

4   numbering is out of sequence because page 131 is actually

5   earlier in terms of chronology.  And page number 130, is

6   that right -- in other words, maybe the next page of what

7   you have, the first date on the left side is 10/14/97, is

8   that right?

9        A    It  looks like -- wait, I'm sorry.  Yes, you are

10  correct.

11       Q    And you were reading from the entry of 6/2/99.

12  Is that right?

13       A    Right.  And also 6/9/99 and 7/26/99.

14       Q    And there's a reference to -- actually, I'm

15  sorry.  Could you read the 6/9/99 again, please?

16       A    Right.  It says, let's see, June 9, 1999, voc.

17  review, own occupation, only claim.  Then it has DBS,

18  which is disability specialist, paid through own

19  occupation period, and close.  Then it has the initials,

20  well, I know its Tony Gullidge.  It might be TLG.

21       Q    You are familiar with Tony's handwriting?

22       A    Yes.

23       Q    What's the reference to close mean, if you know?

24       A    It just means that the file is -- the claimant is

25

56

1    only disabled from their own occupation, and not disabled

2    from any occupation, so to pay out under those provisions.

3    And close usually means to go ahead and give them their

4    appeal rights.

5        Q    And, indeed, the next entry on this two-page

6    exhibit -- actually I'm not sure I even asked you to

7    identify it.  Is this the final activity sheet that you

8    were referring to?

9        A    Yes, it is.

10       Q    And the next entry on the file activity sheet,

11   with a Bates numbering of 130, is 7/26/99.  Is that right?

12       A    I'm sorry.  What is that again?

13       Q    The next date as you are going down the page on

14   the left side, right after the entry you just referred to,

15   is dated July 26, 1999?

16       A    Correct.

17       Q    And that states, quote, own occ. letter sent, L.

18   Collins.  Is that right?

19       A    Correct.

20       Q    And is this the letter that you send when you are

21   confirming the termination of own occ. coverage?

22       A    Correct.  It would identify the occupation

23   described or that had been identified by the vocational

24   consultant and that no further benefits are payable, and

25

57

1    would offer appeal rights.

2        Q    Is there any other information recorded in your

3    file as to the findings of the vocational case manager?

4        A    Well, just what I had identified previously on

5    the nurse case manager database would be a typed

6    assessment conducted by Mr. Gullidge on July 9, 1999,

7    about his own occupation, or any occupation assessment.

8        Q    7/9/99?

9        A    No.  It's June 9, 1999.  It's page one of one

10   page.

11       Q    I'm with you.  I see a second page.  Okay.  I've

12   got the pages you are referring to here.  Just for the

13   record, that's Bates no. 141.  And it appears to be 142.

14   It looks like it spilled over onto the next page, unless

15   I'm misunderstanding it.  Or maybe that's -- I'm sorry.

16   That's Holly Henry's reference, I believe.

17           MR. BURNS:  They are different pages.

18           MR. DORRANCE:  Yes.  So it's only a one-page

19   document.

20           MR. BURNS:  Right.  That's 141, so the record's

21   clear.

22   BY MR. DORRANCE:

23       Q    Right.  Back to your Exhibit Number 2.  The very

24   next entry as we are going down the page is August 24,

25

58

1    1999; is that correct?

2    A    That's correct.

3    Q    Correct me if I am wrong, it says as follows,

4    quote, review for settlement, not appropriate since the

5    own occ. period is not more than six months, period, end

6    of quote.  And I can't read the initials.  Is that an

7    accurate quoting of that entry?

8    A    Actually, it reads, I think part of it -- I'll

9    read it exactly how I can read it here.

10   Q    Okay.

11   A    It says reviewed for settlement, not appropriate

12   since the remaining own occupation period is not more than

13   six months.

14        MR. BURNS:  Would you identify the signature, Ms.

15   Sauerhoff, too?

16   A    It's P. Ward, W-A-R-D.

17   BY MR. DORRANCE:

18   Q    Do you know who P. Ward is?

19   A    Pamela Ward.

20   Q    And who is Pamela Ward?  What is her job title?

21   A    Disability specialist.

22   Q    So Laura Collins was the initial disability

23   specialist on the file?

24   A    Correct.

25

1       Q    Is there any indication why Paula Ward -- is it

2    Paula Ward?

3       A    Pamela.

4       Q    Pamela Ward became --

5       MR. BURNS:  Ward.

6    BY MR. DORRANCE:

7       Q    Pamela Ward, is that the right name?

8       A    Correct.  Pamela Ward.

9       Q    Is there any indication as to why she took over

10   this file from Laura Collins?

11       MR. BURNS:  Objection to the form of the

12   question, assuming facts not of regard.

13   BY MR. DORRANCE:

14       Q    Do you know whether Pamela Ward took over the

15   file from Laura Collins?

16       A    I don't believe she took over the file, but I

17   think payouts were being proposed.  It's an alternative

18   resolution payment.  In other words, you have so many

19   months remaining of the file, would you prefer to have

20   this in a lump sum or paid monthly.

21       And I think in this situation, because there was

22   less than six months remaining, when they indicate review

23   for settlement, they are looking at actually a payout of

24   the remaining of the own occupation period.  But it was

25

1   determined that would not be appropriate since there's

2   less than six months left, they would just pay out each

3   month, accordingly.

4       Q    Would that decision be something that Laura

5   Collins would customarily make, or is that something that

6   is uniquely part of Pamela Ward's responsibilities?

7         MR. BURNS:  Object to the form of the question,

8   that's compound, and also the characterization in terms of

9   definitions of uniquely.

10        MR. DORRANCE:  I'll rephrase it.

11        MR. BURNS:  It's very unclear.

12        MR. DORRANCE:  I agree.

13  BY MR. DORRANCE:

14       Q    Is that something that would be part of Laura

15   Collins' responsibilities?

16       A    No.  I don't believe it would have been.

17       Q    Based on your knowledge, is that something that

18   would be normally part of Pamela Ward's responsibilities?

19       A    Yes.  I believe that was Pamela's responsibility,

20   to identify any potential payout claims.

21       Q    Have you been able to identify any entries or

22   documents created by the nurse case manager?

23       A    You mean other than the nurse case manager

24   database?

25

1    Q    Right.

2    A    Well, there were some entries that were cosigned

3    by the nurse case manager and the disability specialist.

4    Q    Could you just identify those for the record,

5    please.

6    A    Yes.  It was on June 2, 1999, of the file

7    activity sheet where it indicated that Laura Collins and

8    Holly Henry conjunctly reviewed the information and

9    forwarded the file on for a vocational assessment for any

10   occupation.  And I believe Ms. Henry had a typed nurse

11   case manager note corresponding to that that was behind

12   Mr. Gullidge's any occupation assessment.  Ms. Henry's

13   note was dated June 2, 1999.

14   Q    And that states, among other things, quote, will

15   send file to VOC, and close the case management, period,

16   end of quote?

17   A    Correct.

18   Q    And actually, the preceding statement in that

19   document which has a Bates number of 142 states, quote,

20   based upon information from capital A, capital P, comma,

21   claimant appears to be, capital T, capital D, own occ.,

22   period, end of quote.  Is that an accurate quote?

23   A    Yes, it is.

24   Q    And I think you previously said the AP reference

25

62

1      refers to attending physician; is that right?

2          A    Correct.

3          Q    Do you know which physician is being referred to

4      there by the abbreviation AP?

5          A    Well, I'd have to look at the preceding notes

6      leading up to that.  And it looks like Ms. Henry was

7      contacting Dr. Wolf and recording restrictions and

8      information that he had presented.

9          Q    And it appears also that Dr. Rubenstein, the

10     family doctor, was being consulted; is that correct?

11             MR. BURNS:   Make sure.

12         A    I'm looking now.  Now I know prior to -- I'm

13     looking at a claim activity sheet that begins with the

14     date of May 11, 1999, at the top.  On the very bottom it

15     has page two of nine.  And there are information drawing

16     from Dr. Rubenstein, as well.  But that information was

17     dated March 10 of 1999.  And they were waiting for Dr.

18     Wolf's response as well.

19         Q    I see a document which has a Bates numbering of

20     185.  In fact, I'm going to make this as an exhibit.

21     We'll call it Sauerhoff Exhibit 3.  It's really easier to

22     read sideways.  In fact, it's set up in a format that you,

23     I should say read from bottom to top.  And it looks like

24     it's completed by Dr. Rubenstein, attention Stacey.  And

25

1    one of the headings is, quote, please see the included job

2    activity sheet, period, end of quote.  Tell me if you are

3    able to identify that one.

4            (Document marked as Sauerhoff Exhibit Number 3.)

5            MR. BURNS:  Can I direct her to where it is?

6            MR. DORRANCE:  Sure.

7            MR. BURNS:  Cheryl?

8        A    Yes.

9            MR. BURNS:  It's right after The Orthopedic

10    Institute of Pennsylvania, there's a fax to Holly Henry.

11    Then after that, there's a May 11, 1999 letter to Dr. Wolf

12    where he completed a physical capacity for the nurse case

13    manager, and then after that, there's a sideways paper

14    which is a CNA form.  And it says Dr. Rubenstein,

15    attention Stacey, regarding Joan Tesche.

16        A    I have that.

17    BY MR. DORRANCE:

18        Q    Are you familiar with this document?

19        A    Yes.

20        Q    This is a one-page form completed by Dr.

21    Rubenstein?

22        A    Correct.

23        Q    Does it say at the bottom, quote, the above are

24    the patient's self-described limitations, period.  If

25

1    confirmation is required, suggest independent medical

2    examination by physiatrist or orthopedic surgeon, period,

3    end of quote.

4        A    Yes.

5        Q    Do you know whether or not there was an

6    independent medical examination of Joan Tesche by any

7    healthcare provider?

8        A    No, there was not.

9        Q    I call your attention to a one-page document

10   which actually was the one Mr. Burns was referring to,

11   with a Bates no. 184.  It's a letter from Holly Henry to

12   Dr. Wolf dated May 11, 1999.  Do you have that document?

13       A    Yes, I do.

14       Q    Could you please describe what you call this

15   document?

16       A    Well, I don't know of a name for it.  It's a

17   questionnaire that the nurse, in this case Holly Henry,

18   had sent to the doctor regarding restrictions or

19   limitations to assess functionality.

20       Q    And does it indicate any question concerning

21   whether Ms. Tesche would be disabled from any occupation?

22       A    No.  It asked for, you know -- there was a series

23   of four questions.  And it just asks what the current

24   restrictions and limitations are, what findings did he

25

1    have to support that, is she medically stable at this

2    time, and what's her prognosis for return to her

3    occupation.  I don't see any indication of any occupation.

4         Q    Do you know whether or not there was any

5    questionnaire directed to either Dr. Rubenstein or Dr.

6    Wolf, inquiring whether Ms. Tesche was disabled from any

7    occupation?

8         A    No.  The information requested from CNA asked for

9    restrictions, limitations, medical stability.

10   Determinations of any occupation are a vocational matter.

11   So we wouldn't have asked the doctor are they capable of

12   performing any occupation.

13        Q    So there was no questionnaire specifically asking

14   the doctor, any doctor, whether it be Dr. Rubenstein, Dr.

15   Wolf, or any other physician, whether Ms. Tesche was

16   totally disabled from any occupation?

17             MR. BURNS:  Objection, leading question.  But you

18   can answer, Ms. Sauerhoff.

19        A    Correct.  There was no question to any of the

20   doctors asking if Ms. Tesche was disabled from any

21   occupation.

22   BY MR. DORRANCE:

23        Q    So once the case changed from an own occ. status

24   to a determination of whether Ms. Tesche qualified under

25

1    the any occ. definition, it's your understanding that CNA

2    was only looking at the disability issue from a vocational

3    standpoint.

4           MR. BURNS:  Objection.  Mischaracterizes the

5    record and her testimony.  But if you understand the

6    question, you can answer it.

7           MR. DORRANCE:  I'll rephrase the question.

8    BY MR. DORRANCE:

9       Q    Is it your understanding that after the case

10   transitioned to the issue of whether Ms. Tesche was

11   disabled from any employment, CNA was only looking at this

12   case from a vocational standpoint?

13          MR. BURNS:  Same objections.  But you can answer

14   it if you understand it, Ms. Sauerhoff.

15      A    Well, at that point, once it got beyond the own

16   occupation, we were looking at the medical restrictions,

17   abilities, limitations, medical stability, to determine

18   was she disabled from any occupation.  And that would be a

19   vocational determination.

20   BY MR. DORRANCE:

21      Q    But during the appeal process, did CNA ask Ms.

22   Tesche to provide any additional information supporting

23   her disability claim?

24      A    Well, in the original denial or termination

25

67

1    letter, Ms. Collins did offer appeal rights to Ms. Tesche

2    that would say, if you have any additional information

3    that you wish to submit that would alter our decision,

4    then she had that opportunity at that point to produce

5    that.

6        Q    So, were you considering additional medical

7    evidence, or were you limiting your review to vocational

8    information?

9            MR. BURNS:  Objection.  Mischaracterization and

10   misrepresentation.  But you can answer it if you

11   understand it, Ms. Sauerhoff.

12       A    It would be any information that Ms. Tesche felt

13   would alter the decision.  And that could include medical,

14   it could include a variety of information.

15   BY MR. DORRANCE:

16       Q    I turn your attention back to your letter denying

17   her appeal.  It was dated -- bear with me here.

18           MR. BURNS:  February 21, 2000.

19           MR. DORRANCE:  February 21, 2000.  Thank you.

20       A    Okay.

21   BY MR. DORRANCE:

22       Q    I specifically call your attention to the second

23   page, third paragraph, last two sentences, the sentence

24   that begins, quote, the letter dated 12/22/99 from Dr.

25

1    Wolf.  Do you see that?

2         A    Yes, I do.

3         Q    Please take a minute to review those two

4    sentences.

5         A    Okay.

6         Q    Now, the first sentence states that, essentially,

7    Dr. Wolf's letter did not provide his opinion as to why

8    the listed occupations -- let me rephrase that, I'm sorry.

9    Basically, it says that Dr. Wolf's letter of December 22,

10   1999, does not state why he feels the claimant is unable

11   to perform the listed occupations; is that right?

12        A    Correct.

13        Q    At any time during the appeal process, did CNA

14   send a questionnaire to Dr. Wolf asking for more detail?

15        A    No.

16        Q    At any time during the appeal process, did CNA

17   advise Ms. Tesche that she should obtain additional

18   information from Dr. Wolf explaining his findings

19   concerning her inability to perform any employment?

20             MR. BURNS:  I'm just going to object to the form

21   of the question.  But you can answer it, if you understand

22   it.

23        A    I'd say no.

24   BY MR. DORRANCE:

25

69

1       Q    I call your attention to the next paragraph,

2    after the one we just referred to.  Could you please read

3    that for us?

4       A    "While we appreciate Dr. Wolf's opinion, the any

5    occupation determination is a vocational determination

6    based on the claimant's permanent medical restrictions,

7    geographic location, economic parity, age, experience, and

8    education."

9       Q    Is that a correct description of the standard

10   that you use in reviewing a long-term disability claim?

11      A    Yes.

12      Q    Turn your attention to the final paragraph.  You

13   state that:  In your opinion, the decision to terminate

14   benefits was correct, quote, correct and proper, end

15   quote.  Is that correct?

16      A    Correct.

17      Q    And then it states, quote, you have exhausted

18   your administrative remedies at this time and this

19   decision is final and binding, period, end of quote.  Is

20   that correct?

21      A    Correct.

22      Q    Do you have any document which states that the

23   appeals committee's decision is final and binding?

24      A    Well, we don't have any documents.  But we

25

1    operate under a list of regulations which do entitle the

2    claimant to a fair and independent review.  And it doesn't

3    speak to multiple appeals or reviews.

4        Q    So you are not aware of any document that states

5    your appeals committee's decision is final and binding?

6            MR. BURNS:  I'll object to that statement.  I

7    think she just responded to that.  But you can answer the

8    question, if you understand it.

9        A    Well, again, there is no document that I am aware

10   of.

11   BY MR. DORRANCE:

12       Q    And, if you know, ERISA does authorize a claimant

13   to file suit in court to seek unpaid benefits, doesn't it?

14       A    Yes, it does.

15       Q    So, really, the decision of the appeals committee

16   is not final and binding; is that correct?

17           MR. BURNS:  I'm going to object to the

18   characterization and to the form of the question.  But if

19   you understand it, Ms. Sauerhoff, you can answer it.

20       A    It's my understanding that the appeals committee

21   reviews, independently, all the facts of the case, the

22   information presented, and makes a determination.

23           And if the determination is that the claim is not

24   payable, then that is final and binding, in our policy.

25

1    And when we say you've exhausted all administrative

2    remedies, that means the appeals process is complete.

3    BY MR. DORRANCE:

4        Q    Now, there seemed to be some question on the part

5    of Steven Courtney, the lawyer previously representing Ms.

6    Tesche, as to whether your final decision had been made in

7    this case.  Do you recall that exchange of correspondence?

8        A    No.  Do you have a letter or date you can refer

9    me to?

10       Q    Yes.  First of all, does anyone need to take a

11   break?

12       A    I'm fine.

13       Q    I'm looking at everybody here in attendance.  I'm

14   looking at, well, among other things, a document, a one

15   page document with a Bates number 115, a letter from Jon,

16   J-O-N, Holland, H-O-L-L-A-N-D, directed to Steven

17   Courtney, Attorney at Law.  I think I said it was dated

18   April 12, 2000.

19       A    Okay.  I see that.

20       Q    Obviously Mr. Courtney -- apparently, I shouldn't

21   say obviously -- it appears that Mr. Courtney either did

22   not receive or -- well, it appears that he did not receive

23   your final decision that we've marked as Sauerhoff Exhibit

24   1.  Does your review of this letter refresh your

25

72

1    recollection?

2        A    I'm looking at a letter now that was from

3    Mr. Courtney, dated April 7, 2000, directed to Laura

4    Collins.

5        Q    Okay.

6        A    And he does state that:  "Please be advised that

7    as of this date of this letter I have not received any

8    response to my letter dated April 4, 2000, as well as

9    telephone messages that were left for you the previous

10   week."

11            And it goes on, in the body of the letter, he

12   goes on to say:  "And decision from the appeals committee

13   should have been made on or before March 30, 2000.

14   However, as  of the date of this letter, my office has not

15   received any notification relative to her eligibility to

16   receive long-term disability payments."

17            So obviously, at that time, he was not aware of

18   the February 21, 2000 decision.

19       Q    And in the final paragraph -- and just for the

20   reference, Mike, if you haven't identified it yet, has a

21   Bates number 120.

22            MR. BURNS:  Got it.

23   BY MR. DORRANCE:

24       Q    And it says, the final paragraph, well, why don't

25

1  you read the rest, why don't you read the remainder of the

2  letter, please?

3     A    Of that April 7 letter?

4     Q    Please.

5     A    "I would appreciate it if you would contact my

6  office upon the receipt and review this correspondence to

7  discuss this matter in greater detail.  Your anticipated

8  cooperation is appreciated."  And it's signed by Steven

9  Courtney.

10    Q    Correct me if I am wrong, I think you added as

11  the fourth word in that quote, the word it.  And there is

12  no it in that sentence, is that right?  At least it

13  sounded like that.  I'm just trying to be accurate here.

14    A    Yes.  Do you want me to read that sentence again?

15         MR. DORRANCE:  That's fine.  I think it speaks

16  for itself, don't you, Mike?

17         MR. BURNS:  I've been told by greater lawyers

18  than myself never to let a document speak for itself.  Why

19  don't you repeat it?

20         MR. DORRANCE:  Well said.  I guess read the first

21  sentence again that you previously read.

22    A    Okay.  I would appreciate it -- oh, I'm sorry.

23  Yes, you are right.  "I would appreciate if you would

24  contact my office upon your receipt and review of this

25

74

1      correspondence to discuss this matter in greater detail."

2              MR. DORRANCE:  Thank you.

3              MR. BURNS:  Thank you.

4      BY MR. DORRANCE:

5          Q    And then it's your understanding that Ms.

6      Clark's April 12, 2000 letter followed; is that right?

7          A    Correct.

8          Q    Do you have any document confirming that your

9      final decision that we've marked Sauerhoff Exhibit 1 was

10     received by Mr. Courtney?

11         A    No.  It was mailed.  And I was looking at the

12     address, which looks to be the same address on

13     Mr. Courtney's letterhead.  It wasn't sent certified mail

14     or signed receipt or anything.  So I had no knowledge

15     otherwise that it wasn't received.

16         Q    On what do you base your statement that it was

17     mailed on the date indicated on your letter?

18         A    Correct.  It was mailed February 21, 2000.

19         Q    Are you referring to something?

20         A    No, I mean, just the date of my letter.  When I

21     type my letter and sign it, I put it in an envelope and

22     send it out at that point.

23         Q    Do you customarily send it by certified mail

24     or --

25

75

```
 1        A    No.  Normally, it's sent regular mail.  I just
 2   put it in a mail to be picked up slot.
 3        Q    You don't have any proof that Mr. Courtney
 4   received your letter when it was sent?
 5             MR. BURNS:  I'll object to the form of the
 6   question because it's very broad, and it requires her to
 7   know what Mr. Courtney knows or doesn't know.  But there's
 8   a presumption in terms of mailing.  But again, if you
 9   understand the question, you can answer it, Ms. Sauerhoff.
10        A    Again, all I would have done was signed and
11   mailed the letter and put it in the mail slot to be picked
12   up.  What happens beyond that, I would have no knowledge.
13   BY MR. DORRANCE:
14        Q    I call your attention to the document that's been
15   marked as Exhibit E and attached to the amended complaint.
16   It purports to be a one-page letter dated January 3, 2000,
17   from Laura Collins to Steve Courtney.  I'm trying to
18   locate the Bates numbering of it.
19        A    You are talking about January 3, 2000, a letter
20   from Laura Collins to Steven Courtney?
21        Q    Yes.
22        A    Okay.  I've located it.
23        Q    I call your attention to the fourth paragraph.
24             MR. BURNS:  Let's just get the Bates number on
25
```

1 record so we have it.

2       MR. DORRANCE: Okay. What is it, do you have it?

3       MR. BURNS: No. I have a December 3rd letter,

4 but I don't have a January 3rd, December 3rd, not a

5 January 3rd. What does the letter say?

6       MR. DORRANCE: I'll ask a general question and

7 then I'll ask a specific question about the letter.

8    A   Michael, you are still trying to locate the

9 letter, right?

10       MR. BURNS: Yes. What is it?

11    A   It says, Dear Mr. Courtney, today we received

12 your letter along with a letter from Stephen B. Wolf dated

13 December 22nd, 1999.

14       MR. BURNS: I'll find it, go ahead.

15 BY MR. DORRANCE:

16    Q   It's my understanding that generally speaking,

17 the appeals committee must issue a ruling within 60 days

18 after its receipt of a claimant's appeal, is that correct?

19    A   Yes. Or if additional time is necessary or

20 further information is necessary, then we are obligated to

21 inform the claimant that an additional 60 days may be

22 required.

23    Q   Do you have any indication in your file that you

24 notified the claimant that an additional 60 days was

25

1    required to reach a decision?

2         A    No.  We received the appeal and logged it in and

3    rendered our decision on February 21st, 2000.

4         Q    Does the January 3, 2000 letter that we've been

5    referring to indicate, quote, the committee will notify

6    you in writing if the additional time is required, period,

7    end of quote?

8         A    Correct.  But, it's my understanding that a

9    decision was rendered before that period.

10        Q    Now, do you recall in reviewing your file,

11   whether Mr. Courtney had asked Ms. Collins for specific

12   written job descriptions of the jobs which CNA felt Ms.

13   Tesche was capable of performing?

14        A    Yes, I do recall a letter.  I'm looking now to

15   see.

16        Q    I recall it was a two-page letter.  I'm looking

17   for it also.  It's Bates no. 178 and 179 and 180.  It's a

18   three-page letter.  It's dated September 14, 1999.

19        A    Just one second.

20             MR. BURNS:  Right before that last document that

21   we looked at, the physical capacity restrictions forms,

22   about three or four ahead of those, Cheryl.

23        A    Okay.  I think I found it.  You said a letter

24   dated September 14, 1999, from Mr. Courtney to CNA?

25

78

BY MR. DORRANCE:

    Q    Yes.

    A    It had an authorization attached from Ms. Tesche.
I do see that.

    Q    And on the second page of that document with a
Bates number 179, specifically numbered paragraph five,
does Mr. Courtney ask Ms. Collins to provide, quote, the
complete job descriptions for the jobs of telemarketer,
customer service representative, motel night auditor, and
automobile rental agent, which you referenced in your July
26, 1999 letter, including all duties involved in such
jobs, end quote.  Is that an accurate quote of that
request?

    A    Yes, it is.

    Q    And to your knowledge, did Ms. Clark respond to
that request?

    A    She responded on October 12, 1999.

    Q    And what was her response?

    A    All right.  Hold on.  Wait one second.  I'm
looking at copies of letters.  Just one minute.  Actually,
there was a response from Ms. Collins On October 7th.  But
Mr. Courtney reminded them that he still needed to see the
complete job descriptions.  And then October 25, 1999, Ms.
Collins replied to that specific request.

1      Q    And when you say Mr. Courtney reminded her that

2  she hadn't provided the descriptions, I believe you were

3  referring to an October 12, 1999 letter with a Bates

4  number of 173 directed to Ms. Collins; is that correct?

5      A    Correct.

6      Q    And actually, it's authored by another lawyer in

7  Mr. Courtney's firm by the name of Clark DeVere, that's

8  D-E-V-E-R-E; is that correct?

9      A    Correct.

10     Q    And then the letter that you also referred to was

11 an October 25, 1999 letter to Mr. DeVere from Ms. Collins;

12 is that right?

13     A    Correct.

14     Q    With a Bates number of 172.  And in response to

15 Mr. DeVere's request, Ms. Collins notes, quote, the job

16 descriptions for the occupations noted are available in

17 the dictionary of occupational titles available at your

18 local library, period, end quote.  Is that correct?

19     A    Correct.

20     Q    Does CNA customarily assist the claimant and her

21 attorney in providing information about job descriptions?

22          MR. BURNS:  Object to the form of the question

23 and the use of the word customarily, it's not defined.

24 But you can answer the question if you understand it.

25

1       A     I'm sorry.  Could you repeat the question?  I

2   missed the first couple words.

3   BY MR. DORRANCE:

4       Q     Sure.  In reviewing applications for long term

5   disability benefits, does CNA customarily assist the

6   claimant and her attorney in providing job descriptions?

7            MR. BURNS:  I note the same objection.  But you

8   can answer it, Ms. Sauerhoff.

9       A     Well, normally, I can tell you this response is

10  not what we would normally say.  If somebody asked for

11  information from the claim file, we would provide that

12  information.  So if you would ask for job descriptions, we

13  would have provided that information.

14  BY MR. DORRANCE:

15      Q     So CNA did not follow its customary procedures in

16  sending this letter?

17           MR. BURNS:  I'm going to object to that question

18  on the basis that it calls for a legal conclusion and

19  misrepresents her statement.  But you can answer it, if

20  you understand it, Ms. Sauerhoff.

21      A     What I'm saying is, if you had asked for the job

22  duties or the specifics of the occupations that were

23  listed in the denial or termination letter, we normally

24  would not tell you go look at the DOT in your legal

25

1     library.  We would either provide you those pages, or the

2     vocational consultant would provide the information relied

3     upon in the vocational assessment for your review.

4     BY MR. DORRANCE:

5         Q    Do you know whether or not CNA provided Ms.

6     Tesche and her lawyer with the information provided by the

7     vocational case manager?

8         A    Just a second.  Let me take a look at the file

9     activity sheet.  Based on Ms. Collins' entry on the file

10    activity sheet dated October 25, 1999, she had said letter

11    received from attorney on October 12, requesting copies of

12    job description for -- it says R-E-V, review or referred

13    jobs, I'm not quite sure what that means -- but voc.

14    review jobs.  Advised by fax letter to obtain local

15    library.  So it looked like Ms. Collins -- I don't see

16    where she consulted anybody.  I just see her name and that

17    entry indicated, that the decision was not to provide that

18    information, to refer the attorney to the local library

19    for that information.

20        Q    Is there any indication of whether Ms. Tesche or

21    her attorney were provided with the findings of the

22    vocational case manager?

23        A    I did see an entry of October 7, 1999, where Ms.

24    Collins is indicating she received the attorney letter,

25

82

1    Clark DeVere, on September 20, requesting information to

2    prepare for appeal, sent copy of policy, copy of medical,

3    initial claim forms, correspondence, and vocational

4    assessment, along with own occupation termination letter.

5    So the own occupation assessment or any occupation

6    assessment was sent.

7        Q    And which document would that have been?

8        A    That would have been Mr. Gullidge's typed any

9    occupation assessment of June 9, 1999.

10       Q    Do you have any indication whether or not Ms.

11   Tesche or her lawyer were provided with any findings by

12   the nurse case manager?

13       A    Again, I can only indicate what Ms. Collins

14   indicated on October 7, 1999, that was provided.  She

15   doesn't say specifically nurse case manager notes, but I

16   don't know if that means she did or did not send them.

17       Q    Actually, since we have been referring to this

18   file activity sheet, I think we should make it part of the

19   record.  You are referring to, I guess, a continuation of

20   the file activity sheet that we previously made an

21   exhibit; is that correct?

22       A    Correct.

23       MR. DORRANCE:  And this would be Bates numbered

24   129, Mike, I believe.

25

83

 1           MR. BURNS:  Yes, got it.  Thanks.
 2    BY MR. DORRANCE:
 3       Q    Got it.  And it's a one-page document, to my
 4    knowledge; is that correct?
 5       A    Correct.
 6       Q    And on the far left side the initial date
 7    recorded is 10/7/99; is that correct?
 8       A    Correct.
 9       Q    And the last date referenced is 2/21/00; is that
10    correct?
11       A    Correct.
12           (File activity sheet marked as Sauerhoff Exhibit
13    Number 4.)
14    BY MR. DORRANCE:
15       Q    I guess the last two entries on that -- we'll
16    make this Exhibit 4, I believe.  And you identified this
17    as the continuation of the file activity sheet?
18       A    Correct.
19       Q    And you made two entries on this document we've
20    marked Exhibit 4; is that correct?
21       A    Yes.
22       Q    And the first one you might have already
23    testified to, does that abbreviation stand for
24    acknowledgement received appeal?
25

1      A    Actually, it's appeal committee -- the AC stands

2    for appeal committee received appeal.  And then I signed

3    my name to that.

4      Q    And that's dated 1/3/2000?

5      A    Correct.

6      Q    Now, Ms. Tesche's attorneys had sent previous

7    correspondence to CNA; is that correct?

8      A    Correct.  There was previous correspondence with

9    Ms. Collins.

10      Q    Is there any significance to that January 3, 2000

11    date as to you receiving a specific document?

12           MR. BURNS:  I'm going to object to the form of

13    the question.  It's a little unclear.

14      A    I'm sorry.  Which one are we talking about?

15    BY MR. DORRANCE:

16      Q    I think I answered my own question.  We are

17    talking about -- I'm trying to find out a little bit more

18    about your entry on January 3, 2000, and what documents,

19    if any, you received on that date.  If you are able to

20    tell, do you know what documents you received on that

21    date?

22      A    Okay.  I think on January 3, 2000, I would have

23    received the entire file.  In other words, the appeal has

24    now been perfected and has come before the appeals

25

1    committee.  I think the entries going up to December 3,

2    1999, Ms. Collins indicates that she did receive an appeal

3    request from the attorney.

4          She called to confirm, but then the attorney

5    indicated that he wished for her to wait for an additional

6    medical information.  And I think that's from Dr. Wolf.

7    And that's what the significance was of January 3, 2000,

8    is they have now received Dr. Wolf's letter, and it's okay

9    to proceed with the appeal.

10    Q   In terms of the claimant timely perfecting the

11    appeal, does that start with your receipt of the December

12    3, 2000 letter in this case?

13          MR. BURNS:  I'll object to the form of the

14    question to the extent it calls for a legal conclusion.

15    But you can answer it, Ms. Sauerhoff.

16    A   Well, actually, the appeal would have been

17    perfected as of the date that Dr. Wolf's letter was

18    received by CNA.  And that looks to be January 3, 2000.

19          MR. DORRANCE:  I'm looking for an earlier letter

20    from either Mr. Courtney or Mr. DeVere where he confirms

21    that he wants you to treat this as an appeal of the

22    initial determination.  I believe it was in November of

23    '99.

24          MR. BURNS:  157, Bates no. 157?

25

86

1              MR. DORRANCE:  157?

2              MR. BURNS:  Is that the one you are talking

3       about?

4       BY MR. DORRANCE:

5           Q    I'm shifting back and forth between the amended

6       complaint exhibits and the Bates numbered documents.  Yes,

7       it purports to be a December 3, 1999 letter, purporting to

8       be sent via facsimile and regular mail from Mr. Courtney

9       to Laura Collins.  Do you have that document?

10          A    Was that November 3, 1999?

11          Q    December 3, 1999?

12          A    Just a second.  Yes.  I do have a letter from

13      Mr. Courtney to Ms. Collins dated December 3, 1999.

14          Q    And is this considered an appeal of the initial

15      decision?

16          A    Well, what this is indicating -- and I think Ms.

17      Collins clarifies in a telephone conversation with

18      Mr. Courtney of that same date -- that Mr. Courtney is

19      exercising appeal rights, but he is still waiting for

20      additional medical information from Dr. Wolf.  And as soon

21      as he receives it, he'll forward it on to our attention.

22      And what Ms. Collins did is she did call Mr. Courtney on

23      December 3, 1999.

24              She says she called the attorney.  He indicates

25

87

1    he will be forwarding medical information from claimant's

2    physician, and as soon as it's received, he hopes to have

3    it by next week, will hold appeal until received.  So at

4    that point, we take that as perfecting the appeal.

5        Q    Do you consider updated medical records in making

6    your decision as a member of the appeals committee?

7        A    Well, we consider any information that the

8    claimant and/or their representative wish to submit.  In

9    other words, somebody can exercise their appeal rights;

10   but if they say, well, hold it, I've got something else

11   I'm having done next week and I want that made part of the

12   review, then at that point we will either extend that

13   extension or waive it so we won't conduct our appeal until

14   it's perfected.  And that would be the date of receipt of

15   additional information.

16       Q    So the answer is you consider any evidence

17   provided by the claimant, including any updated medical

18   records?

19       A    While it's pending appeal, correct.

20       Q    And in your capacity as a member of the appeals

21   committee, or I should say, when you are serving as the

22   sole decider as the appeals committee, do you ever contact

23   the claimant or the claimant's attorney and ask for

24   additional information or clarification?

25

88

1          MR. BURNS:  I just object to the form to the

2     extent it's not relevant.  You can answer it if you want,

3     Ms. Sauerhoff.

4          A     Yes.  In reviewing the file, if we feel there is

5     a pertinent piece of information or need for

6     clarification, yes, we have that authority, or we have the

7     ability to speak to anybody regarding that or call the

8     doctor or the claimant for that information if we feel

9     that is necessary.

10    BY MR. DORRANCE:

11         Q     And it's my understanding that you didn't do that

12    in this particular case?

13         A     Right.  I felt that the information presented in

14    its totality supported the company's position that Ms.

15    Tesche had the ability and capability of performing the

16    occupations as identified.

17         Q     I turn your attention back to Exhibit 1 which was

18    your decision, last paragraph on page one.

19         A     Just one second.  Okay.

20         Q     The second sentence begins, quote, based on the

21    claimant's -- actually I'll read it.  Quote, based on the

22    claimant's age, experience, geographic location, salary,

23    education and the medical restrictions given by the

24    treating physician, it was determined that the claimant

25

89

1    was not totally disabled from any occupation, period, end

2    of quote.

3           Those factors that I just quoted -- actually,

4    I'll rephrase the question.  Based on your experience as a

5    CNA representative, as well as your experience working for

6    the Social Security Administration, are the factors that I

7    just identified the factors used by the Social Security

8    Administration in deciding whether to award Social

9    Security disability benefits?

10        A    Well, again, we are going back.  I haven't been

11   with Social Security in 10 years, but they do look at

12   economic parity.  They look at age and education,

13   experience.  I think those are pretty much the same

14   factors.

15        Q    I turn your attention to the second page of your

16   letter, and you refer to the job classification or the

17   physical classification of, quote, sedentary, end of

18   quote.  Do you see that reference?

19        A    Yes.

20        Q    How do you define that phrase, if you know?

21        A    Sedentary?

22        Q    Yes.

23        A    Sedentary would be the ability to lift up to 10

24   pounds on a continuous basis, ability to sit for up to

25

1    six, seven hours a day.  It usually refers to occupations

2    that don't require a lot of physical or manual exertion.

3    In other words, a lot of your clerical-type occupations

4    are sedentary.

5        Q    If you know, is that definition used by the

6    Social Security Administration?

7        A    Well, sedentary is in the dictionary of

8    occupational titles, that physical category.  And I

9    believe that is used within the Social Security

10   administration.

11       Q    Does CNA use the dictionary of occupational

12   titles in reviewing disability claims?

13       A    I believe that's -- I'm not sure what the

14   vocational consultants utilize, but I know they do have a

15   dictionary of occupational titles.

16       Q    The next paragraph talks about Dr. Rubenstein's

17   records.  Now, this particular case, you are referring in

18   that paragraph to Dr. Rubenstein's records and you are

19   stating that those records do not support a less than

20   sedentary status, whether in 1999 or previous to this

21   time, is that correct, in the first sentence?

22       A    Correct.

23       Q    Is there a customary period of time in obtaining

24   medical records -- actually, let me rephrase that.  If the

25

91

1     last medical records that you have are, say, six months or

2     more old when you are reviewing a file, is it customary

3     for you to obtain updated records and updated statements

4     from the physician to make your decision?

5             MR. BURNS:  Objection just to the

6     characterization and the use of the word customary.  But

7     if you understand the question, you can answer it.

8        A     I believe that's what the nurse case managers

9     were doing in March of 1999 and May of 1999 to find out

10    the permanent restrictions and medical stability and so

11    forth so they can prepare to determine if the claimant is

12    disabled from any occupation.  And, of course, if there is

13    any changes to that, then it would be the claimant's

14    obligation -- or the doctor's obligation -- to identify

15    information contrary to what those restrictions and

16    limitations are.

17    BY MR. DORRANCE:

18       Q     Now, you referred to the nurse case managers

19    reviewing records, most recently in April of 1999, I

20    believe you said; is that right?

21       A     Well, in May of 1999, latter part of May,

22    everything leading up to the vocational any occupation

23    assessment which was performed very early part of June,

24    1999.

25

92

1      Q    And you made your decision on or about February

2  21, 2000?

3      A    Well, the appeals decision was on that date.

4      Q    And when did you make your decision?

5      A    I'm with the appeals committee.  My decision was

6  February 21, 2000.

7      Q    And your entry on Exhibit 4 indicates, quote,

8  appeal upheld and letter drafted, end quote.

9      A    Correct.

10     Q    Other than your February 21, 2000 letter, is

11 there any document which details the results of your

12 investigation and your findings?

13          MR. BURNS:  I object to it, compound.  But you

14 can answer it, if you understand it.

15     A    My letter of February 21, 2000, would be the

16 results of my review of the entire claim file, along with

17 the policy.

18 BY MR. DORRANCE:

19     Q    And I apologize if I've already asked you this

20 question.  You didn't discuss this case with any CNA

21 employee in rendering your decision?

22     A    No, I did not.

23     Q    You stated that it's the claimant's obligation to

24 provide any updated medical records.

25

1      A    Well, any information --

2           MR. BURNS:  I object to the question as asked and

3      answered, but also object to the form of the question as

4      mischaracterization.  But you can answer it.

5           MR. DORRANCE:  Okay, let me rephrase it.

6           MR. BURNS:  I thought we went through this

7      already.

8           MR. DORRANCE:  Did we?  I --

9           MR. BURNS:  Your first question was it the burden

10     of the Plaintiff to prove a disability.  And we talked

11     about it.

12          MR. DORRANCE:  I withdraw the question.  Bear

13     with me here, just a few more questions.

14     BY MR. DORRANCE:

15     Q    Ms. Sauerhoff, have you had other cases where you

16     consulted with fellow members of the appeals committee in

17     making a decision?

18     A    Yes, I have.

19     Q    Have you had other cases where you've asked the

20     claimant or her attorney to provide clarification on

21     medical -- on the issue of disability?

22     A    Yes, I have.

23     Q    Is that your customary practice?

24          MR. BURNS:  I'm going to object to that

25

1   conclusion predicated on the fact that characterization

2   may be mischaracterization.  But you can answer, Ms.

3   Sauerhoff.

4       A    Each case is based upon the merits of the case

5   and the evidence produced and the policy applicable to

6   that case.  So, if there is a case being reviewed where it

7   may not be as clear or there's further information that

8   might help further clarify, then obviously, you know, that

9   would -- we have the opportunity to request further

10  information or to clarify.  But in Ms. Tesche's case, I

11  felt the evidence was very clear.  The information

12  presented spoke for itself, and I concurred with the any

13  occupation assessment.

14  BY MR. DORRANCE:

15      Q    Same page of your letter talks about Dr. Wolf not

16  providing sufficient detail, the reasons why he felt Ms.

17  Tesche was totally disabled from all employment.

18      A    I think what Dr. Wolf indicated is that he did

19  not feel Ms. Tesche was employable in those occupations.

20  But I didn't see any evidence to refute that she wasn't

21  able to perform those occupations.

22      Q    And I may have asked you this, I apologize.  You

23  didn't ask for any additional detail on that question from

24  Dr. Wolf?

25

1    MR. BURNS:  Objection, asked and answered.  But

2  you can answer it, Ms. Sauerhoff.

3    A    We didn't ask the doctor is she disabled any

4  occupation.  We asked for medical evidence, restrictions,

5  and her limitations.  And then the any occupation

6  assessment was performed by our vocational consultant.

7  BY MR. DORRANCE:

8    Q    Does the appeals committee ever convene as a

9  whole in making final decisions?

10    A    We do on occasion.  Again, depending on the case

11  presented, the evidence, and policy provisions to that

12  specific case.

13    Q    If you are able to estimate, what percentage of

14  cases are decided by one member of the appeals committee?

15    MR. BURNS:  I'm going to object to the extent

16  that she doesn't have personal knowledge of that fact.

17  But if you do have personal knowledge, you can respond to

18  that question.

19    A    I know a majority of our cases are reviewed

20  independently.  We have -- I couldn't tell you how many

21  meetings, but not a lot of meetings on every case.

22  BY MR. DORRANCE:

23    Q    Let's just say -- and again, this is an estimate,

24  only if you are able to provide one.  Assume a given 100

25

96

1    cases on appeal to the appeals committee.  What percentage

2    of those 100 cases would be decided by one individual?

3            MR. BURNS:  I'm going to object to that.  I think

4    that that calls for complete speculation, and I don't

5    think it is appropriate for her to comment.  Of course, if

6    you have personal knowledge of the actual figures as

7    opposed to estimates, I wouldn't mind.  You can testify to

8    that, Ms. Sauerhoff.

9        A    No.  I don't have any personal knowledge to

10   actual figures.

11   BY MR. DORRANCE:

12       Q    Would you be able to estimate how many cases you

13   handled as a member of the appeals committee?

14       A    Well, in my career with the appeals committee,

15   I'm sure it's been hundreds or so.

16       Q    And of that percentage -- of that number, that

17   estimate, what percentage have been decided by you alone?

18       A    I would just say a vast majority of the cases are

19   decided independently.

20       Q    When you say independently, you mean by one

21   person?

22       A    Correct.

23            (Brief pause.)

24   BY MR. DORRANCE:

25

97

1    Q    I appreciate your patience.  I'm looking at a

2    document from Laura Collins dated July 26, 1999, directed

3    to Joan Tesche.  The Bates number on that is 182.

4    A    Is that the letter advising Ms. Tesche of her

5    maximum 24 months for disabilities from her own

6    occupation?

7    Q    Yes.

8    A    Okay.

9    Q    Do you have that in front of you?

10   A    Yes, I do.

11   Q    Is this the final decision on whether Ms. Tesche

12   can receive continuing own occ. benefits?

13   A    No.  This is notification.  Because Ms. Collins

14   said at the end of that:  We will continue to monitor your

15   medical condition and treatment through the

16   duration of your claim for any change in your condition.

17   This isn't the letter advising her that no further

18   benefits are payable.  I think that came in October.

19   Q    Was that the October 7th letter from Laura

20   Collins?

21   A    Correct.

22   MR. DORRANCE:  I have no further questions.

23   Thank you for your patience.

24   MR. BURNS:  I have one follow-up question.  But

25

98

1    I've got to lay a few foundation questions before I get

2    there.  So it's going to take about a minute.

3

4                    CROSS EXAMINATION

5

6    BY MR. BURNS:

7        Q    Are you ready?  I hope you don't have to go back

8    to your documents, Ms. Sauerhoff.  But the determination

9    that you made which was recorded in a correspondence dated

10   February 21, 2000, there was a suggestion back there that

11   this document was not received by Mr. Courtney and then

12   there were questions about whether or not you mailed that

13   document.

14            Now referring to the file activity sheet and, in

15   particular, your entry of February 21, 2000, wherein it

16   states appeal upheld and letter drafted.  Ms. Sauerhoff,

17   based upon that entry and the file activity sheet on

18   February 21, 2000, did you have a standard practice that

19   would indicate that the letter was also mailed on that

20   same date?

21       A    Yes.  When I indicate that upheld and letter

22   drafted, I personally type my own letters and then sign

23   them and mail them out that same day.

24       Q    So that it would be your usual practice to note

25

1    in the claim file or the administrative record when you

2    actually sent, signed, and mailed the letter?

3            MR. DORRANCE:  Objection to the use of the word

4    usual.  You may answer.

5        A    Yes.

6    BY MR. BURNS:

7        Q    And based upon that entry, is it your testimony

8    here today that your letter dated February 21, 2000, which

9    was a determination of an appeal made by Ms. Tesche, was

10   mailed on November 21, 2000, to Mr. Courtney, her lawyer?

11       A    It was mailed on February 21, 2000.

12           MR. BURNS:  Thank you.  No further questions.

13           MR. DORRANCE:  One follow-up.

14

15                    REDIRECT EXAMINATION

16

17   BY MR. DORRANCE:

18       Q    Do you generally record all significant findings

19   in the record?

20       A    I'm sorry.  I don't --

21       Q    Do you generally record significant findings in

22   the progress record that you maintain?

23       A    You mean on the file activity sheet?

24       Q    I'm sorry.  File activity sheet.

25

1    A    Yes.  That would be like the directions, the file

2  plan, any actions that were taken on the claim.  If

3  further information was requested, we would record those

4  actions on the file activity sheet.  The nurse case

5  manager does the same on the nurse case manager database.

6    Q    So important actions are recorded in the file

7  activity sheet?

8    MR. BURNS:  Object to the form of the question

9  based upon her prior testimony.  It mischaracterizes it.

10  But you can answer it.

11    A    Actions that are taken -- I mean, it may not

12  record every time somebody calls on the status of a claim,

13  or something like that.  But if there was pertinent

14  information or we call the doctor's office to verify this

15  or call the claimant for an interview, that would be

16  documented.

17  BY MR. DORRANCE:

18    Q    Or if you'd ask Dr. Wolf for a clarification

19  concerning his opinion, would that be documented?

20    MR. BURNS:  Objection.  You are now getting way

21  beyond the scope of redirect.

22    MR. DORRANCE:  Well, I think it all goes to

23  reliability of recordkeeping.

24    MR. BURNS:  I don't think it does.

25

1    MR. DORRANCE:  Well, you are trying to establish

2   presumptions; so am I.

3        MR. BURNS:  Well, I think there's a legal

4   presumption that I'm entitled to take in terms of the

5   record.  And all I was establishing was a foundation for

6   the legal presumption that if it was mailed and delivered

7   on that date.  I wasn't getting into the question about

8   the credibility of the record.

9        MR. DORRANCE:  Well, I think it necessarily

10   implicates it.

11        MR. BURNS:  I'll object to the form of the

12   question.  I'll object on the basis that it is beyond the

13   scope of my redirect examination or my examination.  And

14   you can answer it, Ms. Sauerhoff.  Do you remember what it

15   was?

16    A    Yes, I think I do.  If I had contacted or if

17   anybody had contacted Dr. Wolf for clarification or

18   further information regarding is Ms. Tesche disabled from

19   any occupation, there would have been an entry or

20   documentation of that conversation or response or attempt.

21   BY MR. DORRANCE:

22    Q    And I take it that if anyone, including yourself,

23   had contacted Ms. Tesche's lawyer and asked for additional

24   information, that would have been recorded as part of the

25

102

1    your customary protocol?

2         MR. BURNS:  Same objection, and also to the form

3    of the question in terms of customary protocol.  But you

4    can answer it.

5         A    Yes, it would have been documented.

6    BY MR. DORRANCE:

7         Q    Your entry on the 21st of December -- I'm sorry.

8    Your entry on February 21, 2000, states letter drafted; is

9    that correct?

10        A    Yes, it does.

11        Q    It does not say letter mailed; is that correct?

12        A    No.  But when I draft a letter, I'm typing it and

13   I'm mailing it.

14        Q    So the answer is no?

15        MR. BURNS:  Objection.  Her answer was as it

16   speaks.

17   BY MR. DORRANCE:

18        Q    Does your entry indicate whether or not you

19   mailed the document?

20        A    The entry doesn't indicate that I mailed the

21   document.  But I know that when I say I drafted the

22   letter, me, personally, typed the letter and I sent it out

23   to be mailed.

24        Q    Do you ever write drafted and mailed?

25

1          MR. BURNS:  I'm just going to call for

2     speculation, and it's not relevant.  But you can answer it

3     if you understand it.

4          A     I know personally, when I write, I just put

5     letter drafted.  And drafted to mean to me -- when I say I

6     drafted something, I typed it and I mailed it that date or

7     else my date wouldn't reflect that I completed the review

8     at that time.

9     BY MR. DORRANCE:

10         Q     Is it fair to say that someone reviewing this

11    entry that you've made could come to the conclusion that

12    all you'd done was drafted a letter?

13         MR. BURNS:  Objection.  That calls for

14    speculation based upon her prior testimony.  And I think

15    it mischaracterizes her testimony, or attempts to

16    mischaracterize her testimony.  But if you understand it,

17    you can answer it, Ms. Sauerhoff.

18         A     When I say appeal upheld and letter drafted, I

19    mean that, on that date, my letter is done, that

20    decision's reached, and I completed that file.  And so my

21    letter's gone out that day, even though I don't indicate

22    it was mailed.

23    BY MR. DORRANCE:

24         Q     To your knowledge, is that the way all members of

25

1    the appeals committee record their entries as to whether a

2    decision has been mailed?

3         MR. BURNS:  I'm going to object to relevance.

4    But you can answer it.

5         A    Well, how we record that our decision's been

6    completed is we enter that on -- we have a docket, an

7    appeal tracking system that we record.  And on that date,

8    when it says appeal completed, that means that letter's

9    done, that file -- the review is completed, that letter is

10   out of the building.  I mean we put it in the mail slot to

11   be picked up.

12   BY MR. DORRANCE:

13        Q    I'm not referring to when it says appeal

14   completed.  I'm referring to the phrase "letter drafted."

15   Is that a common term used to confirm that a letter has

16   been mailed out?

17        A    No.  And I believe I'm probably the only one

18   appeal committee member that even used that terminology.

19   It was just specific to me, to what I was doing.  And I

20   was typing a letter and I was mailing it, even though I

21   don't indicate mailed.

22        MR. DORRANCE:  Thank you very much.

23        (The deposition was concluded at 3:30 p.m.)

24

25

105

STATE OF PENNSYLVANIA    :  SS.

COUNTY OF DAUPHIN    :

       I, Virginia Loria, a Reporter Notary-Public, authorized to administer oaths within and for the Commonwealth of Pennsylvania and take depositions in the trial of causes, do hereby certify that the foregoing is the testimony of CHERYL SAUERHOFF.

       I further certify that before the taking of said deposition, the witness was duly sworn; that the questions and answers were taken down stenographically by the said reporter Virginia Loria, a Reporter Notary-Public, approved and agreed to, and afterwards reduced to typewriting under the direction of the said Reporter.

       I further certify that the proceedings and evidence contained fully and accurately in the notes taken by me on the within deposition, and that this copy is a correct transcript of the same.

       In testimony whereof, I have hereunto subscribed my hand this 13th day of December, 2001.

*Virginia Loria*
Virginia Loria, RPR

My commission expires:

May 8, 2002

# CNA GROUP BENEFITS

Group Disability-Claim Administration
PO Box 946710 Maitland FL 32794-6710

**Cheryl Sauerhoff**
Claims Consultant
Telephone 1-800-303-9744 x 6343

February 21, 2000

Steven Courtney
Metzger, Wickersham, Knauss & Erb, PC
3211 North Front St.
PO Box 5300
Harrisburg, PA 17110-0300

Claimant: Joan Tesche

Claim No: 94-34900P1702
Policy No: 0083089679

Dear Mr. Courtney:

The Long-Term Disability clam of the above-mentioned claimant has been referred to Appeals pursuant to the receipt of your letter. A comprehensive review of the file has been completed and the results of the review do not alter the Company's original decision to terminate benefits.

*The Long Term Disability Policy indicates that during the 180-day elimination period and the 24-month Employee Occupation period, the Insured Employee, because of Injury or Sickness is:*

- *Continuously unable to perform the substantial and material duties of the regular occupation;*
- *Under the regular care of a licensed physician other than the Insured Employee; and*
- *Not gainfully employed in any occupation for which you are or become qualified by education, training or experience.*

*After the Monthly Benefit has been payable for the Insured Employee Occupation period of 24 months, "Total Disability" means that, because of Injury or Sickness, the Insured Employee is:*
- *Continuously unable to engage in any occupation for which he is or becomes qualified by education, training or experience: and*
- *Under the regular care of a licensed physician other than himself.*

The date of loss was 5/3/97. The attending physician statement was completed by Dr. Rubenstein dated 9/19/97 for a diagnosis of "chronic back pain". Ms. Tesche's occupation is noted as systems procedure analyst. The noted restrictions are cannot perform heavy lifting, climbing, bending and tolerates prolonged sitting poorly.

The claimant was found to be disabled from her occupation and paid benefits for the 24 month own occupation period commencing after the 180-day elimination period. Based on the claimant's age, experience, geographic location, salary, education and the medical restrictions given by the treating physician, it was determined that the claimant was not totally disabled from any occupation. Those occupations were detailed in the 10/7/99 letter and will not be revisited at this time.

EXHIBIT

*Sauerhoff 1*
*12-3-01    V1*

Policy No: 0083089679                          -2-

All information has been reviewed and indicated that the claimant is not less than sedentary in the physical demand level for occupational work. The medical documentation does not reflect this level of severity.

The information submitted by Dr. Rubenstein does not support a less than sedentary status, whether in 1999 or previous to this time. Dr. Rubenstein's records, in particular, dated 1997 and 4/17/98 state that the claimant is actively searching for work within her physical limitations. His rendition of the claimant's physical capacity to perform shows standing up to one hour, sitting for one half hour, lifting and carrying 10-20 pounds, and walking for 3 hours per day. He claims that these limitations are "the patient's self-prescribed limitations". In 8/1997, the claimant was considered able to perform at a modified light medium physical capacity level by a physical therapist and Dr. Hartman.

Dr. Wolf was requested to give permanent restrictions for the claimant and on 5/11/99 he states that the claimant can sit and stand for one half hour at a time, lift 5 to 10 pounds, walk for 15 minutes and no bending, crawling, squatting. The claimant states that she could not perform her own occupation due to the prolonged sitting and after discussing this with the claimant, the vocational experts detailed occupations that would give the claimant the versatility to move about freely as she needs and are within the permanent restrictions outlined by Dr. Wolf. Dr. Wolf states that she could not return to her own occupation. The letter dated 12/22/99 from Dr. Wolf states that he feels that the occupations described would not be options for the claimant but does not state why. There is no detail of any functional impairment or any information relating to the claimant's inabilities to perform her activities of daily living.

While we appreciate Dr. Wolf's opinion, the any occupation determination is a vocational determination based on the claimant's permanent medical restrictions, geographic location, economic parity, age, experience, and education.

Therefore, based on the information contained within your claim file, we find that the decision to terminate benefits was correct and proper. You have exhausted your administrative remedies at this time and this decision is final and binding.

Sincerely,


Cheryl Sauerhoff
Appeals Committee Member

**File Activity Sheet**

| Claim Number: 94-34900 | | Claimant: Joan D. Tesche |
|---|---|---|

DOH: 5/2/88    DX: Chr. B Pain    SDI? (Y) N  AMT: 469.13

EFF DT COV: 1/1/95    NORM:    ER %: 100    ELIM. PERIOD: 180

ELIG. PERIOD:    OCC: S+P Paralyd assist    ER CONTACT: Jodi / Melissa

LOW: 5/2/97    CLASS: 1    ER PH. NO: (717) 592-4206

DOL: 5/2/97    SALARY: ?    CLMT'S PH. NO: (717) 469-1161

AGE AT DOL: 42    W/C? Y (N) AMT:    DON: 10/9/97

PRE-X STD: Y (N)    PRE-X LTD: Y (N)    CNA STD: Y (N)    CNA LTD: (Y) N

| DATE | ACTIVITY |
|---|---|
| 10/4/97 | NCM + CIS Conf. CIS to contact ER conc. job req. and salary as dt given for salary is 5/8/97, dol 5/8/97. L. Collins |
| 10/7/97 | L/m for ER as above. L. Collins |
| 10/28/97 | Recd sal fr. ER $2229.50 eff 5/8/95. |
| 1/5/98 | NCM + DS Conf. s/w clmt. NCM to contact ER for current status. DS sw Greg Lutz, Sup. concerning accomodations. See attached yo interview g w/ clmt. L. Collins |
| | NCM to follow for ERTW. |
| 1/14/98 | Issued benefits through current. Will send ltr, cc er. L. Collins |
| | Advised sup of status + possible accomodations once restrictions known. L. Collins |
| 7/27/98 | Faxed questions to Dr. Rubenstein w/ JAS. flu same 2 weeks L. Collins |
| 2/9/99 | Recd updt from NCM. Unable to obtain DS form or contact clmt. Snap out sent requesting they call back. Diary two weeks. L. Collins |
| 2/16/99 | S/w clmt. States she did not have medical coverage for the period of 9/98 through 12/98. States she did see another Dr. at the same office as |

Cont'd.



EXHIBIT

CCC000131

**CNA**
For All the Commitment You Make®

**File Activity Sheet**

| CLAIM NUMBER | Recorded Statement? | CLAIMANT | INSURED |
|---|---|---|---|
| G434900 | ☐YES ☐NO | Joan D. Tesche | AMP |

| DATE | ACTIVITY |
|---|---|
| 2/16/99 Cont'd | Dr. Rubenstein on 1/5/99. Advised her We will again f/u on form and explained we need info to assess current status. L. Collins |
| note | She also advised her current tx is to see a psychologist and to have trigger point injections. |
| 2/18/99 | Recd updt fr. NCM. Dr. in that office only on certain days. NCM to f/u 2/24. L Collins |
| 3/11/99 | Conf. w/ NCM. Need current restrictions. Will contact clmt and advise that Dr. Wolf. Will need to see her before commenting on rest. As of today she does not have an appt per Dr. Wolf's ofc. L Collins/G. Sim? |
| 3/11/99 | S/w clmt. She will set up appt. J. Collins |
| 5/18/99 | S/w clmt. States she had a Dr. appt on 5/13 and he completed our request and dictated a letter to us at that time. NCM to f/u 5/19/99. L. Collins |
| 6/2/99 | Recd permanent restrictions from clp. Conf. w/ NCM. Will send fil for Voc assess. L. Collins/ TY U NY L |
| 6-9-99 | Voc Review. Own occ only claim. RBS pd f/o through own occ period and close file. If work to occur. |
| 7/26/99 | Clsn occ letter sent. L. Collins |
| 8/24/99 | Reviewed for settlement - not appropriate since the remaining own occ period is not more than 6 months. Rland |

G-39496-C

OWN OCC ONLY 10/20/99 remaining

FEB 11 '99 10:40AM OR  ?O S/R    P.1

**CNA**
For All the Commitments You Make™

DR. Rubenstein
Attention: Stacey
Phone: (717)652-3740
Fax: (717)652-0832

RE: Joan Foche'
Date of birth: 2/1/55
Authorization attached

*Necessary information is needed to continue processing your patient's claim for disability benefits.* **PLEASE HELP.**

**PLEASE SEE THE INCLUDED JOB ACTIVITY SHEET.**

## What are the current limitations that prevent return to the patient's own job?

Standing  1/2-1 (consecutively) hr/day
Walking  3 hr/day
Sitting  1/2 (consecutively)  x hr/day

Lifting  10-20 pounds
Carrying  10-20 pounds
Pulling  _ pounds

Pushing  1 pounds
Other:  _

Is ms. Foche' @ m m I?  Not known
Are the limits temporary or permanent?

****OBJECTIVE findings MUST BE PROVIDED to support any limitations given.

The above are The patient's self percived limitations. If corporation
is regured, suggest independent medical examination by physician, an orthopedic surgeon.

*Thank you for your information. CNA is the disability insurance carrier and we provide monthly disability benefits to your patient if the objective medical findings support the disability. Your response is valuable to this patient.*

**Pam Groves, RN, NCM**  phone : 800-303-9744x4055 Fax: 407-858-5399

EXHIBIT
Rubencheff 3



**File Activity Sheet**

| CLAIM NUMBER G434900 | Recorded Statement? ☐ YES ☐ NO | CLAIMANT Jean D. Tesche | INSURED |
|---|---|---|---|

| DATE | ACTIVITY | |
|---|---|---|
| 10/7/99 | Recd atty Letter (Clark DeVere) on 9/20 requesting information to prepare for appeal. Sent copy of policy, copy of medical, initial claim forms, correspondence and voc. accessment, along with own occ termination letter. L. Collins — Separate letter to ER. L. Collins — | AMP |
| 10/25/99 | Letter recd fr. atty on 10/18 requesting copies of job descr. for voc. rev. jobs. Advised by faxed ltr to obtain fr. local library. ER letter sent advising of termination. L. Collins | |
| 11/3/99 | Letter recd fr. atty. wants copies of procedures (outlined in 10/7 letter). Sent copy of letter. L. Collins — | |
| 11/12/99 | Another ltr fr. atty recd. Requesting info responded to on 11/3. Faxed Ltr. L. Collins — . | |
| 12/3/99 | Recd. appeal req. fr. atty - req. call to confirm. Called atty. See note. Wishes us to await med. L. Collins | |
| 1/3/2000 | Received medical info (letter fr. Dr. Wolf) for appeal | |
| 1-3-2000 | VCM & DBS reviewed new medical. No change in decision. FEO / L. Collins — | |
| 1/3/2000 | AC recd appeal. Cheryl Sauerhoff | |
| 2/21/00 | Appeal upheld & ltr drafted. Cheryl Sauerhoff | |

G-39496-G

**EXHIBIT**
Sauerhoff 4