IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOAN D. TESCHÉ,                        :
                                       :   Civil Action No. 1:CV-01-0326
                Plaintiff              :
     v.                                :
                                       :
CNA INSURANCE COMPANIES, and           :
CONTINENTAL CASUALTY COMPANY,          :
                                       :
                Defendants             :   (Judge Caldwell)

**BRADFORD DORRANCE'S SUPPLEMENTAL AFFIDAVIT IN
SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I, the undersigned, hereby swear and affirm as follows:

1.    This supplements my affidavit filed January 3, 2002, which is incorporated by reference herein.

2.    Attached as Exhibit "A" is a true and correct copy of the Social Security Administration's policy interpretation ruling dated July 2, 1996, and identified as Social Security Ruling 96-8p.  This official, public record is an excerpt from West's Social Security Reporting Service (2001 Supplement).

3.    Attached as Exhibit "B" is a copy of an excerpt from the transcript of Joan Tesché's October 4, 2001 deposition.

4.    The facts set forth herein are based on my personal knowledge and the documents attached hereto are true and correct.


_____
Bradford Dorrance


Sworn to and subscribed before me this 28th day of January, 2002.


_____
Notary


NOTARIAL SEAL
PAMELA S. WOLFE, Notary Public
City of Harrisburg, Dauphin County
My Commission Expires Dec. 22, 2003

**RULINGS**                                                    **SSR 96-8p**

*Social Security Ruling 96-8p*
*Policy Interpretation Ruling*

Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims

July 2, 1996

**PURPOSE:** To state the Social Security Administration's policies and policy interpretations regarding the assessment of residual functional capacity (RFC) in initial claims for disability benefits under titles II and XVI of the Social Security Act (the Act). In particular, to emphasize that:

1. Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

2. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms. Age and body habitus are not factors in assessing RFC. It is incorrect to find that an individual has limitations beyond those caused by his or her medically determinable impairment(s) and any related symptoms, due to such factors as age and natural body build, and the activities the individual was accustomed to doing in his or her previous work.

3. When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity.

4. The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

5. RFC is not the least an individual can do despite his or her limitations or restrictions, but the most.

6. Medical impairments and symptoms, including pain, are not intrinsically exertional or nonexertional. It is the functional limitations or restrictions caused by medical impairments and their related symptoms that are categorized as exertional or nonexertional.

**CITATIONS (AUTHORITY):** Sections 223(d) and 1614(a) of the Social Security Act, as amended; Regulations No. 4, subpart P, sections 404.1513, 404.1520, 404.1520a, 404.1545, 404.1546, 404.1560, 404.1561, 404.1569a, and appendix 2; and Regulations No. 16, subpart I, sections 416.913, 416.920, 416.920a, 416.945, 416.946, 416.960, 416.961, and 416.969a.

**INTRODUCTION:** In disability determinations and decisions made at steps 4 and 5 of the sequential evaluation process in 20 CFR 404.1520 and 416.920, in which the individual's ability to do past relevant work and other work must be considered, the

143

adjudicator must assess RFC. This Ruling clarifies the term "RFC" and discusses the elements considered in the assessment. It describes concepts for both physical and mental RFC assessments.

This Ruling applies to the assessment of RFC in claims for initial entitlement to disability benefits under titles II and XVI. Although most rules and procedures regarding RFC assessment in deciding whether an individual's disability continues are the same, there are some differences.

**POLICY INTERPRETATION:**

### GENERAL

When an individual is not engaging in substantial gainful activity and a determination or decision cannot be made on the basis of medical factors alone (i.e., when the impairment is severe because it has more than a minimal effect on the ability to do basic work activities yet does not meet or equal in severity the requirements of any impairment in the Listing of Impairments), the sequential evaluation process generally must continue with an identification of the individual's functional limitations and restrictions and an assessment of his or her remaining capacities for work-related activities.[1] This assessment of RFC is used at step 4 of the sequential evaluation process to determine whether an individual is able to do past relevant work, and at step 5 to determine whether an individual is able to do other work, considering his or her age, education, and work experience.

Definition of RFC. RFC is what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities. (See SSR 96-4p, "Titles II and XVI: Symptoms, Medically Determinable Physical and Mental Impairments, and Exertional and Nonexertional Limitations.") Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.[2] RFC does not represent the least an individual can do despite his or her limitations or restrictions, but the most.[3] RFC is assessed by adjudicators at each level of the administrative review process based on all of the rele-

---

1. However, a finding of "disabled" will be made for an individual who: a) has a severe impairment(s), b) has no past relevant work, c) is age 55 or older, and d) has no more than a limited education. (See SSR 82-63 "Titles II and XVI: Medical-Vocational Profiles Showing an Inability to Make an Adjustment to Other Work" (C.E. 1981-1985, p. 447.) In such a case, it is not necessary to assess the individual's RFC to determine if he or she meets this special profile and is, therefore, disabled.

2. The ability to work 8 hours a day for 5 days a week is not always required when evaluating an individual's ability to do past relevant work at step 4 of the sequential evaluation process. Part-time work that was substantial gainful activity, performed within the past 15 years, and lasted long enough for the person to learn to do it constitutes past relevant work, and an individual who retains the RFC to perform such work must be found not disabled.

3. See SSR 83-10, "Titles II and XVI: Determining Capability to Do Other Work—The Medical Vocational Rules of Appendix 2" (C.E. 1981-1985, p. 516). SSR 83-10 states that "(T)he RFC determines a work capability that is exertionally sufficient to allow performance of at least substantially all of the activities of work at a

144

**RULINGS**                                                    **SSR 96-8p**

vant evidence in the case record, including information about the individual's symptoms and any "medical source statements"—i.e., opinions about what the individual can still do despite his or her impairment(s)—submitted by an individual's treating source or other acceptable medical sources.[4]

The RFC Assessment Must be Based Solely on the Individual's Impairment(s). The Act requires that an individual's inability to work must result from the individual's physical or mental impairment(s). Therefore, in assessing RFC, the adjudicator must consider only limitations and restrictions attributable to medically determinable impairments. It is incorrect to find that an individual has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain, due to factors such as age or height, or whether the individual had ever engaged in certain activities in his or her past relevant work (e.g., lifting heavy weights.) Age and body habitus (i.e., natural body build, physique, constitution, size, and weight, insofar as they are unrelated to the individual's medically determinable impairment(s) and related symptoms) are not factors in assessing RFC in initial claims.[5]

Likewise, when there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity.

RFC AND SEQUENTIAL EVALUATION

RFC is an issue only at steps 4 and 5 of the sequential evaluation process. The following are issues regarding the RFC assessment and its use at each of these steps.

RFC and exertional levels of work. The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. At step 4 of the sequential evaluation process, the RFC must not be expressed initially in terms of the exertional categories of "sedentary," "light," "medium," "heavy," and "very heavy" work because the first consideration at this step is whether the individual can do past relevant work as he or she actually performed it.

RFC may be expressed in terms of an exertional category, such as light, if it becomes necessary to assess whether an individual is able to do his or her past relevant work as it is generally performed in the national economy. However, without the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work as it is generally performed in the national economy because particular occupations may not require all of the exertional and nonexertional demands necessary to do the full range of work at a given exertional level.

---

particular level (e.g., sedentary, light, or medium), but is also insufficient to allow substantial performance of work at greater exertional levels."

4. For a detailed discussion of the difference between the RFC assessment, which is an administrative finding of fact, and the opinion evidence called the "medical source statement" or "MSS," see SSR 96-5p, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner."

5. The definition of disability in the Act requires that an individual's inability to work must be due to a medically determinable physical or mental impairment(s). The assessment of RFC must therefore be concerned with the impact of a disease process or injury on the individual. In determining a person's maximum RFC for sustained activity, factors of age or body habitus must not be allowed to influence the assessment.

**SSR 96-8p**                                  SOCIAL SECURITY REPORTING SERVICE

At step 5 of the sequential evaluation process, RFC must be expressed in terms of, or related to, the exertional categories when the adjudicator determines whether there is other work the individual can do. However, in order for an individual to do a full range of work at a given exertional level, such as sedentary, the individual must be able to perform substantially all of the exertional and nonexertional functions required in work at that level. Therefore, it is necessary to assess the individual's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level.

Initial failure to consider an individual's ability to perform the specific work-related functions could be critical to the outcome of a case. For example:

1. At step 4 of the sequential evaluation process, it is especially important to determine whether an individual who is at least "closely approaching advanced age" is able to do past relevant work because failure to address this issue at step 4 can result in an erroneous finding that the individual is disabled at step 5. It is very important to consider first whether the individual can still do past relevant work as he or she actually performed it because individual jobs within an occupational category as performed for particular employers may not entail all of the requirements of the exertional level indicated for that category in the Dictionary of Occupational Titles and its related volumes.

2. The opposite result may also occur at step 4 of the sequential evaluation process. When it is found that an individual cannot do past relevant work as he or she actually performed it, the adjudicator must consider whether the individual can do the work as it is generally performed in the national economy. Again, however, a failure to first make a function-by-function assessment of the individual's limitations or restrictions could result in the adjudicator overlooking some of an individual's limitations or restrictions. This could lead to an incorrect use of an exertional category to find that the individual is able to do past relevant work as it is generally performed and an erroneous finding that the individual is not disabled.

3. At step 5 of the sequential evaluation process, the same failures could result in an improper application of the rules in appendix 2 to subpart P of the Regulations No. 4 (the "Medical-Vocational Guidelines") and could make the difference between a finding of "disabled" and "not disabled." Without a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have.

RFC represents the most that an individual can do despite his or her limitations or restrictions. At step 5 of the sequential evaluation process, RFC must not be expressed in terms of the lowest exertional level (e.g., "sedentary" or "light") when the individual can perform "medium" work at which the medical-vocational rules would still direct a finding of "not disabled." This would concede lesser functional abilities than the indi-



**RULINGS**                                                      **SSR 96-8p**

vidual actually possesses and would not reflect the most he or she can do based on the evidence in the case record, as directed by the regulations.[6]

The psychiatric review technique. The psychiatric review technique described in 20 CFR 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.

EVIDENCE CONSIDERED

The RFC assessment must be based on all of the relevant evidence in the case record, such as:

- Medical history,
- Medical signs and laboratory findings,
- The effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication),
- Reports of daily activities,
- Lay evidence,
- Recorded observations,
- Medical source statements,
- Effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment,
- Evidence from attempts to work,
- Need for a structured living environment, and
- Work evaluations, if available.

The adjudicator must consider all allegations of physical and mental limitations or

6. In the Fourth Circuit, adjudicators are required to adopt a finding, absent new and material evidence, regarding the individual's RFC made in a final decision by an administrative law judge or the Appeals Council on a prior disability claim arising under the same title of the Act. In this jurisdiction, an unfavorable determination or decision using the lowest exertional level at which the rules would direct a finding of not disabled could result in an unwarranted favorable determination or decision on an individual's subsequent application; for example, if the individual's age changes to a higher age category following the final decision on the earlier application. See Acquiescence Ruling (AR) 94-2(4), "Lively v. Secretary of Health and Human Services, 820 F.2d 1391 (4th Cir. 1987)—Effect of Prior Disability Findings on Adjudication of a Subsequent Disability Claim Arising Under the Same Title of the Social Security Act—Titles II and XVI of the Social Security Act." AR 94-2(4) applies to disability findings in cases involving claimants who reside in the Fourth Circuit at the time of the determination or decision on the subsequent claim.

**SSR 96-8p**                    **SOCIAL SECURITY REPORTING SERVICE**

restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC. Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone.

In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim. For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a "not severe" impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.

EXERTIONAL AND NONEXERTIONAL FUNCTIONS

The RFC assessment must address both the remaining exertional and nonexertional capacities of the individual.

Exertional capacity

Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately (e.g., "the individual can walk for 5 out of 8 hours and stand for 6 out of 8 hours"), even if the final RFC assessment will combine activities (e.g., "walk/stand, lift/carry, push/pull"). Although the regulations describing the exertional levels of work and the Dictionary of Occupational Titles and its related volumes pair some functions, it is not invariably the case that treating the activities together will result in the same decisional outcome as treating them separately.

It is especially important that adjudicators consider the capacities separately when deciding whether an individual can do past relevant work. However, separate consideration may also influence decisionmaking at step 5 of the sequential evaluation process, for reasons already given in the section on "RFC and Sequential Evaluation."

Nonexertional capacity

Nonexertional capacity considers all work-related limitations and restrictions that do not depend on an individual's physical strength; i.e., all physical limitations and restrictions that are not reflected in the seven strength demands, and mental limitations and restrictions. It assesses an individual's abilities to perform physical activities such as postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual (seeing), communicative (hearing, speaking), and mental (e.g., understanding and remembering instructions and responding appropriately to supervision). In addition to these activities, it also considers the ability to tolerate various environmental factors (e.g., tolerance of temperature extremes).

As with exertional capacity, nonexertional capacity must be expressed in terms of work-related functions. For example, in assessing RFC for an individual with a visual

148

7. S

**RULINGS**                                                                          **SSR 96-8p**

impairment, the adjudicator must consider the individual's residual capacity to perform such work-related functions as working with large or small objects, following instructions, or avoiding ordinary hazards in the workplace. In assessing RFC with impairments affecting hearing or speech, the adjudicator must explain how the individual's limitations would affect his or her ability to communicate in the workplace. Work-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting.

### Consider the nature of the activity affected

It is the nature of an individual's limitations or restrictions that determines whether the individual will have only exertional limitations or restrictions, only nonexertional limitations or restrictions, or a combination of exertional and nonexertional limitations or restrictions. For example, symptoms, including pain, are not intrinsically exertional or nonexertional. Symptoms often affect the capacity to perform one of the seven strength demands and may or may not have effects on the demands of occupations other than the strength demands. If the only limitations or restrictions caused by symptoms, such as pain, are in one or more of the seven strength demands (e.g., lifting) the limitations or restrictions will be exertional. On the other hand, if an individual's symptoms cause a limitation or restriction that affects the individual's ability to meet the demands of occupations other than their strength demands (e.g., manipulation or concentration), the limitation or restriction will be classified as nonexertional. Symptoms may also cause both exertional and nonexertional limitations.

Likewise, even though mental impairments usually affect nonexertional functions, they may also limit exertional capacity by affecting one or more of the seven strength demands. For example, a mental impairment may cause fatigue or hysterical paralysis.

### NARRATIVE DISCUSSION REQUIREMENTS

The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule),[7] and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

Symptoms. In all cases in which symptoms, such as pain, are alleged, the RFC assessment must:

- Contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate;

- Include a resolution of any inconsistencies in the evidence as a whole; and

---

7. See Footnote 2.

SSR 96-8p                          SOCIAL SECURITY REPORTING SERVICE

- Set forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work.

The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence. In instances in which the adjudicator has observed the individual, he or she is not free to accept or reject that individual's complaints solely on the basis of such personal observations. (For further information about RFC assessment and the evaluation of symptoms, see SSR 96-7p, "Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements.")

Medical opinions. The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.

Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight. If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the adjudicator must give it controlling weight. (See SSR 96-2p, "Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions," and SSR 96-5p, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner.")[8]

**EFFECTIVE DATE:** This ruling is effective on the date of its publication in the Federal Register.

**CROSS-REFERENCES:** SSR 82-52, "Titles II and XVI: Duration of the Impairment" (C.E. 1981-1985, p. 328), SSR 82-61, "Titles II and XVI: Past Relevant Work—The Particular Job Or the Occupation As Generally Performed" (C.E. 1981-1985, p. 427), SSR 82-62, "Titles II and XVI: A Disability Claimant's Capacity To Do Past Relevant Work, In General" (C.E. 1981-1985, p. 400), SSR 83-20, "Titles II and XVI: Onset of Disability" (C.E. 1981-1985, p. 375), SSR 85-16, "Titles II and XVI: Residual Functional Capacity for Mental Impairments" (C.E. 1981-1985, p. 390), SSR 86-8, "Titles II and XVI: The Sequential Evaluation Process" (C.E. 1986, p. 78), SSR 96-6p, "Titles II and XVI: Consideration of Administrative Findings of Fact by State Agency Medical and Psychological Consultants and Other Program Physicians and Psychologists at the Administrative Law Judge and Appeals Council Levels of Administrative Review; Medical Equivalence," SSR 96-2p, "Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions," SSR 96-4p, "Titles II and XVI:

---

8. A medical source opinion that an individual is "disabled" or "unable to work," has an impairment(s) that meets or is equivalent in severity to the requirements of a listing, has a particular RFC, or that concerns the application of vocational factors, is an opinion on an issue reserved to the Commissioner. Every such opinion must still be considered in adjudicating a disability claim; however, the adjudicator will not give any special significance to the opinion because of its source. See SSR 96-5p, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner." For further information about the evaluation of medical source opinions, SSR 96-6p, "Titles II and XVI: Consideration of Administrative Findings of Fact by State Agency Medical and Psychological Consultants and Other Program Physicians and Psychologists at the Administrative Law Judge and Appeals Council Levels of Administrative Review; Medical Equivalence."

150

**RULINGS**                                                    **SSR 96-8p**

Symptoms, Medically Determinable Physical and Mental Impairments, and Exertional and Nonexertional Limitations," SSR 96-5p "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner," SSR 96-9p "Titles II and XVI: Determining Capability to Do Other Work—Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work," SSR 96-7p, "Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements;" and Program Operations Manual System, sections DI 22515.010, DI 24510.000 ff., DI 24515.002-DI 24515.007, DI 24515.061-DI 24515.062, DI 24515.064, DI 25501.000 ff., DI 25505.000 ff., and DI 28015.000 ff.

---



```
 1        A       Yeah.

 2        Q       Was there a specific department that you

 3   were assigned to?

 4        A       Sales training.

 5        Q       How long were you a secretary at AMP, what

 6   years?

 7        A       I believe it was 1994.

 8        Q       In 1994 you became the system procedure

 9   analyst?

10        A       Correct.

11        Q       That is the job that you held until you

12   filed your claim for disability benefits?

13        A       Correct.

14        Q       Prior to 1998, what jobs did you pursue?

15   I don't mean like, I worked from this date to this

16   date.  If you could just give me a brief outline, that

17   would be great.

18        A       Before AMP I was at Phoenixville Hospital

19   as Admissions Representative.  Before that I was at

20   Pottstown Borough as a PBX operator.

21        Q       What was a PBX operator?

22        A       Telephone operator.

23                Before that I did waitressing jobs.

24        Q       Could you just describe for me what it is,

25   whether it's physical or otherwise, that prevents you
```

APEX Reporting Service

1    from working, what your claim is based on?

2        A        I have scar damage down from the initial

3    fusion and that causes pain, chronic pain.  So pain is

4    my primary reason that I do not work.

5                I also have fibromyalgia which is a

6    connective tissue disease which causes arthritis type

7    complications.

8        Q        Is there anything else?

9        A        From the nerve damage I have drop foot,

10   and I have a hard time with mobility.

11       Q        Am I correct that the first bone screw

12   implantation was back in March of 1992?  That is what

13   the records indicate.

14       A        I would have to look and see.  I believe

15   it was March 1993.

16                It was 1992, March 1992.

17       Q        What was the condition that prompted the

18   bone screws to be implanted?

19       A        Spondylolisthesis.

20       Q        Spondylolisthesis, is it a G or D?

21       A        It's a D.

22       Q        My understanding is that there was a bone

23   screw, and a fusion was done at the L5-S1 level?

24       A        Correct.

25       Q        At least up until this time you are still

1    having pains in that area of the L5-S1 level?

2         A       Yes.

3         Q       Does the pain currently radiate down

4    through your body and your legs?

5         A       My whole spine is involved.  I have pain

6    from the neck to the heels.

7         Q       Could you just describe for me that pain,

8    that current pain?

9         A       It goes from a dull ache to a severe sharp

10   cutting pain.

11        Q       Are there things that prompt the pain to

12   come on or cause the onset of the pain?

13        A       The pain is constant.  However, activities

14   will increase the amount of pain.

15        Q       It's constantly down your entire spinal

16   column?

17        A       The pain migrates.

18        Q       What do you mean by that?

19        A       It will be in different spots according to

20   which way I'm moving, which position I'm sitting in or

21   standing.

22        Q       How does the pain from the nerve injuries

23   in the back differ from the fibromyalgia pain that you

24   experience?  I am assuming that you have pain because

25   you described it as an arthritic condition.

1      A      Yes.

2      Q      My understanding is that fibromyalgia is a

3   painful condition of the joints; is that correct?

4      A      No.  It's actually the tissue covering the

5   muscle that is no longer elastic.  So actually the

6   whole muscles and joints are involved.

7      Q      Where is that?  How do you distinguish

8   that pain from the pain from the nerves in the back?

9      A      The fibromyalgia is a tight crampy

10   feeling, and the spine pain is more like a toothache

11   type of pain, a nerve pain.

12      Q      Are there times where the fibromyalgia

13   pain has its onset?

14      A      It will increase with weather, change in

15   weather, and with stress.

16      Q      Now, currently for the pain that you

17   experience in your back or from the nerve damage, what

18   type of medications do you utilize in order to control

19   the pain?

20      A      Do you need me to read them to you?

21      Q      Just so the record is clear, you have a

22   note card like I always carry that has a listing of

23   your medications.  If you would read those into the

24   record, we would appreciate it.

25      A      I take Celexa, 40 milligrams, and that is

1    taken once a day.  Celebrex, 200 milligrams once a day.

2    Amitriptyline, 50 milligrams once at night.  Levoxyl,

3    75 milligrams one time in the morning.  Lipitor, 40

4    milligrams one time in the morning.  Triamterene,

5    75 fifty tabs once in the morning.  Neurontin, 300

6    milligrams three times a day.  Oxycontin, 10 milligrams

7    four times a day.

8         Q         Of those medications, which medications

9    are related to the back as opposed to the fibromyalgia?

10        A         Related to the back is the Triamterene,

11   Neurontin, Oxycontin, and the Celebrex.

12        Q         Which ones are for the fibromyalgia?

13        A         Amitriptyline, and I suppose that is it.

14        Q         What are the other medications for?

15        A         The Levoxyl is for the thyroid,

16   hypothyroidism, and Lipitor is for high cholesterol.

17        Q         As it stands here today, are there any

18   current surgeries or medical interventions planned in

19   order to address the nerve conditions in your back?

20        A         The 27th I will have spinal injections

21   done.

22        Q         The 27th of October?

23        A         Yes.

24        Q         Those spinal injections, have you had

25   spinal injections before?

1       A       Yes.

2       Q       Do you do spinal injections on a regular

3  basis?

4       A       Yes.

5       Q       What is that protocol?

6       A       Could you rephrase that for me?

7       Q       I am trying to figure out when you have

8  those spinal injections.  Is it done every three

9  months, every six months, or is it done as needed?

10      A       Because the steroids can do damage, they

11 try to limit those injections.  So I really -- I

12 usually receive them every six months.

13      Q       Is it directly into your back?

14      A       Correct.

15      Q       This is for your back pain?

16      A       Correct.

17      Q       Outside of the injections, are there --

18 I'm talking about more invasive procedures, i.e.,

19 cutting you open and looking at your spine and trying

20 to fuse it together.  Anything like that planned in the

21 future?

22      A       Not planned.

23      Q       Have there been any recommendations for a

24 surgical procedure to try to address the nerve damage

25 and your back problems?

1  A  Yes.

2  Q  What recommended procedures have they told

3 you about?

4  A  Fusions of the SI joints which is the

5 sacroiliac joint.

6  Q  What physician has suggested that or

7 recommended?

8  A  Steven Wolf.

9  Q  Is there a reason why you haven't

10 undergone that procedure?

11  A  I'm afraid of more tissue damage, scar

12 tissue.

13  Q  Are there any other procedures besides the

14 procedures that you just mentioned that are either

15 planned or have been recommended to you in order to

16 address the pain related to your nerve and back

17 problems?

18  A  I have continued the degeneration of my

19 disc above the fused area and it has been stated to me

20 that in the future I will probably need more fusions.

21    May I stand, please?

22  Q  Absolutely.  We can take a break any time

23 you want.

24    (A brief recess was taken.)

25 BY MR. BURNS:

1    Q      We took a brief break.  We had been

2  discussing planned or recommended surgeries for your

3  back.

4         I want to switch gears now and talk in

5  terms of your treatment for fibromyalgia.  Are there

6  any planned operative treatments, nonoperative

7  treatments, or hospital stays, or hospital programs

8  that you currently are enrolled in or have been

9  recommended for for purposes of your fibromyalgia

10 condition?

11    A      Aqua-size is a therapeutic recommendation

12 by Dr. Hartman.

13    Q      What is Aqua-size?

14    A      Water exercise, water therapy.

15    Q      Do you do that somewhere?

16    A      Yes.

17    Q      Where is that at?

18    A      Hershey Meadows Nursing Home.

19    Q      Where is that located?

20    A      Hershey, Pennsylvania.

21    Q      How often do you do that?

22    A      Twice a week.

23    Q      Is there anything else that you do on a

24 weekly basis besides taking medications that you do for

25 treatment for purposes of your fibromyalgia?

| | | |
|---|---|---|
| 1 | A | Ice packs, hot spa, the hot tub. |
| 2 | Q | That is it? |
| 3 | A | Yes. |
| 4 | Q | Have you ever been enrolled in a program, |

i.e., a specific treatment program that is directed to
fibromyalgia?

| | | |
|---|---|---|
| 7 | A | No. |
| 8 | Q | Are you planning to enroll in any type of |

treatment program for your fibromyalgia?

| | | |
|---|---|---|
| 10 | A | It has not been suggested. |
| 11 | Q | Is the foot drop permanent? |
| 12 | A | Yes. |
| 13 | Q | Is there anything that you do in order to |

help your mobility and help your foot drop, in other
words, take medications or exercises?

| | | |
|---|---|---|
| 16 | A | I have a brace and I do have physical |

therapy to follow.

| | | |
|---|---|---|
| 18 | Q | Is that home based? |
| 19 | A | Yes. |
| 20 | Q | What is the regimen for that home-based |

physical therapy?

| | | |
|---|---|---|
| 22 | A | Stretching exercises. |
| 23 | Q | How frequently is that done? |
| 24 | A | Three times a week. |
| 25 | Q | How long generally does it take to do |

1   that?

2      A     Ten minutes.

3      Q     In terms of the Aqua-size, how long are

4   you in the actual water doing that exercise?

5      A     One hour.

6      Q     One hour each time?

7      A     Yes.

8      Q     So two times a week, two hours total?

9      A     Yes.

10      Q     Now, for your back, is there physical

11  therapy or any other therapeutic measures that you use

12  for purposes of your back pain or the nerve problems?

13      A     I practice McKenzie physical therapy at

14  home as needed.

15      Q     What is McKenzie physical therapy?

16      A     A series of adjusting your own spine and

17  stretching muscles.

18      Q     When do you do this?

19      A     As needed.

20      Q     Do you find yourself doing it on a daily

21  basis?

22      A     Yes.

23      Q     How many times a day?

24      A     Three.

25      Q     How long does this program with the

1    therapy take?

2        A        Minutes.

3        Q        Any other therapeutic measures that you

4    undertake either daily or on a regular basis for the

5    treatment of your back problems?

6        A        None that I can think of at this time.

7        Q        Have you been to a chiropractor?

8        A        Yes.

9        Q        What is his or her name?

10        A        I can't think of it right now, but it

11    probably will come to mind.

12        Q        How long ago did you see the chiropractor?

13        A        '98, '99.

14        Q        Have you seen that person in 2000 or 2001?

15        A        No.

16        Q        Is there a reason why you stopped going to

17    the chiropractor?

18        A        It really wasn't helping.

19        Q        What was the chiropractor doing for you in

20    terms of your ailments?

21        A        Adjustments and -- I'm trying -- his name

22    is Stynchula, now that I remember that.  Acupuncture.

23        Q        Stynchula, how do you spell that?

24        A        I'd have to look it up.

25        Q        Where is he located?

1      A     He is located in Vartan Way, Harrisburg.

2      Q     Who are your current physicians that you

3 see on a regular basis for the ailments that you have?

4      A     I see my family doctor.

5      Q     What is his name?

6      A     John Muscalus.

7      Q     How do you spell that?

8      A     M-U-S-C-U-L-U-S.

9      Q     Where is he located?

10     A     Hershey Road, Hummelstown, PA.

11     Q     Before you had been seeing a

12 Dr. Rubenstein as your primary medical doctor?

13     A     Yes.

14     Q     When did that stop?

15     A     He went out of practice in 1999.

16     Q     He retired?

17     A     I'm not sure.

18     Q     Then did you start seeing Dr. Muscalus?

19     A     Yes.

20     Q     Does he practice with a group or by

21 himself, Dr. Muscalus?

22     A     He is by himself.

23     Q     In addition to Dr. Muscalus, are there any

24 other physicians that you see on a regular basis?

25     A     I see Steven Wolf, my orthopedic doctor,

1    for yearly checkups.

2         Q        Have you seen any other orthopedists for

3    second opinions within the last two to three years?

4         A        Not in the last two to three years.

5         Q        So Dr. Wolf would be your exclusive

6    orthopedic physician for purposes of all your ailments?

7         A        Yes.

8         Q        What other physicians do you see?

9         A        Dr. Vitale Gordon.

10        Q        What is Dr. Gordon?

11        A        He is an anesthesiologist at Hershey Pain

12   Management.

13        Q        Is that located at the Hershey Pain

14   Clinic?

15        A        Hershey Medical Center.

16        Q        Have you ever had any inpatient

17   hospitalizations at any facility for your back pain or

18   your other problems?

19        A        Other than the surgery, no.

20        Q        Have you ever gone to the Pain Clinic at

21   Hershey Medical Center?  Is there a pain clinic at the

22   Hershey Medical Center?

23        A        Yes.

24        Q        Were you ever enrolled in any programs at

25   that clinic?

30

1    A       No.

2    Q       What does Dr. Gordon do in terms of his

3  treatment or his therapy that he offers to you?

4    A       He is in control of my pain management and

5  also through that does the injections.

6    Q       The spinal injections?

7    A       Correct.

8    Q       Are there any other injections that you

9  receive besides the spinal injections?

10    A       Trigger point injections for the

11  fibromyalgia.

12    Q       Do you receive those at the same time as

13  the spinal injections or are they varied?

14    A       They are varied.

15    Q       How many times have you received the

16  trigger point injections?

17    A       In the past two years, I believe four

18  times.

19    Q       To what locations on your body?

20    A       Back, primarily.

21    Q       Besides Dr. Muscalus, Dr. Wolf, and

22  Dr. Gordon, are there any other physicians that you see

23  on a regular basis?

24    A       No.

25    Q       Do you see Dr. Hartman any more?

```
1        A        No.

2        Q        What was Dr. Hartman for?

3        A        For the fibromyalgia.

4        Q        Why don't you see him any more?

5        A        My family doctor takes care of the

6   fibromyalgia now.

7        Q        Was Dr. Hartman a rheumatologist?

8        A        He is a D.O.

9        Q        Do you know what he specializes in, what

10  area of medicine?

11       A        Physical therapy is his specialty.

12       Q        What is his first name?

13       A        Stuart.

14       Q        Where is he located?

15       A        Here in Harrisburg.

16       Q        Have you ever seen a rheumatologist?

17       A        No.

18       Q        Has it ever been suggested to you or

19  recommended to you that you see a rheumatologist?

20       A        I do not believe so.

21       Q        Does Dr. Wolf do anything for your

22  fibromyalgia?

23       A        No.

24       Q        Of these three physicians, based on your

25  testimony it seems to be that Dr. Muscalus is the one
```

APEX Reporting Service

1 that you see on a regular basis for all of your

2 conditions, and sort of coordinates your therapy and

3 the treatment regimen that you follow?

4     A      He is my primary physician.  So all

5 therapy goes through him.

6     Q      Who is your current health provider, the

7 insurance company?

8     A      Penn State/Geisinger.

9     Q      That is a health insurer?

10     A      Yes, it is.

11     Q      Really.

12           Are there any other physicians that you

13 see on a regular basis or have seen in the last two

14 years for the evaluation of your back or for your

15 fibromyalgia or any of the other ailments that you feel

16 underlie your disability?

17     A      I don't see any other doctors related to

18 the fibromyalgia and the spine condition.

19     Q      You have a thyroid condition, correct?

20     A      Yes.

21     Q      Hypothyroidism or hyperthyroidism?

22     A      Hypo.

23     Q      Who do you see for your hypothyroidism?

24     A      Dr. Muscalus does my blood work for that.

25     Q      Have you seen any other physicians for an

33

1  evaluation in terms of the hypothyroidism?

2      A    Yes, at the Hershey Medical Center, and

3  I do not recall his name.

4      Q    Do you recall his specialty?

5      A    I can't think of what it's called right

6  now.

7      Q    Besides that physician that you can't

8  recall and all of the physicians who you talked about

9  before, are there any other physicians that you have

10  seen within the last two years?

11      A    Yes.

12      Q    Who else?

13      A    I see my gynecologist, of course, but I

14  see -- I have a suspected breast tumor.  So I see

15  Dr. Stanley Smith at the Hershey Medical Center.

16      Q    His specialty is what?

17      A    Oncology surgery.

18      Q    Gynecology/oncology?

19      A    Uh-huh.

20      Q    Any other physicians?

21      A    No.  I have some scheduled, but nothing

22  that I'm seeing yet.

23      Q    What are the ones that you have scheduled?

24      A    For lower GI problems.

25      Q    I assume that means with a

1   gastroenterologist?

2          A        Yes.

3          Q        Do you know who you are going to see about

4   that?

5          A        No, not off the top of my head.

6          Q        What are the lower GI problems that you

7   are having?

8          A        I'm having changes in bowels and

9   impactment.

10         Q        The physical therapy, are you undergoing

11  any physical therapy on a regular basis outside of the

12  home, i.e., at a physical therapy facility?

13         A        No.

14         Q        When was the last time that you underwent

15  physical therapy?

16         A        1999.

17         Q        Where was that at?

18         A        Penn Spine -- Keystone Spine Center in New

19  Cumberland.

20         Q        Is there a reason why the physical therapy

21  was stopped?

22         A        I guess because the physical therapist

23  taught me all I needed to know as far as how to manage

24  my own pain.

25         Q        So it was changed to home-based physical

1   therapy?

2        A       Correct.

3        Q       Is any physical therapy planned in the

4   future?

5        A       Not at this time.

6                I am going to stand.

7        Q       No problem.

8                Could you just describe for me in general

9   what your daily routine is from waking up in the

10  morning until you go to sleep at night, and then if

11  there is problems in the night that you experience, if

12  you could give those to me, I would appreciate it also.

13       A       My daily routine is just to basically take

14  care of myself, and to do light housework and work on

15  hobbies.

16       Q       What are your hobbies?

17       A       Cross stitch, oil painting, and stained

18  glass.

19       Q       What time do you usually get up in the

20  morning?

21       A       Seven.

22       Q       What time do you usually go to sleep?

23       A       Nine.

24       Q       Do you drive?

25       A       Yes.

```
1        Q       How often do you drive?

2        A       Once or twice a week.

3        Q       Is there anybody who resides with you

4    currently?

5        A       Yes.

6        Q       Who lives with you?

7        A       My husband, Joseph.

8        Q       Does he work?

9        A       Yes.

10       Q       Do you have any children?

11       A       Yes, but they are all out of college and

12   out of the home.

13       Q       Do you have a maid or anybody that helps

14   with the housekeeping?

15       A       My daughter and my niece come over and

16   help with the housework.

17       Q       Who prepares the meals for you?

18       A       I prepare the meals.

19       Q       In terms of your daily routine, how much

20   is standing, how much is sitting, how much is reclining

21   for your back?  Is there a pattern that you find

22   yourself following in terms of adapting to the physical

23   pain that you have?

24       A       Yes.

25       Q       What is that?
```

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing document upon the person(s) and in the manner indicated below:

First-Class Mail, Postage Prepaid
Addressed as Follows:

Michael J. Burns, Esquire
CHRISTIE PARABUE MORTENSEN YOUNG
1880 JFK Boulevard
10th Floor
Philadelphia, PA  19103-7424

(Attorneys for Defendants)

Dated:  1/28/02                    _Bradford Dorrance_____
                                        Bradford Dorrance