# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOAN D. TESCHE : CIVIL ACTION

vs. **ORIGINAL**

CNA INSURANCE COMPANIES and : NO. 1:CV-01-0326
CONTINENTAL CASUALTY COMPANY : (William W. Caldwell, J.)

**FILED**
HARRISBURG, PA
AUG 0 2 2002
MARY E. D'ANDREA, CL
Per _____
Deputy Clerk

---

## DEFENDANTS CNA INSURANCE COMPANIES AND CONTINENTAL CASUALTY COMPANY'S MOTION TO PRECLUDE EXPERT TESTIMONY

Defendants CNA Insurance Companies and Continental Casualty Company respectfully move this Court to preclude all evidence and/or testimony at trial emanating from Mark Lukas, Ed.D., C.R.C., under and pursuant to Federal Rules of Civil Procedure 26, 37 and 16 for the reasons detailed in Defendants' Memorandum of Law in support of this motion, which memorandum is incorporated by reference as though set forth at length herein.

**CHRISTIE, PABARUE, MORTENSEN and YOUNG**
A Professional Corporation

BY: _____
JAMES A. YOUNG, ESQUIRE
Attorney ID No. 00213
MICHAEL J. BURNS, ESQUIRE
Attorney ID No. 62088

1880 JFK Blvd., 10th Floor
Philadelphia, PA 19103
(215) 587-1600
(215) 587-1699 (fax)

Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOAN D. TESCHE | : | CIVIL ACTION |
| | : | |
| vs. | : | |
| | : | |
| CNA INSURANCE COMPANIES and | : | NO. 1:CV-01-0326 |
| CONTINENTAL CASUALTY COMPANY | : | (William W. Caldwell, J.) |

FILED
HARRISBURG

AUG 0 2 2002

MARY E. D'ANDREA,
Per

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS CNA INSURANCE COMPANIES AND CONTINENTAL CASUALTY COMPANY'S MOTION TO PRECLUDE EXPERT TESTIMONY

### I.      STATEMENT OF QUESTION INVOLVED

This action involves a claim for reinstatement of long term disability benefits under an ERISA plan.   Defendants CNA Insurance Companies and Continental Casualty Company ("Continental") move herein for preclusion of any and all evidence and/or testimony emanating from Mark Lukas, Ed.D., C.R.C., on the basis that he was not identified as an expert witness within the deadline set by this court and has not provided an expert report, as required by Fed. R. Civ. P. 26(a)(2) and is therefore, subject to sanctions pursuant to Fed. R. Civ. P. 37 and 16.

### II.      FACTUAL AND PROCEDURAL BACKRGROUND

The within action presents a claim for the payment of long term disability insurance benefits under an ERISA[1] employee welfare benefit plan.   A true and correct copy of plaintiff's Complaint is attached hereto as Exhibit "A."   On July 3, 2001, this court issued a Case Management Order, stating "Discovery shall be

---

[1]   The Employee Retirement Income Security Act of 1974, 29 U.S.C. Section 1001, et seq., as amended ("ERISA").

completed by December 3, 2001. The parties shall identify any expert witnesses and shall provide reports promptly. Plaintiff's report is due by December 3, 2001, and defendant's report is due by January 3, 2002. Supplementations, if any, are due by January 22, 2002." A true and correct copy of the July 3, 2001 Case Management Order is attached hereto as Exhibit "B." Upon joint motion by the parties, trial in this matter was scheduled to begin August 9, 2002, pursuant to this court's Order dated May 7, 2002 and filed June 7, 2002. A true and correct copy of the Order dated May 7, 2002 and filed June 7, 2002 is attached hereto as Exhibit "C." On July 24, 2002, defense counsel received a letter from plaintiff's counsel enclosing a Notice of Telephonic Deposition, scheduling the deposition of Mark Lukas, Ed.D., C.R.C. ("Mr. Lukas"), a purported vocational expert, for August 8, 2002, the day before trial is scheduled to begin. A true and correct copy of the July 22, 2002 letter from Bradford Dorrance, Esquire with its enclosures is attached hereto as Exhibit "D." Along with the Notice of Telephonic Deposition, plaintiff's counsel enclosed Mr. Lukas's Curriculum Vitae. See Exhibit "D." Plaintiff's counsel did not enclose a copy of any expert report prepared by Mr. Lukas and has not provided one to date.

## III.  LEGAL ARGUMENT

Federal Rule of Civil Procedure 26(a)(2) mandates disclosure of the identity of testifying experts and the presentation of written expert reports. In particular, this Rule requires that:

> These disclosures shall be made at the times and in the sequence directed by the court. In absence of other

directions from the court or stipulation by the parties, the disclosures shall be made **at least ninety days before the trial date** or the date the case is to be ready for trial or, if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under paragraph (2)(B), within 30 days after the disclosure made by the other party.

Fed. R. Civ. P. 26(a)(2)(C) (emphasis added).

It is clear that plaintiff in the instant matter acted in violation of Rule 26. According to this court's Case Management Order, the deadline for submission of plaintiff's expert reports was January 3, 2002. Plaintiff did not even identify Mr. Lukas as a potential vocational expert until his July 22, 2002 letter and has not yet provided an expert report by Mr. Lukas, when trial in this matter is scheduled for August 9, 2002, only days away. As Rule 26 states, the required expert disclosures must be made at least ninety days prior to trial in absence of other directions of the court or stipulations of the parties. There have been no other directions of the court or stipulations of the parties which would warrant a departure from this Rule. Furthermore, plaintiff notified defendants that Mr. Lukas's deposition is to be held on August 8, 2002, the eve of trial, which would give defendants little or no time to prepare cross-examination of Mr. Lukas or rebuttal of his yet unknown opinions. To allow Mr. Lukas to testify, when his identity has only just been revealed and he has provided no expert report to date would be highly prejudicial to defendants in light of the imminency of trial. Therefore, sanctions precluding any evidence any evidence and/or testimony emanating from Mr. Lukas are warranted pursuant to

Fed. R. Civ. P. 37 and 16.

Federal Rule of Civil Procedure 37(a)(2)(A) states that, "[i]f a party fails to make a disclosure required by Rule 26(a), any other party may move to compel disclosure and for appropriate sanctions." One of the sanctions under this rule is the issuance of "[a]n order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters into evidence." Fed. R. Civ. P. 37(b)(2)(B). In addition, Federal Rule of Civil Procedure 16 provides that:

> [i]f a party or party's attorney fails to obey a scheduling or pretrial order..., the judge, upon motion, or the court's own initiative, may make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2)(B)(C)(D). In lieu of or in addition to any other sanction, the judge shall require the party or the attorney representing the party or both to pay the reasonable expenses incurred because of any non-compliance with this rule, including attorney's fees, unless the judge finds that the noncompliance was substantially justified or that other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 16. Therefore, as detailed below, it is appropriate under these Rules to sanction plaintiff for her blatant disregard of Fed. R. Civ. P. 26.

Federal appellate courts have repeatedly held that federal district courts acted properly in precluding expert witnesses from testifying when the witnesses were not timely identified and their expert reports were not timely filed. For example, in Salgado v. General Motors Corporation, 150 F.3d 735 (7th Cir. 1998), 41 Fed. R. Serv. 3d (Callaghan) 336, where plaintiff filed his expert reports one business day

after they were due, the circuit court found that the district court acted properly in excluding plaintiff's expert testimony. Id. at 737-738. The court reasoned that the plain wording of Federal Rules of Civil Procedure 26 and 37, regarding the time in which expert reports are to be filed and the sanctions for late and incomplete filings, made it clear that the district court exercised proper discretion in setting the discovery schedule it did and in requiring adherence to that schedule. Id. at 741. The court reasoned that the sanction was warranted because the plaintiff failed to show his untimely presentation of the reports was either justified or harmless. Id at 742. Although the court noted that plaintiff's counsel was granted two extensions in which to file an expert report and was specifically warned when the last extension was granted that failure to provide the report in a timely manner would bar plaintiff's expert testimony, the court acknowledged that no warning is necessary as a precursor to the imposition of sanctions. Id.

Similarly, in Laplace-Bayard v. Batlle, No. 01-1109, 2000 U.S. App. Lexis 14307 (1st Cir. July, 16 2002), the circuit court found that the district court properly precluded expert testimony of plaintiff's expert who was identified over two months after the discovery deadline and close to the trial date. A true and correct copy of Laplace-Bayard v. Batlle is attached hereto as Exhibit "E." The court reasoned that "Rule 26(a)(2) mandates the timely disclosure of the identity of expert witnesses as well as expert reports in accordance with the directions of the trial court." Id. at 11. The court further reasoned that plaintiff's plausible belief that the case would settle

was a woefully inadequate excuse for plaintiff's tardy disclosure, and to allow the expert to testify would have seriously impaired defense counsel's ability to cross examine the expert due to the disclosure's proximity to trial. Id. at 13 and 14. The court then found that exclusion of the evidence is a standard Rule 37 sanction and therefore, held that the district court rightfully precluded the expert's testimony as the disclosure was untimely and prejudicial. Id. at 14.

Like the Salgado and Laplace-Bayard cases, the instant case presents a situation where the exclusion of expert testimony is appropriate. The plain wording of Rules 26 and 37 make clear plaintiff's violation and warrant sanctions therefor. The untimely identification of Dr. Lukas as an expert witness and the lack of any report from him are neither justified nor harmless. Plaintiff has provided defendants with no excuse as to the reasons for his late identification and had ample opportunity to identify her experts prior to approximately three weeks before trial. The July 3, 2001 Order setting discovery deadlines is clear and plaintiff never petitioned for an extension. To allow Dr. Lukas to testify when defendants have not yet received his expert report and when his deposition is not scheduled until the eve of trial, would severely impair defendants' preparation for cross-examination and rebuttal of Mr. Lukas' opinions. Therefore, Mr. Lukas must be precluded from testifying.

The instant matter is clearly distinguishable from Bucher v. Gainey Transportation Service of Indiana, Inc., 167 F.R.D. 387 (M.D. Pa. 1996), 36 Fed. R. Serv. 3d (Callaghan) 212, in which the court allowed plaintiff's treating physicians to

testify as experts although they provided no expert reports by the discovery deadline.

In <u>Bucher</u>, the discovery deadline was February 29, 1996, and trial was scheduled for

October 8, 1996.  <u>Id</u>. at 388 and 389.  On February 28, 1996 plaintiffs sent a letter to

defendants identifying plaintiff's treating physicians as experts and supplemented this

disclosure with a report from one treating physician in March 1996 and a curriculum

vitae of the other in April 1996.  <u>Id</u>. at 389.  In May 1996 defendants filed a motion

to preclude plaintiffs' expert testimony.  <u>Id</u>.  The court reasoned that to resolve a

question of whether preclusion is warranted, it must balance several basic

considerations:

> (1) The prejudice or surprise in fact of the party against
> whom the excluded witnesses would have testified; (2)
> the ability of that party to cure the prejudice; (3) the
> extent to which waiver of the rule against calling an
> unlisted witness would disrupt the orderly and efficient
> trial of the case or of the other cases in the court; and
> (4) bad faith or willfulness in failing to comply with the
> court's order.

<u>Id</u>. (quoting <u>Meyers v. Pennypack Woods Home Ownership Assn</u>., 559 F.2d 894,

905 (3d. Cir. 1977, overruled on other grounds).  The court considered these factors

and determined that because the record showed that defendants were made aware of

the substance of the experts opinions on or before the discovery deadline and because

plaintiff had made a good faith effort to adhere to the rules by submitting any

information requested by defendants after the deadline, the expert testimony should

not be precluded.  <u>Id</u>. at 390.  The court, then, reasoned that the better course was to

extend the discovery deadline for defendants and to make plaintiffs responsible for

defendants' costs. Id. The court also found that treating experts are not required to be specifically identified or to submit a report by the discovery deadline as long as their expert opinions are based on their observations during treatment of plaintiff. Id.

Unlike plaintiffs in Bucher, plaintiffs in the instant matter have not made a good faith effort to adhere to the rules. In Bucher, plaintiff submitted the identities of his expert witnesses prior to the discovery deadline and followed up with a report and curriculum vitae within several months of the discovery deadline which was still six months before trial. In the instant matter, plaintiff waited to identify Mr. Lukas until over seven months after the deadline set for disclosure of her expert reports and within less than a month before trial. Furthermore, Mr. Lukas has not treated the plaintiff, and is therefore required to submit an expert report which he has not provided to date. Moreover, to extend the discovery deadline in this matter is not a viable option as both parties jointly agreed to the August 9, 2002 trial date. To postpone trial at this late stage in the proceedings would cause needless delay and expense.

The purposes of requiring the disclosure of expert reports are to eliminate unfair surprise to the opposing party and to conserve resources. Comuso v. Amtrak, No. 97-7891, 1998 U.S. Dist. LEXIS 18054 (E.D. Pa. November 12, 1998). A true and correct copy of Comuso v. Amtrak is attached hereto as Exhibit "F." Furthermore, the time limits set by the rules serve an important function for the expeditious processing of litigation. Sheppard v. Glock, Inc., 176 F.R.D. 471,

473 (E.D. Pa. 1997). Plaintiffs' lack of responsibility for their counsel's dilatory behavior is not dispositive. Id. at 473. It is counsel's duty to plan discovery so that it may be completed in a timely fashion and to inform the court expeditiously of unforeseen circumstances which make compliance with original deadlines impossible. United States of America v. Compaction Systems Corporation, No. 96-5349 (KSH), 2000 U.S. Dist. LEXIS 14362 (D.N.J. July 17, 2000). A true and correct copy of United States of America v. Compaction Systems Corporation is attached hereto as Exhibit "G." Therefore, it is clear that plaintiffs should be sanctioned pursuant to Fed. R. Civ. P. 37 and 16 for their violation of Fed. R. Civ. P. 26, in failing to timely disclose Mr. Lukas as an expert and to provide his expert report. The appropriate sanction is a preclusion of any expert testimony and/or evidence emanating from Mr. Lukas. Accordingly, defendants herein move to preclude any expert testimony and/or evidence emanating from Mr. Lukas.

CHRISTIE, PABARUE, MORTENSEN
and YOUNG
A Professional Corporation

BY: _____
JAMES A. YOUNG, ESQUIRE
Attorney ID No. 00213
MICHAEL J. BURNS, ESQUIRE
Attorney ID No. 62088

1880 JFK Blvd., 10th Floor
Philadelphia, PA 19103
(215) 587-1600
(215) 587-1629 (fax)

Dated: _____5/1/02_____

Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOAN D. TESCHE                          :        CIVIL ACTION
                                        :
    vs.                                 :
                                        :
CNA INSURANCE COMPANIES and             :        NO. 1:CV-01-0326
CONTINENTAL CASUALTY COMPANY:                    (William W. Caldwell, J.)

## CERTIFICATION PURSUANT TO FED. R. CIV. P. 37(B)

I, Michael J. Burns, Esquire, hereby certify that I, in good faith, conferred with/attempted to confer* with plaintiff's counsel in the above captioned matter regarding obtaining the identity and expert reports of all plaintiff's testifying experts in a timely manner.

BY: _____
    MICHAEL J. BURNS, ESQUIRE

Date: __8/1/02__

* Jennifer Ermilio, Esquire, attempted to contact plaintiff's counsel on August 1, 2002 to address whether he concurred with this motion. Ms. Ermilio was advised that Mr. Dorrance was on vacation until August 5, 2002. Accordingly defense counsel was unable to determine if plaintiff's counsel concurred with this motion. However, given the nature of the motion, it is believed that plaintiff's counsel would not concur.

337092-1                              11

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JOAN D. TESCHE | : | CIVIL ACTION |
| | : | |
| vs. | : | |
| | : | |
| CNA INSURANCE COMPANIES and | : | NO. 1:CV-01-0326 |
| CONTINENTAL CASUALTY COMPANY | : | (William W. Caldwell, J.) |

## CERTIFICATION OF NONCONCURRENCE PURSUANT TO LR 7.1

I, Michael J. Burns, Esquire, hereby certify that I sought concurrence from all parties in the foregoing motion and it was denied.*

BY: _____
MICHAEL J. BURNS, ESQUIRE

Date: _8/1/02_

* Jennifer Ermilio, Esquire, attempted to contact plaintiff's counsel on August 1, 2002 to address whether he concurred with this motion. Ms. Ermilio was advised that Mr. Dorrance was on vacation until August 5, 2002. Accordingly defense counsel was unable to determine if plaintiff's counsel concurred with this motion. However, given the nature of the motion, it is believed that plaintiff's counsel would not concur.

337092-1                                    12

A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOAN D. TESCHÉ,                        :
                       Plaintiff       :    Civil Action No. 1:CV-01-0326
          v.                           :
                                       :
CNA INSURANCE COMPANIES, and           :
CONTINENTAL CASUALTY COMPANY,          :
                                       :
                  Defendants           :    (Judge Caldwell)

**AMENDED COMPLAINT**

FILED
HARRISBURG, PA

MAY 0 4 2001

MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

**The Parties**

1.    Plaintiff, Joan D. Tesché ("Mrs. Tesché"), is an
adult individual domiciled and residing at 7737 Fishing Creek
Valley Road, Harrisburg, Dauphin County, Pennsylvania  17112.

2.    Defendant, CNA Insurance Companies ("CNA"), is an
Illinois corporation engaged in the business of writing,
underwriting, and/or administering various types of insurance,
including certain employers' disability plans.  CNA has its
principal place of business at CNA Plaza, Chicago, Illinois; is

qualified to do business in Pennsylvania; and maintains offices in Dauphin County through certain licensed insurance agents.

3.   Defendant, Continental Casualty Company ("CCC"), a CNA affiliate, is a corporation engaged in the business of writing, underwriting, and/or administering various types of insurance, including acting as administrator, trustee, and/or insurer/underwriter of certain employers' disability plans.  CCC has its principal place of business at CNA Plaza, Chicago, Illinois; is qualified to do business in Pennsylvania; and maintains offices in Dauphin County through certain licensed insurance agents.

4.   Defendants and their respective employees, agents, independent contractors, affiliates, plan sponsors, plan trustees, and plan administrators arbitrarily, capriciously, and erroneously denied long-term disability benefits to Mrs. Tesché.


## Jurisdiction and Venue


5.   This is a civil action involving claims in excess of $75,000.00, exclusive of interest and costs.  Jurisdiction is

2

based on 28 U.S.C. §1332 (diversity of citizenship) in that every issue of fact and law is between citizens of different states. Jurisdiction is also based on 28 U.S.C. §1331 (federal question jurisdiction) in that some or all of Mrs. Tesché's claims arise under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1001, et seq., as amended.

6.    Pursuant to Section 502(a), (f) of ERISA, 29 U.S.C. §1132(a), (f), the United States District Courts have jurisdiction over actions by beneficiaries of ERISA-regulated plans to recover benefits due under such plans.

7.    Venue over this action rests with the United States District Court for the Middle District of Pennsylvania.

## ALLEGATIONS COMMON TO ALL COUNTS

8.    At all relevant times, Mrs. Tesché was a full-time employee of AMP Incorporated of Harrisburg, Pennsylvania.

9.    As an AMP employee, Mrs. Tesché was entitled to long-term disability benefits through CNA Insurance Companies "CNA") and its affiliate/underwriter/plan trustee/plan

3

administrator, Continental Casualty Company ("CCC").  (CNA and CCC are hereafter collectively referred to as "CNA" in this complaint.)  Attached as Exhibit "A" is a copy of the disability ("LTD") policy, under which Mrs. Tesché qualified as an "Insured Employee" and/or a beneficiary or participant of the plan.

10.  CNA's LTD policy was and is an "employee welfare benefit plan" governed by ERISA, 29 U.S.C. §1002(1), and related provisions.

11.  On or about May 3, 1997, CNA determined that Mrs. Tesché was disabled from her occupation as a System Procedure Analyst; and CNA paid benefits for the 24-month own occupation period commencing after the 180-day elimination period.

12.  By letter dated October 7, 1999, CNA determined that Mrs. Tesché did not fall within the definition of "total disability" under the policy, and that she was not entitled to benefits beyond October 30, 1999, i.e., the end of the 24-month period of benefits.  Attached as Exhibit "B" is a copy of CNA's October 7, 1999 determination.

13.  By letters dated October 22, 1999 and December 3, 1999, Mrs. Tesché, through her attorney, Steven Courtney, timely

4

appealed CNA's initial determination.  Attached as Exhibit "C"
are copies of Mr. Courtney's appeal letters.

14.   In support of her appeal, Mrs. Tesché submitted a
December 22, 1999 medical report from her treating physician,
Steven B. Wolf, M.D.  In his report, Dr. Wolf opined that Mrs.
Tesché was not employable based on her current medical condition,
including her inability to perform jobs identified by CNA.
Attached as Exhibit "D" is a copy of Dr. Wolf's December 22, 1999
report.

15.   By letter dated January 3, 2000, CNA and its
affiliate/plan trustee/plan administrator/plan sponsor, CNA Group
Benefits, confirmed that the final decision would be determined
by the CNA Appeals Committee within the time period required by
ERISA.  Attached as Exhibit "E" is a copy of CNA's January 3,
2000 letter.

16.   By letter dated February 21, 2000, CNA and CNA
Group Benefits rendered an untimely final decision on Mrs.
Tesché's appeal.  Attached as Exhibit "F" is a copy of CNA's
February 21, 2000 decision.

5

17.  Mrs. Tesché has exhausted all administrative appeals of CNA's decision denying her continued receipt of LTD benefits.

18.  Mrs. Tesché applied for social security disability benefits, alleging that she was unable to perform any gainful employment.

19.  By letter dated January 15, 2001, the Social Security Administration awarded social security benefits to Mrs. Tesché retroactive to October 1, 1999.  Attached as Exhibit "G" is a copy of the Social Security Administration's January 15, 2001 award letter.

## COUNT I - FIDUCIARY VIOLATIONS OF ERISA
### TESCHÉ v. CNA, CCC

20.  Plaintiff incorporates herein by reference the allegations in paragraphs 1 through 19 above.

21.  This ERISA action under 29 U.S.C. §1132(a)(2) is partially based on the CNA policy, a copy of which is attached as Exhibit "A."  This count, alleging defendants' breach of ERISA

fiduciary duties, is based on all summary plan descriptions, claims manuals, plan documents, the CNA policy, and other related documents (collectively "the Contract"), all of which are in defendant's possession and are incorporated by reference herein.

22.  Defendants, and their respective employees, agents, plan administrators, plan trustees, and plan sponsors, breached certain fiduciary duties under ERISA, including, without limitation:

(a)  they had superior knowledge regarding the requirements for continuing LTD benefits and failed to disclose such information to Mrs. Tesché as part of the appeal process;

(b)  CNA and its agents knew or should have known that they had a duty to disclose such material facts;

(c)  specifically, CNA did not advise Mrs. Tesché that her treating physician would have to address certain required criteria in his medical report, including "...a vocational determination based on the claimant's permanent medical restrictions, geographic location, economic parity, age, experience, and education." See Exhibit "F."

7

(d)   they failed to counsel and notify Mrs. Tesché about the subtle but critical distinction between the own occupation definition and the any occupation definition in the Contract;

(e)   they breached their fiduciary duties by failing to advise Mrs. Tesché about all necessary requirements for her continued receipt of LTD benefits; and

(f)   they failed to provide Mrs. Tesché with an opportunity to submit additional medical evidence addressing CNA's disability criteria, and they issued an untimely decision.

23.  As a result of defendants' breach of their fiduciary duties under 29 U.S.C. §1132(a)(2) and related provisions, Mrs. Tesché has sustained and will continue sustain unliquidated damages and losses in excess of $75,000.00, representing past and ongoing LTD benefits, plus interest, attorneys' fees, and costs.

**WHEREFORE**, plaintiff demands judgment against defendants, CNA Insurance Companies and Continental Casualty

8

Company, jointly and severally, in an amount in excess of
$75,000.00, exclusive of interest, attorneys' fees, and costs.

### COUNT II - CLAIM FOR ERISA BENEFITS
### TESCHÉ v. CNA, CCC

24.  Plaintiff incorporates herein by reference the
allegations contained in paragraphs 1 through 23 above.

25.  This cause of action is based on Section 502 of
ERISA, 29 U.S.C. §§1132(a)(1)(B), 1132(a)(3), and related
provisions, which authorize participants and beneficiaries:

(a)  to recover benefits due under the terms of a
plan, or to enforce or clarify rights under the plan; and

(b)  to seek equitable relief and to redress
violations of ERISA and the plan.

26.  This Court should review defendants' February 21,
2000 decision (Exhibit F) based on a de novo standard in that:

(a)  CNA's Contract does not vest discretion in
its plan administrator to construe the plan's terms and to
determine claimants' eligibility for benefits;

9

(b)   the <u>de novo</u> standard applies to defendants'
purely factual determination;

(c)   defendants and their respective
representatives had a conflict of interest in evaluating and
deciding Mrs. Tesché's claim;

(d)   defendants and their respective
representatives breached their fiduciary duties under ERISA;

(e)   defendants and their respective
representatives failed to conduct a thorough, independent, and
professional review of the relevant evidence; and

(f)   the <u>de novo</u> standard is appropriate based on
such other grounds as may be established through discovery and at
trial.

27.   Alternatively, this Court should review and
reverse defendants' decision and conclude that it was arbitrary
and capricious, unsupported by substantial evidence, and/or
erroneous as a matter of law.

28.   Based on defendants' violations of ERISA, Mrs.
Tesché is entitled to all available relief under ERISA and all

benefits under the plan, inclusive of LTD benefits, interest, attorneys' fees, and costs.

29. Alternatively, if the Court is not inclined to grant monetary damages and other available relief, plaintiff requests that:

(a)   the Court award attorneys' fees and costs and retroactively reinstate Mrs. Tesché's benefits, with interest; or

(b)   remand the case to defendants' plan administrator, with the direction that Mrs. Tesché be afforded the opportunity to submit further evidence in support of her claim.

**WHEREFORE**, plaintiff demands judgment against defendants, CNA Insurance Companies and Continental Casualty Company, jointly and severally, in an amount in excess of $75,000.00, exclusive of interest, attorneys' fees, and costs.

Plaintiff requests such other relief under ERISA as the Court deems appropriate.

Respectfully submitted,

KEEFER WOOD ALLEN & RAHAL, LLP

Dated: 5/4/01

Bradford Dorrance
I. D. No. 32147
210 Walnut Street
P. O. Box 11963
Harrisburg, PA  17108-1963
(717) 255-8014

(Attorneys for Plaintiff)

12

Attach this document to your policy

# Continental Casualty Company

**CNA**

For All the Commitments You Make®

CNA Plaza
Chicago, Illinois 60685

A Stock Company

## RIDER # 6

In consideration of the payment of premium for the policy to which this rider is attached, it is hereby agreed and understood that the following named division is made a part of this policy:

M/A COM, A Division of Amp Incorporated

In all other respects, this policy will remain unchanged.

Signed By: _____    Title: _____

Date: _____

This rider takes effect on January 1, 1999, 12:01 A.M., Standard Time, at the address of the Holder; it expires concurrently with the policy to which it is attached and is subject to all the definitions, conditions and provisions of the policy not inconsistent herewith.

Attached to and made part of Policy No. SR - 83089679 issued to AMP Incorporated by the CONTINENTAL CASUALTY COMPANY, General Office, Chicago Illinois, but the same shall not be binding upon the Company unless countersigned by its duly authorized agent.

*Bernard L. Hengelbengh*
Chairman of the Board

*Jonathan Kanton*
Secretary

SRR-15288

Countersigned by
Licensed Resident Agent _____

HIPH 83089679

# Continental Casualty Company

**CNA**
For All the Commitments You Make®

CNA Plaza
Chicago, Illinois 60685

A Stock Company

## RIDER # 5

In consideration of the payment of the premium for the Policy to which this rider is attached, it is hereby understood and agreed that the Minimum Monthly Benefit as stated on Addendum 2 form B1-54765-A is amended to read as follows:

In no event will the Monthly Benefit payable for Total Disability (but not for Partial Disability and/or Rehabilitative Employment) be reduced to less than 10% of the Employee's base pay.

In all other respects the Policy shall remain the same.

Accepted By: _John A Vantine_____

Title: _GLOBAL RISK MANAGER_____

Date: _____

This rider takes effect on September 4, 1998, 12:01 A.M., Standard Time, at the address of the Holder; it expires concurrently with the policy to which it is attached and is subject to all the definitions, conditions, and provisions of the policy not inconsistent herewith.

Attached to and made a part of Policy No. SR-83089679 issued to AMP, Incorporated by the CONTINENTAL CASUALTY COMPANY, General Office, Chicago, Illinois, but the same shall not be binding upon the Company unless countersigned by its duly authorized agent.

SIGNED FOR THE CONTINENTAL CASUALTY COMPANY,

_Dennis Chookaszian_
Chairman of the Board

_Jonathan Kantor_
Secretary

'Attach this document to your Po

# Continental Casualty Company

**CNA**
For All the Commitments You Make®

CNA Plaza
Chicago, Illinois 60685    A Stock Company

Amendment Rider #4

In consideration of the payment of the premium for the policy to which this rider is attached, We agree to waive Our right to change the premium rate. Such agreement shall be valid until <u>January 1, 2000</u> if:

(1)    There are no changes made to the program;

(2)    There is a minimum of 10 Insured Employees and there is less than a <u>25%</u> change to the number of Insured Employees since the EFFECTIVE DATE of this rider;

(3)    There are no new classes of employees, subsidiaries, affiliated companies or new acquisitions of the Employer added after the EFFECTIVE DATE of this rider.

In all other respects this policy shall remain the same.

This rider takes effect on January 1, 1998, 12:01 A.M., Standard Time, at the address of the Holder; it expires concurrently with the policy to which it is attached and is subject to all the definitions, conditions and provisions of the policy not inconsistent herewith.

Attached to and made part of Policy No. SR#83089679 issued to AMP, Inc. by the CONTINENTAL CASUALTY COMPANY, General Office, Chicago Illinois, but the same shall not be binding upon the Company unless countersigned by its duly authorized agent.

*D. H. Choskagian*
Chairman of the Board

*D. M. Lowry*
Secretary

SRR-15288

Countersigned by _____

Licensed Resident Agent

*Laura*

Attach this document to your Policy

# Continental Casualty Company

**CNA**

For All the Commitments You Make®

CNA Plaza          A Stock Company
Chicago, Illinois 60685

### Amendment Rider #3

In consideration of the payment of the premium for the policy to which this rider is attached, it is hereby understood and agreed that the Description of Eligible Employees as stated in Item #2 of the Master Application, Z1-67957-C is amended to read as follows:

*Active, full-time means an employee who is normally scheduled to work an average of at least 32 hours per week and meets AMP Incorporated's definition of a full-time employee.

In all other respects this policy shall remain the same.

This rider takes effect on January 1, 1997, 12:01 A.M., Standard Time, at the address of the Holder; it expires concurrently with the policy to which it is attached and is subject to all the definitions, conditions and provisions of the policy not inconsistent herewith.

Attached to and made part of Policy No. SR#83089679 issued to AMP Incorporated by the CONTINENTAL CASUALTY COMPANY, General Office, Chicago Illinois, but the same shall not be binding upon the Company unless countersigned by its duly authorized agent.

*D. H. Chookaszian*
Chairman of the Board

*D. W. Young*
Secretary

Countersigned by _____

SRR-15288

Attach this document to your Policy

## Continental Casualty Company

### CNA
For all the Commitments You Make

| CNA Plaza | A Stock Company |
| Chicago, Illinois | Herein called the Company |

Rider # 2

In consideration of the payment of the premium for the policy to which this rider is attached, it is hereby understood an agreed that paragraph (2) of the Exclusions and Limitations section of the policy is amended to read as follows:

(2)  Disability beyond 24 months after the Elimination Period if it is due to mental or emotional disorders of any type or drug or alcohol addiction; except that it at the end of such 24 month period, the Employee is  confined in a hospital or other institution qualified to provide care and treatment incident to such Disability:

In all other respects, the policy remains unchanged.

Accepted By:  _____

Title:  _____

Date:  _____

This rider takes effect on January 1, 1996, 12:01 A.M., Standard Time, at the address of the Holder; it expires concurrently with the policy to which it is attached and is subject to all the definitions, conditions and provisions of the policy not inconsistent herewith.

Attached to and made part of Policy No. SR#83089679 issued to AMP Incorporated by the CONTINENTAL CASUALTY COMPANY, General Office, Chicago Illinois, but the same shall not be binding upon the Company unless countersigned by its duly authorized agent.

*D. H. Chookasyian*

**Chairman of the Board**

*D. M. Long*

**Secretary**

Countersigned by  _____

**SRR-15288**

Licensed Resident Agent

**Attach this document to your Policy**

# *Continental Casualty Company*



**For all the Commitments You Make**

CNA Plaza
Chicago, Illinois

A Stock Company
Herein called the Company

Rider #1

In consideration of the payment of the premium for the policy to which this rider is attached, it is hereby understood an agreed that the Monthly Benefit as described in item #9 of the Master Application (Z1-67957-C) is amended to read as follows:

MONTHLY BENEFIT        -        60% of the Insured Employee's Salary (1) or $18,000 per month, whichever is the lesser amount, minus the reductions in (2) below.

In all other respects, the policy remains unchanged.

Accepted by: _____

Title:        _____

Date:        _____

This rider takes effect on January 1,1995,12:01 A.M., Standard Time, at the address of the Holder; it expires concurrently with the policy to which it is attached and is subject to all the definitions, conditions and provisions of the policy not inconsistent herewith.

Attached to and made part of Policy No. SR#83089679 issued to AMP Incorporated by the CONTINENTAL CASUALTY COMPANY, General Office, Chicago Illinois, but the same shall not be binding upon the Company unless countersigned by its duly authorized agent.

*D. H. Choskazjian*
Chairman of the Board

*D. W. Long*
Secretary

SRR-15288

Countersigned by _____
Licensed Resident Agent

# Continental Casualty Company



CNA Plaza
Chicago, Illinois 60685

A Stock Company

FORMS ATTACHED AT ISSUANCE

AMP Incorporated
EMPLOYER

SR 83089679
POLICY NUMBER

January 1, 1995
EFFECTIVE DATE

B1-68058-C
T1-68083-B37
T1-67942-B
B1-89395-A
T1-67955-B
B1-89406-A
T1-89397-A37

We agree with the Employer to insure certain eligible employees of the Employer. We promise to pay benefits for loss covered by this policy in accordance with its provisions.

This policy is issued in consideration of the payment of premium and the statement made in the Application.

## POLICY EFFECTIVE DATE AND TERM

This policy takes effect on the Effective Date stated above. All insurance periods will be computed from that date. This policy remains in force for the period for which premium has been paid. It may be renewed for further successive periods by payment of premium as stated in this policy. We have the right to non-renew it as of the first annual anniversary date or any later premium due date. If We non-renew, We must give the Employer at least 31 days prior written notice of such non-renewal.

All periods of insurance begin and end at 12:01 a.m., Standard Time, at the Employer's address stated in the Application.

## ELIGIBLE EMPLOYEES

The employees eligible to be insured under this policy are described in Statement 2 of the Application.

## EMPLOYEE'S EFFECTIVE DATE OF INSURANCE

The insurance for employees who are eligible as of the Effective Date of this policy shall take effect on such date. The insurance for employees who become eligible after the Effective Date of this policy and enroll within 30 days shall take effect as stated in Statement 8 of the Application. The insurance of employees who enroll more than 30 days after becoming eligible will take effect on the date We approve such evidence of insurability as We may require.

If, because of Injury or Sickness, an eligible employee is not working full-time on the date the insurance would otherwise take effect, it will take effect on the day the employee returns to full-time work for a continuous period equal to the time the employee was not working full-time. This return to full-time work requirement will not exceed 30 days.

SIGNED FOR THE CONTINENTAL CASUALTY COMPANY

*D. H. Chookaszian*
Chairman of the Board

*D. M. Lowry*
Secretary

Countersigned by _____

Licensed Resident Agent

# Continental Casualty Company



CNA Plaza                        A Stock Company
Chicago, Illinois 60685

SR 83089679

Application is hereby made to the Continental Casualty Company for a policy of group insurance based on the following statements and representations:

1.   Employer_____AMP Incorporated_____
                     470 Friendship Road
     Address___P.O. Box 3608, M/S 176 -23_City_____Harrisburg_____State_____PA_____Zip Code__17105-3608_____

     Nature of Business___Mfg. Electronic and Electrical Devices_____

2.   What period of time must elapse before an employee is eligible for this coverage?
                                          Exempt - 0 days                              Exempt - 0 days
     Present Employees_____Non-Exempt - 3 Months_____New Employees_____Non-Exempt - 3 Months_____

The following group or groups of employees are eligible:

| DESCRIPTION OF ELIGIBLE EMPLOYEES |
|---|
| All active, full-time* exempt and non-exempt employees of the Holder who elect to purchase Supplemental LTD Insurance<br><br><br><br>*"Active, full-time" means an employee works at least 40 hours per week.  Part-time, temporary or seasonal employees are not eligible. |

3.   Total Number of Employees on Payroll_____14,677_____Total Number Eligible___14,677_____

4.   Insured Employee Occupation Period:_____24 months_____

5.   Premium is calculated by:        See Addendum 1

6.   Premium is payable in the following manner:        See Addendum 1

7.   What percent of the premium is to be paid by the Employer?        0    %

8.   This policy shall be made effective at 12:01 A.M., Standard Time at the above address of the Employer on January 1, 1995 .

     The insurance of Employees who become eligible after the effective date of this policy shall become effective on:

          The first day of the month coinciding with or next following the date the eligible employee's enrollment card is
          received by the Employer.

G1-67057 C

# TABLE OF CONTENTS

| | Page |
|---|---|
| Eligible Employees | 1 |
| Policy Effective Date and Term | 1 |
| Employee's Effective Date of Insurance | 1 |
| Definitions | 3 |
| Disability Benefits | 4 |
| Extension of Maximum Period Payable | 5 |
| Recurrent Disability | 5 |
| Exclusions and Limitations | 5 |
| Termination of Employee's Insurance | 6 |
| Premium | 6 |
| Waiver of Premium | 6 |
| Certificate | 6 |
| Uniform Provisions | 6-7 |
| General Provisions | 7 |
| Attachments | |

# DEFINITIONS

"Application" means the Employer's application attached to this policy.

"Disability" means Total Disability and Rehabilitative Employment.

"Injury" means bodily injury caused by an accident which results, directly and independently of all other causes, in loss which begins while the Insured Employee's coverage is in force.

"Insured Employee" means an employee whose insurance is in force under the terms of this policy.

"Monthly Benefit", "Elimination Period", and "Maximum Period Payable" mean that benefit and those periods shown in the Schedule of Benefits which apply to the Insured Employee.

"Pre-existing Condition" means a condition for which medical treatment or advice was rendered, prescribed or recommended within 90 days prior to the Insured Employee's effective date of insurance. A condition shall no longer be considered pre-existing if it causes loss which begins after the employee has been insured under this policy for a period of 12 consecutive months.

"Rehabilitative Employment" means that the Insured Employee, because of Injury or Sickness, is:
(1)  continuously unable to perform the substantial and material duties of his regular occupation;
(2)  under the regular care of a licensed physician other than himself; and
(3)  gainfully employed in any occupation, on a full-time or part-time basis, for which he is or becomes qualified by education, training or experience.

"Salary" means as defined in the Schedule of Benefits.

"Schedule of Benefits" means Statement 9 of the Application for this policy.

"Sickness" means sickness or disease causing loss which begins while the Insured Employee's coverage is in force. Sickness shall not include any loss caused by or resulting from a pre-existing condition.

"Total Disability" means that, during the Elimination Period and the Insured Employee Occupation Period shown in Statement 4 of the Application, the Insured Employee, because of Injury or Sickness, is:
(1)  continuously unable to perform the substantial and material duties of his regular occupation;
(2)  under the regular care of a licensed physician other than himself; and
(3)  not gainfully employed in any occupation for which he is or becomes qualified by education, training or experience.

After the Monthly Benefit has been payable for the Insured Employee Occupation Period shown in Statement 4 of the Application, "Total Disability" means that, because of Injury or Sickness, the Insured Employee is:
(1)  continuously unable to engage in any occupation to which he is or becomes qualified by education, training or experience; and
(2)  under the regular care of a licensed physician other than himself.

"We", "Our" and "Us" means the Continental Casualty Company, Chicago, Illinois.

## DISABILITY BENEFITS

**TOTAL DISABILITY BENEFIT.** We will pay the Monthly Benefit for each month of Total Disability which continues after the Elimination Period. The Monthly Benefit will not be payable during the Elimination Period nor beyond the Maximum Period Payable.

**REHABILITATIVE EMPLOYMENT BENEFIT.** We will pay a Rehabilitative Employment Benefit for each month of Rehabilitative Employment which follows: (1) the Elimination Period; or (2) a period for which Total Disability Benefits were payable.

The amount payable will be equal to the Monthly Benefit less a portion of the Insured Employee's earnings from such employment. The portion which will be deducted is the Rehabilitative Employment Reduction shown in the Schedule of Benefits.

Rehabilitative Employment Benefits will cease: (1) on the date the Insured Employee's earnings from such Rehabilitative Employment equals or exceeds 100% of the Insured Employee's pre-Disability Salary; or (2) at the end of the Maximum Period Payable, whichever occurs first.

**GENERAL.** Total benefits payable for Total Disability and Rehabilitative Employment shall not exceed the Maximum Period Payable.

If a benefit is payable for a period less than 1 month, it will be paid on the basis of 1/30th of the Monthly Benefit for each day of Disability.

## EXTENSION OF MAXIMUM PERIOD PAYABLE

The Maximum Period Payable will extend beyond the age at which the Monthly Benefit otherwise ceases if the disabled employee reaches that age but has not received 12 Monthly Benefit payments during the current period of Disability. In that event, the Maximum Period Payable shall be extended during the continuance of the Disability until a total of 12 monthly payments have been made.

T1-67949-A

## RECURRENT DISABILITY

If Disability for which benefits were payable ends but recurs to the same or related causes less than six months after the end of a prior Disability, it will be considered a resumption of the prior Disability. Such recurrent Disability shall be subject to the provisions of this policy that were in effect at the time the prior Disability began.

Disability which recurs more than six months after the end of a prior Disability shall be subject to: (1) a new Elimination Period; (2) a new Maximum Period Payable; and (3) the other provisions of this policy that are in effect on the date the Disability recurs.

Disability must recur while the Insured Employee's coverage is in force under this policy.

T1-67950-B

## EXCLUSIONS AND LIMITATIONS

The policy does not cover any loss caused by or resulting from:

    (1)   declared or undeclared war or any act of either;

    (2)   Disability beyond 24 months after the Elimination Period if it is due to mental or emotional disorders of any type; except that if at the end of such 24 month period, the Employee is confined in a hospital or other institution qualified to provide care and treatment incident to such Disability:

        (a)   if such confinement is for a period of not less than 14 consecutive days, indemnity will be paid during such confinement and for not longer than 90 days after the termination of such confinement; and

        (b)   if, during the 90 day period specified in paragraph (a) above, an Employee is reconfined in such hospital or institution for a period of not less than 14 consecutive days, indemnity will be paid during such reconfinement and for not longer than 90 days after the termination of such reconfinement; or

    (3)   a Pre-existing condition.

## TERMINATION OF EMPLOYEE'S INSURANCE

The Insured Employee's coverage will terminate on the earliest of the following dates:
   (1)  the date this policy is terminated;
   (2)  the premium due date if the Employer fails to pay the required premium for the Insured Employee, except for an inadvertent error; or
   (3)  the date the Insured Employee
      (a)  is no longer a member of a class eligible for this insurance,
      (b)  with draws from the program,
      (c)  is retired or pensioned, or
      (d)  ceases work because of a leave of absence, furlough, layoff or temporary work stoppage due to a labor dispute, unless We and the Employer have agreed in writing to continue insurance during such period.

Termination will not affect a covered loss which began before the date of termination.

T1-67951-A

## PREMIUM

Premium for this policy is computed as stated in Statement 5 of the Application.  It shall be paid by the Employer as stated in Statement 6 of the Application.  Payment is to be made to Us or Our Agent.  The Premium rate may be changed at the end of the first insurance year or any later premium due date.

## WAIVER OF PREMIUM

We will waive premium for an Insured Employee during the period of Disability for which the Monthly Benefit is payable under this policy.  During this period, the Insured Employee's insurance will remain in force.  This provision is subject to the Termination of Employee's Insurance provision, except for payment of premium.

T1-67952-B

## CERTIFICATES

We will deliver certificates of insurance to the Employer for issuance to each Insured Employee.  The certificates will describe the benefits, to whom they are payable, the policy limitations and where this policy may be inspected.

T1-67953-A

## UNIFORM PROVISIONS

**ENTIRE CONTACT; CHANGES.**  This policy, the Application, the evidence of insurability (if any) of each Insured Employee, and any attached papers are the entire contract between the parties.
Any statement made by the Employer or any Insured Employee shall, in the absence of fraud, be a representation and not a warranty. No such statement shall void the insurance, reduce the benefits or be used in defense to a claim unless it is in writing and a copy furnished to the Employer or Insured Employee, whoever made the statement.  No statement of the Employer will be used to void this policy after it has been in force for two years.  No statement of any Insured Employee will be used in defense to a claim for loss incurred or disability which begins after the employee has been insured for 2 years.
No change in this policy is valid unless approved in writing on this policy by one of Our officers.  No agent has the right to change this policy or to waive any of its provisions.

**GRACE PERIOD.**  A grace period of 31 days is allowed for the payment of each premium due after the first premium.  This policy will remain in force during the grace period.

A grace period will not apply if We have sent written notice to the Employer of Our intent not to renew this policy at least 31 days before the premium due date.  Such notice will be sent to the Employer's last address as shown in Our records.

If the Employer gives Us written notice of his intent to renew this policy, the grace period will not apply. This policy will terminate on the date stated on the notice or on the date We receive such notice, whichever is later. The Employer will be liable for all premiums due for the period this policy remains in force including the grace period, if it applies.

**NOTICE OF CLAIM.**  Written notice of claim must be given to Us within 30 days after the loss begins or as soon as reasonably possible

The notice will suffice if it identifies the Insured Employee and this policy. It must be sent to Us at Out Home Office, CNA Plaza, Chicago, Illinois 60685 or given to Our agent.

**CLAIM FORMS.**  After We receive the written notice of claim, We will furnish claim forms within 15 days. If we do not, the claimant will be considered to have met the requirements for written proof of loss if We receive written proof which describes the occurrence, extent and nature of the loss.

**WRITTEN PROOF OF LOSS.**  Written proof of loss must be furnished to Us within 90 days after the end of a period for which We are liable. If it is not possible to give the proof within 90 days, the claim is not affected if the proof is given as soon as reasonably possible. Unless the Insured Employee is legally incapacitated, written proof must be given within 1 year of the time it is otherwise due.

**TIME OF PAYMENT OF CLAIM.**  Benefits will be paid monthly immediately after We receive due written proof of loss.

**PAYMENT OF CLAIM.**  All Disability benefits are paid to the Insured Employee. Any accrued Disability or Survivor Income benefits unpaid at the Insured Employee's death will be paid to the named beneficiary, if any.

If there is no surviving named beneficiary, payment may be made at Our option, to the surviving person or persons in the first of the following classes of successive preference beneficiaries: the Insured Employee's (a) spouse; (b) children including legally adopted children; (c) parents; or (d) estate.

If any benefit is payable to an estate, a minor or a person not competent to give a valid release, We may pay up to $1,000 to any relative or beneficiary of the Insured Employee whom We deem to be entitled to this amount. We will be discharged to the extent of such payment made by Us in good faith.

**PHYSICAL EXAMINATION.**  At Our expense, We have the right to have a physician examine the Insured Employee as often as reasonably necessary while the claim is pending.

**LEGAL ACTIONS.**  No action at law or in equity can be brought until after 60 days following the date written proof of loss was given. No action can be brought after 3 years (Kansas 5 years, South Carolina 6 years) from the date written proof is required.

**CONFORMITY WITH STATE STATUTES.**  If any provision of this policy conflicts with the statutes of the state in which this policy was delivered or issued, it is automatically changed to meet the minimum requirements of the statute.

## GENERAL PROVISION

We have the right to inspect all of the Employer's records on this policy at any reasonable time. This right will extend until: (1) 2 years after termination of this policy; or (2) all claims under this policy have been settled, whichever is later.

This policy is not in lieu of and does not affect any requirements for coverage by Worker's Compensation Insurance.

# Continental Casualty Company

**CNA**

For All the Commitments You Make®

CNA Plaza
Chicago, Illinois 60685

A Stock Company

## POLICY TERM AND PREMIUM RATE
## GUARANTEE RIDER

We agree to waive Our right to non-renew this policy and to change the premium rate. Such agreement shall be valid until the  1st  annual anniversary date if:

    (1)   There are no changes made to the program;

    (2)   There is a minimum of 10 Insured Employees and there is less than a  25%  change to the number of Insured Employee since the EFFECTIVE DATE of this policy; and

    (3)   There are no new classes of employees, subsidiaries, affiliated companies or new acquisitions of the Employer added after the EFFECTIVE DATE of this policy.

This rider takes effect on the EFFECTIVE DATE of this policy, it is subject to all definitions, conditions and provisions of this policy not inconsistent herewith.

Attached to and made a part of Policy No.  SR 83089679                        issued to  AMP Incorporated                                        by Continental Casualty Company, General Office, Chicago, Illinois but the same shall not be binding upon Us unless countersigned by Our authorized agent.

*D. H. Chookaszian*

**Chairman of the Board**

*D. W. Lowry*

**Secretary**

**Countersigned by** _____

## CONTINUITY OF COVERAGE

Continuity of coverage is provided as follows for all your Employees whose coverage and/or eligibility are affected by the cancellation of your prior group long-term disability insurance policy and replaced with this policy.

**EMPLOYEES ACTIVELY-AT-WORK.** Each employee insured under the prior policy on the date the Employer changed insurers will be covered by the benefits provided under this policy if such employee is:

1)    eligible for coverage under this policy in accordance with its ELIGIBLE EMPLOYEES provision; and
2)    actively-at-work on the Effective Date of this policy.

**EMPLOYEES NOT ACTIVELY-AT-WORK.** An employee not actively-at-work, due to Injury or Sickness, on the EFFECTIVE DATE of this policy will be covered for the benefits indicated below provided such employee:

1)    was validly insured under the Employer's prior policy on the date of transfer; and
2)    is a member of the ELIGIBLE EMPLOYEES under this policy.

The benefits provided will be the benefits provided by the prior policy less any benefits paid or payable under that policy.

Coverage will be provided until the earliest of the following dates:

1)    the date the employee becomes eligible and insured under this policy as described in the ACTIVELY-AT-WORK provision above;
2)    the date the employee's coverage ends in accordance with the termination provision of this policy; or
3)    the date that is the end of any benefit extension as provided under the prior carrier's policy.

**PRE-EXISTING CONDITIONS.** If a Pre-existing Condition Exclusion is included in this policy, benefits may be payable for a disability due to a pre-existing condition for eligible employees who:

1)    were actively-at-work on the date of transfer; and
2)    insured under this policy on its Effective Date.

The benefit payable will be the benefit payable under this policy.

Any time applied towards satisfying the elimination or waiting periods of the same or similar provisions under the prior policy shall be credited towards our policy.

## SURVIVOR INCOME BENEFIT

If an Insured Employee dies after having received the benefit provided by this policy for at least 12 successive months and during a period for which benefits are payable, We will pay a Survivor Income Benefit. This benefit is equal to the amount the Insured Employee was last entitled to receive for the month preceding his death.

The Survivor Income Benefit shall be payable on a monthly basis immediately after We receive written proof of the Insured Employee's death. It is payable for the period stated in Statement 9 of the Application. The benefit shall accrue from the Insured Employee's date of death.

This benefit is payable to the beneficiary, if any, named by the Insured Employee under this policy. If no such beneficiary exists, the benefit will be payable in accordance with the PAYMENT OF CLAIMS provisions.

ADDENDUM 1

SR 83089679
Policy Number

AMP Incorporated
Employer

January 1, 1995
Effective Date

5.   Premium is calculated by:

Multiplying the monthly salary for each Insured Employee by __*__. An Insured Employee's salary in excess of $30,000 per month shall not be included in the premium calculation for such Insured Employee.

6.   Premium is payable in the following manner:

The policy is issued in consideration of the payment in arrears of the monthly premium which is based on the actual wage or salary of all Insured Employees for the first and each subsequent policy and calculated at the premium rate stated above.  Such payment shall be made within 20 days after the end of each monthly premium accounting period, or as soon thereafter as is reasonably possible and shall be accompanied by a premium adjustment report.

"Salary" as used in Statements 5 and 6 with respect to an Employee other than a Commissioned Salesperson means the monthly wage or salary that the Insured Employee was receiving from the Employer on the date the Disability began.  It excludes commissions, overtime earnings, incentive pay, bonuses or other compensation.

"Salary" as used in Statements 5 and 6 with respect to a Commissioned Salesperson means the monthly wage or salary that the Insured Employee was receiving from the Employer on the date the Disability began.  It excludes overtime earnings, incentive pay, bonuses or other compensation, but it includes the monthly average of commissions paid to the Insured Employee by the Employer during the preceding 12 month period, but not to exceed the maximum monthly benefit amount on file with the Human Resources Department.

| *Age Bond | Payroll Factor |
|-----------|----------------|
| 20 – 24   | .04%           |
| 25 – 29   | .05%           |
| 30 – 34   | .06%           |
| 35 – 39   | .10%           |
| 40 – 44   | .15%           |
| 45 – 49   | .22%           |
| 50 – 54   | .31%           |
| 55 – 59   | .43%           |
| 60 – 64   | .50%           |
| 65 – 69   | .41%           |
| 70 – 74   | .20%           |

ADDENDUM 2

SR 8309679
Policy Number

AMP Incorporated
Employer

Januay 1, 1995
Effective Date

(1)   "Salary" as used in Statements 5 and 6 with respect to an Employee other than a Commissioned Salesperson means the monthly wage or salary that the Insured Employee was receiving from the Employer on the date the Disability began.  It excludes commissions, overtime earnings, incentive pay, bonuses or other compensation.

   "Salary" as used in Statements 5 and 6 with respect to a Commissioned Salesperson means the monthly wage or salary that the Insured Employee was receiving from the Employer on the date the Disability began.  It excludes overtime earnings, incentive pay, bonuses or other compensation, but it includes the monthly average of commissions paid to the Insured Employee by the Employer during the preceding 12 month period, but not to exceed the maximum monthly benefit base amount on file with the Human Resources Department.

(2)   The Monthly Benefit under this policy shall be reduced by:

   1.   Disability benefits paid, payable, or for which there is a right under:
      a.   The Social Security Act, excluding any amounts for which the Insured Employee's dependents may qualify because of the Insured Employee's Disability.
      b.   Any Worker's Compensation or Occupational Disease Act or Law, or any other law which provides compensation for an occupational injury or sickness,
      c.   Any State Disability Benefit Law:

   2.   Disability benefits paid under:
      a.   Any group insurance plan provided by or through the Employer,
      b.   Any formal sick leave plan provided by the Employer, or
      c.   Any Retirement Plan provided by the Employer;

   3.   Retirement benefits paid under the Social Security Act, excluding any amounts for which the Insured Employee's dependents may qualify because of the Insured Employee's retirement.

   4.   Retirement benefits paid under a Retirement Plan provided by the Employer for which the Insured Employee did not make a contribution.

If any benefit described above is paid in a single sum through compromise settlement or as an advance on future liability, the amount which pertains to the Insured Employee's Disability will be divided by the number of months from the date of its receipt to the end of the benefit period applicable to the Insured Employee.  The result shall be deducted from the Insured Employee's Monthly Benefit.

The Monthly Benefit, after the reductions stated above, if any, will not be further reduced for subsequent cost-of-living increases which are paid, payable, or for which there is a right under any other benefit described above.

"Retirement Plan" means a plan which provides retirement benefits to employees and is not funded wholly by employee contributions.  It does not include: 1) a profit sharing plan, a thrift or savings plan; 2) an individual retirement account (IRA); 3) a tax sheltered annutiy (TSA); 4) a stock ownership plan; or 5) a deferred compensation plan.

ADDENDUM 2 (continued)

SR 83089679
Policy Number

AMP Incorporated
Employer

January 1, 1995
Effective Date

In no event will the Monthly Benefit payable for Total Disability (but not for Partial Disability and/or Rehabilitative Employment) be reduced to less than $____50.00_____ or __10_% of the Insured Employee's Monthly Benefit prior to the reductions stated above, whichever is greater.

ADDENDUM 3

SR 83089679
Policy Number

AMP Incorporated
Employer

January 1, 1995
Effective Date

Age on Date
Disability Commences

| | |
|---|---|
| 59 years or younger | To the Insured Employee's 65th Birthday |
| 60 – 64 | 54 months |
| 65 – 69 | 30 months |
| 70 – 74 | 18 months |
| 75 and older | 12 months |

$\mathcal{B}$

OCT 1 1 1999

# CNA GROUP BENEFITS

P O Box 946710  Maitland  FL  32794-6710

**Laura Collins, HIA**
Disability Specialist
National Accounts Claims
Telephone   800-262-7997  x6239
Facsimile    407-919-6410

October 7, 1999

Clark De Vere
Metzger, Wickersham, Knauss & Erb, P.C.
3211 North Front Street
P.O. Box 5300
Harrisburg, PA  17110-0300

Claimant: Joan D. Tesche
Claim No.: 94-34900P1702
Policy No.: 0083089679
Continental Casualty Company

Dear Mr. De Vere:

We are contacting you with regard to the status of Ms. Tesche's Long Term Disability claim.

Initially and for the first 24 months, "Total Disability" under this policy means that, the Insured Employee, because of Injury or Sickness, is:

> 1) continuously unable to perform the substantial and material duties of his regular occupation;
> 2) under the regular care of a licensed physician other than himself; and
> 3) not gainfully employed in any occupation for which he is or becomes qualified by education, training or experience.

After the Monthly Benefit has been payable for the Insured Employee Occupation Period of 24 months, "Total Disability" means that, because of Injury or Sickness, the Insured Employee is:

> 1) continuously unable to engage in any occupation for which he is or becomes qualified by education, training or experience; and
> 2) under the regular care of a licensed physician other than himself.

Based on medical information in our file, Ms. Tesche is unable to perform the duties of her occupation as S & P Analyst Assistant which required her to sit 7 hours per day.  Information from Steven B. Wolf, M.D. indicates Ms. Tesche is able to sit for ½ hour at a time, stand ½ hour at a time, lift 5 to 10 lbs., walk 15 minutes at a time.  He notes these are permanent restrictions. With consideration of her education, training and experience, she is not disabled from other occupations and is not entitled to benefits beyond 24 months (10/30/99).  We had her claim reviewed by a vocational specialist who identified the jobs of Telemarketer, Customer Service Representative, Motel Night Auditor, and Automobile Rental Agent as potential employment opportunities.

Claimant: Joan D. Tesche
Claim No.: 94-34900P1702
Policy No.: 0083089679
Continental Casualty Company                    -2-                    October 7, 1999

If you disagree with our decision, you have the right to appeal under regulations specified by the Employee Retirement Income Security Act(ERISA)1974 as amended.

If you have additional medical information not mentioned above or wish us to reconsider our decision, you should

- submit your formal request for reconsideration **in writing** to my attention **within 60 days** of the date of this letter

- addressed to                **Attn: Laura Collins**
                              **CNA**
                              **PO BOX 946710**
                              **Maitland, FL 32794-6710**

- include your **claim number** and **policy number** on any correspondence.

Our decision will be reconsidered at the time of receipt of your information.  If this information does not alter our decision, you will be informed of this and your claim will then be submitted to the Appeals Committee for a formal review.  The Committee will issue a ruling within 60 days of receipt of your appeal as mandated by the Employee Retirement Income Security Act(ERISA)1974 as amended.  This regulations allows an additional 60 days to reach a decision if necessary, however you will be notified within the first 60 days if this review will require an extension of time to reach a decision.  This decision will be in writing and mailed directly to you or your representative.

**Appeals received later than 60 days may not be considered.**

Sincerely,

*Laura Collins*

Laura Collins, HIA



October 22, 1999

**SINCE 1888**

3211 North Front Street
P.O. Box 5300
Harrisburg, PA 17110-0300
717-238-8187
Fax: 717-234-9478

124 West King Street
Shippensburg, PA 17257
717-530-7515
Fax: 717-530-0734

CNA Group Benefits
National Account
P.O. Box 946710
Maitland, FL 32794-6710

Attn:   Laura Collins, HIA
        Disability Specialist



RE:   Claim No.      :     94-34900P1702
      Policy No.     :     0083089679
      My Client      :     Joan D. Tesche
      **Continental Casualty Company**



Dear Laura:

As you know, this office represents Joan Tesche in regards to her long-term disability claim through her employer AMP.  I have prepared this correspondence to serve as a written request for the "Other Information" Section regarding the appeal procedure that is referenced in the AMP Employee Handbook regarding Long Term Disability.  Moreover, I would appreciate if you would forward a copy of the procedure that is to be followed regarding the termination of an employee's long-term disability status.



Please forward the aforementioned documents to my office at your earliest convenience.  In the meantime, please contact my office with any questions or concerns.

Very truly yours,

METZGER, WICKERSHAM, KNAUSS & ERB, P.C.

Steven C. Courtney

SCC:ae

cc    Ms. Joan Tesche

Christian S. Erb, Jr.
Robert E. Yetter
James F. Carl
Edward E. Knauss, IV*
Jered L. Hock
Karl R. Hildabrand*
Richard B. Druby
Steven P. Miner
Clark DeVere
E. Ralph Godfrey
Carrie L. Carroll

*Board Certified in civil
trial law and advocacy
by the National Board

3 December 1999

**METZGER WICKERSHAM**

SINCE 1888

3211 North Front Street
P.O. Box 5300
Harrisburg, PA 17110-0300
717-238-8187
Fax: 717-234-9478

VIA FACSIMILE AND REGULAR MAIL

124 West King Street
Shippensburg, PA 17257
717-530-7515
Fax: 717-530-0734

Laura Collins
CNA Group Benefits
National Account
P.O. Box 946710
Maitland, FL 32794-6710

RE:    **Claim No.      :      94-34900P1702**
       **Policy No.     :      0083089679**
       **My Client      :      Joan D. Tesche**
       **Continental Casualty Company**

Dear Laura:

Please be advised that this office represents Joan Tesche in regards to the above referenced matter. I have prepared this letter to serve as a formal request for a reconsideration of the termination of my client's long-term disability status relative to the above referenced matter. Moreover, I have requested a medical report from Ms. Tesche's attending physician, Dr. Steven B. Wolf of Orthopedic Institute of Pennsylvania, regarding her current medical condition as well as a prognosis. I initially made this request on October 27, 1999, however, as of the time of this letter, I have not received the medical report. I contacted Dr. Wolf's office on the above date and I was assured that the report would be forwarded to my office in the very near future. Please be advised that I will immediately forward to your attention a copy of this report once it is made available.

After you have had an opportunity to review this correspondence, please contact my office with any questions or concerns. Your anticipated cooperation is appreciated.

Very truly yours,

METZGER, WICKERSHAM, KNAUSS & ERB, P.C.

Steven C. Courtney
SCC/ae
cc      Ms. Joan Tesche

Christian S. Erb, Jr.
Robert E. Yetter
James F. Carl
Edward E. Knauss, IV*
Jered L. Hock
Karl R. Hildabrand*
Richard B. Druby
Steven P. Miner
Clark DeVere
E. Ralph Godfrey
Carrie L. Carroll

*Board Certified in civil
trial law and advocacy
by the National Board

Document #: 164981.1

D

DAVID M. JY    R M.D., F.A.C.S.
RICHA    OAL, M.D.
ROBERT A. DAHMUS, M.D.
WILLIAM W. DeHUTH, M.D., F.A.C.S.
JOHN R. FRANKENY II, M.D., F.A.C.S.
MARK R. GRUBB, M.D.
RICHARD H. HALLOCK, M.D.
JAMES R. HAMPTER, M.D., F.A.C.S.

## THE SPINE
## CENTER
## AT

GREGORY A. HANKS, M.D.
ALEXANDER KALENAK, M.D.
ROBERT R. KANEDA, D.O.
RONALD W. LIPPE, M.D., F.A.C.S.
JASON J. LITTON, M.D.
STEVEN B. WOLF, M.D.
THOMAS J. YUCHA, M.D.

# ORTHOPEDIC INSTITUTE OF PENNSYLVANIA

TELEPHONE: (717) 761-5530  •  (800) 834-4020  •  FAX: (717) 737-7197

December 22, 1999

Steven C. Courtney, Esq
3211 North Front Street
PO Box 5300
Harrisburg, PA 17110-0300

RE:  Joan D. Tesche
182 48 9637

Dear Mr. Courtney:

This letter is in reference to Joan D. Tesche, who, as you know, is a patient I have seen at the Orthopedic Institute of Pennsylvania. Unfortunately, I am no longer able to take care of Mrs. Tesche due to her current health insurance plan.

I saw Mrs. Tesche in May of 1999. At that time, she was complaining of pain her left SI joint area as well as multiple other problems. She had some involuntary shaking and movements in the arms and legs which is difficult to explain. She has had some increasing pain her back as well as in her left SI joint and has had some problems in her arms and legs as well. She has had fibromyalgia type symptoms. She also has been having some problems with her gait. Her sitting tolerance is getting worse. She cannot sit for more than a half an hour at a time and she cannot stand for more than a half an hour at a time. She cannot walk for more than fifteen minutes at a time. She is constantly shifting.

At this point, I certainly cannot see her returning to her previous job at all. Her condition seems to be worsening and I think her prognosis is poor for returning to her occupation. She is currently going to the Hershey Pain Clinic for treatment.

Her physical exam, when I saw her, showed that she had a markedly positive FABER test on the left side and she has increased pain in her left SI joint with a shock on her nerve root. She is unable to sit on her left buttock cheek very well at all. She shifts her weight when sitting. She is unable to sit in one position. She has no sciatic nerve tension signs at all. Her strength is intact in her lower extremities. Her upper extremities also shows normal strength. She has negative Hoffman's signs although her reflexes are brisk at the biceps and triceps as well as at the knees and the ankles. Her Babinski's are down going and there is no sustained clonus.

I referred Joan to Dr. Fred Hess who is a spine surgeon who could see Joan with her current health insurance plan. I felt that Joan may need a work up by a Rheumatologist as well.

RE: TESCHE, JOAN D.
PAGE 2
December 22, 1999


At this point, I do not feel that Mrs. Tesche is employable including these
positions; telemarketer, customer service representative, motel night
auditor and an automobile rental agent.

Sincerely,

Steven B. Wolf MD

SBW/nyd

Sent via fax, original to follow

E

# CNA GROUP BENEFITS

P O Box 946710 Maitland FL 32794-6710

**Laura Collins, HIA**
Disability Specialist
National Accounts Claims
Telephone   800-262-7997 x6239
Facsimile   407-919-6410

January 3, 2000

Steven C. Courtney
Metzger, Wickersham, Knauss & Erb, P.C.
3211 North Front Street
P. O. Box 5300
Harrisburg, PA  17110-0300

Claimant: Joan D. Tesche
Claim No.: 94-34900P1702
Policy No.: 83089679
Continental Casualty Company

Dear Mr. Courtney:

Today we received your letter along with the letter from Steven B. Wolf, MD, dated December 22, 1999.

We have fully reviewed this information and find it provides us with no additional medical documentation that would alter our previous decision of October 7, 1999.

Therefore, at this time, we have forwarded this letter, along with Ms. Tesche's complete file to the Appeals Committee for their review.

The Appeals Committee will issue a ruling within 60 days of receipt of your appeal.  ERISA regulations allow the Committee an additional 60 days to reach a decision if necessary.  The Committee will notify you in writing if the additional time is required.

Should you have any questions, please contact our office.  Thank you.

Sincerely,

Laura Collins

Laura Collins, HIA

Exhibit "E"

F

# CNA GROUP BENEFITS

Group Disability-Claim Administration
PO Box 946710 Maitland FL 32794-6710

**Cheryl Sauerhoff**
Claims Consultant
Telephone 1-800-303-9744 x 6343

February 21, 2000

Steven Courtney
Metzger, Wickersham, Knauss & Erb, PC
3211 North Front St.
PO Box 5300
Harrisburg, PA 17110-0300

Claimant: Joan Tesche

Claim No: 94-34900P1702
Policy No: 0083089679

Dear Mr. Courtney:

The Long-Term Disability clam of the above-mentioned claimant has been referred to Appeals pursuant to the receipt of your letter. A comprehensive review of the file has been completed and the results of the review do not alter the Company's original decision to terminate benefits.

The Long Term Disability Policy indicates that during the 180-day elimination period and the 24-month Employee Occupation period, the Insured Employee, because of Injury or Sickness is:

- Continuously unable to perform the substantial and material duties of the regular occupation;
- Under the regular care of a licensed physician other than the Insured Employee; and
- Not gainfully employed in any occupation for which you are or become qualified by education, training or experience.

After the Monthly Benefit has been payable for the Insured Employee Occupation period of 24 months, "Total Disability" means that, because of Injury or Sickness, the Insured Employee is:

- Continuously unable to engage in any occupation for which he is or becomes qualified by education, training or experience: and
- Under the regular care of a licensed physician other than himself.

The date of loss was **5/3/97**. The attending physician statement was completed by Dr. Rubenstein dated 9/19/97 for a diagnosis of "chronic back pain". Ms. Tesche's occupation is noted as systems procedure analyst. The noted restrictions are cannot perform heavy lifting, climbing, bending and tolerates prolonged sitting poorly.

The claimant was found to be disabled from her occupation and paid benefits for the 24 month own occupation period commencing after the 180-day elimination period. Based on the claimant's age, experience, geographic location, salary, education and the medical restrictions given by the treating physician, it was determined that the claimant was not totally disabled from any occupation. Those occupations were detailed in the 10/7/99 letter and will not be revisited at this time.

Policy No: 0083089679                    -2-

All information has been reviewed and indicated that the claimant is not less than sedentary in the physical demand level for occupational work. The medical documentation does not reflect this level of severity.

The information submitted by Dr. Rubenstein does not support a less than sedentary status, whether in 1999 or previous to this time. Dr. Rubenstein's records, in particular, dated 1997 and 4/17/98 state that the claimant is actively searching for work within her physical limitations. His rendition of the claimant's physical capacity to perform shows standing up to one hour, sitting for one half hour, lifting and carrying 10-20 pounds, and walking for 3 hours per day. He claims that these limitations are "the patient's self-prescribed limitations". In 8/1997, the claimant was considered able to perform at a modified light medium physical capacity level by a physical therapist and Dr. Hartman.

Dr. Wolf was requested to give permanent restrictions for the claimant and on 5/11/99 he states that the claimant can sit and stand for one half hour at a time, lift 5 to 10 pounds, walk for 15 minutes and no bending, crawling, squatting. The claimant states that she could not perform her own occupation due to the prolonged sitting and after discussing this with the claimant, the vocational experts detailed occupations that would give the claimant the versatility to move about freely as she needs and are within the permanent restrictions outlined by Dr. Wolf. Dr. Wolf states that she could not return to her own occupation. The letter dated 12/22/99 from Dr. Wolf states that he feels that the occupations described would not be options for the claimant but does not state why. There is no detail of any functional impairment or any information relating to the claimant's inabilities to perform her activities of daily living.

While we appreciate Dr. Wolf's opinion, the any occupation determination is a vocational determination based on the claimant's permanent medical restrictions, geographic location, economic parity, age, experience, and education.

Therefore, based on the information contained within your claim file, we find that the decision to terminate benefits was correct and proper. You have exhausted your administrative remedies at this time and this decision is final and binding.

Sincerely.


Cheryl Sauerhoff
Appeals Committee Member



717 469-9277

m: Joan D. Tesche    Fax: +1(717)469-9277    To: Brad Dorrance    Fax: +1(717)255-8050    age 2 of 6 Tuesday, January 30, 2001 11:01 AM

# Social Security Administration
# Retirement, Survivors and Disability Insurance
Notice of Award

Office of Central Operations
1500 Woodlawn Drive
Baltimore, Maryland 21241-1500
Date: January 15, 2001
Claim Number: 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HA

JOAN D TESCHE
7737 FISHING CREEK
VALLEY RD
HARRISBURG, PA 17112

You are entitled to monthly disability benefits beginning October 1999.

**The Date You Became Disabled**

We found that you became disabled under our rules on May 1, 1999. This is different from the date given on the application.

Also, you have to be disabled for 5 full calendar months in a row before you can be entitled to benefits. For these reasons, your first month of entitlement to benefits is October 1999.

**What We Will Pay And When**

- You will receive $10,851.00 around January 21, 2001.

- This is the money you are due for October 1999 through December 2000.

- Your next payment of $749.00, which is for January 2001, will be received on or about the second Wednesday of February 2001.

- After that you will receive $749.00 on or about the second Wednesday of each month.

The day we make payments on this record is based on your date of birth.

Enclosure(s):
Pub 05-10153

C                                        See Next Page

Exhibit "G"

717  469-9277

n: Joan D. Tesche    Fax: +1(717)469-9277     To: Brad Dorrance    Fax: +1(717)255-8050     .ge  3  of  6  Tuesday, January 30, 2001 11:01 AM

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HA                                                        Page  2 of 5

## Your Benefits

The following chart shows your benefit amount(s) before any deductions or rounding.  The amount you actually receive(s) may differ from your full benefit amount.  When we figure how much to pay you, we must deduct certain amounts, such as Medicare premiums.  We must also round down to the nearest dollar.

| Beginning Date | | Benefit Amount | Reason |
|---|---|---|---|
| October | 1999 | $707.30 | Entitlement began |
| December | 1999 | $724.20 | Cost-of-living adjustment |
| December | 2000 | $749.50 | Cost-of-living adjustment |

## Other Social Security Benefits

The benefit described in this letter is the only one you can receive from Social Security.  If you think that you might qualify for another kind of Social Security benefit in the future, you will have to file another application.

## Your Responsibilities

The decisions we made on your claim are based on information you gave us.  If this information changes, it could affect your benefits.  For this reason, it is important that you report changes to us right away.

We have enclosed a pamphlet, "When You Get Social Security Disability Benefits...What You Need To Know."  It will tell you what must be reported and how to report.  Please be sure to read the parts of the pamphlet which explain what to do if you go to work or if your health improves.

A state or other public or private vocational rehabilitation provider may contact you to talk about their services.  The rehabilitation provider may offer you counseling, training, and other services that may help you go to work.  To keep getting disability benefits, you have to accept the services offered unless we decide you have a good reason for not accepting.

You do not have to wait to be contacted about vocational rehabilitation services. You can contact the nearest state vocational rehabilitation office directly and let them know that you are interested in receiving services.

717 469-9277

m: Joan D. Tesche    Fax: +1(717)469-9277    To: Brad Dorrance    Fax: +1(717)255-8050    Page 4 of 6 Tuesday, January 30, 2001 11:01 AM

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HA                                                    Page 3 of 5

If you go to work, special rules can allow us to continue your cash payments and health insurance coverage. For more information about how work and earnings may affect disability benefits, you may call or visit any Social Security office. You may wish to ask for any of the following publications:

- Social Security - Working While Disabled...How We Can Help (SSA Publication No. 05-10095).

- Social Security - If You Are Blind--How We Can Help (SSA Publication No. 05-10052).

- How Social Security Can Help With Vocational Rehabilitation (SSA Publication No. 05-10050).

### If You Disagree With The Decisions

If you disagree with the decisions, you have the right to appeal. A person who did not make the first decision will decide your case. We will review those parts of the decisions you disagree with and will look at any new facts you have. We may also review those parts of the case that you believe are correct and may make them unfavorable or less favorable to you.

### About The Appeals

If you disagree with the nonmedical decisions we made on your case, the appeal is called a reconsideration. Some examples of nonmedical decisions are the amount of your payment, and the month your payment starts. You will not meet with the person who decides your case.

If you disagree with the disability (medical) decision made by the state, the appeal is called a hearing. Some examples of medical decisions are the date your disability started or whether you are still disabled.

### If You Want To Appeal

- You have 60 days to ask for an appeal.

- The 60 days start the day after you receive this letter. We assume you got this letter 5 days after the date on it unless you show us that you did not get it within the 5-day period.

- You must have a good reason if you wait more than 60 days to ask for an appeal.

- You have to ask for an appeal in writing. We will ask you to sign a form SSA-561-U2, called "Request for Reconsideration," or a form HA-501, called "Request for Hearing." Contact one of our offices if you want help.

### If You Ask For A Reconsideration And A Hearing

If you ask for both a reconsideration and a hearing, we will process the hearing first, even if you made the reconsideration request first. When we make our decisions, we will send you letters explaining our decisions on both the reconsideration and the hearing.

717 469-9277

n: Joan D. Tesche    Fax: +1(717)469-9277        To: Brad Dorrance    Fax: +1(717)255-8050        Page 5 of 6 Tuesday, January 30, 2001 11:01 AM

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HA                                                                    Page 4 of 5

## How The Hearing Process Works

After we send your case for a hearing, an Administrative Law Judge (ALJ) will mail you a letter at least 20 days before the hearing to tell you its date, time and place. The letter will explain the law in your case and tell you what has to be decided. Since the ALJ will review all the facts in your case, it is important that you give us any new facts as soon as you can.

The hearing is your chance to tell the ALJ why you disagree with the decisions in your case. You can give the ALJ new evidence and bring people to testify for you. The ALJ also can require people to bring important papers to your hearing and give facts about your case. You can question these people at your hearing.

### It Is Important To Go To The Hearing

It is very important that you go to the hearing. If for any reason you can't go, contact the ALJ as soon as possible before the hearing and explain why. The ALJ will reschedule the hearing if you have a good reason.

If you don't go to the hearing and don't have a good reason for not going, the ALJ may dismiss your request for a hearing.

### Things To Remember For The Future

We decided that you are disabled under our rules. But, this decision must be reviewed once every 3 years. We will send you a letter before we start the review. Based on that review, your benefits will continue if you are still disabled, but will end if you are no longer disabled.

### If You Have Any Questions

We invite you to visit our website at www.ssa.gov on the Internet to find general information about Social Security. If you have any specific questions, you may call us toll-free at 1-800-772-1213, or call your local Social Security office at 1-717-782-3400. We can answer most questions over the phone. If you are deaf or hard of hearing, you may call our TTY number, 1-800-325-0778. You can also write or visit any Social Security office. The office that serves your area is located at:

SOCIAL SECURITY
555 WALNUT STREET
HARRISBURG, PA 17101

717  469—9277

n: Joan D. Tesche      Fax: +1(717)469-9277      To: Brad Dorrance      Fax: +1(717)255-8050      Page  6  of  6  Tuesday,  January 30, 2001 11:01 AM

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HA                                                Page  5 of  5

If you do call or visit an office, please have this letter with you.  It will help us answer your questions.  Also, if you plan to visit an office, you may call ahead to make an appointment.  This will help us serve you more quickly when you arrive at the office.

*Carolyn W. Colvin*

Carolyn W. Colvin
Deputy Commissioner
for Operations

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing document upon the person(s) and in the manner indicated below:

### First-Class Mail, Postage Prepaid
### Addressed as Follows:

Michael J. Burns, Esquire
CHRISTIE PARABUE MORTENSEN YOUNG
1880 JFK Boulevard
10th Floor
Philadelphia, PA  17103-7424

(Attorneys for Defendants)


Dated: 5/4/01


Bradford Dorrance

7/3

10

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOAN D. TESCHE,                          :

       Plaintiff                       :

                             :

       vs.                             :          CIVIL ACTION NO. 1:CV-01-0326

                             :

CNA INSURANCE COMPANIES, and             :
CONTINENTAL CASUALTY COMPANY,
       Defendants                      :

**FILED**
**HARRISBURG, PA**

JUL 0 3 2001

MARY E. D'ANDREA, CLERK
PER_____
             DEPUTY CLERK

O R D E R

AND NOW, this 3rd day of July, 2001, in connection
with the case management conference in this matter IT IS ORDERED
THAT:

      a)  Discovery shall be completed by
December 3, 2001.  The parties shall identify
any expert witnesses and shall provide reports
promptly.  Plaintiff's report is due by
December 3, 2001, and defendant's report is
due by January 3, 2002.  Supplementations, if
any, are due by January 22, 2002.  (This case
is on the standard track).

      b)  Motions for joinder of parties shall be
filed by August 1, 2001.  Motions to amend
pleadings shall be filed by August 1, 2001.

      c)  All pre-trial motions shall be filed by
December 3, 2001, accompanied by a supporting
brief.  All briefs filed in this case shall
comply with Local Rule 7.8 and paragraph IV of
the scheduling order previously entered in
this case.

      d)  This case shall be placed on the April,
2002 trial list of this court, scheduling
order to follow.  Parties and known witnesses

AO 72A

shall be notified of this schedule
immediately, or as soon as identified as such.

Litigants should be aware that it is my policy to adhere to the
schedule hereby established.  Continuances of trial and extensions
of the discovery period will be granted only when extraordinary
circumstances arise and application is timely made.

William W. Caldwell
United States District Judge

2

AO 72A



6-7-02
sc

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOAN D. TESCHE,                    :

      Plaintiff            :

                 :

      vs.                  :          CIVIL ACTION NO. 1:CV-01-0326

                 :

CNA INSURANCE COMPANIES, and       :          **FILED**
CONTINENTAL CASUALTY COMPANY,                 HARRISBURG, PA
      Defendants           :
                                              JUN  7 2002

                                              ᴿY E. D'ANDREA, **CLERK**

        A|                 _Exhibit_          )2, upon consideration

of a joint ᵣ                                  ₁s ORDERED that said

motion is gᵣ                                  ₅ continued from June

12, 2002 to                                   ) a.m., in Court Room

No. 1, nintℎ                                  ᴶalnut Street,

Harrisburg,

                    _William W. Caldwell_
                    William W. Caldwell
                    United States District Judge

AO 72A

HEATH L. ALLEN
N. DAVID RAHAL
CHARLES W. RUBENDALL II
ROBERT L. WELDON
EUGENE E. PEPINSKY, JR.
JOHN H. ENOS III
GARY E. FRENCH
DONNA S. WELDON
BRADFORD DORRANCE
JEFFREY S. STOKES
ROBERT R. CHURCH
STEPHEN L. GROSE
R. SCOTT SHEARER
WAYNE M. PECHT
ELYSE E. ROGERS
CRAIG A. LONGYEAR
DONALD M. LEWIS III
BRIDGET M. WHITLEY
JOHN A. FEICHTEL
ANN McGEE CARBON
ELIZABETH J. GOLDSTEIN
BARBARA A. GALL
STEPHANIE KLEINFELTER

## KEEFER WOOD ALLEN & RAHAL, LLP

210 WALNUT STREET
P. O. BOX 11963
HARRISBURG, PA 17108-1963

PHONE (717) 255-8000

EIN No. 23-0716135
www.keeferwood.com

ESTABLISHED IN 1878

OF COUNSEL:
SAMUEL C. HARRY

WEST SHORE OFFICE:
415 FALLOWFIELD ROAD
CAMP HILL, PA 17011
(717) 612-5800

WRITER'S CONTACT INFORMATION:

July 22, 2002

(717) 255-8014

**RECEIVED**

JUL 2 4 2002

**BY - MJB**

Michael J. Burns, Esquire
CHRISTIE PARABUE MORTENSEN YOUNG
1880 JFK Boulevard
10th Floor
Philadelphia, PA  19103-7424

    Re:  Joan Tesché v. CNA Insurance Companies, etc.
       U.S. Dist. Ct., Mid. Dist. of PA, No. 1:CV-01-0326

Dear Michael:

    As a follow-up to my previous letters and more recent voice mails, I enclose a notice scheduling the telephonic deposition of plaintiff's vocational expert, Mark Lukas, Ed. D., for 11:30 a.m. on August 8, 2002.  Enclosed is Dr. Lukas's CV.  Dr. Lukas shall prepare a brief report setting forth certain vocational principles.  I will provide that report to you as soon as I receive it.  Please call me if you have any questions.  Thank you.

          Sincerely,

          KEEFER WOOD ALLEN & RAHAL, LLP

          By:  Bradford Dorrance

BD/ral

enclosures

cc:  Mrs. Joan Tesché

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOAN D. TESCHÉ,                      :
                                     :   Civil Action No. 1:CV-01-0326
                 Plaintiff           :
      v.                             :
                                     :
CNA INSURANCE COMPANIES, and         :
CONTINENTAL CASUALTY COMPANY,        :
                                     :
                 Defendants          :   (Judge Caldwell)

### NOTICE OF TELEPHONIC DEPOSITION

TO:  Mark Lukas, Ed. D., C.R.C.
     25 West Third Street
     Media, PA  19063-2803

**PLEASE TAKE NOTICE** that on August 8, 2002, at 11:30 a.m.,

before an individual authorized to administer oaths, plaintiff

will take the deposition upon oral examination of Mark Lukas, Ed.

D., C.R.C., pursuant to Fed. R. Civ. P. 30(b) and related

provisions.

     Pursuant to Fed. R. Civ. P. 30(b)(7), the parties have

agreed that the deposition will be taken telephonically from the

law offices of KEEFER WOOD ALLEN & RAHAL, LLP, 210 Walnut Street,

Harrisburg, Pennsylvania, with the court reporter and the

deponent in attendance at Dr. Lukas's office (25 West Third

Street, Media, Pennsylvania, 19063).  Defendants' and plaintiff's

counsel shall be participating by telephone from 210 Walnut Street, Harrisburg, Pennsylvania.  The deposition shall be taken for use at trial in the above-reference case.


Dated: 7/22/02

Bradford Dorrance
I.D. #32147
KEEFER WOOD ALLEN & RAHAL, LLP
210 Walnut Street
P. O. Box 11963
Harrisburg, PA  17108-1963
(717) 255-8014

(Attorneys for Plaintiff)

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing document upon the person(s) and in the manner indicated below:

First-Class Mail, Postage Prepaid
Addressed as Follows:

Michael J. Burns, Esquire
CHRISTIE PARABUE MORTENSEN YOUNG
1880 JFK Boulevard
10th Floor
Philadelphia, PA  19103-7424

(Attorneys for Defendants)

Dated: 7/22/02

Bradford Dorrance

## MARK LUKAS, ED.D.
### VOCATIONAL & EVALUATION SERVICES

25 WEST THIRD STREET
MEDIA, PENNSYLVANIA 19063-2803

EVALUATIONS
TESTING
COUNSELING

610-565-7466
FAX: 610-565-7380
EMAIL: drlukas@enter.net

## CURRICULUM VITAE

### CREDENTIALS

| | |
|---|---|
| 1982 - Present | Office of Hearings and Appeals<br>U.S. Social Security Administration<br>Vocational Expert |
| 1990 - 2002 | Commission on Certification of Work Adjustment<br>and Vocational Evaluation Specialists<br>Certified Vocational Evaluator #02668 |
| 1980 - 2002 | Commission on Rehabilitation Counselor<br>Certification<br>Certified Rehabilitation Counselor #14163 |
| 1991 - 2002 | Vocational Evaluation & Work Adjustment Association<br>Registered ADA Service Provider |
| 1991 - 2002 | United States Department of Labor<br>Consultant Services<br>Rehabilitation Counselor #03-119 |
| 1985 - 2002 | American Board of Vocational Experts<br>Diplomate |

### EDUCATION

| | |
|---|---|
| 1995 - 1998 | Wilmington College, Ed.D. |
| 1981 - 1988 | Temple University, Doctoral Studies<br>Vocational Education |
| 1976 - 1979 | University of Scranton<br>Master of Science, Rehabilitation Counseling |

Page 2

1970 - 1974                    Bloomsburg University
                               Bachelor of Science, Social Welfare

## PROFESSIONAL EXPERIENCE

1989 - Present                 <u>Vocational Consultant,</u> Vocational & Evaluation
                               Services

                               Provides vocational and rehabilitation related services
                               including; vocational evaluations, occupational testing,
                               assessments of earning and diminished earning capacity,
                               projections of employability, rehabilitation counseling, job and
                               retraining placement, ADA employer compliance assistance,
                               job functions analysis, job accomodation assessments.

1983 - 1989                    <u>Director of Rehabilitation Services,</u> Hoover Rehabilitation
                               Services, Inc., Exton, PA

                               Responsible for all medical and vocational services provided
                               under company auspices to persons disabled in industrial
                               injuries. Supervised a staff of counselors and nurses in the
                               implementation of rehabilitation services for individuals
                               leading to the highest level of functioning.

1981 - 1983                    <u>Rehabilitation Counselor,</u> Hoover Rehabilitation Services, Inc.
                               Allentown, PA

                               Provided rehabilitation counseling and placement services to
                               on-going caseload. Activities included: evaluations, testing
                               job analysis, employability preparation and post employment
                               support.

1980 - 1981                    <u>Vocational Evaluator,</u> Private Industry Council of Lehigh
                               Valley

                               Supervised a staff in the administration of aptitude, vocational
                               interest and achievement tests including work samples to a
                               client population of handicapped and disadvantaged
                               persons.

Page 3

| | |
|---|---|
| 1974 - 1980 | <u>Vocational Counselor</u>, Luzerne County Human Resources, Wilkes-Barre, PA |

Acted as team leader coordinating the employment efforts of job developers, orientation specialists, intake workers, and program recruiters. Personally responsible for employment counseling and placement in re-training programs and competitive employment for handicapped and disadvantaged clients.

<u>AFFILIATIONS</u>

National Rehabilitation Association
Pennsylvania Rehabilitation Counselors Association
Vocational Evaluation and Work Adjustment Association
National Rehabilitation Counselors Association

<u>SEMINARS
SPECIAL PROJECTS</u>

| | |
|---|---|
| 1999 | <u>Faculty</u>, Wilmington College, Division of Behavioral Science (Adjunct) |
| 1994 | <u>Faculty</u>, Practicing Law Institute |
| 1994 | <u>Lecturer</u>, Children's Hospital of Philadelphia |
| 1993 | <u>Guest Speaker</u>, Villanova University Graduate School, Vocational Assessment |
| 1989 | <u>Guest Speaker</u>, University of Scranton Professional Associations and Counselor Licensure. |
| 1987 | <u>Seminar Lecturer</u>, HRS, Inc. Training Series, The Social Security Disability Determination Process |
| 1986 | <u>Seminar Lecturer</u>, Insurance Industry Series, Using Vocational Rehabilitation Services with the Worker's Compensation Claimant |
| 1986 | <u>Seminar Lecturer</u>, HRS, Inc., Training Series Expert Vocational Testimony |

Page 4

| | |
|---|---|
| 1981 | <u>Seminar Lecturer</u>, Pennsylvania Department of Vocational Education, In-House Vocational Assessment Procedures for Disadvantaged and Handicapped Clients |
| 1981 | <u>Private Industry Council/Genesco Corporation</u><br>Designed and implemented work samples test battery to screen clients for training in skilled garment industry occupations. |
| 1980 | <u>U.S. Department of Labor/Conrail Training Program</u><br>Developed comprehensive vocational testing program for screening applicants for clerical occupations in Eastern Region Conrail System. |
| 1977 | <u>U.S. Department of Labor</u><br>The Vocational Assessment Process |

⬤                              ⬤

Source: All Sources > Federal Legal - U.S. > **Federal Cases After 1944, Combined Courts** ⓘ
Terms: **rule 26(a)(2) and expert and untimely**  (Edit Search)

☞ Select for FOCUS™ or Delivery
☐

*2002 U.S. App. LEXIS 14307, \**

LILY LAPLACE-BAYARD, ET AL., Plaintiffs, Appellants, v. DR. FRANCISCO BATLLE, Defendant, Appellee.

No. 01-1109

UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

2002 U.S. App. LEXIS 14307

July 16, 2002, Decided

**PRIOR HISTORY:  [\*1]**  APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO. Hon. Jose A. Fuste, U.S. District Judge.

**DISPOSITION:** Affirmed.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiffs, an injured wife and her husband, appealed a no-liability jury verdict in favor of defendant doctor in the United States District Court for the District of Puerto Rico on their medical malpractice claims.

**OVERVIEW:** The wife had elective surgery to remove a cyst on one of her ovaries. During the operation, her colon was perforated; however the perforation went unnoticed. A day later she returned to the hospital with abdominal pain. The doctor performed exploratory surgery and repaired the perforation one day later. Plaintiffs filed a medical malpractice action against a number of physicians and the hospital, including the doctor. Plaintiffs listed only one **expert** witness during discovery. The doctor claimed that he was not negligent in his care and refused to settle the claims along with the remaining defendants. On the eve of trial, plaintiffs attempted to add an additional **expert** witness after the doctor refused to settle. On appeal, plaintiffs sought a new trial. The court found that plaintiffs simply chose to postpone the costs associated with retaining an **expert** in an attempt to increase, in their view, the likelihood of settlement. In doing so, they assumed the risk that their delayed trial preparation would compromise their ability to put on their best case. To excuse their belated disclosures now would have relieved them of the consequences of the risk they assumed.

**OUTCOME:** The jury verdict was affirmed.

**CORE TERMS:** surgery, pre-trial, expert witness, settlement, disclosure, acute, expert testimony, deposition, surgeon, medical expert, post-operative, abdominal, discovery, colon, infection, diagnosed, pain, settlement demand, testifying, abdomen, fault, cyst, attending physician, direct examination, duty of care owed, limine motion, expert report, new trial, perforation, cumulative

**CORE CONCEPTS -** ♦ Hide Concepts



📄 Civil Procedure : Sanctions : Discovery Misconduct
📄 Civil Procedure : Appeals : Standards of Review : Abuse of Discretion
⬇ An appellate court reviews a Fed. R. Civ. P. 37(c) ruling under an abuse of discretion standard. In reviewing a trial court's sanction order concerning a discovery-related matter, an abuse-of-discretion standard controls.

📄 Civil Procedure : Sanctions : Discovery Misconduct
⬇    See Fed. R. Civ. P. 37(c).

📄 Civil Procedure : Disclosure & Discovery : Mandatory Disclosure
⬇    Fed. R. Civ. P. 26(a)(2).

📄 Civil Procedure : Disclosure & Discovery : Mandatory Disclosure
⬇ Fed. R. Civ. P. 26(a)(2) mandates the timely disclosure of the identity of **expert** witnesses as well as **expert** reports in accordance with the directions of the trial court.

📄 Civil Procedure : Disclosure & Discovery : Mandatory Disclosure
⬇ In the arena of **expert** discovery, a setting which often involves complex factual inquiries, Fed. R. Civ. P. 26 increases the quality of trials by better preparing attorneys for cross-examination. The introduction of new **expert** testimony on the eve of trial can be seriously prejudicial to the opposing party.

📄 Civil Procedure : Disclosure & Discovery : Mandatory Disclosure
📄 Civil Procedure : Sanctions : Discovery Misconduct
⬇ District courts have broad discretion in meting out Fed. R. Civ. P. 37(c) sanctions for Fed. R. Civ. P. 26 violations. These sanctions range from limited exclusion to dismissal of the case entirely. Exclusion of evidence is a standard sanction for a violation of the duty of disclosure under Fed. R. Civ. P. 26(a).

**COUNSEL:** Alexander H. Bopp, with whom Indiano & Williams, P.S.C. was on brief for appellants.

Jorge J. Lopez Lopez, with whom Ramonita Dieppa Gonzalez and Otero & Lopez, L.L.P. were on brief for appellee.

**JUDGES:** Before Selya, Circuit Judge, Coffin, Senior Circuit Judge, and Lipez, Circuit Judge.

**OPINIONBY:** LIPEZ

**OPINION: LIPEZ, Circuit Judge.** This is an appeal from a no-liability jury verdict in a medical malpractice case. Plaintiffs-appellants -- Lily LaPlace-Bayard, her husband Daniel Bayard, and their conjugal partnership (collectively "plaintiffs") -- brought this diversity action in negligence against, inter alia, defendant-appellee, Dr. Francisco Batlle, alleging that Dr. Batlle breached the duty of care owed to his patient LaPlace-Bayard when he failed to timely diagnose her condition and perform immediate remedial surgery, causing her substantial injury. After trial, the jury returned a verdict for Dr. Batlle, and judgment was accordingly entered in his favor. On appeal, plaintiffs seek a new trial on the grounds that the trial court abused its discretion **[*2]** by (1) excluding the testimony of one of their proposed medical **experts** and (2) allowing Dr. Batlle to testify as an **expert** witness. Unpersuaded by plaintiffs' arguments, we affirm.

**I.**



In the summer of 1998, when LaPlace-Bayard and her then-fiance Daniel Bayard were residents of the U.S. Virgin Islands, LaPlace-Bayard was diagnosed with a cyst on one of her ovaries. Upon consultation with a gynecologist in Puerto Rico, LaPlace-Bayard decided to undergo surgery to have the cyst removed. The surgery took place on August 6, 1998, at Auxilio Mutuo Hospital in Puerto Rico. It is undisputed by the parties to this appeal that, during surgery, the operating physician inadvertently perforated LaPlace-Bayard's colon in removing the cyst. That perforation went unnoticed, however, and LaPlace-Bayard was discharged from the hospital later that day. Complaining of abdominal pain and fever, LaPlace-Bayard returned to the hospital on August 7, 1998, where she was seen by, inter alia, an emergency room surgeon, Dr. Batlle, who diagnosed her as suffering from "acute abdomen," an intra-abdominal condition manifested by severe pain. On August 8, 1998, Dr. Batlle performed exploratory surgery  **[\*3]**  on LaPlace-Bayard and, upon discovery, repaired the perforation in her colon.

Following surgery, Dr. Batlle, as her attending physician, had primary responsibility for LaPlace-Bayard during her post-operative stay in the hospital. Given the risk of infection associated with colon perforation reparation, Dr. Batlle put LaPlace-Bayard on a regimen of antibiotics and arranged for a consultation with an infectious disease specialist. After her discharge from the hospital on August 16, 1998, she returned to her residence in St. Thomas. However, she continued to experience nausea, abdominal pain and difficulty breathing. As a result, on August 23, 1998, LaPlace-Bayard admitted herself into Palms West Hospital in Florida, where she was treated for acute pancreatitis, severe pleural effusion (fluid in the thoracic cavity), suppurative peritonitis (infection in abdominal cavity), and a serious bacterial infection. She was discharged from Palms West on September 1, 1998.

On August 5, 1999, plaintiffs brought this medical malpractice action against, inter alia, Auxilio Mutuo Hospital, Dr. Batlle, and several other physicians, alleging negligence in the care and treatment of LaPlace-Bayard  **[\*4]**  at Auxilio Mutuo Hospital in August 1998. Specifically with respect to Dr. Batlle (the only defendant relevant to this appeal), plaintiffs claimed in their pre-trial submission that Dr. Batlle, upon diagnosing LaPlace-Bayard with "acute abdomen" on August 7, 1998, should have immediately diagnosed a perforated colon and performed remedial surgery. He failed to do so and instead waited over twelve hours before performing the surgery. n1 That delay caused additional fecal material to leak into LaPlace-Bayard's abdominal cavity, exacerbating the infection. Plaintiffs alleged that Dr. Batlle thus breached his duty of care owed to LaPlace-Bayard under Puerto Rico law, specifically 31 L.P.R.A. § 5141, n2 and caused her severe physical injury and emotional pain. Dr. Batlle responded that he was not negligent in his care and treatment of LaPlace-Bayard and that LaPlace-Bayard was largely at fault for her damages because she failed to follow the instructions provided by her physicians.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n1 The parties disagree as to why Dr. Batlle did not perform surgery sooner. LaPlace-Bayard claims that Dr. Batlle should have performed surgery immediately on August 7, 1998, when he diagnosed her with "acute abdomen." According to Dr. Batlle, however, he did in fact recommend surgery to LaPlace-Bayard on August 7, but she did not consent to surgery until August 8.  **[\*5]**

n2 Section 5141 provides:

A person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done. Concurrent imprudence of the party aggrieved does not exempt from liability, but entails a reduction of the indemnity.

31 L.P.R.A. § 5141.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Over the course of the litigation, the parties engaged in settlement discussions. By August 16, 2000, plaintiffs had reached a settlement n3 with all of the defendants, except for Dr. Batlle. Previously, in a scheduling order dated January 26, 2000, the court had informed the parties that a pre-trial conference was to be held on August 22, 2000, and directed them to file a Joint Proposed Pre-trial Order in advance of that conference. On August 18, 2000, plaintiffs informed the court that (1) a settlement had been reached with four of the five named defendants; (2) they were hopeful that a Joint Proposed Pre-Trial Order would not have to be filed in this case because a settlement with Dr. Batlle, the sole remaining defendant in the case, seemed imminent; and (3) in the event a settlement was **[*6]** not reached with Dr. Batlle by August 21, 2000, the proposed pre-trial order would be submitted at that point.

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n3 That settlement was finalized on August 24, 2000.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

On August 22, 2000, the pre-trial conference was cancelled because of Hurricane Debby. On August 23, 2000, Dr. Batlle sent a letter to plaintiffs categorically rejecting any settlement demand. The next day, plaintiffs filed (1) a motion to reschedule a pre-trial/settlement conference and (2) given defense counsel's unwillingness to participate in a joint submission, a unilateral proposed pre-trial order, listing Dr. Vilaire Bayard, Jr., M.D., n4 a Massachusetts-based surgeon, as their only **expert** witness. Dr. Batlle did not list any **expert** witnesses in his pre-trial submission.

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n4 Dr. Bayard and Daniel Bayard are second cousins.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

On October 16, 2000, the court held a status conference. **[*7]** Plaintiffs informed the court that settlement efforts with Dr. Batlle had been unsuccessful to date, but that they were not prepared for trial. Nevertheless, the district court issued an order which provided:

> This case has been settled as to all defendants except Dr. Francisco Batlle-Batlle. The demand against this physician is $ 20,000. The court strongly recommends that the case be settled in that amount . . . . 10 days to report. Trial shall be held Nov. 2, [20]00, 9:30 A.M.

Accordingly, plaintiffs gave Dr. Batlle until October 25, 2000, to accept the settlement demand. On that date, Dr. Batlle again flatly rejected the settlement demand, setting in motion a flurry of trial preparation activity, including the following: (1) on October 26, plaintiffs filed an emergency motion to take a videotaped deposition of Dr. Bayard and to substitute that deposition for his live testimony, due to his unavailability to appear at trial; that motion was granted over defendant's objection, and the deposition was taken on October 31 in Worcester, Massachusetts; (2) also on October 26, plaintiffs notified the court of their intention to name an additional medical **expert** witness, **[*8]** Dr. Claudia Lorenzo Perez, M.D. (Dr. Lorenzo) and the next day filed a motion to supplement their proposed pre-trial order to include Dr. Lorenzo as an **expert** witness. In opposition to that motion, Dr.


Batlle filed an in limine motion to bar Dr. Lorenzo from testifying at trial.

The trial commenced on November 2, 2000. At trial, Dr. Bayard, via his October 31 videotaped deposition, provided **expert** testimony on behalf of plaintiffs on the applicable duty of care owed by Dr. Batlle to LaPlace-Bayard. Upon the close of Dr. Bayard's testimony, the court, granting Dr. Batlle's in limine motion, barred Dr. Lorenzo from testifying as an **expert** witness in plaintiffs' case. In defendant's case, Dr. Batlle testified on his own behalf but presented no independent medical **expert** testimony. The jury returned a no-liability verdict for Dr. Batlle and judgment was entered accordingly. This appeal ensued.

**II.**

Plaintiffs raise two issues on appeal as grounds for a new trial. First, they argue that the court improperly excluded testimony of Dr. Lorenzo, one of their two proposed medical **expert** witnesses. Second, they claim that Dr. Batlle testified as an **expert** witness and should not have been **[*9]** allowed to do so.

**A. Exclusion of Dr. Lorenzo's Medical Expert Testimony**

The court explained its decision to exclude Dr. Lorenzo's testimony as follows:

> I have read the doctor's report, and I have a serious concern about the fact that this case has been on the docket for quite a while. And the truth of the matter is that everybody left **expert** retaining and preparation for the very last minute. Perhaps everybody thought the case would settle. I'm not trying to find fault here, but the truth of the matter is that since October 16th it was quite evident that this case could be tried, especially when it did not settle as to one of the co-defendants. And I find it a bit difficult to accept that somebody who is retained in the middle of taking Dr. Bayard's deposition on October 30th and October 31st is going to testify now and has not been consulted before. And I think it's quite cumulative, also. And I have read [Dr. Lorenzo's] report, and I don't see anything there that [Dr. Bayard] has not covered.

There are two grounds for the exclusion of Dr. Lorenzo's testimony apparent from this ruling: (1) plaintiffs failed to timely announce their intention to use **[*10]** Dr. Lorenzo as an **expert** witness, and (2) Dr. Lorenzo's anticipated testimony (as evidenced from her **expert** report) would be cumulative of Dr. Bayard's **expert** testimony, already admitted into evidence by videotape deposition. We examine each rationale in turn.

1. **Untimely** Disclosure

The court's exclusion of Dr. Lorenzo's testimony on the ground of **untimely** disclosure is a discovery sanction under Fed. R. Civ. P. 37(c) n5 for a violation of the mandatory discovery rules under Fed. R. Civ. P. 26(a)(2). n6 ☆We review that ruling under an abuse of discretion standard. See Thibeault v. Square D Co., 960 F.2d 239, 243 (1st Cir. 1992) ("In reviewing a trial court's sanction order concerning a discovery-related matter, an abuse-of-discretion standard controls.").

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n5 Rule 37(c) provides in relevant part:

⍑A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions. In addition to requiring payment of reasonable expenses, including attorney's fees, caused by the failure, these sanctions may include any of the actions authorized under Rule 37(b)(2)(A), (B), and (C) and may include informing the jury of the failure to make the disclosure.

Fed. R. Civ. P. 37(c).  **[*11]**

n6 **Rule 26(a)(2)** provides in relevant part:

⍑[A] party shall disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence. . . . This disclosure shall, with respect to a witness who is retained or specially employed to provide **expert** testimony in the case or whose duties as an employee of the party regularly involve giving **expert** testimony, be accompanied by a written report prepared and signed by the witness. . . . These disclosures shall be made at the times and in the sequence directed by the court. In the absence of other directions from the court or stipulation by the parties, the disclosures shall be made at least 90 days before the trial date or the date the case is to be ready for trial . . . .

Fed. R. Civ. P. 26(a)(2).

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

⍑**Rule 26(a)(2)** mandates the timely disclosure of the identity of **expert** witnesses as well as **expert** reports in accordance with the directions of the trial court. Here, the district court, in its January 26, 2000, scheduling order, directed the parties to identify  **[*12]**  their **expert** witnesses and summarize each **expert** witness's qualifications in a joint proposed pre-trial order to be filed no later than August 18, 2000. In their August pre-trial memorandum, however, plaintiffs listed Dr. Bayard as their only **expert** witness. It was not until October 26, 2000, barely a week before trial, that plaintiffs disclosed their intention to use Dr. Lorenzo as an **expert** witness. n7 Until then, Dr. Batlle had no notice of plaintiffs' intention to retain another medical **expert** witness. Dr. Lorenzo's **expert** report and curriculum vitae were not provided to Dr. Batlle until the night of October 30, 2000, a mere three days before trial.

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n7 On October 27, 2000, plaintiffs moved to supplement their pre-trial order to add Dr. Lorenzo as a second **expert** witness.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

Plaintiffs argue that their failure to comply with the discovery rules in a more timely manner was justified by the "unusual" circumstances of the case, described as the likelihood of settlement with all of the defendants. Given that likelihood,  **[*13]**  they opted not to retain Dr. Lorenzo earlier in the litigation in an effort to keep costs down, thus maximizing the

possibility of settlement. Only on October 25 when Dr. Batlle unequivocally rejected the $ 20,000 settlement demand did they retain Dr. Lorenzo as an **expert** and expedite the production of **expert** reports.

That justification, however, is woefully inadequate to excuse plaintiffs' tardy disclosures. Litigants routinely engage in settlement negotiations until the eve of trial and beyond. That reality does not excuse them from responding to interrogatories and retaining **experts** and disclosing them and their reports to opposing counsel in a timely manner pursuant to the discovery rules. Plaintiffs simply chose to postpone the costs associated with retaining an **expert** in an attempt to increase, in their view, the likelihood of settlement. In doing so, they assumed the risk that their delayed trial preparation would compromise their ability to put on their best case. To excuse their belated disclosures now would relieve them of the consequences of the risk they assumed.

Furthermore, we have recognized that ☂"in the arena of **expert** discovery -- a setting which often involves complex **[\*14]** factual inquiries -- Rule 26 increases the quality of trials by better preparing attorneys for cross-examination." Id. at 244. We cannot ignore the real danger that, if Dr. Lorenzo had been allowed to testify, plaintiffs' belated disclosures would have undermined defense counsel's ability to cross-examine her. See id. at 246-47 ("Many courts -- this court included -- have recognized the introduction of new **expert** testimony on the eve of trial can be seriously prejudicial to the opposing party.").

As noted above, ☂district courts have broad discretion in meting out Rule 37(c) sanctions for Rule 26 violations. See Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia de Puerto Rico, 248 F.3d 29, 34 (1st Cir. 2001). These sanctions range from limited exclusion to dismissal of the case entirely. See id. "Exclusion of evidence is a standard sanction for a violation of the duty of disclosure under Rule 26(a)." Samos Imex Corp. v. Nextel Communications, Inc., 194 F.3d 301, 305 (1st Cir. 1999). Given the facts in this case, we could hardly say that the district court exceeded its discretion in excluding Dr. **[\*15]** Lorenzo's testimony.

2. Cumulativeness

For the sake of completeness, and to dispel any notion of plaintiffs that the exclusionary ruling of the trial court was somehow unfair to them, we evaluate the court's second ground for excluding Dr. Lorenzo's testimony, namely, that it would have been cumulative under Rule 403 of the Federal Rules of Evidence in light of the testimony of Dr. Bayard, plaintiffs' other medical **expert.**

Plaintiffs insist that the court did not understand the full scope of their case. They claim that their case against Dr. Batlle was premised upon two discrete negligence theories of liability to be addressed separately by each **expert.** Dr. Bayard, trained as a surgeon, testified only as to Dr. Batlle's negligence in his capacity as LaPlace-Bayard's surgeon. Dr. Lorenzo -- an alleged **expert** on matters of risk management and the administration of health institutions - - would have testified as to the negligence of Dr. Batlle in his role as LaPlace-Bayard's attending physician and in managing the post-operative risks associated with her condition. Thus, having retained two separate **experts** to serve two distinct purposes, plaintiffs maintain that Dr. Lorenzo's **[\*16]** testimony would have differed dramatically from that of Dr. Bayard.

Plaintiffs overstate the pre-trial clarity of their two discrete theories of Dr. Batlle's liability. In their pre-trial submission, they articulated only one theory of liability to the trial court -- namely, that Dr. Batlle was negligent in his role as LaPlace-Bayard's surgeon:

Dr. Batlle noted acute abdominal pain and high fever. Dr. Batlle should have



> immediately diagnosed a punctured colon and performed immediate remedial surgery. As a result of Dr. Batle's failure to timely diagnose [LaPlace-Bayard's] punctured colon and his failure to timely perform corrective surgery, she suffered permanent and irreparable physical injuries, and continues to suffer both substantial emotional and physical pain.

(emphasis added). In that submission, plaintiffs further characterized the ultimate facts in dispute as "the extent of the damage caused by the delay in performing corrective surgery after [LaPlace-Bayard] presented herself at the emergency room with acute abdominal pain." (emphasis added). There is no mention in plaintiffs' pre-trial memorandum that their theory of the case included Dr. Batle's **[*17]** negligence in LaPlace-Bayard's post-operative care, including managing the risks associated with her post-operative condition. In the absence of such timely representations to the court below, we doubt that plaintiffs could rely on that broader theory of liability now to win a new trial. See Thibeault, 960 F.2d at 247 (noting potential for prejudice to opposing counsel in "an eleventh-hour change in a party's theory of the case").

We need not decide that issue, however, because Dr. Bayard did present testimony on Dr. Batle's post-operative negligence, as plaintiffs said he would. Contrary to their position on appeal, plaintiffs explicitly stated in an October 26, 2000, court submission that "Dr. Bayard will serve as the Plaintiffs' **expert** on surgery and the quality of aftercare rendered post-operatively by Dr. Battle [sic]." Similarly, plaintiffs' counsel explicitly stated at Dr. Bayard's October 31 deposition his intention to use Dr. Bayard both "as an **expert** in this trial with respect to the surgical procedures, and the quality of after-care that was rendered by the surgeon, Dr. Francisco Batlle." The record indicates that Dr. Bayard did in fact provide **expert [*18]** opinion testimony on both the August 8 surgery as well as the quality of after-care provided by Dr. Batle in his role as attending physician.

With respect to the surgery, Dr. Bayard testified that, when a patient presents with acute abdomen after recently undergoing surgery to remove an ovarian cyst, a physician should suspect a perforated bowel and should perform surgery immediately. He testified that there was no medical justification for Dr. Batle's waiting twelve hours to perform the surgery. His testimony, however, did not end there. Dr. Bayard proceeded to testify as to (1) the diagnostic lab tests that should have been performed on LaPlace-Bayard in the days following the August 8 surgery; (2) his opinion on the range of antibiotics Dr. Batle administered to LaPlace-Bayard after surgery; and (3) his opinion that Dr. Batle should have taken a culture of the infection observed during surgery in order to know what antibiotics to administer. He testified that LaPlace-Bayard should not have been discharged from the hospital on August 16, 1998, because it was likely she was suffering from acute pancreatitis and other conditions at that time. In light of Dr. Bayard's testimony **[*19]** as to LaPlace-Bayard's post-operative care, we can hardly find fault with the district court's finding that Dr. Lorenzo's proffered testimony would have been cumulative evidence.

In a further effort to distinguish Dr. Lorenzo's testimony from that of Dr. Bayard, plaintiffs argue that Dr. Bayard's credibility may have been diminished because (1) he was plaintiff Daniel Bayard's second cousin, and (2) Dr. Bayard, unable to read Spanish, was limited in his review of the medical file to those records that were in English. Thus, plaintiffs argue, the testimony of Dr. Lorenzo (who was fluent in Spanish and thus able to review the entire medical file) would have bolstered the strength of their case. Again, plaintiffs seek relief from the consequences of their own decisions. Plaintiffs chose to disclose in their pre-trial submission only one medical **expert** witness, knowing of his inability to understand Spanish and of his relationship to Daniel Bayard. Moreover, plaintiffs could have provided Dr. Bayard with an English translation of the Spanish portions of the medical record. They chose not to do so. Having made these decisions, they cannot complain now of the consequences.

Finally, plaintiffs **[*20]** claim that even if the exclusion of Dr. Lorenzo's testimony was otherwise warranted, the timing of the court's ruling irreparably prejudiced them. They point out that, although Dr. Batlle had filed his motion to exclude Dr. Lorenzo's testimony before trial had commenced, it was not until after the court heard Dr. Bayard's videotaped deposition testimony that it announced its decision to exclude Dr. Lorenzo's testimony. At that point, however, plaintiffs had already told the jury in their opening statement that it would hear testimony from **"experts"** in the plural. They now claim that the court's ruling prevented them from keeping their promise of introducing testimony from more than one **expert,** thus undermining their credibility with the jury.

At the time that plaintiffs gave their opening statement, they knew that the court had not yet ruled on Dr. Batlle's motion to exclude Dr. Lorenzo's testimony. Well aware of that pending in limine motion, plaintiffs proceeded at their peril in promising the jury testimony from more than one **expert.** Having made that choice, plaintiffs cannot expect once again to be relieved of the consequences of their own judgment call.

**B. Admission of  [*21]  Dr. Batlle's Testimony**

In considering plaintiffs' second ground for appeal, we note at the outset that the court never characterized Dr. Batlle as an **expert** witness, stating instead that Dr. Batlle would be "treated as the surgeon who operated on" LaPlace-Bayard. Nevertheless, plaintiffs argue that Dr. Batlle gave **expert** testimony at trial and should not have been allowed to do so without providing an **expert** report and disclosing his qualifications as required by Fed. R. Civ. P. 26 (a)(2)(B). n8

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n8 See supra note 5.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

Despite these general averments, plaintiffs fail to identify which particular statements of Dr. Batlle should have been excluded. Nor did they raise at trial any specific objections (save one as to relevancy) during the course of Dr. Batlle's direct examination. Having carefully examined the trial transcript of Dr. Batlle's direct testimony ourselves, we cannot identify a colorable basis for plaintiffs' claim of error.

In his direct examination, Dr. Batlle methodically took the jury through  **[*22]**  a day-by-day account of his actions and decisions relating to the care and treatment of LaPlace-Bayard at Auxilio Mutuo Hospital from August 7, 1998, through her discharge on August 16, 1998. He was never asked on direct to render opinions regarding treatment by other physicians or other institutions. Dr. Batlle only offered opinions beyond the scope of his own treatment of LaPlace-Bayard in response to plaintiffs' own questions on cross-examination as to the treatment given to LaPlace-Bayard at Palms West Hospital after her discharge from Auxilio Mutuo Hospital. n9 Having opened the door to that testimony, plaintiffs cannot now be heard to complain about the court's admission of such testimony. n10 See McDonald v. Federal Laboratories, Inc., 724 F.2d 243, 248 (1st Cir. 1984) (rejecting claim of error in admission of **expert** testimony where challenged testimony was elicited by appellant's counsel); see also Aetna Casualty & Surety Co. v. Tryniecki, 293 F.2d 289, 290-91 (5th Cir. 1961) (similar result); 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2885 at 463 n. 14 (2d ed. 1995) (citing cases where court  **[*23]**  refused to notice any alleged error where such error was invited by complaining party).

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - -

n9 In fact, defense counsel specifically objected to that line of questioning as being outside



the scope of direct examination. Those objections were overruled.

n10 In a corollary argument, plaintiffs maintain that the court abused its discretion when it failed to instruct the jury that Dr. Batlle was not testifying as an **expert.** We disagree. The jury heard plaintiffs' counsel explicitly state his intention to use Dr. Bayard as an **expert** witness. In contrast, neither the court nor defense counsel ever told the jury that Dr. Batlle would be testifying as an **expert** on his own behalf. Moreover, the jury knew that Dr. Batlle was the defendant. Thus, there was no need to instruct the jury that Dr. Batlle was not an **expert** witness in this case.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

**Affirmed.**

Source:   All Sources > Federal Legal - U.S. > **Federal Cases After 1944, Combined Courts** ⓘ
Terms:   **rule 26(a)(2) and expert and untimely**  (Edit Search)
View:   Full
Date/Time:  Wednesday, July 24, 2002 - 2:05 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2002 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Source:  All Sources > Federal Legal - U.S. > District Court Cases - By Circuit > US District Court Cases - 3rd Circuit ⓘ
Terms:  "rule 26" and expert and untimely  (Edit Search)

☞ Select for FOCUS™ or Delivery

▢

*1998 U.S. Dist. LEXIS 18054, ***

MARIO G. COMUSO v. NATIONAL RAILROAD PASSENGER CORPORATION a/k/a AMTRAK

CIVIL ACTION NO. 97-7891

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1998 U.S. Dist. LEXIS 18054

November 9, 1998, Decided
November 12, 1998, Filed

**DISPOSITION:** **[*1]** Motion of Defendant National Railroad Passenger Corporation a/k/a AMTRAK to Extend Deadline to Disclose **Expert** Liability Testimony (Docket No. 6), Plaintiff's response thereto (Docket No. 7), Defendant's Supplemental Memorandum of Law in support of its motion (Docket No. 8) and Defendant's Supplement to its Motion for Extension (Docket No. 9) GRANTED.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff employee filed suit against defendant employer under the Federal Employers' Liability Act, 45 U.S.C.S. §§ 51 et seq. The employer filed a motion to extend the deadline to disclose its **expert** liability testimony. The employee opposed the motion and moved to preclude the employer from introducing **expert** testimony in rebuttal to his own liability **expert,** or in the alternative, for an award of costs associated with the delay.

**OVERVIEW:** After the suit was initiated, the court entered a scheduling order specifying the date on which all discovery was to be completed; including the date on which **expert** testimony was to be disclosed. The employer filed its motion to extend the time for disclosing **expert** testimony based on an allegation that the employee, himself, had failed to disclose his **experts** by the deadline. The court granted the employer's motion. Based on the employee's own failure to timely identify a liability **expert,** the employer was unable to retain a liability **expert** for rebuttal purposes prior to the deadline. Thus, the employer's failure to timely disclose **expert** testimony was justified thereby satisfying its burden under Fed. R. Civ. P. 16(b) for an extension of time. Based on the fact that the **untimely** disclosure was justified, that the employee was not unduly prejudiced or unfairly surprised by the delay, and the fact that the employer did not act willfully or in bad faith, preclusion of the **expert's** testimony under Fed. R. Civ. P. 37(c)(1) was not proper. Likewise, the employee was not entitled to costs associated with any delay.

**OUTCOME:** The court granted the employer's motion and extended the time in which the employer had to disclose its **expert** liability testimony in rebuttal to the employee's **expert.**

**CORE TERMS:** expert testimony, disclose, deadline, engineering, discovery, disclosure, failure to disclose, good cause, noncompliance, Federal Rules of Civil Procedure, Federal Rule

of Civil Procedure, failure to timely, scheduling, producing, modify, bolts, pole, Supplemental Memorandum of Law, substantial justification, substantially justified, harmless

### CORE CONCEPTS - ◆ Hide Concepts

🖹 Civil Procedure : Trials : Pretrial Conferences
⬥Under Fed. R. Civ. P. 16(b), the court may only modify a scheduling order upon a showing of good cause. The court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension. In order to establish good cause, the moving party should demonstrate that a more diligent pursuit of discovery was impossible.

🖹 Civil Procedure : Disclosure & Discovery : Mandatory Disclosure
🖹 Civil Procedure : Discovery Methods : Expert Witness Discovery
⬥The automatic disclosure provisions governed by Fed. R. Civ. P. 26 require the disclosure of **expert** reports. The purpose behind requiring **expert** reports is the elimination of unfair surprise to the opposing party and the conservation of resources.

🖹 Civil Procedure : Sanctions : Discovery Misconduct
⬥Fed. R. Civ. P. 37(c)(1) controls where a party fails to comply with Fed. R. Civ. P. 26 or 26(e)(1). It states: A party that without substantial justification fails to disclose information required by **Rule 26**(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence at trial any witness or information not disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions. Fed. R. Civ. P. 37(c)(1).

🖹 Civil Procedure : Sanctions : Discovery Misconduct
⬥The imposition of sanctions under Fed. R. Civ. P. 37(c)(1) is within the discretion of the trial court. However, the exclusion of critical evidence is an extreme sanction, not normally imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence.

🖹 Civil Procedure : Sanctions : Discovery Misconduct
⬥When determining whether to exclude **expert** testimony under Fed. R. Civ. P. 37(c), a court must consider: (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or other cases of the court, and (4) the bad faith or willfulness in failing to comply with the district court's order. Sanctions should not be imposed if substantial justification exists for the failure to disclose, or if the failure to disclose was harmless. Moreover, the importance of the excluded testimony is an important final consideration.

🖹 Civil Procedure : Sanctions : Misconduct & Unethical Behavior
⬥Fed. R. Civ. P. 16(f) authorizes sanctions for the failure of a party or a party's attorney to obey a scheduling order. It provides that the court shall require the party or the attorney representing the party or both to pay the reasonable expenses incurred because of any noncompliance with this rule including attorney's fees, unless the judge finds that the noncompliance was substantially justified or that other circumstances make an award of expenses unjust.

**COUNSEL:** For MARIO G. COMUSO, PLAINTIFF: MARVIN I. BARISH, LAW OFFICES OF

MARVIN I. BARISH, P.C., PHILA, PA USA.

For NATIONAL RAILROAD PASSENGER CORPORATION, DEFENDANT: PAUL F. X. GALLAGHER, GALLAGHER, REILLY AND LACHAT, P.C., PHILA, PA USA.

For NATIONAL RAILROAD PASSENGER CORPORATION, DEFENDANT: WILFRED T. MILLS, JR., PHILADELPHIA, PA USA.

**JUDGES:** HERBERT J. HUTTON, J.

**OPINIONBY:** HERBERT J. HUTTON

**OPINION: MEMORANDUM AND ORDER**

HUTTON, J.

November 9, 1998

Presently before this Court is the Motion of Defendant National Railroad Passenger Corporation a/k/a AMTRAK to Extend the Deadline to Disclose **Expert** Liability Testimony (Docket No. 6), the Plaintiff's response thereto (Docket No. 7), the Defendant's Supplemental Memorandum of Law in support of its motion (Docket No. 8) and the Defendant's Supplement to its Motion for Extension **[*2]** (Docket No. 9).

**I. BACKGROUND**

On December 19, 1997, the Plaintiff, Mario G. Comuso, commenced the instant litigation pursuant to the Provisions of the Federal Employers' Liability Act, 45 U.S.C. §§ 51, et seq., alleging that on May 21, 1997, he injured his hand while attempting to remove pole foundation bolts near milepost 66.35, on the Conestoga River Bridge, Conestoga Creek, Lancaster, Pennsylvania. On August 17, 1998, this Court issued an Amended Scheduling Order requesting that all discovery be completed on or before November 2, 1998, and that all disclosure of **expert** testimony be completed thirty (30) days before the close of discovery. The thirtieth day before the close of discovery was October 3, 1998. On October 5, 1998, the Defendant alleges that the Plaintiff disclosed testimony of an engineering **expert,** George P. Widas, P.E., CSP. On October 6, 1998, after having failed to disclose **expert** testimony by the deadline, the Defendant, National Railroad Passenger Corporation a/k/a AMTRAK, filed the instant motion seeking an extension of time to disclose **expert** liability testimony until November 2, 1998. On October 19, 1998, the Plaintiff filed his motion and memorandum **[*3]** in opposition to the Defendant's motion. The Plaintiff seeks to preclude the Defendant from introducing **expert** testimony to rebut his own liability **expert,** or in the alternative, at least to pay the costs associated with the delay including attorney's fees. On October 30, 1998, the Defendant filed two supplements to its motion to extend deadline to disclose **expert** testimony. For the following reasons, the Defendant's motion is **GRANTED.**

**II. DISCUSSION**

**A. Extension of Deadline**

♣Under Rule 16(b) of the Federal Rules of Civil Procedure, the Court may only modify the Scheduling Order upon a showing of good cause. Fed. R. Civ. P. 16(b). The Advisory Committee Notes to Rule 16 provide that "the court may modify the schedule on a showing good cause if it cannot reasonably be met despite the diligence of the party seeking the extension." In order to establish good cause, the Defendant should demonstrate that a more diligent pursuit of discovery was impossible. McElyea v. Navistar Int'l Trans. Corp., 788 F. Supp. 1366, 1371 (E.D. Pa. 1991), aff'd without opinion, 950 F.2d 723 (3d Cir. 1991). The



Defendant has sustained its burden as to the reason for  **[*4]**  failing to meet the deadline for **expert** disclosures and the additional time needed to do so. Defendant explains that its failure to timely disclose **expert** testimony was justified, because of the Plaintiff's own failure to identify an **expert** in engineering until October 5, 1998. The Defendant contends that it was unable to retain **experts** before reviewing the discovery materials disclosed by the Plaintiff. The Defendant alleges that it has submitted all **expert** reports in its possession, with the exception of **expert** reports in liability, since the Plaintiff at no time indicated that he would be producing an **expert** liability report. Accordingly, the Defendant's Motion to extend the deadline for disclosing **expert** testimony is granted.

## B. Sanctions

## 1. Prohibiting Expert Testimony

The automatic disclosure provisions governed by Federal Rule of Civil Procedure 26 require the disclosure of **expert** reports. The purpose behind "requiring **expert** reports is 'the elimination of unfair surprise to the opposing party and the conservation of resources.'" Reed v. Binder, 165 F.R.D. 424, 429 (D.N.J. 1996) (quoting Sylla-Sawdon v. Uniroyal Goodrich Tire Co., 47 F.3d 277, **[*5]**  284 (8th Cir.), cert. denied, 516 U.S. 822, 133 L. Ed. 2d 42, 116 S. Ct. 84 (1995)). Federal Rule of Civil Procedure 37(c)(1) controls where a party fails to comply with **Rule 26**(a) or 26(e)(1). It states:

> A party that without substantial justification fails to disclose information required by **Rule 26**(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence at trial ... any witness or information not disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions.

Fed. R. Civ. P. 37(c)(1).

The imposition of sanctions under Rule 37(c)(1) is within the discretion of the trial court. Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 156 (3d Cir. 1995). However, "'the exclusion of critical evidence is an extreme sanction, not normally imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence.'" In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 791-92 (3d Cir. 1994), cert. denied, 513 U.S. 1190 (1995) (quoting Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894, **[*6]** 905 (3d Cir. 1977), overruled on other grounds, Goodman v. Lukens Steel Co., 777 F.2d 113 (3d Cir. 1985), aff'd, 482 U.S. 656, 96 L. Ed. 2d 572, 107 S. Ct. 2617 (1987)).

When determining whether to exclude **expert** testimony under Rule 37(c), a court must consider: (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or other cases of the court, and (4) the bad faith or willfulness in failing to comply with the district court's order. Meyers, 559 F.2d at 904-905. "Sanctions should not be imposed if substantial justification exists for the failure to disclose, or if the failure to disclose was harmless." Newman, 60 F.3d at 156. Moreover, "the importance of the excluded testimony is an important final consideration." Gibson v. National R.R. Passenger Corp., 176 F.R.D. 190, 192 (E.D. Pa. 1997) (citing Meyers, 559 F.2d at 905); see also Tunis Brothers Co., Inc. v. Ford Motor Co., 124 F.R.D. 95, 97-98 (E.D. Pa. 1989) (discussing **[*7]** 37(c) considerations).

In the instant action, these considerations weigh against the Plaintiff's request that the

Defendant be prohibited from presenting **expert** testimony. First, the Defendant explains that its failure to timely disclose **expert** testimony was justified, because of the Plaintiff's own failure to identify an **expert** in engineering until October 5, 1998. The Defendant contends that since the Plaintiff never previously indicated that he would be producing an **expert** liability report, it was impossible for the Defendant to disclose its own **expert** liability report. Accordingly, the Defendant asserts that its delay was excusable.

Second, the prejudice to the Plaintiff is minimal. According to this Court's Scheduling Order of August 17, 1998, the parties were required to disclose all **expert** testimony by October 5, 1998. Although the Defendant failed to do so, the delay has been minimal. Moreover, the Defendant's **expert** will address the very issues raised by the Plaintiff and will not inject any new elements or controversies into the case. Thus, this Court finds that the Plaintiff has not been unduly prejudiced or unfairly surprised by the Defendant's delayed production of its  **[*8]** **expert** reports.

Third, this Court cannot make a finding that the Defendant acted willfully and in bad faith. Although the Defendant admits that it failed to follow the Court's scheduling order, they have provided a reasonable excuse for their actions.

Finally, the Defendant's **expert** testimony is clearly essential to its ability to properly defend itself. The Plaintiff seeks to recover damages arising from an injury incurred while attempting to remove pole foundation bolts. To prove his case, the Plaintiff proposes to use an **expert** in engineering. The Defendant would suffer significant problems challenging this evidence without an **expert** of its own.

## 2. Expenses Including Attorney's Fees

⚓Rule 16(f) of the Federal Rules of Civil Procedure authorizes sanctions for the failure of a party or a party's attorney to obey a scheduling order. Fed. R. Civ. P. 16(f). It provides that the Court "shall require the party or the attorney representing the party or both to pay the reasonable expenses incurred because of any noncompliance with this rule including attorney's fees, unless the judge finds that the noncompliance was substantially justified or that other circumstances make an  **[*9]** award of expenses unjust." Id. In his response to the Defendant's motion, the Plaintiff requests that the Defendant pay all expenses incurred because of its noncompliance with the August 17, 1998 Order, including an award of attorney's fees. For the reasons stated above, this Court finds the Defendant's failure to disclose **expert** testimony of its liability **expert** substantially justified.

An appropriate Order follows.

## ORDER

AND NOW, this 9th day of November, 1998, upon consideration of the Motion of Defendant National Railroad Passenger Corporation a/k/a AMTRAK to Extend the Deadline to Disclose **Expert** Liability Testimony (Docket No. 6), the Plaintiff's response thereto (Docket No. 7), the Defendant's Supplemental Memorandum of Law in support of its motion (Docket No. 8) and the Defendant's Supplement to its Motion for Extension (Docket No. 9), IT IS HEREBY ORDERED that the Defendant's Motion is **GRANTED.**

IT IS FURTHER ORDERED that the Defendant SHALL have until November 23, 1998, to disclose **expert** liability testimony in rebuttal to the Plaintiff's **expert** in engineering, George P. Widas, P.E., CSP.

BY THE COURT:

HERBERT J. HUTTON, J.

Source: <u>All Sources</u> > <u>Federal Legal - U.S.</u> > <u>District Court Cases - By Circuit</u> > **US District Court Cases - 3rd Circuit** 
Terms: **"rule 26" and expert and untimely** (<u>Edit Search</u>)
View: **Full**
Date/Time: Wednesday, July 24, 2002 - 12:37 PM EDT

<u>About LexisNexis</u> | <u>Terms and Conditions</u>

<u>Copyright ©</u> 2002 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Source: All Sources > Federal Legal - U.S. > District Court Cases - By Circuit > **US District Court Cases - 3rd Circuit** 🛈
Terms: **"rule 26" and expert and untimely**  (Edit Search)

☞ Select for FOCUS™ or Delivery
☐

*2000 U.S. Dist. LEXIS 14362, \**

United States of America v. Compaction Systems Corporation, et al.

Civil Action No. 96-5349 (KSH)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

2000 U.S. Dist. LEXIS 14362

July 11, 2000, Decided
July 12, 2000, Filed; July 17, 2000, Entered on the Docket

**DISPOSITION:  [\*1]** Motion to Quash GRANTED.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Defendants/third-party plaintiffs, joined by state agency, moved to quash a subpoena issued by third-party defendant for deposition of a state environmental production inspector or, in the alternative, for a protective order pursuant to Fed. R. Civ. P. 26(c).

**OVERVIEW:** Third-party defendant issued a subpoena to depose a non-**expert** witness. Defendants/third-party plaintiffs moved to quash the subpoena as **untimely,** having been served well after the close of discovery. Third-party defendant argued that the deposition was relevant to providing information about the wastes disposed of by third-party defendant at a particular landfill superfund site. The court quashed the subpoena. The discovery deadline had long expired, and no motion had been made to extend it. Although there might have been some relevancy to the discovery sought, third-party defendant did not act promptly in requesting the deposition. Third-party defendant should have deposed the witness prior to the end of discovery, at which time it was aware of her under her maiden name, or when it contacted her to discuss her knowledge of the activities at the site, at which time it was aware of her under her married name. No prejudice would result from the court's determination because the information the witness would provide was within the knowledge of third-party defendant's employees.

**OUTCOME:** Defendants/third party plaintiffs' motion to quash subpoena for deposition granted because third-party defendant, who issued subpoena, did not act promptly in requesting deposition; motion for protective order not addressed.

**CORE TERMS:** discovery, subpoena, deposition, deadline, waste, protective order, inspection, partial, depose, summary judgment motion, summary judgment, undue burden, trial date, dispositive, disclosure, deposed, formal discovery, motion to quash, bifurcated, promptly, inspection report, quash a subpoena, reconsideration, rescheduled, third-party, settlement, scheduling, privileged, appearance, contending

### CORE CONCEPTS - ♦ Hide Concepts

📄 Civil Procedure : Trials : Subpoenas




See Fed. R. Civ. P. 45(c)(3)(A).

📄 Civil Procedure : Trials : Subpoenas
A motion to quash should be made by the person from whom the discovery is requested. Ordinarily a party has no standing to seek to quash a subpoena issued to someone who is not a party to the action unless the party claims some personal right or privilege with regard to the document sought.

📄 Civil Procedure : Trials : Subpoenas
Fed. R. Civ. P. 45 subpoenas are encompassed within the definition of "discovery," as enunciated in Fed. R. Civ. P. 26(a)(5) and, therefore, are subject to the same time constraints that apply to all of the other methods of formal discovery. Therefore, where a party is aware of the existence of information before the cutoff of discovery but fails to request such information until after the discovery deadline has passed, the and subpoenas should be denied.

📄 Civil Procedure : Trials : Subpoenas
When parties attempt to use subpoenas to obtain information just before trial, courts routinely find that subpoenas may not be used improperly as a discovery device.

📁 Civil Procedure : Disclosure & Discovery
📄 Governments : Courts : Authority to Adjudicate
Discovery and discovery rules mandate liberal reading. However, discovery, like all matters of procedure, has ultimate and necessary boundaries. Moreover, federal judges have broad discretion in discovery motions and controlling discovery.

📁 Civil Procedure : Discovery Methods
Counsel have a duty to plan discovery so that it may be completed in a timely manner and to inform the court promptly if unforeseen circumstances make compliance with the original deadline impossible.

**COUNSEL:** For EDWARD J. DAUBER, mediator: EDWARD J. DAUBER, GREENBERG, DAUBER, EPSTEIN & TUCKER, NEWARK, NJ.

For UNITED STATES OF AMERICA, plaintiff: SUSAN C. CASSELL, UNITED STATES ATTORNEY'S OFFICE, NEWARK, NJ.

For UNITED STATES OF AMERICA, plaintiff: BRIAN G. DONOHUE, UNITED STATES DEPARTMENT OF JUSTICE, WASHINGTON, DC.

For COMPACTION SYSTEMS CORPORATION, COMPACTION SYSTEMS CORPORATION OF CONNECTICUT, defendants: JEFFREY M. POLLACK, SILLS, CUMMIS, ZUCKERMAN, RADIN, TISCHMAN, EPSTEIN & GROSS, P.A., NEWARK, NJ.

For CONNECTICUT RESOURCE RECOVERY AUTHORITY, INC., defendant: BRIAN J. MOLLOY, WILENTZ, GOLDMAN & SPITZER, PC, WOODBRIDGE, NJ.

For OCCIDENTAL PETROLEUM CORPORATION, defendant: ROBERT JOSEPH FETTWEIS, FLEMING, ROTH & FETTWEIS, NEWARK, NJ.

For RAYONIER, INC., defendant: LYNN WRIGHT, ESQ., EDWARDS & ANGELL, ESQS., SHORT HILLS, NJ.

For KNOLL PHARMACEUTICAL COMPANY, INC., defendant: DAVID PAUL SCHNEIDER,

BRESSLER, AMERY & ROSS, PC, FLORHAM PARK, NJ.

For BROWNING-FERRIS INDUSTRIES OF SOUTH JERSEY, INC., defendant: WAYNE L. MELLO, HERSH, RAMSEY & BERMAN, P.C., MORRISTOWN, NJ.

For TOWN OF BOONTOWN, CHATHAM BOROUGH, EAST HANOVER TOWNSHIP, HANOVER TOWNSHIP, MOUNT ARLINGTON, MOUNTAIN LAKES BOROUGH, RANDOLPH TOWNSHIP, ROCKAWAY TOWNSHIP, WHARTON TOWNSHIP, third-party defendants: JOHN H. DORSEY, DORSEY & FISHER, ESQS., BOONTON, NJ.

For CWM CHEMICAL SERVICES, INC., R&R SANITATION SERVICES, INC., WASTE MANAGEMENT OF NORTH JERSEY, third-party defendants: PAMELA S. GOODWIN, SAUL, EWING, REMICK & SAUL LLP, PRINCETON, NJ.

For TOWN OF DARIEN, TOWN OF EASTON, TOWN OF GREENWICH, TOWN OF MONROE, TOWN OF STRATFORD, TOWN OF TRUMBULL, TOWN OF WESTPORT, third-party defendants: BARBARA H. KELLY, WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP, NEWARK, NJ.

For CHATHAM TOWNSHIP, third-party defendant: CARL R WOODWARD, III, CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI, STEWART & OLSTEIN, ROSELAND, NJ.

For DAYCO CORPORATION, third-party defendant: MICHAEL DAVID LICHTENSTEIN, LOWENSTEIN, SANDLER, KOHL, FISHER & BOYLAN, ROSELAND, NJ.

For DART INDUSTRIES, INC., third-party defendant: DAVID W. REGER, BRESSLER, AMERY & ROSS, ESQS., MORRISTOWN, NJ.

For DENVILLE, HACKETTSTOWN, MORRIS PLAINS BOROUGH, MOUNT OLIVE TOWNSHIP, PARSIPPANY-TROY HILLS TOWNSHIP, ROCKAWAY BOROUGH, ROXBURY TOWNSHIP, WASHINGTON BOROUGH, third-party defendants: STEVEN A. KUNZMAN, DIFRANCESCO, KUNZMAN, COLEY, YOSPIN, BERNSTEIN & BATEMAN, PC, WARREN, NJ.

For DOMINICK INTERNATIONAL, THATCHER GLASS MANUFACTURING COMPANY, third-party defendants: DONALD J. CAMERSON, II, BRESSLER, AMERY & ROSS, FLORHAM PARK, NJ.

For EAST HANOVER TOWNSHIP, third-party defendant: JOHN C. MARCOLINI, ESQ., WEINER LESNIAK, PARSIPPANY, NJ.

For FILIBERTO SANITATION, INC., third-party defendant: DAMON R. SEDITA, SCHWARTZ, TOBIA, STANZIALE, BECKER, ROSENSWEIG & SEDITA, MONTCLAIR, NJ.

For FLORHAM PARK BOROUGH, third-party defendant: JOSEPH J. BELL, DENVILLE, NJ.

For HARDING TOWNSHIP, third-party defendant: GREGORY JOSEPH COFFEY, COFFEY & SULLIVAN, ESQS., MORRISTOWN, NJ.

For KEUFFEL & ESSER COMPANY, third-party defendant: JOHN H. KLOCK, GIBBONS, DEL DEO, DOLAN, GRIFFINGER & VECCHIONE, PC, NEWARK, NJ.

For LESLIE CONTROLS, INC., third-party defendant: FRANK A LATTAL, CONNELL, FOLEY & GEISER, P.C., ROSELAND, NJ.

For MENNEN COMPANY, THE, third-party defendant: JOHN A. MCKINNEY, JR., ESQ., MCCARTER & ENGLISH, LLP, NEWARK, NJ.

For MORRIS TOWNSHIP, third-party defendant: JOHN M MILLS, III, MILLS & MILLS,



MORRISTOWN, NJ.

For MORRISTOWN, third-party defendant: THOMAS F. COLLINS, ESQ., VOGEL, CHAIT, SCHWARTZ AND COLLINS, MORRISTOWN, NJ.

For PAUL M. RITTER ROOFING CO., third-party defendant: JAMES R GREENE, HARDIN, KUNDLA, MCKEON, POLETTO & POLIFRONI, PC, SPRINGFIELD, NJ.

For POLICASTRO SANITATION, third-party defendant: PAMELA R. ESTERMAN, SIVE, PAGET & RIESEL, P.C., NEW YORK, NY.

For POLICASTRO SANITATION, third-party defendant: RONALD S. BERGAMINI, RONALD S. BERGAMINI, COUNSELLOR AT LAW, HASBROUCK HEIGHTS, NJ.

For WASHINGTON TOWNSHIP, third-party defendant: KIM HOLLAENDER, MANTA AND WELGE, WEST TRENTON, NJ.

For MENNEN COMPANY, THE, MENNEN COMPANY, fourth-party plaintiffs: JOHN A. MCKINNEY, JR., ESQ., MCCARTER & ENGLISH, LLP, NEWARK, NJ.

For WASTE MANAGEMENT OF NORTH JERSEY, WASTE MANAGEMENT OF NORTH JERSEY, INC., fourth-party plaintiffs: PAMELA S. GOODWIN, SAUL, EWING, REMICK & SAUL LLP, PRINCETON, NJ.

For OCCIDENTAL PETROLEUM CORPORATION, cross-claimant: ROBERT JOSEPH FETTWEIS, FLEMING, ROTH & FETTWEIS, NEWARK, NJ.

For CONNECTICUT RESOURCE RECOVERY AUTHORITY, INC., cross-claimant: BRIAN J. MOLLOY, WILENTZ, GOLDMAN & SPITZER, PC, WOODBRIDGE, NJ.

For COMPACTION SYSTEMS CORPORATION, COMPACTION SYSTEMS CORPORATION OF CONNECTICUT, cross-claimants: JEFFREY M. POLLACK, SILLS, CUMMIS, ZUCKERMAN, RADIN, TISCHMAN, EPSTEIN & GROSS, P.A., NEWARK, NJ.

For WHARTON TOWNSHIP, ROCKAWAY TOWNSHIP, RANDOLPH TOWNSHIP, MOUNTAIN LAKES BOROUGH, MOUNT ARLINGTON, HANOVER TOWNSHIP, EAST HANOVER TOWNSHIP, CHATHAM BOROUGH, TOWN OF BOONTOWN, cross-claimants: JOHN H. DORSEY, DORSEY & FISHER, ESQS., BOONTON, NJ.

For ROXBURY TOWNSHIP, MOUNT OLIVE TOWNSHIP, MORRIS PLAINS BOROUGH, MONTVILLE TOWNSHIP, DENVILLE, HACKETTSTOWN, PARSIPPANY-TROY HILLS TOWNSHIP, ROCKAWAY BOROUGH, cross-claimants: STEVEN A. KUNZMAN, DIFRANCESCO, KUNZMAN, COLEY, YOSPIN, BERNSTEIN & BATEMAN, PC, WARREN, NJ.

For FLORHAM PARK BOROUGH, cross-claimant: JOSEPH J. BELL, DENVILLE, NJ.

For TOWN OF DARIEN, TOWN OF EASTON, TOWN OF GREENWICH, TOWN OF MONROE, TOWN OF STRATFORD, TOWN OF TRUMBULL, TOWN OF WESTPORT, cross-claimants: BARBARA H. KELLY, WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP, NEWARK, NJ.

For PAUL M. RITTER ROOFING CO., cross-claimant: JAMES R GREENE, HARDIN, KUNDLA, MCKEON, POLETTO & POLIFRONI, PC, SPRINGFIELD, NJ.

For MORRISTOWN, cross-claimant: THOMAS F. COLLINS, ESQ., VOGEL, CHAIT, SCHWARTZ AND COLLINS, MORRISTOWN, NJ.

For CHATHAM TOWNSHIP, cross-claimant: CARL R WOODWARD, III, CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI, STEWART & OLSTEIN, ROSELAND, NJ.

For FILIBERTO SANITATION, INC., cross-claimant: DAMON R. SEDITA, SCHWARTZ, TOBIA, STANZIALE, BECKER, ROSENSWEIG & SEDITA, MONTCLAIR, NJ.

For EAST HANOVER TOWNSHIP, cross-claimant: JOHN C. MARCOLINI, ESQ., WEINER LESNIAK, PARSIPPANY, NJ.

For HARDING TOWNSHIP, cross-claimant: GREGORY JOSEPH COFFEY, COFFEY & SULLIVAN, ESQS., MORRISTOWN, NJ.

For MORRIS TOWNSHIP, cross-claimant: JOHN M MILLS, III, MILLS & MILLS, MORRISTOWN, NJ.

For DOMINICK INTERNATIONAL, THATCHER GLASS MANUFACTURING COMPANY, cross-claimants: DONALD J. CAMERSON, II, BRESSLER, AMERY & ROSS, FLORHAM PARK, NJ.

For MENNEN COMPANY, cross-claimant: JOHN A. MCKINNEY, JR., ESQ., MCCARTER & ENGLISH, LLP, NEWARK, NJ.

For WASTE MANAGEMENT OF NORTH JERSEY, cross-claimant: PAMELA S. GOODWIN, SAUL, EWING, REMICK & SAUL LLP, PRINCETON, NJ.

For COMPACTION SYSTEMS CORPORATION, COMPACTION SYSTEMS CORPORATION OF CONNECTICUT, third-party plaintiffs: JEFFREY M. POLLACK, SILLS, CUMMIS, ZUCKERMAN, RADIN, TISCHMAN, EPSTEIN & GROSS, P.A., NEWARK, NJ.

For CONNECTICUT RESOURCE RECOVERY AUTHORITY, INC., third-party plaintiff: BRIAN J. MOLLOY, WILENTZ, GOLDMAN & SPITZER, PC, WOODBRIDGE, NJ.

For OCCIDENTAL PETROLEUM CORPORATION, third-party plaintiff: ROBERT JOSEPH FETTWEIS, FLEMING, ROTH & FETTWEIS, NEWARK, NJ.

For RAYONIER, INC., third-party plaintiff: LYNN WRIGHT, ESQ., EDWARDS & ANGELL, ESQS., SHORT HILLS, NJ.

For KNOLL PHARMACEUTICAL COMPANY, INC., third-party plaintiff: DAVID PAUL SCHNEIDER, BRESSLER, AMERY & ROSS, PC, FLORHAM PARK, NJ.

For BROWNING-FERRIS INDUSTRIES OF SOUTH JERSEY, INC., third-party plaintiff: WAYNE MELLO, HERSH, RAMSEY & BERMAN, P.C., MORRISTOWN, NJ.

For WHARTON TOWNSHIP, ROCKAWAY TOWNSHIP, RANDOLPH TOWNSHIP, MOUNTAIN LAKES BOROUGH, MOUNT ARLINGTON, HANOVER TOWNSHIP, EAST HANOVER TOWNSHIP, CHATHAM BOROUGH, TOWN OF BOONTOWN, counter-claimants: JOHN H. DORSEY, DORSEY & FISHER, ESQS., BOONTON, NJ.

For ROXBURY TOWNSHIP, MOUNT OLIVE TOWNSHIP, MORRIS PLAINS BOROUGH, MONTVILLE TOWNSHIP, DENVILLE, counter-claimants: STEVEN A. KUNZMAN, DIFRANCESCO, KUNZMAN, COLEY, YOSPIN, BERNSTEIN & BATEMAN, PC, WARREN, NJ.

For FLORHAM PARK BOROUGH, counter-claimant: JOSEPH J. BELL, DENVILLE, NJ.

For TOWN OF DARIEN, TOWN OF EASTON, TOWN OF GREENWICH, TOWN OF MONROE, TOWN OF STRATFORD, TOWN OF TRUMBULL, TOWN OF WESTPORT, counter-claimants:

BARBARA H. KELLY, WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP, NEWARK, NJ.

For PAUL M. RITTER ROOFING CO., counter-claimant: JAMES R GREENE, HARDIN, KUNDLA, MCKEON, POLETTO & POLIFRONI, PC, SPRINGFIELD, NJ.

For CHATHAM TOWNSHIP, counter-claimant: CARL R WOODWARD, III, CARELLA, BYRNE, BAIN, GILFILLAN, CECCHI, STEWART & OLSTEIN, ROSELAND, NJ.

For FILIBERTO SANITATION, INC., counter-claimant: DAMON R. SEDITA, SCHWARTZ, TOBIA, STANZIALE, BECKER, ROSENSWEIG & SEDITA, MONTCLAIR, NJ.

For EAST HANOVER TOWNSHIP, counter-claimant: JOHN C. MARCOLINI, ESQ., WEINER LESNIAK, PARSIPPANY, NJ.

For HARDING TOWNSHIP, counter-claimant: GREGORY JOSEPH COFFEY, COFFEY & SULLIVAN, ESQS., MORRISTOWN, NJ.

For MORRIS TOWNSHIP, counter-claimant: JOHN M MILLS, III, MILLS & MILLS, MORRISTOWN, NJ.

For DOMINICK INTERNATIONAL, THATCHER GLASS MANUFACTURING COMPANY, counter-claimants: DONALD J. CAMERSON, II, BRESSLER, AMERY & ROSS, FLORHAM PARK, NJ.

For MENNEN COMPANY, counter-claimant: JOHN A. MCKINNEY, JR., ESQ., MCCARTER & ENGLISH, LLP, NEWARK, NJ.

For ROCKAWAY BOROUGH, counter-claimant: STEVEN A. KUNZMAN, DIFRANCESCO, KUNZMAN, COLEY, YOSPIN, BERNSTEIN & BATEMAN, PC, WARREN, NJ.

**JUDGES:** RONALD J. HEDGES, UNITED STATES MAGISTRATE JUDGE.

**OPINIONBY:** RONALD J. HEDGES

**OPINION: LETTER-OPINION AND ORDER**

**ORIGINAL FILED WITH THE CLERK OF THE COURT**

John H. Klock, Esq.
Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C.
One Riverfront Plaza
Newark, NJ 07102-5497

Lynn Wright, Esq.
Edwards & Angell, Esqs.
150 John F. Kennedy Parkway
Short Hills, NJ 07078-2701

Re: **United States of America v. Compaction Systems Corporation, et al.**

Civil Action No. 96-5349 (KSH)

Dear Counsel:

**INTRODUCTION**

This matter comes before me on the motion of defendants/third-party plaintiffs, Browning

Ferris Industries of North Jersey, Inc., Connecticut Resources Recovery Authority, Knoll Pharmaceutical Company, Occidental Petroleum Corporation, and Rayonier Inc. and third-party defendants BASF Corporation, CWM Chemical Services LLC f/k/a CWM Chemical Services, Inc., as successor to R&R Sanitation, Waste Management of North Jersey, Inc., Cadillac Plastic Groups, Inc., Dart Industries, Inc., Garbco Associates, Inc. f/k/a J. Filiberto Sanitation Inc., The Mennen Company, and Paul Ritter Roofing Co., Inc. (the "Settlors"), to quash **[*2]** a subpoena issued by third-party-defendant Keuffel & Esser Company ("K&E") for the deposition of Tessie Fields ("Fields") or, in the alternative, for a protective order pursuant to **Rule 26**(c). The New Jersey Department of Environmental Production ("NJDEP") joins in the motion. K&E opposes the motion. I have considered the papers submitted in support of and in opposition to the motion. There was no oral argument. Rule 78.

## BACKGROUND

On August 15, 1997, a scheduling order was issued providing that depositions of non-**expert** witnesses were to be conducted between November 1, 1997 and April 15, 1998. With consent of the parties, depositions were rescheduled and I ordered that nonexpert fact discovery be completed by September 8, 1998. The deadline was extended to October 23, 1998, at which time, discovery concluded. Settlors and K&E consented to my jurisdiction, and a trial date was scheduled for May 10, 1999.

Dispositive motions were filed and the trial date was adjourned. K&E's summary judgment motion was denied on June 18, 1999. Settlors moved for partial summary judgment against K&E. As part of this motion, an affidavit by Fields, a NJDEP inspector, was submitted, which set **[*3]** forth the scope of her knowledge relating to K&E's disposal of waste at the Combe Fill North Landfill Superfund Site (the "Site"). n1 K&E sought to exclude the affidavit, contending that it was undated and unsworn and that K&E was "surprised and prejudiced" by its "last minute appearance". K&E argued that the Settlors were required on three occasions during discovery to provide the identity of every person who had knowledge regarding allegations that K&E transported waste to the Site and failed to provide Fields as someone with such knowledge. K&E also attempted to "preclude the Settlors from introducing any statements, [ ], testimony or other evidence made by Fields." Order of July 19, 1999, at 10.

- - - - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n1 Fields was the NJDEP inspector in 1981 when she visited inspected the K&E facility. At the inspection, she prepared a contemporaneous report in which she described some of the substances K&E disposed of at the Site. The information in the report was provided by two K&E employees.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

The Settlors argued that K&E **[*4]** should not have been surprised by the affidavit because the same information was set forth in an inspection report in Fields' maiden name, Wishart, which K&E should have received at the time of the inspection. If not, K&E had access to the inspection report since June of 1997, when both the United States and the Settlors placed the report in the document depository. The Settlors contended that in July 1998, another copy of the report was sent to K&E.

Based on K&E's arguments, I excluded the Affidavit from my consideration of K&E's alleged disposal of wastes at the Site, concluding that, "it [was] not reasonable to assume that, from the information the Settlors supplied to K&E, K&E was made aware that Fields had such knowledge." n2 I then granted Settlors' motion for partial summary judgment, finding K&E liable. I granted K&E's motion for reconsideration, but reversed the decision on December 1, 1999. In the December 1st Order, I affirmed K&E's liability and reinstated my July 15th Order granting the Settlors' motion for partial summary judgment. n3 I also instructed the parties

to "submit to the Court evidence that Settlors' payment to the United States Government exceeded payment **[\*5]** of their fair share of the settlement [to] include the Settlors' and K&E's recommendations as to how liability should be apportioned and documentation justifying such proposals. This shall be submitted no later than March 1, 2000." Order of Dec. 1, 1999, at 26. The parties did not timely submit their allocations. Rather, an extension was requested and the Settlors provided their **expert** report on April 18, 2000. The trial date for the determination of damages was rescheduled to the week of September 18, 2000. On May 5, 2000, K&E moved to issue a subpoena for the deposition of Fields to prepare for the trial. Settlors now move to quash or in the alternative, for a protective order.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n2 I held that Rule 37(c) will not permit the disclosure of such information when a "party without substantial justification fails to disclose information required by **Rule 26**(a) or 26(e) . . . unless such failure is harmless [to] be permitted to use as evidence at a trial, at a or on a motion any witness or information not so disclosed." Rule 37(c). Settlors argued that they were not aware of Wishart's current name or that she still worked for the NJDEP. **[\*6]**

n3 I denied K&E's Motion for Reconsideration on February 1, 2000.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

The Settlors oppose the deposition on the grounds that it is **untimely,** having been served well after the close of discovery and seeking information that is not relevant to damages. Settlors argue that K&E had the opportunity to depose Fields during discovery and that, K&E is aware of what Fields knows. Furthermore, Settlors argue, in late 1998 or early 1999, K&E's counsel contacted Fields telephonically to question her about the Site. During that conversation, K&E's counsel asked Fields if she had been deposed and asked her substantive questions regarding K&E and the Site. Settlors argue that despite K&E's knowledge of Fields, K&E failed to depose her. Moreover, Settlors contend that Fields' knowledge is limited to K&E's employees told her during her inspection of the K&E facility and that no new information is available from her that warrants reopening discovery. Settlors also argue that Fields' knowledge is relevant solely on the issue of liability, which has already been decided, and that K&E is merely attempting to delay **[\*7]** the trial, confuse issues related to liability, and to cause Settlors to incur further expense. Simply, Settlors argue that K&E seeks to "make an end run around this Court's holding that K&E is liable at the Site". Settlors' Letter Brief, May 18, 2000.

The NJDEP joins in Settlors' motion. NJDEP filed its own cost recovery action for the Site in State court (NJDEP v. BASF Corp., et al., Docket No. MRSL-1196-98), in which K&E is named as a direct defendant. Discovery in that action is stayed pending the conclusion of settlement negotiations. NJDEP agrees with Settlors in that that deposing Fields at this time is inappropriate and out of time. It further argues that, "for this party to depose Tessie Fields in the instant matter despite the apparent close of discovery would permit K&E to take discovery from NJDEP in violation of the stay in the NJDEP action."

K&E argues that the deposition is relevant and necessary to provide the Court with information regarding the wastes disposed of by K&E at the Site. K&E also argues that Fields' testimony may show that K&E has no liability in that its share of waste deposited at the Site constitutes no more than background amounts of hazardous **[\*8]** substances or a de minimis share. K&E further argues that it could not have deposed Fields in April 1999 because discovery was closed and the parties were engaged in dispositive motions. K&E attacks Settlors' **expert's** opinion, contending that it would not pass the standards of Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993). K&E challenges Settlors' methodology of allocation in that it is not volumetric. K&E argues that volume is a key factor of the allocation and that the Gore factors, of which this is

part, should apply.

K&E also argues that the Court agreed to the deposition in its May 5th conference, a verbal order to which Settlors' did not object at the time, and a subsequent proposed form of order, to which they also did not object. Moreover, K&E argues that it met the requirements of Rule 45(c) in that the subpoena was timely, that Fields did not object to the timing and scope of the subpoena, that her work location is within 100 miles of where the deposition will occur, that the subpoena does not require the disclosure of privileged or other protected matter, and it does not subject her to any undue burden. **[*9]** K&E argues that before the Court quashes a subpoena on the basis of oppressiveness, it should consider modifying it. K&E points out that Fields and Settlors have no undue burden and that there will be no undue delay to Settlors in that the deposition will last only one day. K&E argues against the issuance of a protective order.

**DISCUSSION**

⏧Rule 45(c) provides that,

> "On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
>
> (i) fails to allow reasonable time for compliance;
> (ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person . . ., or
> (iii) requires disclosure of privileged or other protected matter and no exception or waiver apples, or
> (iv) subjects a person to undue burden . . .

In such an instance,

> The court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue **[*10]** hardship and assure that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

Rule 45(c)(3)(A). ⏧"A motion to quash . . . should be made by the person from whom the [discovery is] requested. Ordinarily a party has no standing to seek to quash a subpoena issued to someone who is not a party to the action unless the party claims some personal right or privilege with regard to the document sought." 9A Wright & A. Miller, Federal Practice and Procedure, § 2459 at 41 (2d ed. 1994) (footnotes omitted); see Smith v. Midland Brake, Inc., 162 F.R.D. 683, 685 (D.Kan. 1995).

⏧Rule 45 subpoenas "are encompassed within the definition of 'discovery,' as enunciated in **Rule 26**(a)(5) and, therefore, are subject to the same time constraints that apply to all of the other methods of formal discovery." Marvin Lumber and Cedar Co. v. PPG Indus., Inc., 177 F.R.D. 443, 445 (D.Minn. 1997). Therefore, where a party is aware of the existence of information before the cutoff of discovery but fails to request such information until after the discovery deadline has **[*11]** passed, the discovery and subpoenas should be denied.



McNerney v. Archer Daniels Midland Co., 164 F.R.D. 584, 588 (W.D. N.Y. 1995); see Leach v. Quality Health Services, 162 F.R.D. 40, 42 (E.D. Pa. 1995). ☦When parties attempt to use subpoenas to obtain information just before trial, courts routinely find that "subpoenas [may not be used] improperly as a discovery device." Puritan Inv. Corp. v. ASLL Corp., 1997 U.S. Dist. LEXIS 19559, *5, 1997 WL 793569, *2 (E.D.Pa. Dec. 9, 1997) (documents should have been requested through formal discovery procedure).

☦Discovery and discovery rules mandate liberal reading. GLS v. Dow Chemical Co., 1989 U.S. Dist. LEXIS 14034, 1989 WL 144056, *2 (E.D. Pa. Nov. 21, 1989); see Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 350, 57 L. Ed. 2d 253, 98 S. Ct. 2380 (1978); Hickman v. Taylor, 329 U.S. 495, 507, 91 L. Ed. 451, 67 S. Ct. 385 (1947). However, "discovery, like all matters of procedure, has ultimate and necessary boundaries." Oppenheimer Fund, 437 U.S. at 351; see Hickman, 329 U.S. at 507. Moreover, I have broad discretion in discovery motions and controlling discovery. **[*12]** Herbert v. Lando, 441 U.S. 153, 177, 60 L. Ed. 2d 115, 99 S. Ct. 1635 (1979) ("judges should not hesitate to exercise appropriate control over the discovery process"); see GLS, 1989 WL 144056, at *2; Frank v. County of Hudson, 924 F. Supp. 620, 623 (D.N.J. 1996); National Gateway Telecom, Inc. v. Aldridge, 701 F. Supp. 1104, 1119 (D.N.J. 1988), aff'd, 879 F.2d 858 (3d Cir. 1989). Rule 16(b) permits me to issue scheduling orders, and Rule 16(b)(3) enables me to limit the time in which discovery is to be completed. GLS, 1989 WL 144056, at *2.

☦Counsel have a duty to plan discovery so that it may be completed in a timely manner and to "inform the court *promptly* if unforeseen circumstances make compliance with the original deadline impossible." GLS, 1989 WL 144056, at *2 (emphasis added). To ignore discovery deadlines renders them meaningless and deprives the Court of the discretion needed to ensure "fair and orderly discovery." Clarke v. Mellon Bank, 1993 U.S. Dist. LEXIS 6680, *18, 1993 WL 170950, *5 (E.D.Pa. May 11, 1993). The discovery deadline was October of 1998. No motion was **[*13]** made to extend this deadline. Although the proceedings here were bifurcated into a summary judgment motion on liability and a trial on damages, discovery was not bifurcated. Therefore, although there may be some relevancy to the discovery it seeks, K&E did not act promptly in requesting this deposition. K&E should have deposed Fields prior to the end of discovery, at which time K&E was aware of her as "Wishart", or over one year ago when K&E contacted her to discuss her knowledge of the activities at the Site, at which time K&E was aware of her under her married name, "Fields." K&E had another opportunity to depose Fields when her affidavit appeared as part of Settlors' partial summary judgment motion. Despite the dispositive motions, K&E could and should have moved for discovery related to Fields, rather than moving to preclude her testimony and affidavit. Moreover, although the NJDEP's interest in this deposition does not require me to quash this subpoena, I find it interesting that K&E requested Fields' deposition here while discovery in the related State action against it has been stayed.

Based on the foregoing, I will grant Settlors' motion to quash the subpoena. I will not address **[*14]** the motion for a protective order. K&E will not be prejudiced by this determination because, as Settlors argue, the information that Fields would provide is within the knowledge of K&E's employees, who provided her with the information she reported during her inspection. n4

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n4 I will address K&E's Daubert motion at trial.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

## CONCLUSION

Based on the foregoing, the Motion to Quash is GRANTED.

SO ORDERED.

RONALD J. HEDGES, U.S.M.J.

Source:  All Sources > Federal Legal - U.S. > District Court Cases - By Circuit > **US District Court Cases - 3rd Circuit** 🛈
Terms:  **"rule 26" and expert and untimely**  (Edit Search)
View:  Full
Date/Time:  Wednesday, July 24, 2002 - 12:34 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2002 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.