56
12/16/0

1                IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

2

3    JOAN D. TESCHE,                 :
            Plaintiff

4                           :

            v.              CIVIL ACTION NO. 1:CV-01-0326

5                           :

   CNA INSURANCE COMPANIES

6    and CONTINENTAL CASUALTY      :
   COMPANY,

7             Defendants     :

8

9

10                TRANSCRIPT OF PROCEEDINGS

11                   NON-JURY TRIAL

12       Before:   Hon. William W. Caldwell, Senior Judge

13       Date:   August 9, 2002

14       Place:   Courtroom No. 1
                 Federal Building

15                  Harrisburg, Pa.

16

17

**FILED**
**HARRISBURG, PA**

DEC 13 2002

MARY E. D'ANDREA, CLERK
Per _____ Deputy Clerk

18    COUNSEL PRESENT:

19       BRADFORD DORRANCE, Esquire

20         For - Plaintiff

21       MICHAEL J. BURNS, Esquire

22         For - Defendants

23

24                          Monica L. Zamiska, RPR

25                          Official Court Reporter

2

INDEX TO WITNESSES

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| For the Plaintiff: | | | | |
| Joan D. Tesche | 5 | 23 | 32 | |
| Cheryl Sauerhoff | 34 | | | |
| | | | | |
| For the Defendants: | | | | |
| Cheryl Sauerhoff (recalled) | 68 | 88 | 104 | |

INDEX TO EXHIBITS

|  | Identified | Admitted |
|---|---|---|
| For the Plaintiff: | | |
| P X A (Dr. Wolf's deposition transcript) | 67 | |
| P X B (social security ruling 96-8, dated 7-2-96) | 67 | 67 |
| | | |
| For the Defendants: | | |
| D X A (Continental Casualty Co.'s claim file for Joan Tesche-administrative claim) | 28 | 108 |
| | | |
| Joint Exhibits: | | |
| J X 1 (Continental Casualty Co. Group Ltd. policy issued to AMP, Inc.) | 68 | 108 |
| J X 2 (2-21-00 Continental Casualty Co.'s LTD claim determination dated 2-21-00) | 46 | 108 |
| J X 3 (Social Security Administration's 1-15-01 notice of award in favor of Joan Tesche) | 13 | 108 |

3

1          THE COURT:  Are we ready to proceed?  I assume that

2      we are.

3          MR. DORRANCE:  Yes, judge, if I may, Brad Dorrance

4      here on behalf of the plaintiff Joan Tesche.  I believe Mr.

5      Burns and I have agreed, unless the Court would like an

6      opening statement, that we'll waive the right to present an

7      opening.

8          THE COURT:  I think I understand the problem.

9          MR. DORRANCE:  Thank you very much.

10         We do have an exhibit list which we have handed up

11     to you.  I believe Mr. Burns and I stipulate to the

12     authenticity and admissibility of all documents with the

13     exception of the claim file.

14         Now the claim file in most respects is acceptable

15     to me.  However, there has been a recent issue that has

16     arisen.  We, and this touches on the recently filed motion to

17     preclude the expert testimony, and I know this isn't the

18     appropriate time or place to go into a lengthy explanation,

19     judge, of the background of this, but I think it's necessary

20     if the Court wants to consider the admissibility of the claim

21     file today.

22         THE COURT:  I don't know if I do or not.  Why don't

23     we proceed, and at the appropriate time, if you object to

24     something, why I can address it then.

25         MR. DORRANCE:  Thank you.  I'm just succinctly

4

1    stating we thought that we were going to have the vocational

2    specialist from Continental here today to testify.  I don't

3    know if that gentleman would be qualified as an expert, but

4    he's the individual who made the vocational decision on

5    behalf of the insurance company.  Both parties identified

6    Tony Gulledge in their pretrial statement as a witness for

7    trial.  After the pretrial statements were filed, I learned

8    that he was no longer employed by the defendant.  I tried to

9    seek some stipulations on the vocational points, that was

10   unavailing.  I tried to get someone else to substitute for

11   Mr. Gulledge, that was unavailing.  So then I finally got my

12   own expert, my own report admittedly belated, but I got it,

13   and so that's the context of this issue of what the parties

14   should be permitted to do on the vocational issue.

15          MR. BURNS:  Your Honor, to respond, I would just

16   disagree, and I think we can address this issue through the

17   briefing that you have requested subsequent to trial.

18          THE COURT:  I think so, too.

19          MR. BURNS:  In terms of the exhibits, I do not have

20   a problem with any of the exhibits in terms of the Court

21   taking them into consideration and for purposes of being

22   authentic.  However, there is one exhibit, Plaintiff's

23   Exhibit B, which is the social security ruling, which while

24   the Court may deem it admissible, I do not deem it admissible

25   because it's not relevant.  We are not trying the social

5

1    security case here.  We are trying a case based on a

2    long-term disability insurance policy.  That's my only

3    statement, Your Honor.  Thanks.

4            MR. DORRANCE:  Thank you, judge.  I have two

5    witnesses, Joan Tesche and, as on cross, Cheryl Sauerhoff.

6    So I'd like to call Mrs. Tesche if I could.

7            Judge, would you mind if I conducted the direct up

8    here?

9            THE COURT:  No, that's fine, just don't stand

10   between Mr. Burns and the witness.

11           MR. DORRANCE:  Okay.  Can you see?

12           MR. BURNS:  Fine.

13           JOAN DALTON TESCHE, called as a witness, being duly

14   sworn or affirmed, testified as follows:

                        DIRECT EXAMINATION

16   BY MR. DORRANCE:

17   Q    Joan, please state your full name and address.

18   A    Joan Dalton Tesche, 7737 Fishing Creek Valley Road,

19   Harrisburg, Pa.

20   Q    And what's your date of birth, Joan?

21   A    2-1-55.

22   Q    Joan, have you ever testified in a court hearing or a

23   trial before?

24   A    No.

25   Q    Just to give you some overview of the topics we're

6

1    going to discuss, and I know the Judge is going to get

2    medical evidence from Dr. Wolf, so we don't need to dwell too

3    much on medical evidence.  We're going to touch on four or

4    five major categories, your educational background, your work

5    history, your medical history as it relates to your claimed

6    disability, your activities of daily living, your interview

7    with a vocational specialist Mr. Gulledge and, finally, why

8    you feel you cannot work, why you feel you're disabled.  Do

9    you have any questions before we begin?

10   A    No, I don't.

11   Q    Okay.

12        MR. DORRANCE:  Judge, occasionally Mrs. Tesche has

13   to get up.  Is that okay?

14        THE COURT:  Sure, just let me know when.

15        MR. DORRANCE:  Okay, or she might raise her hand or

16   something like that.

17   BY MR. DORRANCE:

18   Q    Joan, please summarize your educational background for

19   Judge Caldwell.

20   A    I have a high school degree.  I went to a business

21   school for secretarial training.  I also received a Desk Top

22   Publishing certificate, and then I was going to HACC for an

23   AA in computer systems.

24   Q    Okay, when did you first begin matriculating at AMP, I

25   mean, at HAAC?

7

1    A    1993 was the first year I attended classes at HACC.

2    Q    Okay, so sometime after you graduated from high school?

3    A    Yes.

4    Q    When did you graduate from high school?

5    A    1971.

6    Q    Okay, could you briefly summarize your work experience

7    starting with your first job but putting more emphasis on

8    your more recent jobs, including the one as a systems

9    procedure analyst at AMP?

10    A    My first job I was 12 years old and I started cleaning

11    houses for the elderly at my church.  At 17 I did waitressing

12    at a nearby restaurant, and there was several restaurants

13    after that.  I stayed at home for about five years while my

14    children were -- before they went to school, and then I

15    worked as a clerk receiving tickets at a police station, and

16    I went to Phoenixville Hospital and worked as an admission

17    representative after that, and then I went to AMP and worked

18    there for about 10 years.

19    Q    How long did you work at Phoenixville Hospital?

20    A    Three years.

21    Q    After your children started going to school were you

22    more or less continuously employed?

23    A    Yes.

24    Q    And then if you could just briefly describe your job

25    responsibilities as a systems procedure analyst.  Is that the

8

1    correct term?

2    A    Yes, it is.  My position required me to do on-line, on

3    computers, on-line documentation.  It would be the help

4    windows that pop up when you need help or by pressing an F1

5    key or using a mouse to receive help from a computer, and I

6    also wrote manuals, hard copy manuals, in case the computer

7    user would be more comfortable reading on paper rather than

8    on the computer screen.

9    Q    And when did you start working at AMP?

10    A    In 1988.

11    Q    And then your first job there was as a secretary.  Is

12    that correct?

13    A    Yes, I started as a secretary and worked my way up.

14    Q    Okay, and is that when you -- as part of working your

15    way up, was that when you took the Desk Top Publishing

16    course?

17    A    Yes, it was.

18    Q    Okay, did there come a time when you ceased working for

19    AMP?

20    A    I had several back surgeries, so I had gone out on long

21    -- on sick leave, and I had some more surgeries, and I was

22    finally terminated to long-term disability by AMP in 1998.

23    Q    '98 or '97, if you recall?

24    A    I'm -- I do not recall exactly.

25         THE COURT:  I'm sure you know the date.

9

1          MR. DORRANCE:  Okay, thank you.

2  BY MR. DORRANCE:

3  Q    Before you left AMP was there a waiting period before

4  you became eligible for disability insurance?

5  A    Yes, AMP had a program where for the first six months

6  that you were out on sick leave that you would receive 80

7  percent of your pay from AMP.  After those six months your

8  long-term disability would pick up and pay 60 percent of your

9  income.

10          THE COURT:  How much?  Excuse me, how much?

11          THE WITNESS:  Sixty percent.

12          THE COURT:  Sixty percent?

13          THE WITNESS:  Yes.

14  BY MR. DORRANCE:

15  Q    So when did you actually stop working as a systems

16  procedure analyst?

17  A    In 1997, I believe.

18  Q    Okay.

19  A    I'm sorry, my memory is not too good.

20  Q    That's all right, that's fine.  Recognizing that Dr.

21  Wolf has already testified to some of the medical issues in

22  this case, we really don't need an elaborate discussion of

23  your medical history, but if you could briefly summarize your

24  relevant medical history?

25          THE WITNESS:  May I stand for a moment please.

10

1          MR. DORRANCE:  Judge.

2          THE COURT:  Any time you want to you just stand up.

3          THE WITNESS:  Okay, thank you.  I don't require to

4     stand long.

5          I'm sorry, your question?

6          MR. DORRANCE:  Excuse me, judge, could I get her a

7     glass of water?

8          THE COURT:  Do you want a glass of water?

9          THE WITNESS:  Yes.

10          MR. DORRANCE:  She mentioned that she gets dry.

11          THE COURT:  I'll ask her.

12          MR. DORRANCE:  Thank you, and I don't mean to be

13     solicitous, I know that Joan has indicated she gets very dry.

14          THE WITNESS:  I get a dry mouth from my medication.

15     BY MR. DORRANCE:

16     Q    Could you please briefly summarize your relevant

17     medical history during the past 15 years or so.

18     A    Since 1990 I have been seeing orthopedic doctors in

19     reference to lower back pain, and I have had surgery in 1993

20     where the lower spine was fused at L5 S1 with rods and

21     screws, and then in 1995 I had another fusion at the same

22     level but on the anterior, going from the front with cages,

23     and then in 1996 I had the rods and screws removed.

24     Q    Okay, and have you been followed by any treating

25     physician during that period?

11

1    A    Yes, Dr. Wolf has been my doctor since 1993 I believe.

2    Q    And what are your current medications if you recall?

3    A    I take Amitriptyline and I take Levoxyl and Lipitor.  I

4    now take Ibuprofen, an anti-inflammatory, Oxycontin and I

5    believe I'm missing one.  I take eight different medications.

6    Q    Which medications, if you recall, are taken for the

7    disabilities that you are claiming in this case?

8    A    The Oxycontin and the Ibuprofen, and I also will take

9    for regular pain some Darvocet.

10   Q    What is the Oxycontin prescribed for?

11   A    Oxycontin is a narcotic that is strictly for the pain.

12   Q    Okay, are there any side effects with the medications

13   that you have just mentioned?

14   A    Oh, yes, I have a bad memory now, lack of concentration

15   and tiredness, they make you drowsy.  They can also cause

16   blurring of your sight, all of which I do have.

17   Q    Briefly, other than being followed by Dr. Wolf, have

18   you received any other form of treatment?

19   A    Yes, I see my family physician, and he prescribes for

20   the fibromyalgia complications that I have, in addition to

21   the spinal problems, and I also go to Hershey pain management

22   clinic and see a Dr. Gordon there.

23   Q    Have you received any physical therapy?

24   A    I have not received any physical therapy lately, but I

25   have just been prescribed to go receive some more physical

12

1    therapy at my last visit with Dr. Wolf.

2    Q    Have you had any other modalities, including, for

3    example, spinal injections?

4    A    Yes, I do receive spinal injections every six months.

5    Q    Do you use any devices to help you with your claimed

6    disabilities?

7    A    Yes, I use a back brace.  It's called a lower tear

8    support back brace.  I use a TNS unit.  I use devices to help

9    me pick up things.  I use a cane to help steady me, and I

10   also will use a wheelchair if I need to go to the mall or do

11   any walking that would require more than 10 minutes of

12   walking.

13   Q    You actually sit in a wheelchair or just use it as a

14   guide while walking?

15   A    I use it to sit in.

16   Q    You mentioned that you have a TNS unit?

17   A    Yes.

18   Q    Could you just briefly describe what that is?

19   A    A TNS unit are electrodes that you attach to your back,

20   and there is a little pack that you wear that looks like a

21   beeper, and it provides electronic stimulation to the nerve

22   endings to distract the pain.  It doesn't really relieve the

23   pain, it changes the pain.

24   Q    Okay, does that pretty much summarize your medical

25   treatment as you recall?

13

1    A    Yes.

2    Q    Okay, did you apply for social security disability?

3    A    Yes, I did.

4    Q    Do you recall approximately when that was?

5    A    I would believe it was in 1997.

6    Q    And I take it you submitted an application to the

7    Social Security Administration?

8    A    Yes, I did.

9    Q    Okay, was there a decision made on your application?

10    A    Yes, I received benefits within three months.

11    Q    Within three months?

12    A    Of applying, yes.

13    Q    Did you have to go to an administrative law judge?

14    A    No, it was strictly done on the paper that I submitted.

15    Q    Okay, I show you a -- and actually I have got the wrong

16    one.  Do you have it here?

17            MR. BURNS:  Your Honor, I can help Brad.

18            MR. DORRANCE:  Pardon?

19            MR. BURNS:  Do you have --

20            MR. DORRANCE:  Yeah, I have it right here.  Thank

21    you.

22            Judge, if I may approach.

23    BY MR. DORRANCE:

24    Q    I show you a five page document which we have marked

25    Joint Exhibit 3.  Can you identify this document?

14

1    A    Yes, I can.

2    Q    This indicates that you became disabled on May 1, 1999?

3    A    Yes.

4    Q    Okay, is this a copy of the notice of award from the

5    Social Security Administration?

6    A    Yes, it is.

7    Q    Okay, thank you.

8    A    My memory must be terribly off.

9    Q    Okay, and this set indicates that you receive a monthly

10   payment of $749?

11   A    Yes.

12   Q    Is that your current payment as well?

13   A    Yes, it is.

14   Q    It's not adjusted for inflation every year?

15   A    No, it hasn't been.

16   Q    Okay, the next category I'd like to receive some

17   testimony from you on is your activities of daily living.  Do

18   you know what that means?

19   A    Yes.

20   Q    Okay, could you please explain to Judge Caldwell what

21   you do on a given day.

22   A    I basically wake up around six o'clock when my husband

23   leaves for work, take my medication, and by seven o'clock I'm

24   capable to get up and get out of bed and dress.  I usually

25   sit and read the paper, let the dogs out, that type of

15

```
 1   activity, pick up any cups or anything that needs just basic

 2   tidying up around the house.  By ten o'clock I usually have

 3   to go lay in bed again for about an hour to two hours

 4   depending on the pain.  Then around twelve o'clock I'm up,

 5   and I will stay up and do some light tasks around the house

 6   until about three o'clock where I lay down again for another

 7   two hours, and about five o'clock I get up and prepare

 8   dinner.  I'm usually up until about seven o'clock, and then I

 9   lay down again and go back to sleep by nine.

10   Q    Do you ever have days where you don't have to lie down?

11   A    Rarely, I usually have to lay down at least twice a

12   day.

13   Q    Okay.

14   A    Some days I have to stay in bed more.

15   Q    So you do have some days that are worse than others?

16   A    Yes, some.

17   Q    Are there some days where you basically can't do

18   anything?

19   A    Yes, there are days when I stay in bed and don't do

20   anything other than try to find my way out of pain, move

21   around in bed trying to get comfortable.

22   Q    In a given month would you be able to estimate how many

23   days per month, if any, you must completely shut down?

24   A    I would say it's about four days a week, I mean, excuse

25   me, four days a month that I'm left in the bed.
```

16

1    Q    Do you have any hobbies?

2    A    Yes, I cross stitch, I oil paint and I do some stain

3    glass work, but I find that really difficult to do, so I

4    really haven't done much of that anymore.  I read.

5    Q    Are you able to do any yard work?

6    A    I can water my plants.  We have gotten those very light

7    cloth hoses, so I can do watering and maybe some dead heading

8    of plants that are in planters that are high enough, but

9    other than that I can't do the yard work I used to do which I

10   loved.

11   Q    Do you help with the cleaning around the house?

12   A    I will do light dusting.  I'll do the laundry, but my

13   husband takes a basket downstairs, and then he carries it

14   back upstairs, and I'll fold it, move it from the washer to

15   the drier and fold it.  I use the device to lift it out of

16   the drier.  But other than that I sometimes will pay some

17   bills if I'm up to it.

18   Q    Okay.

19   A    And cooking.

20   Q    You do the cooking?

21   A    Yes.

22   Q    Do you do any scrubbing of floors or that kind of

23   housework?

24   A    No, no, in fact I'm in the process of hiring someone to

25   come in to do that if I can find someone to do it at a

17

1    reasonable rate.

2    Q    Do you have any social or volunteer activities?

3    A    I go to church.  I'm no longer able to volunteer at

4    church like I used to.  I used to teach Sunday school and

5    help with the bazaar and vacation Bible school, but I no

6    longer can do those things.  I basically just attend church

7    on Sunday now.

8    Q    Are you able to drive?

9    A    If I can't get out of it, yes, I can drive, but I

10   usually prefer to have someone else drive.

11   Q    In a given week how often can you drive?

12   A    I usually drive just once a week, but I can drive once

13   or twice a week.

14   Q    Did you drive to today's trial?

15   A    No, my husband drove.

16   Q    You're looking over there, is that your husband over

17   there?

18   A    Yes, that's my husband.

19   Q    Okay, does that summarize your activities of daily

20   living?

21   A    Yes.

22   Q    Okay, I'd like to receive a little more testimony about

23   the location of your pain and the severity of your pain

24   briefly.

25   A    My pain starts at my neck and goes down to my feet.  I

1    have a bulging disc at C6 of my neck, and I have broken

2    vertebra at T7, and I have the lower spine problems.  So

3    basically I have pain from the neck down.

4    Q    Does the pain range in intensity or is it the same all

5    the time?

6    A    It definitely changes in degree.  There is really no

7    rhyme or reason why it will change.  I mean, activity and

8    stress will definitely increase the pain.  The weather will

9    increase pain, but it goes from a dull ache to a very sharp

10   severe cutting pain.

11   Q    Would you be able to estimate how far you can walk on a

12   given occasion?

13   A    I'm not really good at estimating how long of a

14   distance I can walk but about 10 minutes as long as it's on

15   level ground.

16   Q    Would you be able to estimate how long you can sit in a

17   given time?

18   A    I can sit for about 15 minutes with relative comfort.

19   After 15 minutes it slowly increases my pain until I have to

20   change position.  I just change position without even

21   thinking about it anymore.

22   Q    Are you able to estimate how long you can stand at a

23   given time such as you're doing right now?

24   A    It depends on the floor.  Actually if it's a cement

25   floor, I can't stand on a cement floor very long at all, but

19

1    a wood floor, such as in my home, it would be 10, 15 minutes.

2    So I vary between positions constantly.

3    Q    Are you able to bend, crouch or crawl on a regular

4    basis?

5    A    No.

6    Q    Would you be able to estimate how much you can lift on

7    a given occasion?

8    A    I can lift up to 10 pounds, but even lifting a gallon

9    of milk hurts.

10   Q    Do you do the groceries yourself?

11   A    No, I have my daughter goes along with me to do grocery

12   shopping, and I usually wind up sitting in the front of the

13   store while she finishes, I give her a list.

14   Q    You I believe you mentioned that you have sometimes

15   problems with your memory?

16   A    Yes, I definitely have memory problems.

17   Q    Do you have good stamina?

18   A    No, no, I get fatigued very easily.

19   Q    You mentioned you do your hobbies on occasion.  How

20   long are you able to be involved in one of your hobbies in a

21   given day?

22   A    I would say I can usually work on something for about

23   30 minutes before I have to either walk around, lay down just

24   for a couple minutes or change positions somehow.

25   Q    Do you recall having an interview with a gentleman by

20

1    the name of Tony Gulledge.

2    A     Yes, I do.

3    Q     Which I believe is spelled G-u-l-l-e-d-g-e.  Do you

4    recall anything about that interview?

5    A     Yes, he called me and he said he was helping Laura

6    Collins, my -- the person that handled my case at CNA, and he

7    just asked me questions as far as my capabilities and what I

8    did during the day.  It wasn't a very long conversation.

9    Q     Now you have just testified what you do in a given day.

10   Did Mr. Gulledge ask you questions touching on all those

11   subjects?

12   A     Yes, he did.

13   Q     Okay, and did he indicate if he thought you were able

14   to continue working at your job as a systems analyst?

15   A     He questioned me all the time why I thought I couldn't

16   work, and I kept on reexplaining my limitations, and he kept

17   on saying that he thought I could do work.

18   Q     Okay, did your job as a systems analyst require you to

19   sit for part of the day?

20   A     Yes, it did, all the day.

21   Q     All the day.  Was there something about that job that

22   prevented you from, in your opinion, prevented you from

23   working in that job?

24   A     Yes, my need to stand and walk around and lay down.  My

25   employer couldn't have me laying down for two hours in the

21

1    morning and two hours in the afternoon.

2    Q    Now Mr. Gulledge, did he identify any other jobs that

3    he thought that you could perform?

4    A    Yes, he did say something about a night auditor or a

5    desk clerk, and I explained to him I would still need to lay

6    down.

7    Q    Did you indicate how long you would need to lie down?

8    A    Yes, I did tell him that I would, you know, how often I

9    needed to lay down, and that it would be anywhere from an

10   hour to two hours at a time.

11   Q    Did you tell Mr. Gulledge that you had received some

12   post-graduate education at HACC?

13   A    Yes, I did.

14   Q    Now did you obtain an associate's degree at HACC?

15   A    No, I did not get to complete it.

16   Q    Okay, I'd like to now hear why you feel you're disabled

17   from employment.  I know you -- well, tell me what job

18   efforts you have taken since you last worked for AMP?

19   A    Well, I did look into jobs that you could do from home

20   and was not able to find any real opportunities out there.

21   You hear about companies doing -- allowing workers to work

22   from the home, and really I haven't found any that do do that

23   type of work.  I also looked into doing some distributorship

24   with Market America, but that also requires you to travel and

25   get your customer base and work on a computer.  So that

22

1    wouldn't have worked out either.

2    Q    Okay, have you worked with any outside agencies such as

3    the Office of Vocational Rehabilitation?

4    A    Yes, I did contact them to help me find, you know,

5    potential companies that would allow me to work at home at my

6    own pace, and he had said that they have nothing like that

7    available.  Basically what they will do is send you to school

8    if you need schooling to put you into a position which

9    requires the normal work week.

10   Q    Okay, could you summarize the reasons, if any, why you

11   feel you're unable to continuously engage in any form of

12   gainful employment?

13   A    I believe my -- I'm not mentally as sharp as I used to

14   be.  I can't concentrate due to the pain and medication.  I

15   have problems, I would need to lay down several times a day,

16   and I don't really think any employer would be willing to

17   have me lay down four hours of an eight day work week or work

18   day.

19   Q    Do you believe -- let's assume that you actually will

20   try a job, including perhaps one of the jobs that Mr.

21   Gulledge thought you could do, do you believe you'd be able

22   to sustain employment -- sustain employment during the 40

23   hour work week?

24   A    No, no.

25   Q    Do you believe that you'd be able to sustain employment

23

1    during a 20 hour work week?

2    A    No.

3         MR. DORRANCE:  I have no further questions, judge.

4         THE COURT:  Okay, Mr. Burns.

5         MR. BURNS:  May I approach the witness, Your Honor,

6    to provide her with an exhibit?

7         THE COURT:  Yes.

8         MR. BURNS:  Thank you.

9                    CROSS EXAMINATION

10   BY MR. BURNS:

11   Q    Good morning, Mrs. Tesche.  My name is Michael Burns,

12   and we have met previously.

13   A    Yes.

14   Q    I'm going to ask you some questions with regard to your

15   testimony that you provided to Mr. Dorrance.  You were the

16   one who made the decision to stop working at your job at AMP

17   back in 1997.  Is that correct?

18   A    The doctor -- my primary physician at the time and

19   myself both decided together.

20   Q    And that primary physician was who, ma'am?

21   A    Dr. Rubenstein.

22   Q    And Dr. Rubenstein also provided some reports to

23   Continental Casualty in the context of your claim

24   information, are you aware of that?

25   A    Yes.

24

1    Q    And in fact Dr. Rubenstein, not Dr. Wolf, was the first

2    person to complete a statement that you were disabled that

3    was provided to the insurance company.  Is that correct?

4    A    I believe he did.

5    Q    Okay, and Dr. Rubenstein though has not been called

6    here as a witness at trial.  Is that correct?

7    A    That's correct.

8    Q    If I understand the problem with your spine, and it's

9    the primary problem that Dr. Wolf is treating, it's that you

10   needed a fusion because the spine is in effect unstable.  Is

11   that correct?

12   A    Yes.

13   Q    Okay, and in order to keep the spine stable, they fused

14   together or they made an insert, a device, to try to keep it

15   together.  Correct?

16   A    Yes.

17   Q    Okay, but that failed in your case.  Right?

18   A    Yes.

19   Q    Now you have had another fusion that was done.

20   Correct?

21   A    Yes.

22   Q    Okay, so you have had two fusions and one spinal

23   plantation.  Correct?

24   A    Correct.

25   Q    In addition to having those fusions, there is a device

25

1    that they use in order to stabilize your back, isn't there?

2    A    Yes.

3    Q    And that's a back brace I guess is what it's called?

4    A    Yes.

5    Q    And you wear that every day?

6    A    No, not every day.

7    Q    Do you wear it all the time?

8    A    No, I do not wear it all the time.

9    Q    When you were deposed, you indicated to me that there

10   were some things that you had around the house that helped

11   you do those tasks.

12   A    Yes.

13   Q    Today you testified about I guess almost like a probe

14   that allows you to pick things up on the floor.  Correct?

15   A    Yes.

16   Q    Okay, in addition I think you testified that you have a

17   specific chair at home that allows you to get up and get

18   down.  Is that correct?

19   A    Yes.

20   Q    Okay, you also have other devices around the house that

21   help you walk around there.  Is that correct?

22   A    I don't really use devices to walk around the home

23   anymore because it's not very large, and there is basically

24   something, a railing or a wall that I can hold onto.

25   Q    But, in any case, you have adopted your home

26

1    environment to assist you with your pain and your problem so

2    that you can do your activities of daily living.  Correct?

3    A    Definitely, yes.

4    Q    And I think you said that -- you testified on direct

5    that indeed because you're so accustomed to experiencing pain

6    in a period of time that it's second-hand work, you sit and

7    change your position all the time?

8         MR. DORRANCE:  Objection, judge, as to the

9    characterization of her testimony.

10        THE COURT:  Well, the witness will answer the

11   question and correct Mr. Burns I guess.

12        MR. BURNS:  I'll rephrase the question because it

13   got a little convoluted in the middle there.

14   BY MR. BURNS:

15   Q    I'm just trying to establish that in your direct

16   testimony you basically told us that it's second nature for

17   you to move around these days because you need to constantly

18   be adjusting your position.  Correct?

19   A    I have been living with pain for so long that I have

20   just grown accustomed to changing position all the time in

21   order to change the pain.

22   Q    And that's the issue here, isn't it, it's that staying

23   in one place for one period of time causes you pain.

24   Correct?

25   A    Yes.

27

1    Q    Okay, and because you can't stay in one place for one

2    period of time, you just don't feel like you can work.

3    Correct?

4    A    It's because of the pain that I feel I can't work.

5    Q    You indicated at least three times on your direct

6    testimony that you have problems with your memory.  Is that

7    correct?

8    A    Yes.

9    Q    When was your interview with Tony Gulledge?

10   A    I'm not sure of the exact date.

11   Q    And I think you told me that you recall Mr. Gulledge

12   asking you a whole bunch of questions about your activities

13   of your daily living.  Is that correct?

14   A    Yes.

15   Q    And you answered those questions correctly.  Right?

16   A    Yes.

17   Q    And you informed him that you needed to sit down or lay

18   down, I'm sorry, four hours a day?

19   A    Yes.

20   Q    Did anybody else from CNA ever call you and ask you

21   what your activities of daily living were?

22   A    No.

23   Q    Are you sure about that?

24   A    I do not recall anyone else calling me.

25   Q    I'm going to ask you to look at that exhibit which I

28

1    provided to you, ma'am, for the record that's Defendants'

2    Exhibit A, and I'd ask you on the bottom there are numbers

3    starting with 111, the right-hand corner from the bottom,

4    111.  I'd ask you, ma'am, to turn to pages 148 through 150.

5    Do you have that document?

6    A    Yes.

7    Q    That's a three page document that goes from -- excuse

8    me, actually it's a four page document that goes from Exhibit

9    A, pages 148 to 151.  Have you ever seen that document

10   before?

11   A    No.

12   Q    Would you take a look through it and see if anything in

13   that document refreshes your recollection as to whether or

14   not you had any discussions with CNA besides Mr. Gulledge?

15   A    I do remember talking to Pam Groover, and she was --

16   she identified herself as a nurse for CNA, and -- but I did

17   not recall talking to her about my condition.

18   Q    Okay, do you recall speaking to her about her

19   activities of daily living, your activities of daily living?

20   A    I don't recall that, not really, not really.

21   Q    The document I have shown to you I'd ask you to go to

22   the first page, which is page 148, and look at question No.

23   8.  Do you see that question?

24   A    Yes.

25   Q    Before I get there, ma'am, how many years has it been

1    since you have been -- since it requires you on a daily basis

2    to lay down for approximately four hours during the day in

3    order to alleviate your pain or alleviate your symptoms?

4    A    Since I had my surgery in 1996.

5    Q    Okay, so since 1996 your testimony today about your

6    activities of daily living has always included at least four

7    hours during the day where you have had to lay down?

8    A    Yes, yes.

9    Q    Okay, and that would be laying down in the morning and

10   then laying down in the afternoon.  Correct?

11   A    Most days, yes.

12   Q    You had an attorney who represented you in the claim

13   that you submitted to CNA.  Is that correct?

14   A    Yes.

15   Q    An individual name Steve Courtney.  Is that correct?

16   A    Yes.

17   Q    And you recognized based upon your review of the policy

18   and your retention of an attorney that you were required to

19   submit proof that you were disabled.  Is that correct?

20   A    Could you rephrase that?

21   Q    Sure, in terms of your retention of an attorney and in

22   terms of your work with your disability claim you recognized

23   that the burden; that is, the proof of the requirement to

24   submit medical evidence like the doctors' reports, like the

25   initial statements was on you.  Right?

30

1    A    No, I'm not sure I knew that.

2    Q    Did you ever write a letter to CNA describing your

3    activities of daily living?

4    A    Not that I recall.

5    Q    Did you ever write -- have any other communications

6    outside of Mr. Gulledge and Miss Groover where you told CNA

7    or Continental Casualty Company, I'm using them

8    interchangeably, about your activities of daily living?

9    A    I may have talked to Laura about what I was doing

10   during the day in conversation.  I really can't recall.

11   Q    Did you tell your attorneys when you retained them

12   about your activities of daily living and how they were

13   impacted?

14          MR. DORRANCE:  Objection, Your Honor, that's

15   confidential.

16          THE COURT:  Overruled.

17   A    Did I explain to my attorneys my daily living?

18   BY MR. BURNS:

19   Q    Limitations and restrictions, yes.

20   A    Yes.

21   Q    Okay, did they ever communicate that to CNA that you're

22   aware of?

23          MR. DORRANCE:  Objection, it wasn't part of this

24   disability claim.

25          MR. BURNS:  We have gone way beyond the disability

31

1    claim, Your Honor, in her testimony and the deposition of Dr.

2    Wolf, so I think it's an appropriate question.

3              THE COURT:  I'm going to overrule the objection

4    because this is a non-jury trial, and I think I can recognize

5    evidence that's not relevant or admissible.

6    A    Okay, could you restate the question?

7    BY MR. BURNS:

8    Q    Sure, I will.  Did your attorneys ever tell CNA about

9    your activities of daily living; that is, your limitations

10   and your restrictions?

11             THE COURT:  So far as you know.

12   BY MR. BURNS:

13   Q    So far as you know.

14   A    I really can't remember if they did that particular

15   thing.  At that time my son had died in a car accident, so my

16   memory is very vague in '97 and '98.

17   Q    And if I recall correctly, you indicated in your direct

18   testimony that periods of stress also cause an increase in

19   your back pain?

20   A    Oh, yes, definitely.

21   Q    Was it stressful when your son died?

22   A    Oh, yes.

23   Q    Was it stressful when your father died?

24   A    Yes.

25   Q    Have you ever overcome those problems?

32

1    A     I don't think you overcome the loss of a child.

2    Q     Understood.  Ma'am, I'm going to ask you to turn to

3    page 141 of that Exhibit A, Defendants' Exhibit A, which I

4    provided to you.  Be comfortable please.  I only have a few

5    more minutes.

6              MR. BURNS:  Your Honor, take a moment for her to --

7              THE WITNESS:  I'm sorry, the thought of my son at

8    that time is still very difficult for me.

9              THE COURT:  We'll take a five minute recess to let

10   Mrs. Tesche compose herself.

11             (A recess began at 10:10 a.m. and the case

12   continued at 10:22 a.m.)

13             THE COURT:  Thank you, Mr. Burns.

14             MR. BURNS:  Your Honor, I have no further questions

15   of this witness.

16             THE COURT:  Okay, any redirect?

17             MR. DORRANCE:  Just a few, judge.

18                       REDIRECT EXAMINATION

19   BY MR. DORRANCE:

20   Q     Mrs. Tesche, I just have two or three questions.

21   A     Okay.

22   Q     You testified during cross examination that Dr.

23   Rubenstein was your family doctor?

24   A     Yes, he was.

25   Q     Is he still your family doctor?

1    A      No, he isn't.  He retired or left his practice, I'm not

2    quite sure what happened, but he left the practice.

3    Q      Do you recall when that was?

4    A      It was either late '97 or early '98.

5    Q      Do you have a new family doctor?

6    A      Yes, I do.

7    Q      Who is he?

8    A      Dr. John Muscalus.

9    Q      Mr. Burns had asked you a few questions concerning that

10   big fat packet right there in front of you marked Defendants'

11   Exhibit A, specifically on page 148, if you could turn to

12   that.  Under the numbered paragraph 1 at the top, the last

13   sentence, it indicates, quote:  "She notices a profound

14   increase in symptoms since 10/97."  Do you recall saying that

15   to Pam Groover, the Continental representative?

16   A      I can't say that I actually remember saying that.

17   Q      Are you able to testify today with any recollection as

18   to whether you had a profound increase in symptoms around

19   that time?

20   A      Yes, yes, I did.

21   Q      Okay, would you be able to compare how you feel now

22   with the way you felt in say May of 1999 when you were

23   terminated to disability by AMP?

24          MR. BURNS:  Your Honor, I'm going to object because

25   I think that's beyond the scope of my cross examination.  I

1    did not get into any questions regarding --

2            THE COURT:  I think it is too.  We'll sustain that

3    objection.

4            MR. DORRANCE:  Okay, thank you very much.  I have

5    no further questions.

6            THE COURT:  Thank you.  That's all, Mrs. Tesche.

7            THE WITNESS:  Okay, thank you.

8            MR. DORRANCE:  Judge, I'd like to call Cheryl

9    Sauerhoff.

10            CHERYL SAUERHOFF, called as a witness, being duly

11    sworn or affirmed, testified as follows:

12            THE CLERK:  Would you state for the record, ma'am,

13    your full name please.

14            THE WITNESS:  I'm sorry?

15            THE CLERK:  Would you state for the record your

16    full name please.

17            THE WITNESS:  My name is Cheryl, C-h-e-r-y-l,

18    Sauerhoff, S-a-u-e-r-h-o-f-f.

19            THE CLERK:  Thank you very much.

20                        DIRECT EXAMINATION

21    BY MR. DORRANCE:

22    Q    Miss Sauerhoff, are you employed by Continental

23    Casualty Company?

24    A    Actually I'm employed by CNA but Continental Casualty

25    Company is the underwriting company.

35

1    Q    Okay, could you please briefly summarize your job

2    responsibilities.

3    A    Yes, currently I'm the Appeals Committee Director for

4    the Appeals Committee of CNA.

5    Q    Okay, and what are your responsibilities in that

6    capacity?

7    A    As the Appeals Committee Director, I'm responsible to

8    see that all the appeals meet the ERISA time service

9    requirements.  Also I do conduct independent appeal reviews

10    of the claims along with the other Appeals Committee members,

11    and these are claims that have been denied or terminated and

12    are appealed before CNA.

13    Q    Could you please briefly summarize your educational

14    background for us.

15    A    Yes, I have a bachelor of arts in criminal justice and

16    psychology from the University of Central Florida.  I

17    obtained that in 1978.

18    Q    Okay, have you had any post-graduate training in any

19    field?

20    A    I took a few post-baccalaureate courses in psychology

21    but just a few, and then in other work experience I have

22    received some training in medical aspects of disability.

23    Q    Have you had any training concerning vocational aspects

24    of disability?

25    A    There was also some vocational training.  I had worked

36

1    for the Social Security Administration for a period of time.

2    Q     Approximately how long did you work for the Social

3    Security Administration?

4    A     For five and a half years.

5    Q     Maybe you could just briefly summarize your work

6    history, very briefly.

7    A     Sure, I'll go into the claims related experience.  In

8    1981 through, I'm sorry, 1986 through 1991 I worked for

9    Office of Disability Determination, which was a state agency

10   contracted to make medical determinations for the Social

11   Security Administration, and that's where we had reviewed all

12   the claims before the Social Security Administration for

13   disability, and we would gather all medical information,

14   determining the criteria, medical criteria, for social

15   security, and that would entail looking at the vocational

16   information as well.  And when I left the social security

17   arena, I was employed by CNA Insurance Company in 1991, and

18   my vast experience has been with long-term disability claims

19   prior to joining the Appeals Committee in 1997.

20   Q     Okay, so you worked in more of a claims capacity during

21   your first few years at CNA?

22   A     Yes.

23   Q     Okay, could you please briefly summarize -- we keep

24   using CNA and Continental interchangeably but they are one

25   and the same.  Is that right?

37

1    A    CNA is actually the holding name of the company, but I

2    interchange CNA and Continental Casualty Company myself, but

3    I know the underwriting company is Continental Casualty

4    Company.

5    Q    Okay, could you please briefly summarize Continental's

6    appeal procedure for disability claims.

7    A    Sure, when a person is denied or benefits are

8    terminated, they're given appeal rights that's explained in

9    detail in their letter of denial or termination, and in those

10   rights it gives the claimant the opportunity to present any

11   further information that they would like to consider or have

12   CNA consider that would alter the decision.  That information

13   is initially brought forth to the original disability

14   specialist because sometimes there might be further

15   information that was not presented initially that if that

16   specialist had known that at the time, they certainly would

17   have reversed their decision, so that's a built-in

18   reconsideration phase, and, in other words, if the claimant

19   exercises their appeal rights and produces further

20   information that alters that denial or termination, then

21   benefits are reversed at that point, so it never comes to

22   appeals.  But for those claims where the information is

23   presented or sometimes there is just no --

24        THE COURT:  Could you just slow down a little bit,

25   the reporter has to keep up.

38

1        THE WITNESS:  Yes, I'm sorry.  I'm sorry.

2        Sometimes there is no further information presented

3   or the information that is presented doesn't alter the

4   decision.  What the disability specialist does at that time

5   would be to explain in writing what information was reviewed,

6   that it didn't alter the decisions, the reasons why, and then

7   that the claim is now being forwarded to the Appeals

8   Committee, and at that point it's independent.

9   BY MR. DORRANCE:

10  Q    Before you became a member of the Appeals Committee

11  were you a disability specialist?

12  A    Yes, I was.

13  Q    Okay, so that was your primary other job for

14  Continental?

15  A    Right, when I began with CNA, I was employed as a

16  disability -- I think it was an examiner, and then within

17  three years I was promoted to specialist, but it was

18  primarily handling long-term disability claims and then some

19  short-term disability claims.

20  Q    Is a college degree required for that position?

21  A    No, because there are people who have various

22  experiences that relate, so a college degree is not required.

23  Q    During your deposition you talked -- and I know I'm

24  leading here a little, judge, but it might make it a little

25  quicker -- you indicated that there was sort of a two person

1    team during the initial stages of the appeal process, is that

2    correct, or the review process?

3    A    Probably the initial claim submission process that

4    there is a disability specialist partnered with a nurse case

5    manager in reviewing the disability claim submitted.

6    Q    The nurse case manager is an RN.  Is that right?

7    A    I believe the disability case specialists are RN's with

8    CNA.

9    Q    And if that two person team feels they needed any

10   additional expertise, is there anyone they can call on?

11   A    Certainly, everybody within the claims organization has

12   access to vocational consultants, medical consultants, if

13   that's necessary, so there are various expertise within the

14   company of resources that could be utilized at any time.

15   Q    Okay, and would that include the medical consultants?

16   A    Yes, it would.

17   Q    And would that include the vocational case manager?

18   A    Yes.

19   Q    Okay, and are you familiar with the qualifications of a

20   vocational case manager?

21   A    Well, I know CNA has a vocational case management team.

22   I know that some of the members of the team are certified.

23   Now I'm not sure what everybody's certification is.  Not all

24   members have the same certification, but I do know that

25   they're all vocational -- have vocational expertise and

40

1    background, and they consist of the vocational case

2    management team.

3    Q    Do you recall testifying in your deposition about the

4    qualifications of a vocational counselor?

5    A    In my deposition I remember talking about the

6    vocational case managers and that they have expertise in

7    vocational case management.

8              MR. DORRANCE:  Judge, if I may approach.

9              THE COURT:  All right.

10   BY MR. DORRANCE:

11   Q    I show you page 49 of the transcript of your December

12   3, 2001 deposition.  If you could read the first two entries

13   on that page.

14   A    The question is:  In what qualifications -- I should

15   say what requirements or qualifications did the vocational

16   case managers have if you know?  And my answer was:  I don't

17   know.

18   Q    So at the time you took this deposition you didn't know

19   what the qualifications of the vocational case management

20   manager were?

21   A    Well, what their designations or certifications were I

22   didn't know.

23   Q    Tony Gulledge was the vocational case manager in this

24   case.  Is that right?

25   A    Correct.

41

```
 1    Q    And I understand he's no longer with the company?

 2    A    Yes, he left CNA.

 3    Q    Do you know the reason why he left?

 4    A    No, I don't.

 5    Q    Do you know how long he was employed by CNA?

 6    A    I would say a couple years.

 7    Q    You don't know the date he left?

 8    A    It was like a couple years ago that I recall.

 9    Q    Oh, a couple years ago?

10    A    Right.

11    Q    Are there any other vocational case managers employed

12    by the company?

13    A    Yes.

14    Q    Approximately how many?

15    A    I believe the team is eight, possibly nine.

16    Q    And do they testify on behalf of the company from time

17    to time?

18    A    They may, I don't know.

19    Q    Now in this case the two person team did consult with

20    Mr. Gulledge.  Is that correct?

21    A    When -- well, the first 24 months of the policy pays if

22    you're disabled from your own occupation, and I believe the

23    disability specialist and the nurse case manager accepted

24    benefits on the basis that Miss Tesche could not perform her

25    duties of her own occupation, so they would not have
```

42

1     consulted with the vocational case manager at that point.

2     But when the policy goes beyond 24 months into what's called

3     the any occupation provision, at that point the nurse case

4     manager had closed her file out, indicating that the file was

5     now being referred to vocational case management, and that

6     was after obtaining the permanent restrictions and

7     limitations from the medical doctors.

8     Q    And that would be the claimant's medical doctors?

9     A    Correct.

10    Q    But any employee of CNA has the power to ask for an IME

11    of the claimant, do they not?

12    A    Yes.

13    Q    And would that typically be your panel of medical

14    consultants?

15    A    We have what we call the Peer Review Panel which are

16    independent consultants that can be utilized by anybody

17    within the company on a particular claim that feels they need

18    either further medical expertise or they need clarification

19    of the information.

20    Q    Now putting aside the physician consultants or peers,

21    is everyone involved in the evaluation appeal process an

22    employee of the insurance company?

23    A    Just on each particular case it would be the disability

24    specialist and the nurse case manager working that particular

25    file that would have any involvement, I mean, they don't come

43

1    to the Appeals Committee.  Once a decision is rendered and

2    the appeal rights are offered and the claimant exercises

3    those appeal rights, if the decision isn't altered at the

4    reconsideration phase, then the claim or the claim is

5    forwarded on to the Appeals Committee, and there is no

6    further involvement unless as a reviewing member if we have a

7    question or we wanted clarification, we could go back and

8    speak to the nurse case manager or the disability specialist,

9    but they're not involved with the appeal decision.

10   Q    Are the vocational case managers such as Mr. Gulledge

11   employees of the company?

12   A    Yes.

13   Q    And do you recall testifying in your deposition you

14   weren't sure whether the peer physician consultants were

15   employees or not?

16   A    I know they're not employees of the company.

17        MR. DORRANCE:  Judge, if I may approach.

18   BY MR. DORRANCE:

19   Q    I show you page 22 of your deposition transcript, I'm

20   sorry, page 21 at the bottom, if you could read from that

21   first -- that question at the bottom all the way until the

22   middle of the page.

23        THE COURT:  Do you want her to just read it or do

24   you have a question?

25        MR. DORRANCE:  Well, I'm trying to confirm that --

44

1          THE COURT:  Why don't you ask her to read it to

2   herself and then ask her a question rather than put this all

3   on the record.

4          MR. DORRANCE:  Okay, thank you.  That's fine,

5   judge.

6          (Witness reading.)

7   A     Okay.

8   BY MR. DORRANCE:

9   Q     Okay, so you have had an opportunity to read pages 21

10  and 22 of your deposition?

11  A     Right, the area that you pointed out.

12  Q     And is it fair to say during your deposition testimony

13  you stated that you did not know whether the doctors were

14  employees or had some contractual arrangement with the

15  company?

16  A     Now you were asking me if we had a medical director,

17  and I said we don't have a medical director but there is an

18  independent peer review, but they're not employees.  I think

19  you were asking about their salaries, and I didn't know their

20  salaries.

21  Q     Okay, anyone in the company can consult the peer

22  consultants.  Is that correct?

23  A     Right, they're a resource available to us.

24  Q     And the Appeals Committee does have the power to not

25  only request an IME but also obtain other medical information

45

1   and vocational information?

2   A    Right, if we feel necessary based on our review of the

3   claim file.

4   Q    And again I'm leading you a bit, but based on your

5   testimony during your deposition the Appeals Committee

6   usually consists of one person?

7   A    Right, there is six members of the team, but we work

8   independently, review the file independently, but the member

9   reviewing the file has the authority to call the other

10  members of the committee to discuss any pertinent facts or

11  information that we might need clarification on with the

12  team.

13  Q    And in Joan Tesche's case you made the decision on

14  whether you needed to obtain more information on her file.

15  Is that right?

16  A    Well, I was the review member that reviewed Miss

17  Tesche's claim based on the administrative record and did not

18  feel the need to convene the other members, and I felt that

19  the information presented was very concise and made my

20  decision based on that information.

21  Q    So you did not interview Mrs. Tesche?

22  A    No, I did not.

23  Q    You did not speak with the disability specialist?

24  A    No, I did not.

25  Q    You did not speak with the vocational case manager?

46

1    A    No.

2    Q    You did not speak with any member of the panel of

3    physicians?

4    A    No.

5    Q    You did not request an IME?

6    A    No, I did not.

7    Q    Was your decision based solely on your administrative

8    record?

9    A    Yes, it was based on the administrative record and the

10   policy file.

11   Q    And it was Mr. Gulledge that was the one that developed

12   the four potential job opportunities for Miss Tesche?

13   A    Yes, he was the vocational case manager that had

14   performed the any occupation assessment.

15           MR. DORRANCE:  If I may, judge.

16           THE COURT:  All right.

17   BY MR. DORRANCE:

18   Q    I show you a two page document which has been marked

19   Joint Exhibit 2.  Can you identify this document?

20   A    Yes, this would be the committee, the Appeals

21   Committee, decision that I had reached on February 21, 2000.

22   Q    Are all the grounds for your decision set forth in this

23   two page determination?

24   A    Yes, they are.

25   Q    Almost halfway down the first page is a definition of

1    total disability.  Is this in your opinion the governing

2    definition in the long-term disability policy?

3    A    Yes, this would be the any occupation portion of the

4    disability provision that applied to Miss Tesche's case.

5    Q    And the so-called own occ. or own occupation definition

6    is contained immediately above it.  Is that correct?

7    A    Correct.

8    Q    Now right underneath the definition of the any occ.,

9    occupation in the policy, there is a reference to the quote,

10   "Date of loss was 5-3-97."  Period, end of quote.  Could you

11   describe for me what that means?

12   A    That would be the date that Miss Tesche had indicated

13   that she was no longer able to continue working performing

14   the substantial materiality duties of her regular occupation.

15   Q    Now the last paragraph on the first page talks about

16   certain considerations that form the basis of the company's

17   decision, specifically the second sentence in that last

18   paragraph, it starts based on the claimant's age.  Do you see

19   that sentence?

20   A    Yes, I do.

21   Q    Does that set forth the criteria that was used in

22   making this decision?

23   A    Yes, that's the information that the vocational case

24   manager reviews.

25   Q    Now you testified that you worked for the Social

48

1    Security Administration for five or six years.  Is that

2    correct?

3    A     Correct.

4    Q     And you had hands-on experience in reviewing claims and

5    determining whether they should be paid?

6    A     If they met the medical -- we didn't actually do the

7    payment, but we made the medical determination, correct.

8    Q     Your office was involved in deciding whether an

9    individual was entitled to social security disability?

10   A     Correct, if they met the medical requirements for

11   disability.

12   Q     And there were also vocational considerations that you

13   reviewed?

14   A     Yes.

15   Q     Now is it fair to say that the Social Security

16   Administration's regulations governing disability are almost

17   identical to the total disability definition concerning any

18   occupation?

19   A     No, I'd say they are separate.  They're not almost

20   identical.  I mean, we may look at some of the information

21   like age, past work experience, education, but CNA's policy

22   indicates that one must be continuously unable to engage in

23   any occupation which becomes qualified by education, training

24   or experience.  Social security will go into gainful

25   employment.  CNA's policy doesn't address or speak to gainful

1    employment.

2    Q    What does CNA's policy address?

3    A    CNA's policy addresses the ability to perform any

4    occupation.

5    Q    And that would be gainful employment?

6    A    It says continuously you must -- in other words, for

7    benefits to continue beyond your own occupation period, you

8    must be continuously unable to perform any occupation, and

9    that's based on your past work experience, your age, your

10   education and the medical restrictions.

11        THE COURT:  I think what Mr. Dorrance is getting at

12   is what is the difference between that and the term gainful

13   employment with the social security --

14        THE WITNESS:  Gainful employment, well, gainful

15   employment with social security goes by being able to make a

16   certain amount, and bear with me because I haven't been with

17   the Social Security Administration in some years, but back

18   when I worked there, if you were able to make $500 a month,

19   you were gainfully employed.  So that's what gainful

20   employment in my understanding when I worked for social

21   security was the ability to make a certain amount of money.

22   BY MR. DORRANCE:

23   Q    But in the CNA policy they do use the word occupation.

24   Is that correct?

25   A    Right, occupation is the ability to perform.

50

1    Occupation is not the same as a job, but it's the ability to

2    perform.

3    Q    But the actual term occupation, is that defined in the

4    policy?

5    A    I would have to look at the policy, but I don't believe

6    it is.

7    Q    Would you like to look at it?

8    A    I could take a look at it.

9        THE COURT:  Do you know whether it is or not?

10       MR. DORRANCE:  It's not.

11       THE COURT:  Okay.

12       MR. BURNS:  And I'll concur that it's not, so we

13   have it on the record.

14   BY MR. DORRANCE:

15   Q    Is it fair to say that the term gainful employment and

16   occupation are synonymous?

17       MR. BURNS:  Objection, asked and answered.  She's

18   already testified three times to that.

19       THE COURT:  And I think that's at this point more

20   of a legal question.

21       MR. DORRANCE:  I agree with you, judge.

22   BY MR. DORRANCE:

23   Q    Do you recall testifying in your deposition about

24   whether social security regulations were the same or were

25   dissimilar to the definition of total disability?

51

1    A    I remember we had a discussion on social security and

2    that I do know that CNA, we administer the policy, our

3    decision is independent from social security.

4            MR. DORRANCE:  Judge, I realize that this may be a

5    legal issue, but I think this is significant enough to get a

6    little more testimony on it if you'll bear with me.

7    BY MR. DORRANCE:

8    Q    I am showing you pages 88 and 89 from your deposition

9    transcript where I'm referencing your two page appeal letter,

10   specifically the bottom, the last paragraph in your appeal

11   letter, and I would just ask you to please read the question

12   beginning with I turn your attention back to Exhibit 1 and

13   then continue reading the rest of the next or half of the

14   next page.

15   A    You want me to just read it to myself?

16   Q    To yourself.

17   A    Okay.

18        (Witness reading.)

19           MR. DORRANCE:  Judge, do you need a copy of the

20   transcript?

21           THE COURT:  I don't think right now I do.  I think

22   I have one available.

23           MR. DORRANCE:  Do you, because, if I could digress,

24   I think the decision in the summary judgment suggested that

25   it wasn't filed, and I did try to file it.

52

1          THE COURT:  You did, and it had been filed, the

2     clerk did not send it to my office.

3          MR. DORRANCE:  Okay, so I don't need to file it

4     again?

5          THE COURT:  No.

6          MR. DORRANCE:  Okay, thank you.

7     BY MR. DORRANCE:

8     Q    Now the testimony during your deposition on those two

9     pages, pages 88 and 89, centered on the criteria that CNA

10    used in making its decision in this case.  Is that right?

11    A    Right.

12    Q    And you have just had a chance to read your deposition

13    transcript.  Is it fair to say that you said, quote:  "I

14    think those are pretty much the same factors."?

15    A    Right, and I recall saying that just a short while ago

16    too that those are the same factors reviewed by social

17    security in determinations and CNA's any occ., occupation

18    assessment.

19    Q    Now you worked in the Social Security Administration

20    handling applications like the one that Joan Tesche had in

21    this case.  Correct?

22    A    Correct.

23    Q    Now when you worked, there were three levels to the

24    appeal process.  Is that correct?

25    A    Correct.

1    Q    There was the initial entry level decision on the

2    application, there was the reconsideration level and then

3    there was the appeal to the administrative law judge?

4    A    Correct.

5    Q    Actually there are more than that but --

6    A    Right, I'm aware there is more beyond that.

7    Q    And is it fair to say that it's very difficult to win

8    at the first level of that process?

9    A    Well, I would have to agree.  The first level, the

10   initial, including the reconsideration level, is what they

11   refer to as a screening out process.  You would have to

12   pretty much meet or equal the regulations under social

13   security.

14   Q    And is it fair to say that most cases have to be

15   decided by an administrative law judge if they're appealed?

16   A    I think the majority of the cases are usually reversed

17   or found more favorable at the administrative law judge

18   level.

19   Q    Are activities of daily living an important

20   consideration for CNA to obtain in making a decision?

21   A    Yes, because it speaks to functionality.  One is not

22   disabled based on the diagnosis or medical condition alone.

23   So we do look at activities of daily living for

24   functionality.

25   Q    Would it be important for CNA to know, for example,

54

1    that Mrs. Tesche reports the need to lie down for two to four

2    hours per day?

3    A    Well, I think any information that impacts one's

4    ability to function certainly, you know, should be made known

5    or would be taken into consideration.

6    Q    And if that information is obtained, does it often

7    affect the types of job opportunities, if any, identified by

8    the vocational specialist?

9    A    What would happen is we look at the medical information

10   and the restrictions and limitations imposed to see if that

11   does match with the medical information, and we look at the

12   activities of daily living and the subjective complaints

13   again to see does this come in line with the medical

14   information, and all that information is taken together to

15   assess functionality and in determining, along with a

16   person's age, education, past work experience and training,

17   what other types of occupation they could perform.

18   Q    Now you had an opportunity to review the claim file

19   before today's trial, did you not?

20   A    Yes, I did.

21   Q    Do you recall the reason identified by Mr. Gulledge or

22   the reason or reasons identified by Mr. Gulledge for Joan

23   Tesche being unable to continue in her job as a systems

24   procedure analyst?

25   A    Right, because that particular job did not allow her to

1    sit or stand or alternate her position.  It was our

2    understanding that she pretty much had to sit the majority,

3    if not the entire work day, and her doctors had indicated

4    because of her back surgeries and the pain that she could not

5    tolerate prolonged sitting.  So Mr. Gulledge, you know, was

6    in agreement that she wasn't able to perform that occupation

7    but identified other types of occupations that would allow

8    Miss Tesche to alternate her sitting or standing, flexibility

9    within her medical restrictions.

10   Q    And do you recall whether that systems procedure

11   analyst job was a sedentary job?

12   A    Well, it required sitting seven hours of the day, and

13   there was really no lifting, manual work, so that would be

14   considered to be a sedentary-type position.

15   Q    And the positions that Mr. Gulledge identified, would

16   they fall within the category of sedentary?

17   A    Right, those were also considered sedentary, but the

18   difference between that and Miss Tesche's original position

19   was that these other occupations would allow you to alternate

20   sitting, standing and altering positions, where Miss Tesche's

21   occupation would not allow that.

22   Q    And was consideration given to whether Miss Tesche

23   would have the opportunity to lie down on average between two

24   and four hours per day?

25   A    Well, that information was not, I mean, I do recall in

56

1     the activities of daily living or interviews conducted,

2     particular with Miss Groover, that Miss Tesche had indicated

3     that she could do some things and did have to lay down for a

4     period of time.  But as far as the medical information and

5     the more recent information relied on when we came to the end

6     of the own occupation period, Dr. Wolf didn't indicate any

7     need for Miss Tesche to lie down or that her pain was a

8     debilitating factor from preventing her from alternating

9     positions.

10    Q     And you have referred to Dr. Wolf, I take it CNA has a

11    customary form that it uses in obtaining medical limitations

12    and restrictions?

13    A     Well, there are forms that the nurse case managers

14    utilize and also they would request medical information,

15    sometimes doctors would feel more comfortable providing their

16    medical records, some doctors will not complete forms, but

17    there are forms, physical capacity evaluation, I think that

18    had been sent out or received.

19    Q     I'm looking for the actual form that I believe Dr. Wolf

20    completed in May of 1999, so if you'll bear with me.

21          MR. BURNS:  Your Honor, I can assist to move the

22    process along.  It would be Defendants' Exhibit A at page

23    184.

24          MR. DORRANCE:  Thank you.

25    BY MR. DORRANCE:

57

1    Q    If you could turn -- I'm sorry, I have to give you

2    Defendants' Exhibit A.  If you could turn to page 184.  Take

3    a minute literally to read that or half a minute.  Tell me

4    when you have had a chance to review it.

5         (Witness reading.)

6    A    Okay.

7    Q    Is it fair to say that numbered paragraph 4 calls for

8    Dr. Wolf's prognosis for Mrs. Tesche to return to the systems

9    procedure analyst position?

10   A    Right, because it says return to her occupation.

11   Q    Okay, does CNA have a form which in the context of this

12   case would ask Dr. Wolf whether Mrs. Tesche could perform any

13   occupation?

14   A    No, not that I'm aware of.

15   Q    Do you know whether or not CNA ever asked Dr. Wolf

16   whether Mrs. Tesche could perform any occupation?

17   A    No, what CNA would ask is for the medical restrictions

18   and limitations based upon her current physical status, and

19   then the vocational consultant would make the determination

20   whether the person is able to perform any occupation.

21   Q    Does numbered paragraph 1 of this May 11, 1999 letter

22   set forth the restrictions and limitations that CNA is

23   seeking?

24   A    Well, these would be the physical duties of one's

25   occupation.  Usually if you look at any of the physical

1    demands analysis forms regarding employment or occupation, it

2    would ask how much time does a person have to sit, stand,

3    lift, carry, bend, stoop, so this is the same type of

4    information that comes from that particular form.

5    Q      There is no category other accommodations on this form,

6    is there?

7    A      On the physical demands analysis it will say are

8    special accommodations necessary or can you make reasonable

9    accommodations, things of that nature.

10   Q      On this particular form that you use for the treating

11   physician there is no category for that.  Is that correct?

12   A      This form didn't indicate such a category.

13   Q      Okay, now this form completed by Dr. Wolf in May of

14   1998 indicates that Miss Tesche's condition is permanent.  Is

15   that correct?

16   A      Right, that was in 1999.

17              MR. BURNS:  Objection, that was in 1999, Your

18   Honor.

19   BY MR. DORRANCE:

20   Q      I'm sorry, I misspoke, 1999?

21   A      Right.

22   Q      Okay, and does it also indicate that her condition is

23   worsening, seems to be worsening?

24   A      Yes, he indicates on No. 3 that she seems to be

25   worsening.

1    Q    And that her prognosis for returning to her occupation

2    was poor at that time.  Is that correct?

3    A    Correct.

4    Q    Now you made your final decision in February 21, 2000.

5    Is that correct?

6    A    Correct.

7    Q    And so you were basing your decision on findings by Dr.

8    Wolf in May of 1999?

9    A    Well, it would have been all the information contained

10   in the administrative record, and I know we did have further

11   information of December 1999 from Dr. Wolf.

12   Q    Do you know whether or not that letter in December of

13   1999 reflected his examination in May of 1999?

14   A    I'd have to look at his letter, but I think he was just

15   referring to restrictions imposed, and I don't recall him

16   indicating when he actually last examined her.

17   Q    Now Dr. Rubenstein, you also obtained documents from

18   him.  Is that correct?

19   A    Correct, information had been sent in by Dr.

20   Rubenstein.

21   Q    Do you recall Mrs. Tesche sending a letter to CNA

22   saying please obtain the information from my treating

23   physician Dr. Wolf?

24   A    Yes, I recall a letter from Miss Tesche following a

25   conversation she had with Laura Collins.

1    Q    Now your letter that we have identified as Joint

2    Exhibit 2 is dated February 21, 2000.  Is there a specific

3    time period within which CNA must make a decision?

4    A    You mean on the appeals level?

5    Q    Yes.

6    A    Well, we are -- we follow the ERISA requirements which

7    allow us 60 days, 60 to 120 days, from receipt of the appeal,

8    and so if a decision isn't rendered within 60 days, then

9    we're required to notify the claimant in writing that we

10   would need an additional 60 days to render a decision.

11   Q    And in this case when did that clock start ticking?

12   A    Actually Mr. Courtney had submitted a letter which we

13   took as an intent to appeal because he was gathering further

14   information, so -- and Miss Collins had contacted Mr.

15   Courtney because I think in December of 1999 she had received

16   a letter from Mr. Courtney regarding the appeal, but then he

17   said he was obtaining further information from Dr. Wolf, and

18   so Miss Collins called Mr. Courtney, and they agreed to

19   withhold the appeal request at that time until this

20   information came in.  And when that information came in I

21   believe it was January 3 of 2000, that's the date the appeal

22   began.

23   Q    And that's the date the clock would begin ticking?

24   A    Yes, that's what we considered the perfected appeal.

25   Q    Now you have had a chance to review the administrative

61

1     claim file?

2     A     Yes.

3     Q     Is there any confirmation in that record that this

4     February 21, 2000 letter was mailed on February 21, 2000?

5     A     Well, I know we had a lot of discussion on that on the

6     deposition, and I had a tendency, I just notate on the file

7     activity sheet the date that I completed the appeal, and I

8     say letter drafted.  Drafted to mean as I typed it and I mail

9     it out that day.  Now I don't physically take it to the post

10    office, but we have a mail slot that I put it in.  And so I

11    can only, you know, assume that when it's in the mail slot,

12    it's picked up to be mailed out.

13    Q     Is the terminology mail or letter drafted customarily

14    used by the appeals council in indicating a letter has been

15    mailed?

16    A     No, that was just my own -- as a matter of fact, I'm

17    the only member of the committee I think that even wrote that

18    kind of a statement.  It was just something I -- my personal

19    style.  So usually what we do is the date of our letter is

20    the date that it's completed and it's mailed out.  We keep a

21    separate appeals tracking system, and we enter the date that

22    we physically complete the letter and mail it out.  Now it

23    doesn't indicate mailed out, but the date that we put in

24    there is the date that the letter is typed, we sign it, we

25    put it in the envelope, and it's mailed out.

62

1    Q    Now the 60 day appeal period would expire sometime in

2    this case in early March of 2000.  Is that correct?

3    A    Right, it would run from January 3, 2000, 60 days from

4    there.

5    Q    And Mr. Courtney, who was then Mrs. Tesche's lawyer,

6    sent some follow-up letters after early March to CNA saying,

7    "I haven't received the decision.  What happened?"  Is that

8    correct?

9    A    Correct.

10    Q    Okay, and that's part of the administrative record.

11    Right?

12    A    Right.

13    Q    And it appears that he said that he never got it.  Is

14    that right?

15    A    Right, that was the impression that we got.  Actually

16    that correspondence went to Miss Collins, and I believe Miss

17    Collins' supervisor had retrieved the file from storage and

18    sent the letter to Mr. Courtney, but that was our first

19    indication that he had not received the decision.

20    Q    And the first confirmation that you received that Mr.

21    Courtney actually obtained a copy of the appeal was in mid

22    April of 2000.  Is that right?

23    A    When Mr. Holland had sent out the letter or faxed it to

24    him, that was when we realized that he received the decision.

25    Q    Now before -- in connection with the appeal Mr.

1    Courtney asked for everything from the file.  Is that

2    correct?

3    A    Yes, I believe he had asked for information and copies

4    of the file and so forth.

5    Q    And among specific items he requested was the

6    vocational report.  Is that correct?

7    A    Yes, I believe so.

8    Q    Was the vocational report provided to Mr. Courtney?

9    A    I know it was.  If you'd like, I can pick up the date

10   on the file activity sheet, but I know Miss Collins did send

11   all information, but I believe what was in dispute was the

12   job description identified for the job that the vocational

13   consultant had indicated.

14   Q    So the extent of your knowledge would be limited to

15   what's in the administrative record which we have marked

16   Defendants' Exhibit A?

17   A    A, correct.

18   Q    So you don't have anything to add to what's in that

19   exhibit?

20   A    Correct, all I know is what's contained in here.

21            MR. DORRANCE:  No further questions, thank you.

22            THE COURT:  Thank you, Mr. Dorrance.

23            MR. BURNS:  I presume you're not going to grant me

24   a directed verdict, Your Honor, so I'm not going to ask her

25   any questions.  I'm going to reserve my questions for my

64

1    case.

2              THE COURT:  Okay, fine.

3              MR. BURNS:  So you can step down, Miss Sauerhoff,

4    I'll call you, unless Mr. Dorrance has more questions.

5              MR. DORRANCE:  Thank you.

6              Judge, that concludes today's testimony on behalf

7    of plaintiffs.  We do have the deposition from Dr. Wolf, the

8    treating physician.  That may take two or three weeks to file

9    with the Court.  There is the issue of whether indeed we even

10   need a vocational expert, but I have provided, recently

11   provided, Mr. Burns with a short vocational expert's report.

12   I understand the Court wants to defer that issue pending

13   submissions from the parties.  Is that correct?

14             THE COURT:  Is this Mr. Lukas?

15             MR. DORRANCE:  Mr. Lukas.

16             THE COURT:  Well, an objection was made to that,

17   and I indicated that you should respond to the objection when

18   I have to decide whether it's too late or whatever.

19             MR. DORRANCE:  Yeah, well, I would ask for an

20   opportunity to respond very specifically to the implication

21   that I have sat on my rights because --

22             THE COURT:  I assume you'll cover that in your

23   brief.

24             MR. DORRANCE:  I would like to respond by affidavit

25   if I could.

65

1          THE COURT:  You can attach an affidavit to your

2     brief.

3          MR. DORRANCE:  Okay.

4          THE COURT:  I mean, a brief has been filed, a

5     response is due from you, and if you want to put an affidavit

6     in it, that's fine.

7          MR. DORRANCE:  And as part of that, judge, I would

8     like I'm going to say a 30 day period of time within which we

9     can obtain Dr. Wolf's deposition transcript, in all

10    likelihood agree to a fairly short stipulation of facts

11    clarifying anything else that has to be clarified, I don't

12    know if there is much to be clarified.  We filed summary

13    judgment motions which contain very similar facts.  My point

14    being it probably would be easier in terms of rendering a

15    decision if we would stipulate to many of the material facts

16    in this case and also as part of that, you know, file our

17    response to the motion to preclude the expert testimony which

18    --

19         THE COURT:  Well, let's not put the cart ahead of

20    the horse at this point.  I'm telling you you have got to

21    respond to the brief, and if you want to include an

22    affidavit, you may.  Let's get this hearing finished, and

23    then we'll decide what we're going to do.

24         MR. DORRANCE:  Okay, thank you.

25         THE COURT:  Do you have any other evidence to

1    present at this time?

2              MR. DORRANCE:  No, judge, I would move for the

3    admission of Plaintiff's Exhibit A and move for a directed

4    verdict in our favor.

5              THE COURT:  Well, the motion for a directed verdict

6    is denied.

7              I assume you have no objection to the admission of

8    the exhibit, Mr. Burns?

9              MR. BURNS:  No objection to Plaintiff's Exhibit A,

10   Your Honor.

11             MR. DORRANCE:  We rest, Your Honor, and reserve the

12   right to recall witnesses in rebuttal, if needed.

13             THE COURT:  Okay, fine.

14             MR. DORRANCE:  I don't think it will be needed.

15             MR. BURNS:  Your Honor, on behalf of the defendants

16   Continental Casualty Company and CNA Insurance Company we

17   call our first witness and only witness to the stand, Cheryl

18   Sauerhoff.  Miss Sauerhoff.

19             THE COURT:  Mr. Burns, we have been here for 45, 50

20   minutes.  So we don't interrupt your examination, I don't

21   know how long you think it's going to take --

22             MR. BURNS:  I would think this is going to be

23   relatively short, but I'm not a good prognosticator as to

24   time, so I think I can get done in 45, 50 minutes.

25             THE COURT:  Well, I think we ought to take a recess

67

1   at this point, then you can have 45 uninterrupted minutes.

2       MR. BURNS:  That would be appreciated.  That would

3   be appreciated if I could.  Thank you, Your Honor.

4       (A recess began at 11:15 a.m. and the case

5   continued at 11:25 a.m.)

6       MR. BURNS:  Your Honor, before I begin, Mr.

7   Dorrance has a point of clarification regarding marking and

8   identifying his exhibits.

9       MR. DORRANCE:  Judge, I moved for the admission of

10  Plaintiff's Exhibit A, I should have moved for the admission

11  of Plaintiff's Exhibit B, which is the Social Security

12  Administration's interpretive ruling which -- of which I

13  request you take judicial notice.

14      THE COURT:  We'll put it in the record.

15      MR. DORRANCE:  And Exhibit A I'll move for that

16  when we get Dr. Wolf's transcript.

17      THE COURT:  Okay.

18      MR. BURNS:  So that the Court is clear, I do object

19  to the introduction of Exhibit B which is the social security

20  ruling on the basis of relevance.  I think in its own words

21  it shows it's not relevant to this case.

22      THE COURT:  It may not be relevant, but if it is,

23  it will be in the record.

24      MR. BURNS:  Right, in the Court's discretion.

25      (Cheryl Sauerhoff was recalled as a witness.)

68

                    DIRECT EXAMINATION

1

2    BY MR. BURNS:

3    Q    Good late morning, Miss Sauerhoff, how are you doing?

4    A    I'm fine, thank you.

5    Q    Good.  You have been up there for a little while, so

6    I'm going to try to be brief.  In front of you, ma'am, I have

7    placed what we marked as Joint Exhibit No. 1.  Could you take

8    that document for me?

9    A    Yes.

10   Q    Could you identify that document for the record?

11   A    Yes, this is the long-term disability policy under

12   which Miss Tesche had been covered.

13   Q    This is the contract that you have with AMP,

14   Incorporated, Mrs. Tesche's former employer.  Correct?

15   A    Correct.

16   Q    And could you explain to me what this contract

17   signifies or what it's utilized for for purposes of

18   evaluating disability claims?

19   A    Well, this is a private insurance contract that was

20   purchased by AMP, and in it it contains the policy provisions

21   regarding total disability and how we evaluate whether one is

22   disabled or not in accordance with the contract.

23   Q    And it contains the standard for purposes of what

24   constitutes a disability, you have previously testified to.

25   Correct?

69

1    A    Correct.

2    Q    And there are two different standards.  There is an own

3    occupation standard and an any occupation standard.  Correct?

4    A    Correct.

5    Q    And in this case Miss Tesche was deemed to be disabled

6    from performing her own occupation.  Correct?

7    A    Correct.

8    Q    So that the only thing that's at issue before the Court

9    at this point in time is CNA's determination with regard to

10    whether she is continuously able to perform any occupation.

11    Correct?

12    A    Correct.

13    Q    Okay, now in terms of the insurance contract, who does

14    it place the burden on with regard to providing information

15    sufficient to support a claim for disability?

16    A    Well, the burden of proof is on the claimant.  They

17    must submit written proof of their disability.  Then also if

18    there is any information that they have pertaining to their

19    disability, that information is provided by the claimant as

20    well.

21    Q    Okay, now in addition to the policy, you testified

22    earlier that there was another document that you utilized and

23    relied upon in terms of making your claim determination.

24    What is that document?

25    A    That would be the claim file, the administrative

70

1    record.

2    Q    Ma'am, I have placed in front of you a document which

3    has been marked as Defendants' Exhibit A and has page numbers

4    at the bottom CCC 000111 through CCC 000276.  Ma'am, is this

5    the administrative record that you're referring to?

6    A    Yes, it is.

7    Q    And could you describe for me what this administrative

8    record consists of, what is it?

9    A    Well, this is the long-term disability claim file, and

10   when the claim is submitted, the claimant presents an

11   employer's statement, an employee's statement, attending

12   physician's statement, and then through that that's the

13   framework for the disability claim.  And it contains all the

14   medical information, any interviews, any statements from Miss

15   Tesche or her representative, and it includes all

16   correspondence from CNA, but it consists of all the

17   information that was -- that constitutes Miss Tesche's

18   long-term disability claim.

19   Q    And is Defendants' Exhibit A the document that in

20   conjunction with the Joint Exhibit No. 1 that you looked at,

21   that you reviewed and that you evaluated in making your

22   determination in regard to Miss Tesche's long-term disability

23   claim?

24   A    Yes, it is.

25              THE COURT:  Could I ask -- could I interrupted you

71

1    for one second.

2              MR. BURNS:  Sure.

3              THE COURT:  I'm assuming when you say long-term

4    disability, you're talking about own occupation, any

5    occupation, this is covering the whole --

6              MR. BURNS:  No, that's not true.

7              THE COURT:  Clarify that for me.

8              MR. BURNS:  Yes, this claim file, ma'am, reflects

9    her claim with regard to long-term disability benefits.

10   Actually, Your Honor, I think you are correct.  I'll let Miss

11   Sauerhoff testify instead of me.

12   BY MR. BURNS:

13   Q    Miss Sauerhoff, does that document contain both the

14   information that was available to CNA for purposes of

15   evaluating the own occupation determination and the any

16   occupation determination?

17   A    Yes, it does.  The long-term disability decision is the

18   first 24 months, refers to the own occupation.

19             THE COURT:  I understand.

20   A    But, yes, it is, it's the entire claim.

21             THE COURT:  One other question, would you point me,

22   sir, to the specific part of the Joint Exhibit No. 1 which

23   places -- you say places the burden of proof on the

24   applicant.

25             MR. BURNS:  Your Honor, I'm going to hand this

72

1       directly up to you.  For purposes of reference, the page

2       before it is identified as page No. 6, and there is no page

3       number on the subsequent page.  The document page that I'm

4       referring to starts at the top:  If the employer gives us

5       written notice of his intent to renew this policy and

6       continues.  The specific provision which I'll direct Your

7       Honor to is the written proof of loss section, time of

8       payment of claim and payment of claim and --

9               THE COURT:  Okay.  All right, I just didn't know if

10      there was a sentence in there that said burden of proof or

11      anything else.

12              MR. BURNS:  That's what I'm -- there is one, time

13      of payment of claim states, Your Honor, benefits will be paid

14      monthly immediately after we, which is defined as CNA or

15      Continental, receive due written proof of loss.

16              MR. DORRANCE:  I'm sorry, what page was that again?

17              (Mr. Burns showed Mr. Dorrance the page.)

18              THE COURT:  Unfortunately these pages aren't

19      number.

20              MR. BURNS:  Yes, and then in addition to that the

21      written proof of loss section indicates written proof of loss

22      must be furnished to us.

23              THE COURT:  Well, I don't want to try to go through

24      this now.

25              (The document was passed to the Court.)

73

1          THE COURT:  What am I supposed to look at?

2          MR. BURNS:  The written proof of loss, and there is

3    two different sections in there, Your Honor, that document or

4    delineate how we pay claims.  No. 1, you have to furnish

5    written proof of loss to us, and then we will make payment of

6    claims, and the time of payment of claims, when we receive

7    that proof.

8          THE COURT:  Okay, that's what you're basing that

9    statement on?

10         MR. BURNS:  Yes, Your Honor.

11   BY MR. BURNS:

12   Q    Now to clarify an issue that was raised previously,

13   social security disability factors that they take into

14   consideration for purposes of evaluating a claim, age,

15   education, those are similar to the factors that CNA takes

16   into consideration in evaluating a claim.  Correct?

17   A    That's correct.

18   Q    What's different?

19   A    Well, social security goes through a sequential

20   evaluation.  They have an entirely different process and go

21   by regulations and medical criteria.  With social security, I

22   believe when you get to the fifth part of the process, they

23   look at are you able to do any occupation, but they look at

24   substantial, gainful employment.

25   Q    And that is a different standard than under the CNA

74

1    policy.  Correct?

2    A    Correct, CNA doesn't look at substantial or gainful

3    employment.

4    Q    Okay, now you indicated in your testimony that

5    diagnosis does not equate to a disability.  Could you explain

6    that for me?

7    A    Well, we recognize that there are a variety of

8    diagnoses and treatment, and because somebody has a diagnosis

9    doesn't automatically make them not able to function.  So we

10   have to look at the medical information that speaks to that

11   diagnosis and how that impacts, in other words, what

12   limitations, what restrictions.  There are many people that

13   have diagnoses that do work, but we have to look specifically

14   at what pertains to the medical information and what impacts

15   that person's functionality.

16   Q    And what is it in the medical information that's

17   compiled as part of the administrative record that you look

18   at?

19   A    Well, in the medical information we look at diagnostic

20   testing, that would be your MRI's, your CAT scan, your lab

21   work, but also the doctors' physical examinations, and the

22   doctors do go through part of that that's called the

23   subjective history, the patient's complaints, then the

24   objective medical findings or their observations on

25   examination, and that would be like your range of motion,

75

1   your sensory loss, muscle loss, atrophy, things of that

2   nature also are taken into the whole picture.

3   Q    As part of your review of the file did you see where

4   any of Mrs. Tesche's physicians either wrote a letter to CNA,

5   wrote in a report or communicated with CNA in any way about

6   Mrs. Tesche's activities of daily living; that is, her

7   functionality?

8   A    No, there was no specific references.  I know from Dr.

9   Wolf I saw no references indicating activities of daily

10  living.  Dr. Rubenstein had indicated that Miss Tesche, and

11  this was back in 1998, that she would be capable of

12  performing some work within her physical capacity as

13  tolerated or something to that effect.

14  Q    If a patient was unable -- was sleeping for two to four

15  hours a day due to pain as she reports, as Mrs. Tesche

16  testified today, and as she claims to have reported to CNA,

17  is that something that you would expect to find in medical

18  records?

19       MR. DORRANCE:  Objection to the characterization

20  sleeping two to four hours.

21       THE COURT:  Resting.

22  BY MR. BURNS:

23  Q    Resting, I'll rephrase the question to include the term

24  resting, and you can answer it.

25       MR. DORRANCE:  Lying down I believe would be the

76

1    correct reference.

2    A    Well, I would think the medical records would reference

3    any kind of functional loss or something of significant -- I

4    know many times doctors don't write everything everybody

5    says, but if somebody was saying that a majority or a good

6    portion of their day was spent not being able to function,

7    that certainly would have been reflected or would I think be

8    reflected in the records.

9    BY MR. BURNS:

10    Q    Was it in this case?

11    A    No.

12    Q    What information -- the information that you procured

13    with regard to the activities of daily living, where did that

14    come from?

15    A    Well, that information came from the interviews that

16    Miss Groover had conducted with Miss Tesche, also Mr.

17    Gulledge had contacted Miss Tesche when he was performing the

18    any occupation assessment.  We look at information in the

19    medical records, like I said, that we didn't see that

20    information in Miss Tesche's records.  But primarily your

21    functionality would come through the interviews or any

22    information presented.  Sometimes the claimant will send in

23    letters explaining what they're not able to do now,

24    differences in their condition.

25    Q    Did Mrs. Tesche do that?

77

1   A   No.

2   Q   Did any of Mrs. Tesche's letters -- lawyers do that?

3   A   No.

4   Q   Did any doctor do that?

5   A   No.

6   Q   But CNA did secure records from physicians, treating

7   physicians.  Correct?

8   A   Yes.

9   Q   And indeed they requested that two of the physicians

10  complete what are known as physical capabilities forms.  Is

11  that correct?

12  A   Correct.

13  Q   Could you describe for me what a physical capabilities

14  form is?

15  A   Well, a physical capabilities form is where the doctor

16  indicates based on the medical condition and the physical

17  findings presented in the examination, along with diagnostic

18  findings of what their medical opinion is of what that person

19  is able to perform within a given day, in other words, how

20  much they could sit, stand, if they're able to climb, squat,

21  bend, stoop.

22  Q   And did CNA in reaching its determination have physical

23  capacity evaluation forms completed by her treating

24  physicians?

25  A   Yes.

78

1    Q    What physicians completed those forms?

2    A    I know Dr. Rubenstein did and Dr. Wolf did.

3    Q    Okay, and what were their conclusions with regard to

4    her current restrictions and her ongoing restrictions and

5    limitations?

6    A    Well, the information they presented had alternated.  I

7    think there was maybe a little bit of difference between Dr.

8    Rubenstein and Dr. Wolf's amount of sitting at a time, but

9    basically the restrictions and limitations imposed would

10   place Mrs. Tesche within a sedentary range.  In other words,

11   there is some physical capability but not being able to do

12   heavy or manual work but within a light to sedentary

13   category.

14             MR. BURNS:  Now, Your Honor, for purposes of the

15   record the physical capacity evaluation forms are located in

16   Defendants' Exhibit A at pages 138 -- I'm sorry, on page 184,

17   that's Dr. Wolf's.  Dr. Rubenstein's two forms are contained

18   at pages 246 and 247, Exhibit A and also page 185 of Exhibit

19   A.

20   BY MR. BURNS:

21   Q    Now what does CNA do when it receives those physical

22   capacity evaluations?  How do they play a role in the

23   determination that's ultimately made?

24             THE COURT:  Would you give me those numbers again

25   so I'll write them down?

1          MR. BURNS:  Sure, Defendants' Exhibit A, for Dr.

2    Wolf page 184, for Dr. Rubenstein page 185 and also pages

3    246-247.  It's the same one just two pages.

4          THE COURT:  Thank you.

5          MR. BURNS:  You're welcome.

6    BY MR. BURNS:

7    Q     The physical capacity evaluation forms that are sent in

8    by treating physicians, what role do they play with regard to

9    CNA's evaluation and claim for disability benefits?

10   A     Well, that information is utilized in evaluating if

11   Miss Tesche is capable of performing other occupations

12   because it's important before you start assessing other

13   occupations what the medical status is and the permanent

14   restrictions and limitations, and so that begins the process.

15   Once that's in place, then the vocational -- the nurse case

16   manager usually closes the file to any further nurse case

17   management, it's referred to the vocational consultant who

18   begins taking those limitations and working from that based

19   on the person's age, education, work experience and

20   identifying other occupations.

21   Q     Do the physicians, the treating physicians' reports,

22   the treating physicians complete physical capacity

23   evaluations, all the medical treatment and care that they

24   render, is that a part of the determination or does it play a

25   role in the evaluation of determination by CNA?

1    A    Oh, yes, all the information is taken in its totality

2    and reviewed.

3    Q    So the whole record is reviewed.  Is that correct?

4    A    Correct.

5    Q    And the whole record would be the administrative

6    record.  Correct?

7    A    Correct.

8    Q    And in this case that administrative record is Exhibit

9    A?

10   A    Correct.

11   Q    So in making its determination CNA considered and

12   evaluated all of the treating physician reports?

13   A    Correct.

14   Q    Okay, in terms of the treating physician reports was

15   there any treating -- the first treating physician was a Dr.

16   Rubenstein.  Is that correct?

17   A    Correct.

18   Q    Okay, who was Dr. Rubenstein?

19   A    I believe he was Miss Tesche's primary care doctor or

20   family -- I'm not quite certain of the specialty, but I know

21   he was the primary care doctor.

22   Q    Did Dr. Rubenstein provide CNA with a physical capacity

23   evaluation?

24   A    Yes, he did.

25   Q    Did he provide his medical records?

1    A    Yes.

2    Q    Did he ever opine to CNA that Miss Tesche was incapable

3    of performing any occupation?

4    A    No.

5    Q    In his records did that ever say that?

6    A    No.

7    Q    CNA had the ability to conduct an independent medical

8    examination.   Correct?

9    A    Yes.

10   Q    Why didn't you do an independent medical examination in

11   this case?

12   A    Well, we look at all of the records presented, the

13   doctors' statements, the -- all the information in totality,

14   and there was nothing within the records that was conflicting

15   or would raise any questions that this just doesn't add up or

16   make sense, and so we saw no need for an independent medical

17   review.

18   Q    Did you see a need to contact any of the treating

19   physicians to clarify any issues?

20   A    No.

21   Q    Why not?

22   A    Again their information was very succinct.  It provided

23   information.  We understood that Miss Tesche had undergone

24   back surgeries and that there were some limitations and

25   restrictions in place, and based on the information the

1    doctors presented we saw no reason to question those

2    restrictions or limitations.

3    Q    And when you were handling the appeal, did you believe

4    that it was necessary to contact Mrs. Tesche to clarify any

5    issues?

6    A    No.

7    Q    Why not?

8    A    Again I looked at all the information within the

9    record, reviewed everything in its totality, and I didn't see

10   anything that didn't make sense or didn't fall in line, so I

11   saw no need.  If there was some question or if I had some

12   doubt or there was some inconsistency, I certainly could have

13   called Miss Tesche, but in this case I didn't see anything.

14   Q    What is it -- what is your determination based upon,

15   Miss Sauerhoff, if you could explain that please.

16   A    I'm sorry, my determination?

17   Q    Your claim determination, could you tell us how you

18   came to your claim determination?

19   A    What I did is I looked at the entire claim file,

20   Exhibit A, and also I reviewed the policy to make sure what

21   provision we were under.  Given all the information I

22   realized that Miss Tesche had had a series of back surgeries

23   and that there would be some limitations and restrictions

24   imposed, but based on the interviews, the vocational

25   consultant review and the jobs identified, I felt that they

83

1    did meet the restrictions imposed based on the medical

2    information and concurred with CNA's decision.

3    Q    And in terms of your review and evaluation you

4    mentioned a vocational consultant's report.  Tell me the role

5    of a vocational consultant in this claim determination?

6    A    On this claim determination when the decision becomes

7    an any occupation decision, that is a vocational

8    determination because an any occupation decision is based on

9    not only medical information but one's past work experience,

10   their training, their ability, their education, so all of

11   those factors are taken into consideration by a vocational

12   consultant who then identifies if there is other jobs

13   available or occupations available for that person.  They

14   look at transferrable skills and things of that nature in

15   making their determination.

16   Q    And in terms of this vocational evaluation, is that

17   something that's commonly done at CNA?

18   A    Yes, it is.

19   Q    With regard to any occupation determination.  Correct?

20   A    Yes.

21   Q    You had Mr. Gulledge's report, which for the record,

22   Your Honor, is contained at Defendants' Exhibit A, page 141,

23   when you were handling the appeal.  Is that correct?

24   A    Yes.

25   Q    Did you review that document?

84

1    A    Yes, I did.

2    Q    Did you evaluate that document?

3    A    Yes.

4    Q    Did you blindly accept the conclusions reached in that

5    document?

6    A    I didn't blindly accept the conclusions, I mean, I read

7    the report, but based on all the information contained in the

8    file, I agreed with those occupations and those conclusions.

9    Q    And tell me, ma'am, why in your independent review that

10   you decided to agree with the conclusions reached by Mr.

11   Gulledge?

12   A    Well, because based on the physical findings and the

13   limitations and Miss Tesche's age, education, past work

14   experience, I felt that these occupations were within her

15   physical capabilities and that she was not disabled from any

16   occupation.

17   Q    And the jobs that were evaluated were a telemarketer.

18   Correct?

19   A    Correct.

20   Q    A customer services representative.  Correct?

21   A    Right.

22   Q    A motel night auditor.  Correct?

23   A    Correct.

24   Q    And an automobile rental agent.  Correct?

25   A    Correct.

1    Q    And you had knowledge of those vocational descriptions

2    from the Dictionary of Occupational Titles?

3        MR. DORRANCE:  Objection, there is no foundation.

4    BY MR. BURNS:

5    Q    Ma'am, when would you working with the Social Security

6    Administration, you said that you handled medical

7    determinations.  Correct?

8    A    Correct.

9    Q    And as part of that medical determination, you

10   evaluated vocational issues.  Correct?

11   A    Yes, we would utilize the department or the Dictionary

12   of Occupational Titles.

13   Q    Tell me what the Dictionary of Occupational Titles is,

14   ma'am?

15   A    Well, it's a list of all the occupations within the

16   national economy, and it's listed by not only your physical

17   requirements, there is another part to the DOT that will go

18   into like the mental aspects of an occupation, but it gives

19   you a foundation of what typically is expected in those

20   positions and the physical requirements relating to that.

21   Q    With that foundation then, ma'am, when you made your

22   determination or you conducted your appellate review of Miss

23   Tesche's disability claim back in late 1999, early 2000, were

24   you familiar with the Dictionary of Occupational Titles?

25       MR. DORRANCE:  Objection, still no foundation.

1          THE COURT:  Overruled.

2     A     Yes, I was.

3     BY MR. BURNS:

4     Q     And so you were familiar then with the job descriptions

5     that were identified by Mr. Gulledge.  Correct?

6     A     Right, these were sedentary occupations identified.

7     Q     What was the key to those occupations that made it

8     different than her working as a computer systems analyst,

9     ma'am?

10    A     Well, these occupations could be performed, they could

11    be performed from home, I mean, not all of them but the

12    telemarketer, customer service rep.  Also they could be

13    performed with a sit/stand option, the ability to move around

14    freely.  You could use a headset.  As a telemarketer you

15    didn't have to be restricted to sitting in one spot.

16    Q     And did the administrative record that was in front of

17    you have any indication as to Miss Tesche's prior job

18    experience?

19    A     Well, there was indication that she had -- was started

20    originally as a secretary with AMP, so there was some

21    secretarial background, but also as a hospital switchboard

22    operator, I believe.

23    Q     So, ma'am, based upon your experience as a vocational

24    person, in conjunction with your knowledge of the Dictionary

25    of Occupational Titles, and based upon her occupational

87

1    experience; that is, her job history, did you come to a --

2    and physical limitations and restrictions that were placed on

3    her by her physicians, as well as any statements of

4    activities of daily living, did you reach a conclusion as to

5    whether or not Mrs. Tesche was continuously able to perform

6    the material and substantial duties of any occupation?

7            MR. DORRANCE:  Objection, Your Honor, I didn't know

8    that Mrs. Sauerhoff was going to be here today to testify as

9    a vocational expert, that was Mr. Gulledge's job, and I was

10   denied the right to take his testimony.

11           MR. BURNS:  I'm not offering her as a vocational

12   expert.

13           THE COURT:  No, I don't think you are.  I think

14   this all goes with the evaluation of the application.

15           MR. BURNS:  And her educational experience as a

16   vocational expert.

17           THE COURT:  Yes.

18           MR. BURNS:  I can't rephrase that question, so I'm

19   going to ask the court reporter if she has a chance to read

20   that back to us.  Do you want me to try and rephrase it

21   again?  I'll try and rephrase it.

22           THE COURT:  Try to shorten it.

23   BY MR. BURNS:

24   Q    Miss Sauerhoff, based upon your testimony here today

25   and your role as an independent evaluator on appeals did you

88

1    make a determination as to Miss Tesche's ability to perform

2    continuously the substantial and material duties of any

3    occupation?

4    A    Yes, I did.

5    Q    What was that decision?

6    A    The decision was that she did have the capabilities to

7    perform these other occupations identified, that she was not

8    disabled from any occupation.

9         MR. BURNS:  Thank you, Miss Sauerhoff.  Your Honor,

10   I have no further questions.

11        THE COURT:  Thank you.

12        MR. DORRANCE:  Judge, as to cross examination.

13                    CROSS EXAMINATION

14   BY MR. DORRANCE:

15   Q    Mrs. Sauerhoff, I call your attention to Joint Exhibit

16   No. 1.  Let me count the number of pages before I get to

17   where I'm going to ask you the question.  It looks like the

18   actual application form 1, 2, 3, 4, 5, 6, it looks like the

19   7th page.  There are numbered paragraphs 1 through 8.  Do you

20   have that?

21   A    Yes.

22   Q    Numbered paragraph 7 indicates the percentage of the

23   premium paid by the employer and it states 0.

24   A    Yes.

25   Q    Do you know what that means?

89

1    A    Yes, this means that the employer does not contribute

2    any money towards the premium, so this would leave us to

3    believe that Miss Tesche paid the entire premium for her

4    long-term disability coverage.

5    Q    Now you testified that in your opinion the burden of

6    proof was on Mrs. Tesche in this case?

7    A    Right, to provide written loss and submit information

8    in support of her disability.

9    Q    And you based that solely on that one sentence in that

10   policy?

11   A    Well, when the application -- it's the claimant's

12   responsibility to submit their claim for disability, and that

13   is written proof of loss.

14   Q    But that's the one sentence you rely on in stating that

15   it's Mrs. Tesche's burden of proof?

16   A    In the policy, yes.

17   Q    Okay, is there any other document you can refer to?

18   A    No, the summary plan description may explain to the

19   claimant what their responsibilities are, but I would just

20   have the policy.

21   Q    You have no information about the summary plan

22   description, do you?

23   A    No.

24   Q    And the insurance company does have the power and right

25   to obtain medical and vocational information on its own.  Is

1    that correct?

2    A    Yes.

3    Q    And it also has the power and right to clarify any

4    unresolved questions in the file.  Is that correct?

5    A    Yes.

6    Q    And it has the power and right to update medical

7    records, does it not?

8    A    Yes.

9    Q    And if it has any question about a physician's finding,

10    it has the right to call that physician and ask him a

11    question?

12    A    Right, if there is any questions, right.

13    Q    And you testified that you didn't call anyone in making

14    your decision.  Is that correct?

15    A    Correct.

16    Q    And that you based your decision solely on the packet

17    of information which we have marked Defendants' Exhibit A?

18    A    Yes.

19    Q    You didn't call Mrs. Tesche?

20    A    Correct.

21    Q    You didn't call Dr. Wolf?

22    A    Correct.

23    Q    You didn't call Tony Gulledge?

24    A    Correct.

25    Q    So you don't know what he may have said or may not have

91

1    said during his interview with Mrs. Tesche?

2    A    No, I went by his vocational assessment report.

3    Q    So you don't know whether Mr. Gulledge asked Mrs.

4    Tesche what her activities of daily living were?

5    A    I only know what is reported in that contact on that

6    form.

7    Q    Could you turn to page 141 please.  Can you find any

8    reference to a question being asked as to Mrs. Tesche's

9    activities of daily living?

10   A    No, I don't see where he references activities of daily

11   living.

12   Q    Is there any reference to any reported need to lie down

13   between two and four hours per day?

14   A    No.

15   Q    Now you testified that there was no information in the

16   administrative record indicating that Mrs. Tesche had

17   reported the need to lie down.  Isn't that correct?

18   A    I think in the interview with Miss Groover there was an

19   indication that she did have to lie down for a period of

20   time.

21   Q    Okay, so you're clarifying your direct testimony?

22   A    I can look at Miss Groover's report.

23   Q    Mrs. Groover's report is on page 148.

24   A    I believe that's where it began.

25   Q    Right at the bottom of that page.

92

1    A    Right.

2    Q    Okay, the last line in that page indicates, quote:  "By

3    2 p.m. she needs to lie down and apply ice."

4    A    Correct.

5    Q    Now I'm comparing the interview conducted by Pam

6    Groover, which is contained at pages 148 through 151, I

7    believe, comparing the nature and extent of questions asked

8    during that interview with the report of Mr. Gulledge on page

9    148.  There is no category in Mr. Gulledge's report that is

10    similar to the category in numbered paragraph 8 of Miss

11    Groover's interview.  Is that correct?

12    A    Correct.

13    Q    And Miss Groover's interview was done on or about

14    January 5, 1998.  Is that correct?

15    A    Correct.

16    Q    And Mr. Gulledge's interview was done on or about June

17    9, 1999.  Is that correct?

18    A    Correct.

19    Q    So roughly a year and a half had passed since the

20    initial interview with Mrs. Tesche in this file?

21    A    Correct.

22    Q    And there is information in the record, indeed Miss

23    Groover's own findings or own report, I should say, right

24    there on page 148 that Mrs. Tesche notices a profound

25    increase in symptoms since October of '97.  Is that correct?

93

1   A    Correct.

2   Q    So CNA was aware that Mrs. Tesche's condition was

3   worsening.  Is that correct?

4   A    Well, right, there was indication, and even Dr. Wolf

5   had indicated, that it seemed to be worsening.

6   Q    Now you mentioned that you relied in part on the

7   records of Dr. Rubenstein?

8   A    Yes, I reviewed all the records contained in the file.

9   Q    And you have heard Mrs. Tesche testify as to Dr.

10  Rubenstein no longer being her family doctor?

11  A    Correct.

12  Q    Okay, is it fair to say that all of Dr. Rubenstein's

13  records predated the any occupation period?

14  A    Yes, those were prior to the any occupation period.

15  Q    And is it fair to say that Dr. Rubenstein in one of his

16  reports to you specifically suggested that you obtain an IME

17  from a specialist, including possibly an orthopedic surgeon?

18  A    I know he made a comment, if you can direct me to it,

19  because I know -- I found it.

20  Q    I believe it's on page 184 or '85.

21  A    Yeah, I have it here on 185.  In response to our

22  question objective findings must be provided to support any

23  limitations given, Dr. Rubenstein had replied:  The above are

24  the patient's self-described limitations.  If confirmation is

25  required, suggest independent medical examination by I think

94

1    it's a physiatrist or orthopedist.  That might be surgeon

2    there, surgeon.

3    Q    And when was this document completed?

4    A    This was completed -- we received it on February 11,

5    1999.

6    Q    Okay, and did you subsequently receive a letter from

7    Mrs. Tesche asking you to direct any further medical

8    inquiries to her treating physician Dr. Wolf?

9    A    Right, I do recall Miss Tesche sending a letter to Miss

10   Collins that the most appropriate person to obtain

11   restrictions and limitations would be Dr. Wolf.

12   Q    You stated that -- in response to Mr. Burns' questions

13   that you saw no need to contact anyone in making your

14   decision.  Do you recall that testimony?

15   A    Yes.

16   Q    Among the people that you decided not to contact was

17   Dr. Wolf?

18   A    Correct.

19   Q    And I believe the reason that you gave in your

20   testimony was that you felt that everything was perfectly

21   clear and did not need to be clarified?

22   A    Right, the information presided -- presented was in

23   line with the restrictions that he had supported, and I saw

24   no reason to question or clarify the information he had

25   provided.

95

1    Q    Do you already have Joint Exhibit 2 there?

2    A    Yes.

3    Q    Okay, I call your attention to page 2 of Joint Exhibit

4    2, which is your decision.  You stated this decision contains

5    all the reasons for Continental's final determination.  Is

6    that correct?

7    A    Yes.

8    Q    In the middle of -- I'm sorry, at the end of paragraph

9    3 on page 2 the last two sentences, please take a moment to

10    read those last two sentences.

11        (Witness reading.)

12    A    Okay.

13    Q    Okay, now you're stating in that paragraph that Dr.

14    Wolf was not specific enough in making his findings.  Is that

15    correct?

16    A    Correct.

17    Q    And this is the first time that Mrs. Tesche was made

18    aware that you felt Dr. Wolf was not specific enough in his

19    findings.  Was that correct?

20    A    Well, he wasn't specific enough with his opinion.  I

21    mean, his findings I think were pretty clear as to what Miss

22    Tesche's limitations were, but when he said that she's not

23    able to, you know, perform the occupation, we didn't

24    understand why based on the restrictions he had imposed, and

25    it gave no clarification or indication as to why.

96

1    Q    So you had a question in your mind when you made this

2    decision, didn't you?

3    A    Well, the question was why wasn't Miss Tesche able to

4    perform a sedentary occupation based on the findings.

5    Q    And you never found out the answer to that question.

6    Is that correct?

7    A    Well, based on the medical records presented, including

8    the limitations presented, we didn't feel there was a

9    question.

10   Q    You didn't feel there was a question as to whether Dr.

11   Wolf had provided sufficient information concerning Mrs.

12   Tesche's inabilities to perform her activities of daily

13   living?

14   A    Well, he didn't even address her activities of daily

15   living.  He indicated the restrictions he imposed were

16   sedentary.

17   Q    And you had the right to ask him that question, didn't

18   you?

19   A    Well, if we felt that those restriction did not match

20   the medical information, we could have questioned them, but

21   we didn't see anything that was inconsistent.

22   Q    And you relied on Mr. Gulledge's report at page 141 in

23   rendering your decision?

24   A    Yes, I reviewed that information.  I agreed with the

25   occupations identified.

1    Q    And you would agree that a more comprehensive interview

2    of the claimant took place some year and a half prior to that

3    with Pam Groover?

4    A    Yes, that was a more comprehensive interview.

5    Q    And Mrs. Tesche's condition during this period has

6    progressively gotten worse.  Is that correct?

7    A    Well, actually the physical findings in the records

8    presented showed that there was no neurologic deficit, there

9    was no muscle wasting or atrophy.  I know her pain, there,

10   you know, there were pain complaints, and we certainly were

11   not disputing that someone would have pain after three back

12   surgeries, but we didn't see any deterioration or evidence in

13   the record to support why she couldn't perform sedentary

14   work.

15   Q    And you had Dr. Wolf's form that he completed in May of

16   1999.  Is that right?

17   A    Yes.

18   Q    And at that time he opined that her condition seemed to

19   be worsening.  Isn't that correct?

20   A    Right, he did indicate that it seemed to be worsening.

21   Q    And her prognosis at least with respect to her

22   returning to her job was poor.  Correct?

23   A    Right, to her occupation he indicated it was poor.

24   Q    And you rendered your decision some nine or 10 months

25   after Dr. Wolf provided his last opinion on the subject?

98

1    A    Right, the decision was made from the Appeals Committee

2    on February 21, 2000, and it related to the any occupation

3    period, which would have began in October of 1999.

4    Q    Do you have any personal knowledge as to whether

5    Continental provided the job descriptions to Mr. Courtney?

6    A    My recollection based on the documentation on the file

7    activity sheet was that Miss Collins had indicated to Mr.

8    Courtney he could obtain the job descriptions through DOT,

9    Dictionary of Occupational Titles, at a local library, but I

10   know that should not have been our response.  We should have

11   provided that information.

12   Q    And that's not your customary procedure?

13   A    Right.  If you had asked for a copy of job descriptions

14   or information we reference, we certainly would have -- we

15   would not have mailed you a Dictionary of Occupational

16   Titles, but we would have sent you copies of those jobs as

17   identified.

18   Q    And do you have any indication whether -- or any

19   personal knowledge of whether Mr. Courtney was provided with

20   other requested information such as the vocational report?

21   A    Right.

22        MR. BURNS:  Objection.  Your Honor, this was

23   already asked and answered previously in his own direct

24   examination, and I never raised this issue in my direct

25   examination, so I think it's beyond the scope and it's not

99

1    relevant.

2              THE COURT:  I think that's right.

3              MR. DORRANCE:  Okay, I'll withdraw the question.

4    BY MR. DORRANCE:

5    Q    Now you testified initially that social security

6    disability regulations and the CNA policy contained similar

7    criteria.  I believe that is what your testimony was.

8    A    Well, the factors, right, that are used to evaluate are

9    similar.

10   Q    That would include, for example, age, work history,

11   medical history, geographic region, things of that nature.

12   Is that correct?

13   A    Correct.

14   Q    And there is specific social security regulations

15   addressing each and every one of those categories.  Is that

16   not right?

17   A    Yes, social security is very strict and very detailed

18   criteria they go by.

19   Q    So is it fair to say that actually based on your own

20   experience working for both social security and for a private

21   insurance company that social security has more rigorous

22   requirements in meeting the definition of disability?

23   A    Well, I know with social security there is no own

24   occupation provision.  I mean, you have to be disabled from

25   any occupation to begin with.  So in that respect, yes, it is

1    very stringent.

2    Q    And indeed you were discussing what you felt to be the

3    differences between substantial gainful employment under the

4    social security regulations or sometimes it's called

5    substantial gainful activity, SGA, and what you feel is a

6    slightly different test under the CNA policy.  Do you recall

7    that testimony?

8    A    Right.

9    Q    Okay, and you felt that it was different under the

10    social security regulations because there they have a

11    monetary consideration if it's -- based on your experience if

12    it's $500 or more, it's considered substantial gainful

13    activity?

14    A    Correct.

15        THE COURT:  Excuse me, I'm not trying to hurry you

16    at all, but how much more time do you need?

17        MR. DORRANCE:  Ten minutes.

18        THE COURT:  It's time for us to break for lunch.

19    If you're going to finish in 10 minutes, I'll wait.

20        MR. DORRANCE:  Well, I suspect lawyers don't intend

21    to lie, but they take longer than they think they will, and I

22    don't want to deny --

23        MR. BURNS:  I would prefer just to move forward,

24    Your Honor.  I'm not going to have much on recross.  I don't

25    think there is any other issue to raise.

1          MR. DORRANCE:  Well, I would probably prefer to

2     adjourn.

3          THE COURT:  I'll give you 10 more minutes.  I think

4     I understand.  You know, --

5          MR. DORRANCE:  Okay, that's fine.

6          THE COURT:  -- it's not a jury trial.

7          MR. DORRANCE:  I appreciate that, judge.

8     BY MR. DORRANCE:

9     Q    CNA's definition assumes full-time employment, does it

10    not?

11    A    Well, it says continuously unable to perform, so it

12    would be on a continuous basis, which would be more than

13    working just one day or so it would be considered full time.

14    Q    So in that respect the Social Security Administration's

15    regulations on the definition of disability are far more

16    difficult to achieve than CNA's regulations?

17    A    Well, my experience with the Social Security

18    Administration is it's very difficult to get approved.

19    Q    So when Mr. Gulledge identified these four potential

20    job opportunities, he was assuming that Mrs. Tesche would

21    have to work on a full-time basis?

22         MR. BURNS:  Objection to the form of the question,

23    assumption.

24         MR. DORRANCE:  Okay, I'll rephrase the question.

25    BY MR. DORRANCE:

1    Q     When CNA prepares job opportunities and when its

2    vocational specialist prepares job opportunities, such as Mr.

3    Gulledge did in this case, part of the consideration in --

4    I'll rephrase the question.  If a vocational specialist such

5    as Mr. Gulledge identifies potential job opportunities, those

6    potential job opportunities are considered full-time

7    employment, are they not?

8    A     Yes, they would be considered full-time employment.

9    Q     Okay, and is it your understanding of full-time

10   employment that it typically means five days a week,

11   sometimes as much as eight hours per day?

12   A     Well, that's not always the case.  We know there is

13   flex hours and different work environments, so full time

14   could be anywhere from 30 to 40 hours but 40 is the

15   customary.

16   Q     And when the vocational specialist like Mr. Gulledge

17   identifies these potential job opportunities, he also factors

18   in whether the individual would be able to perform the work

19   on a continuous regular basis, does he not?

20   A     Yes.

21   Q     And by continuous and regular basis, that would mean

22   full-time employment, would it not?

23   A     I didn't see any indication indicating that Miss Tesche

24   was being evaluated for part-time work or, you know, less

25   than what's required of a sedentary occupation.

1    Q    So the answer would be yes?

2    A    Yes.

3    Q    You stated that you were familiar with the four jobs

4    identified by Mr. Gulledge, and you also -- is that correct?

5    A    Yes.

6    Q    Yes, were you familiar based on an actual written job

7    description that was in CNA's file?

8    A    No, there was never a written job description, just the

9    general duties associated.

10    Q    Okay, so when you were testifying that the claimant has

11    the ability to walk freely around as part of some of these

12    jobs, were you doing that based on your recollection from

13    your days at the Social Security Administration?

14    A    Well, some of that and then plus with files that I

15    review and, you know, within CNA's disability claim files but

16    with job descriptions or just the parameters of those

17    occupations from knowledge, you know, working or otherwise.

18    Q    As far as the specific jobs identified by Mr. Gulledge,

19    you have no personal knowledge as to what those job

20    descriptions said, do you?

21    A    No, I didn't have an actual job description before me.

22    Q    All you had were the actual names of the proposed jobs?

23    A    Correct.

24        MR. DORRANCE:  I have no further questions.

25    Thanks.

104

1              THE COURT:  Thank you.  Any questions on redirect?

2              MR. BURNS:  I think I have two, Your Honor.  If I

3    may, Your Honor.

4              THE COURT:  Of course, sorry.

5                   REDIRECT EXAMINATION

6    BY MR. BURNS:

7    Q    Mrs. Tesche, I'm sorry, Mrs. Sauerhoff, could you

8    please turn to Exhibit A, pages 176 and 177.

9    A    Okay.

10   Q    Would you identify that document for the record, ma'am?

11   A    Yes, this would be the initial termination letter that

12   was written by Laura Collins on October 7, 1999.

13   Q    And who is that directed to, that letter?

14             MR. DORRANCE:  Judge, I would just object.  This is

15   outside the scope of direct examination.

16             MR. BURNS:  I'm laying a foundation for a simple

17   question, Your Honor, which, if you want me to, I'll ask very

18   simply.

19   BY MR. BURNS:

20   Q    Miss Tesche -- Miss Sauerhoff, did CNA in this letter

21   which is marked as Exhibit 176, 177 tell Mr. DeVere, who is

22   Miss Tesche's prior lawyer, the following on page 2:  If you

23   have any additional medical information not mentioned above

24   or wish us to reconsider our decision, you should submit a

25   formal request for appeal.  Correct?

1    A      Correct.

2    Q      Did they then explain to Mr. DeVere, as counsel for

3    Mrs. Tesche, that in order for their continued evaluation of

4    the claim that they needed to have -- if they wanted to

5    submit additional medical evidence, now was the time to do

6    it?  Correct?

7            MR. DORRANCE:  Objection to the reference did they

8    say to do it.  I think that needs to be clarified whether

9    you're talking about something in writing or orally.

10           THE COURT:  I don't understand that, I'm sorry.

11           MR. DORRANCE:  The question -- it was unclear to me

12   whether the question was calling for a hearsay response or

13   whether it was based solely on something in the existing

14   administrative record that we can all point to.

15           THE COURT:  I think the question was about what

16   this letter said to the attorney to the plaintiff.

17           MR. BURNS:  Correct.

18           MR. DORRANCE:  That's fine, I'll withdraw the

19   objection.

20           MR. BURNS:  Thank you.

21   BY MR. BURNS:

22   Q      Miss Sauerhoff, do you remember the question?

23   A      No.

24   Q      Then let me rephrase the question.  In this letter did

25   not CNA tell Mr. DeVere that he had the opportunity to submit

106

1    additional medical information to support Miss Tesche's claim

2    for disability benefits?

3    A    Yes.

4    Q    Did any further information come in after this?

5    A    With the letter from Dr. Wolf.

6    Q    Anything else?

7    A    No, that was the last recollection I have.

8    Q    Did anything from Dr. -- the new family physician, Dr.

9    Monsolay, come in?

10   A    No.

11   Q    Did they submit anything about her activities of daily

12   living?

13   A    No.

14   Q    Did they submit any vocational reports?

15   A    No.

16   Q    Did they submit any vocational evaluations?

17   A    No.

18         MR. BURNS:  No further questions, Your Honor.

19         MR. DORRANCE:  No further questions, Your Honor.

20         THE COURT:  Thank you.  Thank you very much, Mrs.

21   Sauerhoff.

22         THE WITNESS:  Thank you.

23         THE COURT:  That concludes the testimony at this

24   hearing.  I want to talk to counsel about where we're going

25   from here in this case.  I'd like to do that in my chambers.

107

1        MR. BURNS:  Your Honor, if I could, I'd like to at

2   least move into evidence the following exhibits: --

3        THE COURT:  I'm sorry.

4        MR. BURNS:  -- First of all, Exhibit -- Joint

5   Exhibit No. 1 which was identified by Miss Sauerhoff as the

6   Continental Casualty Group long-term disability policy issued

7   to AMP.  Joint Exhibit No. 2, which is her claim

8   determination letter.  Also I'd like to move for the

9   admission of Defendants' Exhibit A, which is Continental

10  Casualty Company's long-term disability claim file for Joan

11  Tesche, the administrative record.

12       THE COURT:  Okay, any objection to that?

13       MR. DORRANCE:  Judge, well, as I noted at the

14  outset, judge, to the extent we're not able to cross examine

15  Mr. Gulledge, that raises -- that ties into the whole

16  outstanding issue concerning the vocational expert that was

17  not made available --

18       THE COURT:  Well, I think the only motion here was

19  to admit his letter or his report.

20       MR. BURNS:  As it's contained in the administrative

21  record, that's all I'm doing.

22       THE COURT:  You can't object to that.

23       MR. DORRANCE:  No, I just note that I can't cross

24  examine him.

25       THE COURT:  Of course you can't cross examine him,

108

1    that's not the question.

2             MR. DORRANCE:  I have no objection to the

3    authenticity and admission of those documents.

4             THE COURT:  Very well, we'll admit those documents.

5             MR. BURNS:  Thank you.

6             THE COURT:  Anything else for the record?

7             MR. DORRANCE:  And Joint Exhibit 3 we have also

8    identified as well, which is the social security's decision.

9             MR. BURNS:  I have no objection to that coming into

10   evidence, Your Honor.

11            MR. DORRANCE:  And then the only remaining exhibit

12   identified in our exhibit list is Dr. Wolf's deposition

13   transcript, which we should receive in two to three weeks,

14   and I move now for its admission subject to the objections

15   noted on the record of that transcript.

16            THE COURT:  What is it an oral -- a transcript that

17   I'm going to get?  How long did that take you to take his

18   deposition?

19            MR. DORRANCE:  Probably 25 minutes for me and 25

20   minutes for Mr. Burns.

21            MR. BURNS:  Approximately one hour, we started at

22   about 7:35, finished just before 8:30 because he told us he

23   had patients.

24            THE COURT:  If he hadn't told you that, you would

25   have probably gone on till midnight.

109

1        MR. DORRANCE:  We tried our best, judge.  We knew

2   that you wanted it short.

3        THE COURT:  Okay.

4        MR. DORRANCE:  Judge, one other thing, if you rule

5   in favor of the plaintiff, we also make a claim for

6   attorney's fees and costs.  I would contemplate submitting

7   that paperwork if and when needed.

8        THE COURT:  That's premature, isn't it?

9        MR. DORRANCE:  It is, but I just wanted to --

10        THE COURT:  Why don't you come around to the office

11   and we'll talk to you.

12        MR. DORRANCE:  Thank you.

13        MR. BURNS:  Thank you, judge.

14        THE COURT:  We'll adjourn.

15        (The proceedings concluded.)

16        I hereby certify that the proceedings and evidence

17   of the court are contained fully and accurately in the notes

18   taken by me on the non-jury trial of the within cause and

19   that this is a correct transcript of the same.

20                    _Monica L. Zamiska_

21                    Monica L. Zamiska, RPR

22                    Official Court Reporter

23

24

25