1

(57)

RB 1/2/

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

3    **ORIGINAL**

4    JOAN D. TESCHE,            :    CIVIL ACTION
                Plaintiff      :
5                              :
            vs.                :    NO. 1:CV-01-0326
6                              :
                              :
7    CNA INSURANCE COMPANIES,   :    (JUDGE CALDWELL)
     and CONTINENTAL CASUALTY   :
8    COMPANY,                   :    FILED
                Defendants.    :    HARRISBURG, PA
9
10                    - - -          DEC 3 0 2002

11        Wednesday, December 4, 2002  MARY E. D'ANDREA, CLERK
                                       Per_____
12                    - - -              Deputy Clerk

13

14            Deposition of MARK LUKAS,

15    ED.D., held at the offices of Mark Lukas, ED.D.,

16    25 West Third Street, Media, Pennsylvania, on the

17    above-mentioned date, commencing at 2:30 p.m.,

18    before Kimberly Pepper, RPR.

19

20                    - - -

21

22

23    PLAINTIFF'S
      EXHIBIT
24    **C**



```
1    APPEARANCES:

2
             KEEFER, WOOD, ALLEN & RAHAL, LLP
3            BY:
             BRADFORD DORRANCE, ESQUIRE
4            210 Walnut Street
             P.O. Box 11963
5            Harrisburg, PA   17108-1963
             Counsel for the Plaintiff
6

7            CHRISTIE, PABARUE, MORTENSEN & YOUNG
             BY:
8            MICHAEL J. BURNS, ESQUIRE
             1880 JFK Boulevard, Tenth Floor
9            Philadelphia, PA   19103
             Counsel for the Defendant
10

11

12

13

14

15                           -  -  -

16

17

18

19

20

21

22

23

24
```



1                          I N D E X

2      WITNESS                                    PAGE

3      MARK LUKAS, ED.D.
           DIRECT BY MR. DORRANCE                   4
4          CROSS BY MR. BURNS                      14
           REDIRECT BY MR. DORRANCE                25
5          RECROSS BY MR. BURNS                    27

6                            - - -
                           EXHIBITS
7      NUMBER            DESCRIPTION              PAGE

8      Lukas 1  Mark Lukas' Curriculum Vitae        4

9

10     Lukas 2  8/6/02 letter to Mr. Dorrance
                from Mark Lukas, ED.D.              4

11

       Lukas 3  Vocational Assessment dated 11/20/02  4
12

13

14

15

16                         - - -

17

18

19

20

21

22

23

24



**Royal Court Reporting Service, Inc.**
1422 Chestnut Street, Suite 200R, Philadelphia, PA  19102

1              (At which time, the Reporter

2    marked Lukas Exhibits 1, 2 and 3 for

3    identification.)

4                    ... MARK LUKAS, ED.D., having

5    been first duly sworn, was examined and testified

6    as follows:

7                    MR. DORRANCE: This is the time

8    and place for the trial deposition of the

9    plaintiff's vocational expert, Dr. Mark Lukas.

10   It's approximately 2:31 according to my watch.

11   Judge Caldwell has directed the parties to

12   complete their vocational depositions and not to

13   exceed thirty minutes.  So we will try to be

14   brief.

15                  All objections shall be raised

16   by counsel and ruled on by the judge or shall be

17   deemed waived.  Is that acceptable, Mr. Burns?

18                  MR. BURNS:  That's acceptable.

19            DIRECT EXAMINATION

20   BY MR. DORRANCE:

21   **Q.**    Doctor, in an effort to speed up the

22   description of your qualifications, I show you a

23   four-page document which we have previously marked

24   Lukas Exhibit 1.  Can you identify this document?



1  **A.**     This is a copy of my Curriculum Vitae.  It

2  details credentials, my educational background,

3  professional work history, affiliations and some

4  seminars and special projects I've been involved

5  with.

6  **Q.**     Does this accurately summarize your

7  educational background and training?

8  **A.**     Yes, sir.

9  **Q.**     And do you serve as a vocational expert for

10  the Office of Hearings and Appeals in the United

11  States Social Security Administration?

12  **A.**     Yes.  I'm called in by the administrative

13  law judges hearing different types of disability

14  cases basically answering questions of a

15  vocational nature.

16  **Q.**     Do you as part of your profession perform

17  vocational assessments and evaluations of

18  individuals?

19  **A.**     Oh, routinely.  It's a substantial portion

20  of my practice.

21  **Q.**     And do you follow customer protocol in

22  performing those vocational assessments and

23  evaluations?

24  **A.**     I do.



MARK LUKAS, ED.D.                    6

1   **Q.**     What is that?  Briefly, what is that

2   customary protocol?

3   **A.**     I like to obtain information about the

4   individual.  I customarily conduct an interview in

5   order to obtain information of a vocational

6   nature, social, educational information.  I also

7   obtain a health history from the subject of the

8   evaluation.  In addition, I customarily review

9   medical records, informational records that help

10  acquaint me with the circumstances.

11  **Q.**     Did you perform a vocational assessment and

12  evaluation of Joan Tesche?

13  **A.**     I did.

14  **Q.**     Okay.  Did you follow your customary

15  protocol with respect to Ms. Tesche's evaluation?

16  **A.**     I did, sir.

17  **Q.**     Doctor, in the interest of time rather than

18  having you summarize all of your findings, did you

19  prepare an initial report based on your evaluation

20  of Joan Tesche?

21  **A.**     I prepared an initial brief report and I

22  thereafter supplemented that report with an

23  assessment.

24  **Q.**     I show you a two-page document which has



MARK LUKAS, ED.D.            7

1   been marked Lukas Exhibit 2.  Can you identify

2   this document?

3   **A.**     This is my initial report concerning Joan

4   Tesche.

5   **Q.**     Okay.  Did you have occasion to perform a

6   supplemental report based on your vocational

7   evaluation of Joan Tesche?

8   **A.**     I did.

9   **Q.**     I show you a seven-page document which was

10  previously marked Lukas Exhibit 3.  Can you

11  identify this document?

12  **A.**     This is a copy of my vocational assessment

13  concerning Ms. Tesche.

14  **Q.**     Do these two assessments marked Lukas

15  Exhibit 2 and 3 accurately summarize your findings

16  and opinions with respect to your evaluation of

17  Joan Tesche?

18  **A.**     Yes, sir.

19  **Q.**     Okay.  I'll ask you to assume certain

20  facts.  The individual in question is female and

21  is 47 years of age, she is a high school graduate,

22  having participated in a general course of study.

23  The individual in question has additional training

24  after high school including a six-month course



**Royal Court Reporting Service, Inc.**
1422 Chestnut Street, Suite 200R, Philadelphia, PA  19102

1    related to secretarial and clerical skills, course

2    responsibilities, desk top publishing course, and

3    approximately fourteen credits towards an

4    associate degree in management information

5    science.

6              With respect to the individual's

7    past relevant work, her work life has included

8    employment as a waitress, as a switchboard

9    operator for a local boro, as an admissions

10   representative in a hospital and more recently for

11   a number of years an electronics manufacturing

12   facility initially working as a secretary and

13   thereafter advancing to the position of a systems

14   procedure analyst.  That most recent position

15   involved the compilation of training-related

16   material used within the company.

17             The individual's past relevant

18   work also involved secretarial and clerical

19   skills, the ability to work to administrative

20   detail and well-developed written communication

21   abilities.  The nature of her work was primarily

22   within the sedentary exertional level extending to

23   a restriction of light work.  With respect to the

24   further assumptions concerning the individual's



MARK LUKAS, ED.D.                9

1   activities of daily living, the individual reports

2   that due to chronic pain in her back, joints and

3   extremities and related medical conditions, she

4   has a limited tolerance for sitting, standing and

5   walking including no more than fifteen minutes of

6   sitting and a corresponding need to stand and move

7   around frequently.

8                   Further assume that the

9   individual reports that she cannot bend from the

10  waist or squat and can only lift minimal amounts

11  between five and ten pounds.  The individual

12  reports the need to lie down on the average

13  between two and four hours per day.  The

14  individual further reports that at least four days

15  per month she is unable to perform any physical

16  activities and must lie in bed or in a reclined

17  position for most of the day.  The individual

18  further reports additional symptoms resulting from

19  her chronic pain including fatigue, and difficulty

20  concentrating on tasks as a result of that chronic

21  pain.

22                  Further assume that the

23  individual has limited mobility and walks with a

24  cane.  With respect to the assumed medical



MARK LUKAS, ED.D.                10

1  restrictions, assume that the individual can sit

2  between fifteen minutes and one half hour at a

3  time, can lift between five and ten pounds, can

4  stand no more than one half hour at a time, can

5  walk no more than fifteen minutes, cannot bend,

6  squat or crawl, has permanent restrictions of that

7  nature as described, has a poor prognosis and as a

8  result of her condition needs to lie down for a

9  few hours each day to relieve her chronic pain.

10                    Assuming all those facts to be

11  accurate, based on your experience and training,

12  do you have an opinion as to whether the

13  individual would be continuously unable to engage

14  in any occupation for which she is or becomes

15  qualified by education, training or experience?

16  **A.**     I have an opinion.

17  **Q.**     What is that opinion, doctor?

18  **A.**     I felt that given the nature of her

19  limitations, the extremely abbreviated tolerances

20  for sitting, standing and walking, the presence of

21  chronic pain, the indicated difficulties with

22  concentration I felt her capabilities fell below

23  the threshold necessary to perform competitive

24  employment, even sedentary work.



MARK LUKAS, ED.D.              11

1    **Q.**    Were your opinions set forth more fully in

2    the two reports that we have identified as

3    exhibits?

4    **A.**    Yes, I believe so.

5    **Q.**    Did you have an opportunity to review the

6    October 28th, 2002 report of defendant's

7    independent vocational expert, Dr. Parsons?

8    **A.**    I did.

9    **Q.**    Okay.  Do you agree with Dr. Parson's

10   report in all respects?

11   **A.**    Not in all respects, no, sir.

12   **Q.**    Can you identify the areas of disagreement

13   with Dr. -- the areas in which you disagree with

14   Dr. Parson's findings or opinions as expressed in

15   his report?

16   **A.**    I don't want to speak for Dr. Parsons, but

17   I did read his report and toward the conclusion of

18   the report he apparently felt that Ms. Tesche's

19   capabilities allowed her the capacity to perform

20   work in a number of job areas.  I depart from that

21   conclusion.  I felt that her limitations were

22   sufficiently severe as to preclude competitive

23   work activity.

24   **Q.**    Are you familiar with the jobs identified



**Royal Court Reporting Service, Inc.**
1422 Chestnut Street, Suite 200R, Philadelphia, PA  19102
Phone: 215.563.1782 • 1.888.595.RCRS • Fax: 215.563.2955

MARK LUKAS, ED.D.                12

1    at the end of Dr. Parson's report?

2    **A.**    I don't have it in front of me, but I would

3    be happy to look at it.  I'm sorry.

4    **Q.**    You did receive a copy of Dr. Parson's

5    report, did you not, as part of your review?

6    **A.**    Yes, sir, I did.

7    **Q.**    And did you receive a copy of the report of

8    CNA's vocational specialist, Tony Gulledge?

9    **A.**    Yes.

10   **Q.**    And did you receive a copy of the written

11   descriptions of the jobs identified by Mr.

12   Gulledge?

13   **A.**    I did, yes.

14   **Q.**    Those documents that you reviewed are all

15   identified in your two reports; is that correct?

16   **A.**    Yes.  At the beginning of my assessment

17   report, I identified a number of documents that I

18   reviewed and those were enumerated.

19   **Q.**    Okay.  Just in the interest of time, I'll

20   show you Dr. Parson's report with specific

21   attention to the end of the third page and the

22   beginning of the next where he identifies certain

23   positions.

24   **A.**    Well, I'll read the report.  He identifies



MARK LUKAS, ED.D.          13

1   positions including interview clerk, expediter,

2   administrative support personnel, scheduler,

3   industrial caller are but a few jobs which would

4   make use of her skills and it looks like comply

5   with her functional limitations.

6                    These types of -- I'm unfamiliar

7   with the work of an industrial caller.  These

8   other types of jobs are generally office or

9   administrative type of work.  I felt that the

10  types of limitations enumerated by Dr. Wolf in his

11  deposition and related reports did not allow Ms.

12  Tesche to perform these types of jobs.

13  **Q.**    Is there any job including those identified

14  by Mr. Gulledge and those identified by Dr.

15  Parsons that Joan Tesche could perform in your

16  opinion?

17  **A.**    In my opinion, no.

18  **Q.**    Have all the opinions set forth in your two

19  reports and all the opinions you've expressed

20  today during your trial deposition been expressed

21  within a reasonable degree of vocational

22  certainty?

23  **A.**    Yes, sir.

24                    MR. DORRANCE: I have no further



MARK LUKAS, ED.D.          14

1    questions.  It's according to my watch 2:45.

2                    MR. BURNS:  Could we go off the

3    record for a second.

4                    (Whereupon, a brief recess was

5    taken.)

6                    MR. DORRANCE: We are back on the

7    record.  Mr. Burns just briefly reviewed Dr.

8    Lukas' file for about one two to two minutes.

9                    MR. BURNS:  Don't take up my

10   time.

11                    CROSS-EXAMINATION

12   BY MR. BURNS:

13   Q.    Dr. Lukas, good afternoon.  My name is

14   Michael Burns and I represent Continental Casualty

15   Company in this case, and I presume you've been

16   paid for your work on behalf of counsel for Ms.

17   Tesche; is that correct?

18   A.    Well, I'm certain we have sent bills.  I

19   honestly don't know if they have been paid.

20   Q.    But you charged for the services that you

21   provided to Mrs. Tesche in this case?

22   A.    Absolutely.

23   Q.    I see that you review some records in

24   preparing your report; is that correct?



MARK LUKAS, ED.D.                15

1    A.      Yes, sir.

2    Q.      Did you review Dr. Wolf's office chart?

3    A.      I did not, no.

4    Q.      Did you review any records from a Dr.

5    Rubinstein who is a family physician?

6    A.      No, sir.

7    Q.      Did you review any records from Hershey

8    Pain Clinic?

9    A.      No.

10   Q.      So isn't it true, doctor, that your report

11   is predicated solely on the testimony of Dr. Wolf

12   and one report that he did; is that correct?

13   A.      It's on the deposition testimony, yes, sir,

14   and a report enumerating physical capacities, yes.

15   Q.      That's the scope, condition and extent of

16   medical information you have from her medical

17   providers; is that correct?

18   A.      Yes.  I should say I did have an

19   opportunity to interview Mrs. Tesche, but in terms

20   of medical information I would agree with you.

21   Q.      In terms of assessing a person's

22   functionality, a vocational expert like yourself

23   relies upon physicians; is that correct?

24   A.      Primarily to establish medical



1    restrictions, yes, sir.

2    Q.    When I say functionality, I mean medical

3    restrictions and limitations; is that correct?

4    A.    Yes.

5    Q.    So in terms of your establishing the

6    medical restrictions and limitations, the only

7    thing that your vocational report relied upon at

8    least from a physician's standpoint was Dr. Wolf's

9    deposition testimony and his report, one report;

10   correct?

11   A.    And the corroborating information from Ms.

12   Tesche, but my answer is correct, yes.

13   Q.    And you've never reviewed the long-term

14   disability policy issued by Continental Casualty

15   Company in this case, have you?

16   A.    I don't think it was included, no, sir.

17   Q.    What is the standard under that disability

18   policy with regard to determination as to whether

19   someone meets the criteria for receipt of

20   benefits?

21   A.    Well, according to the information I

22   reviewed, it indicated that the person had to be

23   continuously unable to engage in any occupation

24   for which he or she is or becomes qualified by



**Royal Court Reporting Service, Inc.**
1422 Chestnut Street, Suite 200R, Philadelphia, PA  19102
Phone: 215.563.1782 • 1.888.595.RCRS • Fax: 215.563.2955

1   education, training or experience and under the

2   regular care of a licensed physician.

3   **Q.**     Okay.  In this case education, Mrs. Tesche

4   had the education to perform telemarketing or a

5   motel night auditor as part of her jobs; is that

6   correct?

7   **A.**     I think I would agree with you.  I think

8   vocationally she has a good work record.  She had

9   performed secretarial types of work in the past,

10   yes, sir.

11   **Q.**     Which leads me to my next question which is

12   that she had the experience to perform the job of

13   a telemarketer or a motel night auditor; correct?

14   **A.**     I don't thinks she performed those

15   particular occupations in her work history,

16   however, the types of skills that she acquired

17   would encompass those types of jobs.

18   **Q.**     So you would agree with me then that

19   educationally-wise, experience-wise and

20   training-wise Mrs. Tesche had the capability of

21   performing telemarketer and motel night auditor

22   jobs; correct?

23   **A.**     Well, independent of her medical

24   restrictions, I think those jobs would normally



MARK LUKAS, ED.D.                18

1    fall within her cadre of occupational abilities,

2    yes.

3    **Q.**    So the answer is yes; correct?

4    **A.**    Yes.

5    **Q.**    Okay.  And those jobs are available in the

6    Harrisburg area; correct?

7    **A.**    I don't know.

8    **Q.**    And those jobs are available to people who

9    are 47 years old; is that correct?

10   **A.**    I don't know of any prohibition that they

11   would be unable to perform them in their 40's.

12   **Q.**    So what you are telling me then, doctor, is

13   that the sole foundation for your vocational

14   opinion is the question of functionality, that is,

15   whether or not her medical limitations and

16   restrictions allow her to do her job; correct?

17   **A.**    Yes.

18   **Q.**    And, again, your information was gathered

19   exclusively and selectively by counsel provided to

20   you was Dr. Wolf; correct?

21   **A.**    Well, I felt I had sufficient information

22   with which to arrive at an evaluation.  I had a

23   deposition to review, and I had some functional

24   capacity checklists that helped me understand her



**Royal Court Reporting Service, Inc.**
1422 Chestnut Street, Suite 200R, Philadelphia, PA  19102
Phone: 215.563.1782 • 1.888.595.RCRS • Fax: 215.563.2055

MARK LUKAS, ED.D.          19

1    restrictions.

2    **Q.**    And the functional capacity checklist was

3    done by Dr. Wolf; correct?

4    **A.**    Yes.

5    **Q.**    It wasn't done by Dr. Rubinstein, was it?

6    **A.**    I don't believe so, no.

7    **Q.**    In fact, you have never seen any reports by

8    Dr. Rubinstein; correct?

9    **A.**    Correct.

10   **Q.**    You have never seen any functional capacity

11   evaluations or physical capability evaluation

12   forms completed by Dr. Rubinstein, have you?

13   **A.**    No, sir.

14   **Q.**    In terms of her functionality, it seems to

15   me a part of it is this question of her chronic

16   pain, her difficulty in performing tasks and her

17   limited mobility?  Those are the things that you

18   said or the things that your counsel said were

19   important in the context of determining that she

20   was unable to perform an occupation?

21   **A.**    Among other limitations.  I mean they're

22   but a few.  She has restrictions on sitting and

23   standing, walking certainly.

24   **Q.**    Okay.  And those restrictions and



**Royal Court Reporting Service, Inc.**
1422 Chestnut Street, Suite 200R, Philadelphia, PA 19102

MARK LUKAS, ED.D.                20

1   limitations are of a sedentary nature, is that

2   correct, if you classify them under the dictionary

3   of occupational titles?

4   **A.**    I would say that these types of limitations

5   confine her to a narrow range of activities.  I

6   don't think that they allow her to perform

7   sedentary work.

8   **Q.**    In terms of your opinion and the foundation

9   about the limitations, the tolerance, the chronic

10  pain, the sole foundation for that would be Dr.

11  Wolf's report as well as the statements from Mrs.

12  Tesche; correct?

13  **A.**    Yes.

14  **Q.**    Did you do yourself any independent

15  evaluation of her subjective complaints with

16  regard to pain, her complaints with regard to

17  tolerance, her difficulty with regard to

18  concentration?

19  **A.**    Not other than comparing her description of

20  her limitations to me with the medical records,

21  and I felt that there was a reasonable consensus

22  between the two.

23  **Q.**    And in terms of her pain, you're assuming

24  that her pain is related solely and completely to



**Royal Court Reporting Service, Inc.**
1422 Chestnut Street, Suite 200R, Philadelphia, PA  19102
Phone: 215-563-1782 • 1-888-595-RCRS • Fax: 215-563-2955

1    her physical status; correct?

2    **A.**    That's my understanding that her pain

3    emanates from her musculoskeletal condition.

4    **Q.**    Do you know if she has any pain from any

5    emotional issues?

6    **A.**    I may have asked.  She told me that she was

7    taking an antidepressant.  I asked her about her

8    emotional state.  She felt she was frustrated,

9    disappointed.  She felt that she experienced

10    depression, anxiety so yes.

11    **Q.**    Did she ever relate to you that she had any

12    pain associated with the loss of a family member?

13    **A.**    No, sir.

14    **Q.**    Is that a significant issue for a

15    vocational specialist?

16    **A.**    It would depend upon the individual.

17    **Q.**    Doesn't it suggest the question of

18    motivation?

19    **A.**    I'm not sure how you mean.  I'm sorry.

20    **Q.**    In the issue in this case and sometimes the

21    vocational people it's not necessarily the

22    functionality but motivation; correct?

23    **A.**    If by motivation you mean motivation to

24    work or motivation to engage in the job economy,



1    sure, that's always a factor.

2    **Q.**    That is something you need to consider;

3    correct?

4    **A.**    If an individual has sufficient capability,

5    then we look to the person's motivation to return

6    to the job market.

7    **Q.**    Did Mrs. Tesche ever try to return to work?

8    **A.**    She did.  She worked at Amp for a number of

9    years.  She underwent some surgery in 1993.  She

10   had attempted to return to work.  She even

11   advanced there for a period of time to a systems

12   type of job for a number of years.  She underwent

13   surgeries in 1995.  She attempted to continue to

14   work.  Finally, I think it was by 1996 she was

15   simply unable to continue.

16   **Q.**    When she went out in 1996, did she ever

17   return to work?

18   **A.**    Not that I'm aware.

19   **Q.**    Did she ever try to return to work after

20   that?

21   **A.**    I don't believe so.

22   **Q.**    So the answer to my question is at least

23   limited to that, isn't it?

24   **A.**    No.  She did try to continue to work at



**Royal Court Reporting Service, Inc.**
1422 Chestnut Street, Suite 200R, Philadelphia, PA  19102
Phone: 215 563 1782 • 1 888 595 RCRS • Fax: 215 563 2955

1    least until 1996.

2    **Q.**     Okay.  In terms of your opinion, your

3    opinion is that she is unable to perform competent

4    or her capabilities fall below the threshold

5    necessary for consideration of competitive

6    employment activity; correct?

7    **A.**     Yes, sir.

8    **Q.**     Is that the standard under the disability

9    policy, doctor?

10   **A.**     Well, by occupation -- well, I'm assuming

11   that they mean competitive work.

12   **Q.**     You are assuming?

13   **A.**     I'm making a conclusion about that, yes,

14   sir.

15   **Q.**     Indeed that is not the standard of

16   competitive employment under the policy, is it,

17   doctor?

18   **A.**     I don't know.  I have a statement

19   concerning the policy which I think we reviewed.

20   **Q.**     Okay.  Doctor, are there other avenues of

21   returning to work outside of the competitive

22   employment activity arenas?

23   **A.**     There are sub competitive employment; in

24   other words, that would be employment in a



**Royal Court Reporting Service, Inc.**
1422 Chestnut Street, Suite 200R, Philadelphia, PA 19102
Phone: 215-563-1782 • 1-888-595-RCRS • Fax: 215-563-2955

1    sheltered workshop or some type of supported

2    employment situation.  It's not a regular job

3    though.

4    **Q.**     But that's a structured -- a supported

5    employment or sheltered workshop is basically a

6    person who has a disability who returns and

7    doesn't necessarily work all the hours, will work

8    at strenuous tasks that somebody in the regular

9    job departments do; correct?

10   **A.**     The productivity standards are lower than

11   competitive employment.

12   **Q.**     But the job requirements are the same?

13   **A.**     No.  I think they are lower.  It's a

14   different type of work.  I don't consider it

15   regular competitive employment because it isn't.

16   **Q.**     Did Mrs. Tesche ever try to return to a

17   sheltered workshop or supported employment?

18   **A.**     Not that I'm aware of.

19   **Q.**     Did she ever undergo any vocational

20   rehabilitation in an effort to return to work?

21   **A.**     I don't think so, no, sir.

22   **Q.**     Doctor, you are telling me here then today

23   that you believe that Mrs. Tesche does not have

24   the ability to even return to a sheltered workshop



1   or any type of supported employment?

2   **A.**     I didn't assess her capabilities to do so.

3   I assessed her capability to return to her

4   occupational area for which she would be qualified

5   for return to her education, training or

6   experience; in other words, administrative types

7   of jobs.

8   **Q.**     There are administrative type jobs though

9   within the confines of the sheltered workshop that

10  supported employment environments?

11  **A.**     I'm not sure.  Honestly, I don't know.

12                      MR. BURNS:  Thank you, doctor.

13  No further questions.  That took approximately ten

14  minutes.

15                      MR. DORRANCE: About ten minutes.

16                      REDIRECT EXAMINATION

17  BY MR. DORRANCE:

18  **Q.**     Doctor, you referred to the provision in

19  the policy.  Were you referring to the February

20  21, 2000 letter from Cheryl Sauerhoff?

21  **A.**     I'm not sure.  It's in a letter of October

22  7th, 1999.

23  **Q.**     Okay.  And does that letter in the first

24  page quote the definition of total disability?



1    **A.**    It does.

2    **Q.**    And what is the first requirement of that

3    definition if you could quote that for us?

4    **A.**    First requirement, continuously unable to

5    perform the substantial and material duties of his

6    regular occupation.

7    **Q.**    Okay.  I'm sorry, I was referring to the

8    next standard here.

9    **A.**    It indicates total disability means that

10   the person is -- I'll read from the letter,

11   continuously unable to engage in any occupation

12   for which he or she is or becomes qualified by

13   education, training or experience and under the

14   regular care of a licensed physician other than

15   himself.  I'm not sure what that means.

16   **Q.**    Okay.  The phrase any occupation in that

17   first section of the definition, is that in your

18   opinion synonymous or different than your phrase

19   competitive and informed?

20   **A.**    I think they are the same.

21   **Q.**    You identified certain documents that you

22   reviewed that were prepared by the treating

23   physician, Dr. Wolf.  Were those documents

24   identified in your vocational report?



**Royal Court Reporting Service, Inc.**
1422 Chestnut Street, Suite 200R, Philadelphia, PA  19102
Phone: 215 563 1782 • 1 888 505 RCRS • Fax: 215 563 2055

1   **A.**     Yes, sir.

2   **Q.**     And did that include the May 11, 1999

3   physical restriction checklist, using your words?

4   **A.**     Yes.

5   **Q.**     And that would include Dr. Wolf's December

6   22, 1999 narrative report?

7   **A.**     Yes, sir.

8   **Q.**     And did that include Dr. Wolf's trial

9   deposition transcript that was taken on August 8,

10  2002?

11  **A.**     Yes, sir.

12  **Q.**     Mr. Burns asked you a number of questions

13  during cross-examination.  Have any of those

14  questions changed the opinions that were set forth

15  in your two reports and that were testified to by

16  you today?

17  **A.**     No, sir.

18                  MR. DORRANCE: I have no further

19  questions.

20                  MR. BURNS:  I have a simple

21  series of redirect questions.

22                  RECROSS-EXAMINATION

23  BY MR. BURNS:

24  **Q.**     Again, doctor, just so I'm clear here, and



1  if you don't mind I would like to take a quick

2  look at this.

3              What we have got marked as

4  Exhibit Wolf Number 2 is a document dated May 11,

5  1999 and it's Dr. Wolf's assessment of current

6  restrictions and limitations; correct?

7  **A.**     Yes, sir.

8  **Q.**     And that's the only physical capabilities

9  evaluation that you looked at with regard to Mrs.

10 Tesche; correct?

11 **A.**     It was the only checklist.  I mean this

12 information was reflected in a narrative report

13 and I think more completely reflected in his

14 deposition but yes.

15 **Q.**     And Dr. Wolf reports that she has chronic

16 pain; correct?

17 **A.**     He does, yes.

18 **Q.**     And I think in your report you note that

19 she goes to a pain clinic on a monthly basis; is

20 that correct?

21 **A.**     That's what she told me.

22 **Q.**     Now, doctor, if you are trying to assess

23 someone's functionality as restricted or limited

24 by pain, wasn't it important for you to get those



**Royal Court Reporting Service, Inc.**
1422 Chestnut Street, Suite 200R, Philadelphia, PA  19102
Phone: 215 563 1782 • 1 888 505 RCRS • Fax: 215 563 2055

1   pain clinic records to evaluate Ms. Tesche's

2   status?

3   **A.**     I felt I had sufficient information based

4   upon Dr. Wolf's restriction.

5                     MR. BURNS: No further questions,

6   doctor.

7                     MR. DORRANCE: No further

8   questions.  Thank you.  I believe we are exactly

9   at 30 minutes.

10                     MR. BURNS:  Great.  Thank you,

11   doctor.

12                     MR. DORRANCE: Plus or minus a

13   few seconds.

14                        - - -

15

16

17

18

19

20

21

22

23

24



1                    CERTIFICATION

2

3            I, Kimberly Pepper, RPR, hereby

4    certify that the testimony and proceedings in the

5    foregoing matter taken on December 4, 2002, are

6    contained fully and accurately in the stenographic

7    notes taken by me, and that Pages 1 to 30,

8    inclusive, of this testimony are a true and

9    correct transcript of the same.

10

11

12            _____

13            Kimberly Pepper, RPR

13

14                        - - -

15

16            The foregoing certification of

17    this transcript does not apply to any reproduction

18    of the same by any means unless under the direct

19    control and/or direction of the certifying

20    shorthand reporter.

21

22

23                        - - -

24





# MARK LUKAS, ED.D.

**VOCATIONAL & EVALUATION SERVICES**

———

**25 WEST THIRD STREET**
**MEDIA, PENNSYLVANIA 19063-2803**

EVALUATIONS
TESTING
COUNSELING

610-565-7466
FAX: 610-565-7380
EMAIL: drlukas@enter.net

## CURRICULUM VITAE

### CREDENTIALS

| | |
|---|---|
| 1982 - Present | Office of Hearings and Appeals<br>U.S. Social Security Administration<br>Vocational Expert |
| 1980 - 2002 | Commission on Rehabilitation Counselor<br>Certification<br>Certified Rehabilitation Counselor #14163 |
| 1991 - 2002 | United States Department of Labor<br>Consultant Services<br>Rehabilitation Counselor #03-119 |
| 1985 - 2002 | American Board of Vocational Experts<br>Diplomate |
| 2002 | Pennsylvania Department of Labor & Industry<br>Vocational Expert |
| 2002 | Commonwealth of Pennsylvania<br>Licensed Professional Counselor #PC002347 |

### EDUCATION

| | |
|---|---|
| 1995 - 1998 | Wilmington College, Ed.D. |
| 1981 - 1988 | Temple University, Doctoral Studies<br>Vocational Education |
| 1976 - 1979 | University of Scranton<br>Master of Science, Rehabilitation Counseling |
| 1970 - 1974 | Bloomsburg University<br>Bachelor of Science, Social Welfare |

Page 2

PROFESSIONAL EXPERIENCE

1989 - Present

Vocational Consultant, Vocational & Evaluation Services

Provides vocational and rehabilitation related services including; vocational evaluations, occupational testing, assessments of earning and diminished earning capacity, projections of employability, rehabilitation counseling, job and retraining placement, ADA employer compliance assistance, job functions analysis, job accommodation assessments.

1983 - 1989

Director of Rehabilitation Services, Hoover Rehabilitation Services, Inc., Exton, PA

Responsible for all medical and vocational services provided under company auspices to persons disabled in industrial injuries. Supervised a staff of counselors and nurses in the implementation of rehabilitation services for individuals leading to the highest level of functioning.

1981 - 1983

Rehabilitation Counselor, Hoover Rehabilitation Services, Inc. Allentown, PA

Provided rehabilitation counseling and placement services to on-going caseload. Activities included: evaluations, testing job analysis, employability preparation and post employment support.

1980 - 1981

Vocational Evaluator, Private Industry Council of Lehigh Valley

Supervised a staff in the administration of aptitude, vocational interest and achievement tests including work samples to a client population of handicapped and disadvantaged persons.

Page 3

| | |
|---|---|
| 1974 - 1980 | <u>Vocational Counselor</u>, Luzerne County Human Resources, Wilkes-Barre, PA |

Acted as team leader coordinating the employment efforts of job developers, orientation specialists, intake workers, and program recruiters. Personally responsible for employment counseling and placement in re-training programs and competitive employment for handicapped and disadvantaged clients.

AFFILIATIONS

International Association of Rehabilitation Professionals
National Rehabilitation Association
Pennsylvania Rehabilitation Counselors Association
National Rehabilitation Counselors Association

SEMINARS
SPECIAL PROJECTS

| | |
|---|---|
| 1999 | <u>Faculty</u>, Wilmington College, Division of Behavioral Science (Adjunct) |
| 1994 | <u>Faculty</u>, Practicing Law Institute |
| 1994 | <u>Lecturer</u>, Children's Hospital of Philadelphia |
| 1993 | <u>Guest Speaker</u>, Villanova University Graduate School, Vocational Assessment |
| 1989 | <u>Guest Speaker</u>, University of Scranton Professional Associations and Counselor Licensure. |
| 1987 | <u>Seminar Lecturer</u>, HRS, Inc. Training Series, The Social Security Disability Determination Process |
| 1986 | <u>Seminar Lecturer</u>, Insurance Industry Series, Using Vocational Rehabilitation Services with the Worker's Compensation Claimant |
| 1986 | <u>Seminar Lecturer</u>, HRS, Inc., Training Series Expert Vocational Testimony |

Page 4

| | |
|---|---|
| 1981 | <u>Seminar Lecturer</u>, Pennsylvania Department of Vocational Education, In-House Vocational Assessment Procedures for Disadvantaged and Handicapped Clients |
| 1981 | <u>Private Industry Council/Genesco Corporation</u> Designed and implemented work samples test battery to screen clients for training in skilled garment industry occupations. |
| 1980 | <u>U.S. Department of Labor/Conrail Training Program</u> Developed comprehensive vocational testing program for screening applicants for clerical occupations in Eastern Region Conrail System. |
| 1977 | <u>U.S. Department of Labor</u> The Vocational Assessment Process |

**MARK LUKAS, ED.D.**

VOCATIONAL & EVALUATION SERVICES

25 WEST THIRD STREET
MEDIA, PENNSYLVANIA 19063-2803



EVALUATIONS
TESTING
COUNSELING

610-565-7466
FAX: 610-565-7380
EMAIL: drlukas@enter.net

August 6, 2002

Bradford Dorrance, Esquire
Keefer, Wood, Allen & Rahal, LLP
210 Walnut Street
P.O. Box 11963
Harrisburg, Pennsylvania 17108-1963



Re: Joan Tesche

Dear Mr. Dorrance:

In response to your request, I have reviewed the documents you provided which included the following: Letter from Laura Collins, HIA, CNA Group Benefits, dated October 7, 1999, including job descriptions; Joan Tesche's Affidavit in Support of Her Motion for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment, dated January 28, 2002; and oral deposition transcript of Joan D. Tesche, dated October 4, 2001.

It should be noted, in the materials reviewed, that there is some indication of limited work capability offered by Steven B. Wolf, M.D. Additionally, in her affidavit, Ms. Tesche identified that she continues with chronic pain and failed back syndrome. Ms. Tesche indicated that her condition is of a severity as to require her to lie down an average of 2 to 4 hours per day and on some days, she is unable to perform any physical activities and must lie in bed for most of the day. There are also references to a constellation of symptomatology surrounding her chronic pain including problems with concentration, memory and fatigue.

In consideration of the restrictions and types of limitations reported by Ms. Tesche in her affidavit, clearly, her capabilities are below the threshold necessary for participation in competitive employment. This includes factors such as consistency and regularity in attendance and punctuality, an ability to meet reasonable productivity standards and a capability to interact effectively with co-workers, supervisors, the general public, etc., and to do so on a sustained basis. It is evident, in recognition of the limitations identified by Ms.

Bradford Dorrance, Esquire
Page 2
Joan Tesche

Tesche, including the need to lie down periodically throughout the course of a work day, that her limitations would simply not allow her to participate within the customary parameters of competitive employment as previously described.

Thank you for providing the opportunity to provide a vocational comment in regard to Joan Tesche.  I would be most pleased to review any additional documents should they become available which may have some bearing upon the opinions and conclusions expressed herein.

Sincerely yours,

Mark Lukas, Ed.D., C.R.C.

ML/dml

*Dictated but not read*

**MARK LUKAS, ED.D.**
VOCATIONAL & EVALUATION SERVICES

25 WEST THIRD STREET
MEDIA, PENNSYLVANIA 19063-2803

EXHIBIT
Lukas 3
TZP 12/4/02

EVALUATIONS
TESTING
COUNSELING

610-565-7466
FAX: 610-565-7380
EMAIL: drlukas@enter.net

November 20, 2002

Bradford Dorrance, Esquire
Keefer, Wood, Allen & Rahal, LLP
210 Walnut Street
P.O. Box 11963
Harrisburg, Pennsylvania  17108-1963

Re:  Joan Tesche
Birth Date – 2/1/55

### *Vocational Assessment*

In response to your request for a vocational assessment, Joan Tesche was interviewed by telephone on November 15, 2002.  Pursuant to the assessment, the following documents were provided and reviewed:  Vocational report of George E. Parsons, Ph.D., dated October 28, 2002; reports of Holly Henry, RN, Nurse Care Manager, CNA Insurance, dated May 11, and June 9, 1999; orthopedic report of Steven B. Wolf, M.D., dated December 22, 1999; and deposition transcript of Steven B. Wolf, M.D., dated August 8, 2002.

Ms. Tesche, age 47, indicated that she suffered the onset of lower back pain through the late 1980's.  She noted that the lower back pain resulted in impaired work capability which, in turn, necessitated submission to surgical procedures.  She initially submitted to a lower back fusion in 1993, and underwent a follow-up procedure in 1995.  In 1996, she underwent an additional procedure to remove hardware which had been implanted through an improper fusion.  Despite the medical and surgical procedures undertaken, she continues with ongoing functional and physical restrictions including chronic pain.  The scope and intensity of her residual problems has precluded occupational re-entry.

*Vocational Information*

Ms. Tesche indicated that she was last employed through late 1996, at AMP, Incorporated, a manufacturer of specialty electronics and related products and

Joan Tesche
Page 2

equipment. She began in 1988, as a secretary, initially functioning in a sales department. Her job involved customary secretarial duties such as typing, filing, telephone work and coordinating activities. She served in this position for about three or four years and thereafter advanced to an alternate secretarial position in another area of the plant. She noted that following commencement of employment at AMP and through the late 1980's, she began to experience an intensification of lower back pain and discomfort. Ultimately, she submitted to an initial surgery in 1993, and returned to work. However, she noted that she continued with difficulties performing her daily work activities. She thereafter served in a secretarial position which she reported, were primarily sedentary in nature with some occasional walking and standing. Ms. Tesche found the sitting requirements of her job quite onerous and challenging to her lower back discomfort. She reported that she experienced lost work time, however, she continued to persevere in her job activities. Eventually, a position became available, system procedure analyst, which involved advancement. She indicated that in this position, she composed manuals and organized technical information for utilization in-house by AMP employees. She reported that the manuals detailed policies, procedures and protocols primarily related to various types of computer applications and systems. She occasionally engaged in staff training in this position. She noted that the exertional demands were primarily sedentary in nature with occasional walking and standing in addition to some lifting and carrying of training manuals. She noted that she had always been regarded as a competent and capable employee but found the presence of lower back pain and discomfort difficult and challenging to performance of her job which had been primarily sedentary in nature. She recalled earning approximately $30,000.00 annually in that position and there had been opportunities for overtime. She had submitted to the surgical procedures in 1993, 1995 and again in 1996, in an effort to moderate her lower back pain and continue to maintain a presence in the job market. Despite the initiatives undertaken, she experienced ongoing lower back pain and discomfort which ultimately forced a withdrawal from work under medical recommendation in late 1996. She has not worked since that time. She is presently the recipient of total Social Security Disability Benefits.

Prior to this, Ms. Tesche had resided in the Philadelphia area and had worked for five years at Phoenixville Hospital as an admissions representative. In pursuit of this, she performed various documentation, data acquisition and coordinating tasks related to patient admissions to this facility. She utilized a telephone, computer and interviewed patients upon admission. She described the exertional demands as primarily sedentary in nature with intermittent short distance walking and standing. She reported that in this position, she was occasionally required to push patients in wheelchairs and assist with the implementation of admissions procedures. She left that position due to a geographical move.

Joan Tesche
Page 3

Before this, she was employed full-time with the Pottstown Borough for approximately two years as a switchboard operator. In this capacity, she accepted and directed incoming calls to this governmental facility, answered questions and performed related activities. She reported that the exertional demands of the job were exclusively sedentary in nature. In the more distant past, she had worked in waitressing capacities and for a period of time, was involved in the agricultural industry. She noted that she had experienced a hiatus from the labor market for a period oft time in order to see to the child care needs of her family.


*Social/Educational Information*


Ms. Tesche (5'4", 195 pounds) indicated that she has realized a weight gain owing to the forced inactivity imposed by her orthopedic condition. She does have a current driver's license and access to an automobile but noted particular difficulty driving or traveling for longer distances. She tends to confine driving to shorter destinations. She is married with grown children. She resides in Harrisburg, Dauphin County, Pennsylvania.


Ms. Tesche graduated from Methacton High School in Norristown in 1972 where she was involved in the general course of study. In 1984, she attended Lansdale School of Business and completed a six month course related to secretarial and clerical tasks. She also completed a correspondence Desktop Publishing course during her work at AMP. Additionally, while employed at AMP, she attended Harrisburg Area Community College working toward an associate degree in management information science. Ms. Tesche reported that to the best of her recollection, she had engaged in course work in the early and mid-1990's, and completed approximately 14 credits. She noted that her participation at the community college was an enhancement to her daily professional responsibilities at AMP where she functioned as a system procedure analyst.


Ms. Tesche reported that she had always enjoyed equestrian and horse related activities as an avocational pursuit. She had continued these activities through the late 1980's, but found the onset of lower back pain significantly inhibited and eventually precluded her participation in this activity. She advised that at home, she experiences particular difficulty performing some of the more exertional household tasks. She is unable to lift or carry baskets of laundry, has trouble cleaning the tub, shower, etc., and noted that she has problems lifting and carrying anything about the home. Ms. Tesche finds that these activities have now fallen to her husband.

Joan Tesche
Page 4

*Health Information*

Ms. Tesche reported satisfactory health throughout childhood and adolescence. As a young adult, she noted that she had always enjoyed good health, however, spoke of involvement in a horse-related accident in 1983, in which she sustained a fracture to a thoracic vertebrae. To the best of her recollection and owing to the location of the fracture, she experienced lower extremity paralysis for a period of several days. She participated in medical care and treatment and ultimately the area healed sufficiently so that she was able to resume ambulation. She reported that nevertheless, owing to the presence of mid-back discomfort, she had withdrawn from agricultural and farm work in addition to waitressing which she has previously performed due to the incumbent physical demands. She noted that she sought specifically, employment at the more modest exertional levels which she thought would best accommodate her historical mid-back discomfort. Unfortunately, following commencement of her employment at AMP in the late 1980's, she experienced an intensification of lower back pain. Nevertheless, she attempted to continue in her customary job activities but unfortunately, experienced an intensification of lower back pain owing to, what she noted, was the sitting demands required in her job. She sought medical care and treatment and submitted to lower back surgery in 1993. Despite that procedure, she recalled that her lower back pain remained unchanged. She underwent follow-up procedures in 1995 and again in 1996, which, unfortunately, were without substantial positive therapeutic result. She noted that during the course of her care and treatment, she has participated in physical therapy periodically and found aqua therapy somewhat helpful in regard to the presence of pain and related discomfort. Ms. Tesche advised that she continues under the care of Dr. Wolf. She is also under the care of a pain clinic and described that she sees a physician, usually one time per month, for examination and follow-up. She utilizes a number of medications including OxyContin, Neurontin, amitriptyline and over the counter Ibuprofen.

Ms. Tesche spoke of significantly abbreviated tolerances for sitting, standing and walking. She felt her comfortable sitting tolerance was about 15 minutes at which time, she would need to arise and move about. She felt capable of standing and walking, however, is unable to ambulate for longer distances. She noted that she experiences a foot drop on the left side and utilizes a MAFO type brace. She walks with a limp and utilizes a cane to ambulate. Her lifting capabilities are limited to only the most nominal of weights. She cannot bend from the waist or squat. Her sleep pattern is disturbed due to the presence of lower back pain which extends into her legs. She has been diagnosed with fibromyalgia and experiences joint pain throughout her body. It is her understanding that she also suffers from a disk abnormality associated with her upper back or cervical spine and experiences tingling and numbness and discomfort in her upper extremities. She feels her grip strength is weakened and she frequently drops items. She is independent in activities of daily living

Joan Tesche
Page 5

including dressing and bathing but now does so more slowly and cautiously. She has trouble negotiating stairs. She advised that her house is a bi-level and she is rarely confronted with the need to ascend a staircase. If she must climb stairs, she does so with caution. She indicated that cold and damp weather intensifies her symptomatology. She described a day of modest activities, noting that she arises early and by mid-morning must lie down usually for an hour or so due to an intensification of discomfort. Thereafter, she engages in a few hours of very light activity about the home and must lie down again in mid-afternoon due to the intensification of pain. Despite a day of modest activity, she finds she is significantly fatigued and usually retires at about 7:00 or 8:00 p.m.

Ms. Tesche reported that she has experienced feelings of depression, anxiety, frustration and disappointment due to the presence of her musculoskeletal condition and is quite pessimistic about her inability to return to the job market. She has been prescribed an anti-depressant medication and at one point, she sought and received psychological help related to adjustment issues related to her limitations.

*Analysis and Conclusions*

Ms. Tesche, now age 47, is a high school graduate, who thereafter participated in occupation specific training in addition to a Desktop Publishing course related to her employment. Her work life has included employment as a waitress in the more distant past, as a switchboard operator for a local borough, as an admissions representative in a hospital and more recently, a number of years at an electronics manufacturing facility, initially functioning as a secretary and thereafter advancing to the position of systems procedure analyst which involved the compilation of training related material utilized within the company. Over the course of her work history, she has quite obviously demonstrated the capability to meet employer established qualitative and quantitative standards and an ability to interact effectively with co-workers, supervisors, the general public, etc. Her historical work has also involved secretarial and clerical skills, the ability to work to administrative detail and well developed written communication abilities. The nature of her work has primarily been within the sedentary exertional level extending to a restricted range of light. Sedentary work is defined as lifting 10 pounds maximum and occasionally lifting and/or carrying such articles as dockets, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required only occasionally and other sedentary criteria are met. Light work is defined as lifting 20 pounds maximum with frequent lifting and/or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be only a negligible amount, a job is in this category when it requires walking or standing

Joan Tesche
Page 6

to a significant degree or when it involves sitting most of the time with a degree of pushing and pulling of arm and/or leg controls.

In the more distant past, Ms. Tesche had functioned as a waitress and performed laboring types work related to the farm and agricultural field. The nature of these employment activities has primarily ranged within the light to medium exertional level with occasional intrusion into the heavy classification. Medium work is defined as lifting 50 pounds maximum with frequent lifting and/or carrying of objects weighing up to 25 pounds and heavy work is defined as lifting 100 pounds maximum with frequent lifting and/or carrying of objects weighing up to 50 pounds.

The medical records detail a history of back difficulties extending to the late 1980's. It is of vocational significance that for a number of years, Ms. Tesche had obviously attempted to function in her usual employment activities despite submission to multiple surgical procedures. Unfortunately, the scope and intensity of her limitations forced a withdrawal from work activity in late 1996. She has since been awarded Social Security Disability Benefits.

Steven B. Wolf, M.D., in a report dated December 22, 1999, indicated that he felt Ms. Tesche was incapable of returning to her previous job. Dr. Wolf reported that her condition was worsening and her prognosis is poor. Dr. Wolf further indicated that Ms. Tesche was not employable in a number of jobs including telemarketer, customer service representative, motel night auditor and automobile rental clerk. Dr. Wolf, in a report of May, 1999, confined Ms. Tesche's sitting tolerance to one-half hour at a time; standing to one-half hour; lifting 5 to 10 pounds; and walking to 15 minutes. She was unable to bend, squat or crawl. Dr. Wolf indicated that her restrictions are permanent and her prognosis remains poor.

Dr. Wolf, in his deposition of August 8, 2002, indicated that he felt Ms. Tesche would not be able to hold down a full-time job in any type of employment situation with the disability that she has. Dr. Wolf further identified that with respect to the presence of pain, difficulty concentrating is definitely something patients in chronic pain possess. The pain disrupts any type of concentration.

A number of job descriptions were provided as an attachment to a letter of October 7, 1999, detailing work as an automobile rental clerk, customer service clerk, telephone solicitor and night auditor. The auto rental clerk and customer service clerk positions fall within the light duty level. Clearly, the lifting limitations identified by Dr. Wolf (5 to 10 pounds) are below the necessary strength requirements for light work which extends to 20 pounds. In consideration of Ms. Tesche's chronic pain, the need for frequent position changes, difficulties with concentration and problems with attention and

Joan Tesche
Page 7

mobility, she would also certainly be precluded from participation in the remaining two positions.

At this time, I hereby wish to reaffirm the findings and conclusions contained in my original letter of August 6, 2002. Based upon the supplemental medical information and the telephone interview completed with Ms. Tesche, it is quite evident that her capabilities fall below the threshold necessary for consideration of competitive employment activities.

Ms. Tesche is encouraged to continue her efforts at pain management in concert with associated physicians.

Thank you for providing the opportunity to perform the vocational assessment of Joan Tesche. I would be most pleased to review any additional documents should they become available which may have some bearing upon the opinions and conclusions expressed herein.

Sincerely yours,

Mark Lukas, Ed.D., C.R.C.

ML/dml