IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOAN D. TESCHE | : | CIVIL ACTION |
| vs. | : | |
| CNA INSURANCE COMPANIES and<br>CONTINENTAL CASUALTY COMPANY | : | NO. 1:CV-01-0326<br>(William W. Caldwell, J.) |

FILED
HARRISBURG, PA
FEB 2 4 2003
MARY E. D'ANDREA, C
Per_____
Deputy Clerk

**DEFENDANTS CNA INSURANCE COMPANIES AND CONTINENTAL CASUALTY COMPANY'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**PROPOSED FINDINGS OF FACT**

1.  Plaintiff's former employer, AMP Inc. funded the long term disability component of its employee welfare benefits plan through the purchase of a group long term disability insurance policy (hereinafter "Plan") from Continental Casualty Company (not CNA Insurance Companies)(hereinafter "Continental"). Joint Exhibit 1.

2.  Continental, not CNA, is the underwriting company for the group long term disability insurance policy. N.T 36-37. CNA is only a trade name. See defendant's Answer to plaintiff's Amended Complaint with affirmative defenses at p 2.

3.  The Plan defines "Total Disability" as is pertinent hereto as follows:

    > "After the Monthly Benefit has been payable for the Insured Employee Occupation period of 24 months, "Total Disability" means that, because of Injury or Sickness, the Insured Employee is: (1) continuously unable to engaged in any occupation of which he is or becomes qualified by education, training or experience; and (2) under the regular care of a licensed physician other than himself."

    Joint Exhibit 1 at p.3.

4.  Continental found plaintiff to be Totally Disabled from performing the duties of her own occupation as an S&P Analyst and paid her benefits for two (2) years in

accordance with the express terms of the Plan. <u>See</u> <u>e.g.</u>, Joint Exhibit 2 at CCC000118 and CCC000262.

5. Plaintiff's claim for long term disability benefits is predicated upon a chronic low back problem. Joint Exhibit 2 at CCC000270.

6. In order to assess plaintiff's continued disability status, Continental periodically sought and obtained information from plaintiff's treating physicians as to her medical condition and, in particular, her physical limitations and restrictions. <u>See</u>, Joint Exhibit 2 at CCC000130-131 and CCC000142-151.

7. In March 1999, Continental contacted plaintiff's family physician Morton J. Rubenstein, M.D. to secure his opinion as to plaintiff's physical restrictions and limitations. Joint Exhibit 2 at CCC000144 (3/10/1999 entry).

8. Dr. Rubenstein provided the following opinions:

What are the current limitations that prevent return to the patient's own job?

Standing: ½ - 1 consecutively hr/day

Walking: 3 hr/day

Sitting: ½ consecutively hr/day

Lifting:     10-20 pounds

Carrying:    10-20 pounds

Is Ms. Tesche at MMI? Are the limits temporary or Permanent? <u>Not Known</u>

***Objective findings MUST BE PROVIDED to support any limitations given.

<u>The above are the patients self-described limitations. If confirmation is required, suggest independent medical examination by physiatrist or orthopedic surgeon.</u>

Joint Exhibit 2 at CCC000185.



9. Plaintiff also advised Continental to secure medical information from her treating orthopedic surgeon, Steven B. Wolf, M.D. Joint Exhibit 2 at CCC000195.

10. In May 1999, Continental after several requests received an updated report from plaintiff's treating orthopedic surgeon, Dr. Wolf, which report included an assessment of plaintiff's physical limitations and restrictions. Joint Exhibit 2 at CCC000183-184 and CCC000189-190.

11. Dr. Wolf responded to questions posed by Continental's Nurse Case Manager Holly Henry, R.N. as follows:

What are Ms. Tesche's current restrictions and limitations in regards to:

Sitting: ½ hour at a time;   Standing: ½ hour at a time;

Lifting: 5-10 pounds;   Walking: 15 minutes;

Bending/Squatting/Crawling: 0

Are these restrictions permanent or temporary? If temporary, when do you expect them to change? Permanent

What objective findings support these limitations?
FABER on left, groin pain, and SI joint pain at shot gun maneuver.

Is Ms. Tesche medically stable at this time? If not, when do you expect this to occur and what is the treatment plan.

She seems to be worsening.

What is the prognosis for a return to her occupation?

Poor.

Joint Exhibit 2 at CCC000184.



12. In his trial deposition on August 8, 2002, Dr. Wolf confirmed that plaintiff's restrictions and limitations remained the same from the time that he completed the above form in May 1999 except for a very poor sitting tolerance which he now estimates at 15-20 minutes although "I don't think you can put a stopwatch on it." Depositions testimony of Steven B. Wolf, M.D. at p. 12-13 and 21.

13. The information provided by Dr. Wolf was reviewed and evaluated by a Nurse Holly Henry. Joint Exhibit 2 at CCC000143 (5/26/99 entry).

14. On June 2, 1999, Nurse Henry and the disability specialist assigned to the file, Laura Collins, conferred and reviewed the information on the file to evaluate plaintiff's disability status. Joint Exhibit 2 at CCC000130 [6/2/99 entry – "received permanent restrictions from AP (attending physician). Conf. (conference) with NCM (nurse case manager). Will send file for Voc. (vocational) asses. (assessment).")].

15. Nurse Henry concluded that the medical information established that plaintiff was disabled from her own occupation. Joint Exhibit 2 at CCC000142.

16. A vocational evaluation was conducted by Continental to examine plaintiff's disability status. Joint Exhibit 2 at CCC000130 and CCC000142.

17. During the claim, Continental interviewed Mrs. Tesche via telephone on at least two occasions. Joint Exhibit 2 at CCC000141 and CCC000148-15.

18. Continental's Nurse Pam Groover conducted a "comprehensive" interview that inquired as to plaintiff's current symptoms, prognosis, typical day, past work, educational background, etc. Joint Exhibit 2 at CCC000148-151; see also, N.T. 97 (plaintiff's counsel and Ms. Sauerhoff acknowledge that this discussion was 'comprehensive"). Though plaintiff had forgotten that she was interviewed by Nurse



Groover, her memory was refreshed by referencing Nurse Groover's report though she did not recall discussing her activities of daily living. N.T. 27-28.

19. On June 9, 1999, Tony Gulledge conducted a vocational evaluation as to plaintiff's claim for benefits. Joint Exhibit 2 at CCC000141.

20. Mr. Gulledge contacted plaintiff and noted as follows in the administrative record:

> Claimant Contact: 717-469-1151. I spoke with Ms. Tesche today and discussed the requirement of her Own OCC as S&P Analyst. Because Ms. Tesche did not have flexibility to stand as needed she was unable to return work in that occupation. We discussed other sedentary job which offer a sit/stand variety which Ms. Tesche should be capable of with her currently limitations. These would include Telemarketer, Customer Service Rep., Motel Night Auditor, and Automobile Rental Agent. Ms. Tesche noted that she had considered returning to work in other home business.

Id.

21. Based upon his review of the file, his discussion with plaintiff, and his experience as a vocational specialist, Mr. Gulledge concluded that plaintiff had the ability to perform sedentary work of the "sit/stand variety" with her current limitations. Id.

22. Mr. Gulledge documented his impression/recommendation in the record as follows:

> Given Ms. Tesche's age, educational level, work experience, geographical location, and current functional capabilities the entry level trainable job options described above would appear appropriate. File plan: DBS will pay through the Own Occ period and close file. If you have any questions concerning this file plan, please give me a call at ext. 5391.

Id.

23. Based upon the vocational review and the information contained in the claim file, Continental concluded that plaintiff was disabled from performing her own occupation but was not totally disabled from performing any occupation. Joint Exhibit 2 at CCC000130 (6/9/99 entry).

24. By letter dated July 26, 1999, Continental advised plaintiff that it found her to be disabled from her own occupation and that it would pay benefits for the twenty four (24) month own occupation period under the Plan. Joint Exhibit 2 at CCC000182.

25. Continental also advised plaintiff by letter dated July 26, 1999 that it did not find her to be disabled from pursuing other occupations stating:

> Based on your limitations and restrictions, you continue to remain disabled from your regular occupation. However, with consideration of your education, training and experience, you are not disabled from other occupations and are not entitled to benefits beyond 24 months (10/30/1999.) We had your claim reviewed by a vocational specialist who identified the jobs of Telemarketer, Customer Service Representative, Motel Night Auditor, and Automobile Rental Agent as potential employment opportunities.

Id.

26. Continental further delineated its position in a letter dated October 7, 1999 that responded to a letter from counsel retained by plaintiff. Joint Exhibit 2 at CCC000176-7.

27. Continental's disability specialist Laura Collins explained in the October 7, 1999 letter as follows:

> Based on medical information in our file, Ms. Tesche is unable to perform the duties of her occupation as S&P Analyst Assistant which required her to sit 7 hours per day. Information from Steven B. Wolf, M.D. indicates Ms. Tesche is able to sit for ½ hour at a time, stand ½ hour at a time, lift 5 to 10 pounds, walk 15 minutes at a t time. He notes these are permanent restrictions. With consideration of her education, training and experience, she is not dibbled from other

occupations and is not entitled to benefits beyond 24 months (10/30/1999). We had her claim reviewed by a vocational specialist who identified the jobs of Telemarketer, Customer Service Representative, Motel Night Auditor, and Automobile Rental Agent as potential employment opportunities. Id. In this same letter, Continental advised plaintiff of her right to appeal the claim determination under ERISA.

Id.

28. Plaintiff, through counsel, appealed Continental's decision. Joint Exhibit 2 at CCC000135; Id. at CCC000129.

29. In the interim, plaintiff through her counsel submitted an updated report from Dr. Wolf dated December 22, 1999, which was the only document submitted by plaintiff to support her appeal. Joint Exhibit 2 at CCC000138-40.

30. The information contained in Dr. Wolf's December 22, 1999 report was based upon his exam in May 1999 as he had not seen or evaluated the plaintiff since that time. Joint Exhibit 2 at CCC000139-40.

31. After Ms. Collins evaluated the new medical information from Dr. Wolf and concluded that "no change in decision" was warranted, this matter was assigned to Cheryl Sauerhoff, a member of Continental's Appeal Committee, for an independent review and evaluation. Joint Exhibit 2 at CCC000129 (1/3/2000 entries).

32. In a letter dated February 21, 2000, Ms. Sauerhoff informed plaintiff's counsel that "[A] comprehensive review of the file has been completed and the results of the review do not alter the Company's original decision to terminate benefits." Joint Exhibit 2 at CCC000118-9.

33. In her letter affirming the benefit termination, Ms. Sauerhoff outlined the significant medical evidence and explained the foundation for her conclusion to uphold the benefit termination at the any occupation standard. Id.

34. In particular, Ms. Sauerhoff found that the medical restrictions and limitations imposed by plaintiff's treating physicians was consistent with a "not less than sedentary" physical demand level. Id.

35. Ms Sauerhoff explained the foundation for the affirmance of the benefit termination as follows:

> The information submitted by Dr. Rubenstein does not support a less than sedentary status, whether in 1999 or previous to this time. Dr. Rubenstein's records, in particular, dated 1997 and 4/17/98 state that the claimant is actively searching for work within her physical limitations. His rendition of the claimant's physical capacity to perform shows standing up to new hour, sitting or one half hour, lifting and carrying 10-20 pounds, and walking for 3 hours per day. He claims that these limitations are "the patient's self-prescribed limitations". In 8/1997, the claimant was considered able to perform at a modified light medium physical capacity level by a physical therapist and Dr. Hartman. Dr. Wolf was requested to give permanent restrictions for the claimant and on 5/11/99 he states that the claimant can sit and stand for one half hour at a time, lift 5 to 10 pounds, walk for 15 minutes and no bending, crawling, squatting. The claimant states that she could not perform her own occupation due to the prolonged sitting and after discussing this with the claimant, the vocational experts detailed occupations that would give the claimant the versatility to move about freely as she needs and are within the permanent restrictions outlined by Dr. Wolf. Dr. Wolf states that she could not return to her own occupation. The letter dated 12/22/99 from Dr. Wolf states that he feels that the occupations described would not be options for the claimant but does not state why. There is no detail of any functional impairment or any information relating to the claimant's inability's to perform her activities of daily living. While we appreciate Dr. Wolf's opinion, the any occupation determination is a vocational determination based on the claimant's permanent medical restrictions, geographic location, economic parity, age, experience, and education.

Id.

## TRIAL TESTIMONY OF CHERYL SAUERHOFF

36. Plaintiff did not provide a report from a vocational expert report or assessment to Continental at anytime during the pendency of her claim. See Joint Exhibit 2.

37. Cheryl Sauerhoff is the "Appeals Committee Director for the Appeals Committee of CNA" (Continental). N.T. 35.

38. Ms. Sauerhoff worked from 1986 through 1991 reviewing disability claims at a state agency, the Office of Disability Determinations, which entity was contracted to make medical determinations for the Social Security Administration. N.T. 36.

39. Ms. Sauerhoff has been employed at "CNA Insurance Company" (Continental) since 1991 and has handled long term disability claims during the course of her employment. N.T. 36.

40. Continental's Cheryl Sauerhoff testified at trial that, in order to assess a disability claim, Continental reviews the totality of evidence submitted by the claimant and adduced in the claim process. N.T. 80. Continental analyzes the evidence as follows: (1) the medical information and restrictions and limitation imposed are examined to see if they correspond with the other medical information in the records; (2) a person's activities of daily living and subjective complaint are evaluated "to see does this come in line with the medical information;" and, (3) all that information is taken together, reviewed in it's totality, to assess functionality and then, based upon a person's age, education, past work experience, and training, an assessment is made as to what other types of occupation she could perform. N.T. 54.

41. Continental does not base its determination of Total Disability upon a diagnosis or medical condition alone but instead, Continental looks to things like activities of daily living to determine a claimant's functionality. N.T. 53.

42. Continental "recognizes that there are a variety of diagnoses and treatment, and because somebody has a diagnosis doesn't automatically make them not able to function." N.T. 74. Continental looks at the medical information that speaks to that diagnosis how that impacts, in other words, what limitations, what restrictions." Id. "There are many people that have diagnoses that do work, but we have to look specifically at what pertains to the medical information and what impacts that person's functionality." Id.

43. To assess functionality, Continental looks at all the medical information, including diagnostic tests, physical examinations, complaints and history reports, in other words the "whole picture." N.T. 75.

44. As testified to by Ms. Sauerhoff, the restrictions and limitations set forth by plaintiff's treating physicians came within the category of sedentary work. N.T. 78.

45. Continental accepted the physical limitations and restrictions provided by plaintiff's treating physician and turned to a vocational review to determine if there were any jobs that not only permitted plaintiff to change positions, so-called "sit/stand variety," but also met her vocational abilities, that is were consistent with her "age, educational level, work experience, and geographical location." N.T. 81-84 and Joint Exhibit 2 at CCC000141.

46. Because Continental accepted the physical restrictions and limitations imposed by plaintiff's treating physicians, which were not conflicting and/or did not make

sense, Continental (in particular, Ms. Sauerhoff) did not need to conduct an independent medical exam. N.T. 81.

47. An in-house vocational evaluation was performed by Tony Gulledge, who after speaking with plaintiff via telephone and reviewing the information set forth in the administrative record, identified four jobs, Telemarketer, Customer Services Rep, Motel Night Auditor, and Automobile Rental Agent, that were appropriate based upon the plaintiff's functional capabilities and her age, educational level, work experience, and geographical location. Joint Exhibit 2 at CCC000141.

48. The jobs identified by Mr. Gulledge differed from plaintiff's original position in that these jobs "would allow sitting, standing and altering positions." N.T. 55.

49. Continental conducts an independent appellate review of an adverse benefits determination which, Ms. Sauerhoff explained involved: (1) providing the claimant with notice of her appeal rights in conjunction is given an opportunity to present additional evidence that would "alter the decision: (2) the information submitted is first reviewed by the original disability specialist who examines this information to determine if it changes her original decision; (3) the claim is then forwarded to the Appeals Committee for an independent review. N.T. 37-38.

50. Ms. Sauerhoff reviewed the entire administrative record on appeal and because the information presented was "very concise," she did not feel that the claim needed to be reviewed by any other members of the Appeals Committee. N.T. 45.

51. Ms. Sauerhoff testified that, based upon her independent review, she concluded that plaintiff had the ability to perform continuously the substantial and material duties of any occupation and that based upon the stated physical limitations and

restrictions and results of the vocational review, it was her belief that plaintiff could perform the duties of any occupation and, in particular, the jobs identified in the vocational assessment. N.T. 82-88.

## POST-TRIAL VOCATIONAL EXPERT OPINIONS

52. After trial in response to plaintiff's production of a vocational expert report, Continental retained George E. Parsons, Ph.D. to conduct an independent vocational evaluation. See Defendants' Exhibits B, C, and D.

53. After trial in response to plaintiff's production of a vocational expert report, Continental retained George E. Parsons, Ph.D. to conduct an independent vocational evaluation. See Defendants' Exhibits B, C, and D.

54. From 1988 to 2002, Dr. Parsons was the Director of Behavioral Medicine for a pain center and for a group of physicians specializing in the management of chronic pain (which is the condition that ails plaintiff). Defendants' Exhibits B and D at pp. 6-8.

55. Dr. Parsons never testified for CNA (Continental) previously. Defendants' Exhibit D at pp. 11-12.

56. Dr. Parsons received and reviewed all vocational reports, the Amended Complaint, plaintiff's deposition and trial testimony, plaintiff's Social Security Award letter, the trial deposition of Steven Wolf, M.D., the entire administrative record which contained all medical reports, and the applicable group policy, inter alia. See Defendants Exhibit C and D at pp. 13-15 and 25-26.

57. Dr. Parsons, based upon his review of the records, which included Mrs. Tesche's extensive testimony on her condition and background as adduced during the trial and discovery but also as denoted in plaintiff's vocational expert's report, concluded:

> Based on the information in file it is safe to assume that Ms. Tesche' has performed a number of clerical tasks in the past specifically as they relate to using a computer, communicating with others, co-coordinating and scheduling others and entering data. Her work has been sedentary and light in nature. Her current limitations places her at the sedentary level of employment with the necessity to change her position frequently. Positions as interview clerk, expeditor, administrative support personnel, schedule and industrial caller are but a few of the jobs which would make use of her skills and compile with her functional limitations. These positions are available throughout the USA.

Defendants Exhibit C at pp. 3-4.

58.  As part of his independent vocational evaluation, Dr. Parsons identified several other jobs, interview clerk, expeditor, administrative support personnel, scheduler, and industrial caller, that fit Ms. Tesche's physical restrictions and limitations and her skill level. Defendants Exhibit C at pp. 3-4 and D at p. 17.

59.  Dr. Parsons affirmed that plaintiff had the ability to perform the jobs identified by Continental's Mr. Gulledge in his vocational assessment. Defendants' Exhibit D at pp. 22-23.

60.  Plaintiff's vocational expert, Mark Lukas, ED.D. was provided and reviewed only one medical report by Dr. Wolf and Dr. Wolf's trial deposition testimony. Deposition of Mark Lukas, ED.D at p. 15.

61.  Dr. Lukas did not have any records or reports from any other of plaintiff's treating physicians, such as Dr. Rubenstein plaintiff's family physician who completed a functional capacity evaluation wherein he noted that plaintiff's physical limitations and restrictions were "self-described", Joint Exhibit 2 at CCC000185, nor from the pain clinic, any physical therapy center, and/or any rehabilitation facility that plaintiff regularly attended. Id. at pp. 15 and 19.



62. Dr. Lukas acknowledged in his testimony that plaintiff had the educational background, work experience, and training necessary to perform two of the jobs identified by Continental's Mr. Gulledge in his vocational assessment: telemarketer and motel night auditor jobs. Id. at p. 17.

63. Mr. Lukas acknowledged that telemarketing and motel night auditor jobs are available to a people, like Ms. Tesche, who are in their forties. Id. at p. 18.

64. Mr. Lukas' further acknowledged that the primary basis for his vocational opinion was Dr. Wolf's physical restrictions and limitations combined with the after the lawsuit was initiated and pursued claim by plaintiff that she needs to lie down on "average 2 to 4 per day." Id. at pp. 15 and 20.

65. Dr. Lukas felt that plaintiff had the qualifications and skills necessary to meet all of the vocational criteria for a return to work including the jobs identified by Mr. Gulledge but that the medical evidence showed "her below the threshold necessary for participation in competitive employment."

66. Dr. Lukas assumed the word "occupation" in the Plan means " competitive work" but he did not know. Id. at p. 23.

### TESTIMONY AND RECORDS OF STEVEN B. WOLF, M.D.

67. Dr. Wolf admitted that he was not a vocational expert. Deposition of Steven B. Wolf, M.D. at p. 18.

68. Dr. Wolf testified that knowing a specific person's activities of daily living is not important in assessing a disability or an ability to work. Id. at p. 42.

69. Dr. Wolf's disability opinion is based upon a generalized understanding of what "any human being does on a daily basis," not specifically on what plaintiff actually does or can do. Id at p. 42.

70. Dr. Wolf did not advise Continental in any way as to what plaintiff's activities of daily living, that is her functionality, was at anytime. N.T. 75.

71. Dr. Wolf was unaware of plaintiff's activities of daily living or what plaintiff did on a daily basis; how long she walked on a daily basis; how long she slept at night; how long she slept during the day; and what hobbies she participated in, like stained glass and computers. Id. at pp. 24-26.

72. In assessing plaintiff's ability to work, while Dr. Wolf knew that plaintiff's past job was as a computer or systems analyst, Dr. Wolf did not know her job description; did not talk about her past work history; and, did not talk about her educational history. Id.

73. When asked whether plaintiff went to high school, Dr. Wolf responded: "No. It wasn't pertinent to my exam." Id. at pp. 28-29.

74. Dr. Wolf as a physician is primarily focused on establishing a person's physical restrictions and limitations. Id. at p. 20.

75. Plaintiff testified that she has to rest or lay down for two to four hours per day since 1996. N.T. 14-15 and 28-29.

76. Dr. Wolf's treatment notes and reports provided to Continental during the claim process do not anywhere indicate that plaintiff had to lie down during the day. Joint Exhibit 2 at CCC000203-229.

77. In his report dated December 22, 1999 in support of plaintiff's claim appeal, Dr. Wolf pointed out that plaintiff had problems with walking and sitting tolerance but he

did not mention anywhere that plaintiff had to rest or lay down during the day. Joint Exhibit 2 at CCC000139.

78.  Dr. Wolf read his note from a July 30, 2002 exam into the record and this report did not note that plaintiff needed to rest or lie down. Id. at pp. 6-7.

79.  Dr. Wolf admitted that he did not know if he had told CNA (Continental) that plaintiff needed to lie down and that he never witnessed the same. Id. at p. 23.

80.  Dr. Wolf acknowledged that he did not know whether plaintiff's self-reported complaint that she needed to rest or lie down was ever recorded in his office chart. Id.

81.  Continental's claim file, except for a note by Nurse Pam Groover that plaintiff "needed to lie down at 2:00 p.m." based upon her telephone interview of plaintiff, Joint Exhibit 2 at CCC000148, is devoid of any statement from plaintiff, her treating physicians, and/or her attorneys that indicates that plaintiff had to rest for two to four hours per day since 1996. N.T. 75, 76, and 77.

82.  While Dr. Wolf would not acknowledge it, Wolf Deposition at p. 23, it is standard practice for a treating physician to document pertinent symptoms or complaints of a patient.

83.  Based upon her experience, Ms. Sauerhoff testified that she would expect that any kind of functional loss for a majority or good portion of their day would certainly be reflected in a physician's records. N.T. 75-76.

84.  A review of Dr. Wolf's notes and reports contained in the administrative record demonstrates that he routinely recorded plaintiff's chief complaint and the basis for the office visit but nowhere did he write that plaintiff needed to rest or lie down for 2 to 4 hours a day. See Joint Exhibit 2 at CCC000203-211.

85.  Dr. Wolf has only seen plaintiff on three occasions since May of 1999: March 2000, May 2000, and July 30, 2002.  Id. at p. 12, lines 5-17.

## PLAINTIFF'S FAILURE TO PRODUCE TREATMENT RECORDS

86.  Plaintiff testified that she receives treatment at the "Hershey pain management clinic." N.T. 11, line 17-22.

87.  In his report dated December 22, 1999, Dr. Wolf noted that plaintiff "is currently going to the Hershey Pain Clinic for treatment.  Joint Exhibit 2 at CCC000139.

88.  Plaintiff never submitted the records related to her treatment at the Hershey Pain Clinic to Continental.

89.  Plaintiff never produced the Hershey Pain Clinic medical records in discovery in this litigation.

90.  Plaintiff did not present or otherwise introduce the Hershey Pain Clinic records at trial.

91.  Plaintiff did not present any updated records from any medical provider and, also, did not call any of her other current and past treating physicians.

Christie, Pabarue, Mortensen & Young
A Professional Corporation

BY: _____
Michael J. Burns, Esquire
1880 JFK Blvd., 10th Floor
Philadelphia, PA 19103
215-587-1600

Dated: 2/21/03

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOAN D. TESCHE | : CIVIL ACTION |
| vs. | : |
| CNA INSURANCE COMPANIES and CONTINENTAL CASUALTY COMPANY | : NO. 1:CV-01-0326<br>: (William W. Caldwell, J.) |

## PROPOSED CONCLUSIONS OF LAW

1. Plaintiff bears the burden of proof in establishing that she is entitled to benefits under an ERISA plan. Mitchell v. Eastman Kodak Co., 113 F.3d 433, 437-8 (3rd Cir. 1997).

2. This Court's evaluation of Continental's claim determination is de novo since the plan does not grant discretion to Continental to make benefit determinations. Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989); Mitchell, supra. At 437-8.

3. Continental's claim determination, predicated on the vocational reviews and the medical records, was correct as this evidence of record established that plaintiff had the capability to perform several jobs, that is "any occupation," as of October 30, 1999. See Orvosh v. Program of Group Ins. For Salaried Emp., 222 F. 3d. 123 (3rd Cir. 2000); Hevener v. Paul Revere Life Ins.Co., 2002 U.S. Dist. Lexis 15893 (E.D. Pa. August 26, 2002); Rendulic v. Kaiser Aluminum & Chemical Corp., 166 F. Supp. 2d 326 (W.D. Pa. 2001); and Ernest v. Plan Adm'r. of Textron Insured Ben. Plan, 124 F. Supp 2d 884 (M.D. Pa. 2000).

4.    Plaintiff was not totally disabled, that is she was not "continuously unable to engage in any occupation for which he is or becomes qualified by education, training or experience" as of October 30, 1999 and, thus, she no longer met the express requirement of the plan for the receipt of long term disability benefits.

5.    Continental, as an ERISA fiduciary, was required to enforce the express terms of the plan and terminate plaintiff's long term disability benefits at the any occupation period starting on October 30, 1999.

6.    The evidence contained in the administrative record as well as presented at trial and to this Court post-trial establishes that as of October 30, 1999, there were jobs ("any occupation") that plaintiff could continuously perform based upon her medical restrictions and limitations and her vocational abilities, that is her past experience, education, and training.

7.    This Court finds the vocational evaluations conducted by Continental's Tony Gulledge and defense vocational expert, Dr. George Parsons, to be credible and entitled to great weight in comparison to plaintiff's vocational expert whose opinion is not credible in that it was based on limited information and his conclusion was not in accordance with the disability standard under the Plan.

8.    This Court finds that Continental's use of reliance upon vocational assessments to evaluate plaintiff's ability to return to "any occupation" was appropriate and correct.

9.    This Court finds that, while Dr. Wolf's opinion as to plaintiff's physical limitations and restriction was appropriate and was consistent with the other medical